1  IRELL & MANELLA LLP
   Morgan Chu (SBN 70446)
2  (mchu@irell.com)
   Jonathan S. Kagan (SBN 166039)
3  (jkagan@irell.com)
4  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
5  Telephone:   (310) 277-1010
   Facsimile:    (310) 203-7199
6
7  David C. McPhie (SBN 231520)
   (dmcphie@irell.com)
8  Nima Hefazi (SBN 272816)
   (nhefazi@irell.com)
9  Douglas J. Dixon (SBN 275389)
   (ddixon@irell.com)
10 840 Newport Center Drive, Suite 400
   Newport Beach, California 92660-6324
11 Telephone:   (949) 760-0991
   Facsimile:    (949) 760-5200
12
13 Attorneys for Defendant
   JUNIPER NETWORKS, INC.
14

15                UNITED STATES DISTRICT COURT
16        FOR THE NORTHERN DISTRICT OF CALIFORNIA
                   SAN FRANCISCO DIVISION
17

18 IMPLICIT NETWORKS, INC.,              Case No. C 10-4234 SI

19              Plaintiff,

20      v.                               **JUNIPER NETWORKS, INC.'S REPLY
                                         IN SUPPORT OF ITS MOTION FOR
21 JUNIPER NETWORKS, INC.,               SUMMARY JUDGMENT OF NON-
                                         INFRINGEMENT**
22              Defendant.
                                         Date:          December 14, 2012
23                                       Time:          9:00 a.m.
                                         Courtroom:     10
24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    IMPLICIT FAILS TO DEMONSTRATE HOW IT CAN LOGICALLY PROVE INFRINGEMENT BY THE SRX AND J SERIES PRODUCTS BASED ON DR. NETTLES'S ANALYSIS OF THE NON-ACCUSED MULTISERVICES PRODUCT..........................................................................................2

   A.    Implicit Failed To Satsify Its Burden To Prove That The Multiservices Module Was A Proper Exemplar. ...................................2

   B.    Implicit Fails To Cite Any Evidence Establishing That The Non-Accused Multiservices Module Is Representative Of The Accused Products. ..............................................................................................3

   C.    Given The Complexity Of The Case And Juniper's Expert Negating Infringement, Implicit Cannot Satisfy Its Burden With Non-Expert Evidence. ..............................................................................................6

II.    EVEN ACCEPTING IMPLICIT'S PROXY ARGUMENT, IMPLICIT HAS FAILED TO ADDUCE EVIDENCE ON MANY ELEMENTS OF THE ASSERTED CLAIMS .................................................................................8

   A.    Implicit Presents No Evidence That The Accused Products Satisfy The "Selecting Individual Components" Limitation...............................8

   B.    Implicit Presents No Evidence That the Accused Products Include A "Plurality Of Components" Satisfying The "State Information" Limitations. ..........................................................................................10

   C.    Implicit Presents No Evidence That The Accused Products Perform The Step Of "Dynamically Identifying . . . After The First Packet."...................13

III.    IMPLICIT HAS FAILED TO POINT TO SPECIFIC INSTANCES WHERE THE ACCUSED PRODUCTS "NECESSARILY" INFRINGE .......................15

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*AquaTex Indus., Inc. v. Techniche Solutions*,
    479 F.3d 1320 (Fed. Cir. 2007) ..................................................................................... 13

*Carmen v. San Francisco Unified Sch. Dist.*,
    237 F.3d 1026 (9th Cir. 2001) ........................................................................................ 14

*Carnegie Mellon University v. Marvell Technology Group, Ltd.*,
    2012 WL 3679551 (W.D. Penn. Aug. 24, 2012) ......................................................... 6, 7

*Centricut, LLC v. Esab Group, Inc.*,
    390 F.3d 1361 (Fed. Cir. 2004) ................................................................................ 6, 7, 8

*Commissariat a l'Energie Atomique v. Samsung Elecs. Co.*,
    524 F. Supp. 2d 534 (D. Del. November 2, 2007) ............................................................ 3

*Cybor Corp. v. FAS Tech., Inc.*,
    138 F.3d 1448 (Fed. Circ. 1998) .................................................................................... 14

*Eugene Baratto, LLC v. Brushstrokes Fine Art, Inc.*,
    701 F.Supp. 2d 1068 (W.D. Wis. March 24, 2010) ...................................................... 3, 5

*In re Oracle*,
    2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009) ............................................. 11

*L&W, Inc. v. Shertech, Inc.*,
    471 F.3d 1311 (Fed. Cir. 2006) ....................................................................................... 2

*Medtronic Vascular, Inc. v. Boston Scientific Corp.*,
    2008 U.S. Dist. LEXIS 53373 (E.D. Tex. July 11, 2008) .............................................. 15

*Mirror Worlds, LLC v. Apple, Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) ..................................................................................... 15

*Novartis Corp. v. Ben Venue Labs., Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001) ................................................................................. 4, 11

*Pixion, Inc. v. Citrix Systems, Inc.*,
    2012 WL 3313533 (Aug. 13, 2012 N.D. Cal.) ............................................................... 11

*TiVo, Inc. v. Echostar Communications Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008) .................................................................................... 5, 6

<u>Other Authorities</u>

Fed. R. Civ. P. 26 .................................................................................................................. 7

Fed. R. Evid. 402 ................................................................................................................ 13

Fed. R. Evid. 403 ................................................................................................................ 13

**Page(s)**

Fed. R. Evid. 702.................................................................................................................... 13

## **TABLE OF ABBREVIATIONS**

The following abbreviations are used throughout Juniper Networks, Inc.'s Reply in Support of Its Motion for Summary Judgment of Non-Infringement:

**Pleadings:**

"**Alexander Ex. __**" refers to the exhibits to the Declaration of Peter Alexander in Support of Juniper Networks, Inc.'s Motion for Summary Judgment of Non-Infringement, executed November 9, 2012. (Dkt. No. 166-6).

"**F5 Opposition**" refers to Implicit Networks, Inc.'s Opposition to F5 Networks, Inc.'s Motion for Summary Judgment of Non-Infringement, filed in the case styled *Implicit Networks, Inc. v. F5 Networks, Inc.*, 10-cv-3365-SI. (Dkt. No. 156).

"**Hefazi Ex. __**" refers to the exhibits to the Declaration of Nima Hefazi in Support of Juniper Networks, Inc.'s Motion for Summary Judgment of Non-Infringement, executed November 9, 2012. (Dkt. No. 166-1).

"**Hosie Ex. __**" refers to the exhibits to the Declaration of Spencer Hosie in Support of Implicit's Opposition to Juniper Networks Inc.'s Motion for Summary Judgment of Non-Infringement, executed November 16, 2012.  (Dkt. No. 182).

"**Implicit's opposition**" or  "**Opp.**" refers to Implicit Networks Inc.'s Opposition to Juniper Networks, Inc.'s Motion for Summary Judgment of Non-Infringement, dated November 16, 2012.  (Dkt. No. 181).

"**Juniper's Motion**" or "**opening brief**" or "**Mot.**" refers to Juniper Networks, Inc.'s Motion for Summary Judgment of Non-Infringement, dated November 12, 2012 (Dkt. No. 166).

"**Reply Ex. __**" refers to the exhibits to the Declaration of Nima Hefazi in Further Support of Juniper Networks, Inc.'s Reply In Support of its Motion for Summary Judgment of Non-Infringement, executed December 3, 2012.

**Other:**

"**163 patent**" refers to U.S. Patent No. 6,629,163.

"**857 patent**" refers to U.S. Patent No. 7,711,857.

"**Asserted claims**" refers to claims 1, 15, and 35 of the '163 patent and claims 1, 4, and 10 of the '857 patent.

"**Dr. Nettles**" refers to Implicit Networks, Inc.'s technical expert Dr. Scott Nettles.

"**Treskunov Report**" refers to the report of Implicit Networks, Inc.'s technical consultant, Pavel Treskunov, regarding his review of the source code for the MultiServices Modules.

In its motion for summary judgment of non-infringement, Juniper challenged Implicit to identify specific evidence presenting triable issues of fact on five discrete topics essential to its infringement claims.  Specifically, Juniper demonstrated that:

1. Implicit's evidence relating to the non-accused Multiservices module is not applicable to the accused SRX and J series products.

2. The accused SRX and J series products do not "select individual components," including the step of determining compatibility between input and output formats for successive components (as required by this Court's *Markman* order).

3. The accused SRX and J series products do not contain multiple components, each of which retrieves, uses, and stores "state information" on a packet-by-packet basis.

4. The accused SRX and J series products do not "dynamically identify" a sequence of components "after the first packet is received."

5. No specific versions of the SRX and J series products are actually configured and/or used in the manner Implicit has accused as infringing.

In order to survive Juniper's summary judgment motion, Implicit was required to present specific probative evidence indicating a triable issue of fact on each of these issues.  It did not do so.  Instead, it spent the bulk of its opposition brief on a lengthy (and ultimately inconsequential) "Statement of the Facts" directed to whether Juniper's products generically perform what is known in the art as "stateful, flow-based processing."  Opp. at 4-15.  But that is not a question relevant to any of the issues raised in Juniper's summary judgment motion.  Indeed, ***Juniper concedes for purposes of this motion that its SRX and J series products are capable of "stateful, flow-based processing."***  This issue is irrelevant for purposes of deciding this motion because, as Implicit concedes, "stateful, flow-based processing" is ***not*** what Mr. Balassanian invented, is ***not*** equivalent to the asserted claims, and ***cannot*** be used as a proxy for infringement in this case.[1]

---

[1] *See, e.g.*, Reply Ex. A (10/19/2012 Nettles Depo. Tr.) at 150:21-24 ("I don't think that Mr. Balassanian invented the stateful flow-based firewall"); Reply Ex. B (Implicit 30(b)(6) Depo. Tr.) at 985:5-9 ("Q.  So if I tell you that Company X has a stateful, flow-based firewall, have I told you everything you need to know to have a good-faith belief that Company X infringes the '163 patent?  A.  No."); *id*. at 989:4-7 ("Q.  And you could also have a stateful, flow-based firewall that does not practice the claims of the '163 patent; correct?  A.  Correct.").

Instead of providing "adequate references" to specific evidence as demanded in Juniper's motion (and required under Ninth Circuit law), Implicit resorts to extended attorney argument and citation to lengthy blocks of inapposite material from the record—usually without explanation or expert analysis.  Indeed, for at least one of Juniper's five issues ("dynamically identifying"), Implicit fails to present any evidence at all.  Simply put, this is inadequate to survive summary judgment.  This Court should therefore grant Juniper's motion.

## ARGUMENT

### I.   IMPLICIT FAILS TO DEMONSTRATE HOW IT CAN LOGICALLY PROVE INFRINGEMENT BY THE SRX AND J SERIES PRODUCTS BASED ON DR. NETTLES'S ANALYSIS OF THE NON-ACCUSED MULTISERVICES PRODUCT

The first issue is whether Implicit can show infringement by the accused products in this case by relying on its expert's technical analysis for a different, non-accused product.  Notably, Implicit expresses no disagreement with Juniper's detailed account of how Implicit tried (unsuccessfully) to pass off its analysis of the non-accused Multiservices products as applicable to the infringement question for the accused SRX and J series products.  *See* Mot. at 3:5-7:2; *id*. at 8:17-9:20.  Indeed, Implicit now admits that what Dr. Nettles analyzed was ***not*** the code for the SRX and J series products, but rather some "***different***" set of code for "***the multiservices card***." Opp. at 2, 19.  Implicit now calls the lengthy, element-by-element section of Dr. Nettles's report the "***multiservices module*** walkthrough."  Opp. at 24.

Implicit nevertheless attempts to excuse the deficiencies of its expert's analysis with three arguments regarding supposed "peculiarities" in Juniper's motion.

### A.   Implicit Failed To Satsify Its Burden To Prove That The Multiservices Module Was A Proper Exemplar.

Implicit first argues that it can proceed under a "proxy" approach to infringement on the theory that it is actually ***Juniper's*** burden to show that its various products are ***different***, as opposed to ***Implicit*** having to show that they are the same.  Opp. at 2, 20-21.  Implicit cites no legal authority for its position, which in fact directly contradicts established Federal Circuit law: "[Implicit] ***cannot*** simply 'assume' that all of [Juniper's] products are like the one [Implicit] tested and thereby shift the burden to show that it is not the case."  *L&W, Inc. v. Shertech, Inc.*,

1  471 F.3d 1311, 1318 (Fed. Cir. 2006).[2]  In other words, there is nothing "peculiar" about Juniper's

2  argument regarding burden—it is just the law.[3]

### B. Implicit Fails To Cite Any Evidence Establishing That The Non-Accused Multiservices Module Is Representative Of The Accused Products.

4  Implicit's second argument is that Juniper is somehow "ignoring" substantial evidence

5  cited in Dr. Nettles's report establishing the relevant similarity of the Multiservices module as

6  compared to the accused SRX and J series products.  Opp. at 3, 15-18.  If that were true (and it is

7  not), one would have expected Implicit to point directly to the page number or paragraph of the

8  Nettles report where the "ignored" evidence can be found.  Implicit does not do this.  Instead, it

9  points again to pp. 5-6 of the report where Dr. Nettles discusses the JUNOS marketing brochure—

10  the very "evidence" that Juniper already addressed in its motion.  *See* Opp. at 16; Mot. at 12-13.[4]

11  Apparently aware that Dr. Nettles did not, in fact, cite to any such evidence, Implicit's

12  opposition attempts to rely on evidence not cited in its expert report.[5]  But even this "new"

13  evidence does not help Implicit.  Two of the new deposition cites quote from the ***very same***

14  ***marketing document*** that Implicit so vehemently claims is not the only source of evidence on this

15  point: one deposition quote simply has Dr. Nettles reading a passage from the Treskunov report,

16  which in turn is a direct quotation from the JUNOS brochure (Hosie Ex. E at 179:3-7),[6] and the

17  other quote involves counsel for Implicit reading from a portion of the Nettles report, which in

---

20  [2] *See also Eugene Baratto, LLC v. Brushstrokes Fine Art, Inc.*, 701 F. Supp. 2d 1068, 1080-81 (W.D. Wis. 2010) (patentee that "group[s] products" must provide "evidence that every product . . . actually functions in the same manner."); *Commissariat a l'Energie Atomique v. Samsung Elecs. Co.*, 524 F. Supp. 2d 534, 541 (D. Del. 2007) (patentee "must specify which [products] are representative of a particular series or group, why they are representative and how their particular properties or components directly [infringe] each and every element of a claim.").

23  [3] Nor is Juniper asking the Court to (as Implicit contends) "rule as a matter of law that the methodological steps of Juniper's flow-based functionality differ across the three products."  Opp. at 3.  The Court does not need to reach any such conclusion to grant Juniper's motion.  In any event, Juniper did present evidence of product differences.  *See, e.g.*, Alexander Ex. A ¶¶ 75-83.

25  [4] Implicit also cites in passing to pp. 9-12 of the Nettles report (Opp. at 17), but does not explain how these pages purportedly show similarity between the Multiservices module and the SRX and J series products (and in fact, these pages do not address that topic at all).

27  [5] Implicit ultimately admits this is evidence "extrinsic to the Nettles report" (Opp. at 20:25-26), thus undermining its earlier accusation that Juniper was "ignoring" the report.

28  [6] This quote is not in Enterprise Routing, contrary to Implicit's assertion (Opp. at 16).

1    turn is quoting the JUNOS brochure (Hosie Ex. F (Alexander Depo. Tr.) at 219:14-24).[7]  Of

2    course, repeatedly quoting this document does not provide any incrementally probative evidence.

3         The other evidence Implicit cites consists of twelve pages from a pair of lengthy books on

4    Juniper products and three citations to a deposition of a Juniper engineer.  As to the first book

5    ("JUNOS Security"), Implicit merely quotes two pages from the preface indicating its potential

6    value for individuals "working with the SRX platforms"—and then fails to point to any actual

7    substance from the book itself.  Opp. at 17:3-12; *see also* Hosie Ex. G.  For the other book

8    ("Enterprise Routing"), Implicit claims that there is "explicit" language somewhere between pages

9    597 and 606 to the effect that all Juniper products operate the same way.  But Implicit neither

10   quotes nor identifies this "explicit" language, and no further explanation of these ten pages is

11   provided.  And, in fact, there is nothing there suggesting relevant similarity between products.[8]

12        As for the deposition cites, one is just a statement of some alleged similarity between the

13   SRX and J series products—it says nothing about any similarity with the Multiservices module.

14   Hosie Ex. B (Krishna Depo. Tr.) at 136:13-24.[9]  The Juniper deponent further made clear that the

15   similarity between the SRX and J series was as to basic "flow-based" functionality alone: "[F]or

16   the first packet, it does the policy lookup and then identifies the predefined set of actions to be

17   taken – and stores that in the flow table."  *Id.* at 136:17-22.  Likewise, when later asked about this

18   kind of basic flow-based processing as to a longer list of Juniper products, the same deponent

19   unsurprisingly identified the Multiservices module (among many other products) as one product

20   "where the flow-based processing happens."  *Id.* at 191:24 – 192:3.  Again, Juniper concedes that

21   it has numerous products that all perform basic flow-based processing.  What this testimony does

22

23        [7] Upon questioning, Dr. Alexander simply confirmed his view that this was a "marketing"
     brochure that was accurate to the extent that it was "talking about one OS being one code base
24   from which products are created by selecting various elements of the code base."  *Id.* at 219:2-24.
     He never testified that all JUNOS products operate the same for purposes of infringement.

25        [8] Implicit claims that the Enterprise Routing text reads like a "detailed roadmap showing
     how the Accused Products infringe."  Opp. at 2.  But without any explanation—much less an
26   element-by-element analysis—this "roadmap" does not lead anywhere.  *Novartis Corp. v.
     Ben Venue Labs., Inc.*, 271 F.3d 1043, 1053-54 (Fed. Cir. 2001).

27        [9] Implicit also cites another JUNOS document as conceding that flow-based processing is
     "identical" between the J series and SRX.  Opp. at 19:5-6.  Again, even if this were true, it is of no
28   import given that the Nettles report is focused on a third product (the Multiservices module).

not address (and what actually matters) is similarity as to specific handling of state information, format compatibility, and other aspects of the products actually accused of infringement.  As Implicit knows, merely establishing that products have the same basic functionality (as Implicit attempts to do with this evidence) is not sufficient to establish infringement.  *See Eugene Baratto,* 701 F. Supp. 2d at 1080-81 (exemplar approach "***does not work*** when the only evidence supporting such grouping is merely that different versions of a product are part of the same family [*i.e.*, JUNOS] and have the same basic functionality [*i.e.*, flow-based processing].").  Instead, Implicit must show that the purported "exemplar" products actually operate in the same manner with respect to the functionality relevant to various claim limitations.[10]  Implicit does no such thing.  It merely alleges (without explanation or evidentiary support) that "[t]he code set forth in the exemplar track and mirrors the flow-based methodology set forth for the JUNOS SRX and J Series based platforms" (Opp. at 19)—not enough to show infringement.

Finally, having run out of "evidence," Implicit attempts a legal argument in reliance on *TiVo, Inc. v. Echostar Communications Corp.*, 516 F.3d 1290 (Fed. Cir. 2008), arguing that "there is nothing wrong about using a representative approach" in an appropriate case (Opp. at 20:2-3).  That is, of course, true so far as it goes, just as Juniper explained in its original motion.  Mot. at 10:9-11:1.  But reading even a little further past the block quote from the *TiVo* opinion that Implicit provided clearly shows why the "representative approach" was appropriate in that case but not this one: In *TiVo*, the patentee's expert provided admissible testimony at trial that the products at issue "operate[d] similarly" to the exemplary accused product ***as to the specific claim limitation at issue***.  *Id*. at 1308.  Moreover, the defendant's own expert "also discussed the various models of [the accused products] collectively and ***made no relevant distinction*** among them with respect to this limitation."  *Id*.  Indeed, the defendant's expert in that case affirmatively testified that other accused products "use[d] the same [feature]" as the exemplary product.  *Id.*

Here the facts are in exact opposition to those of *TiVo*.  Implicit is not using an accused

---

[10] For example, the claim limitations require the plug-ins to perform certain very specific steps that go to nuanced, low-level implementation details.  Implicit, however, provides absolutely no evidence regarding the particular functionality of the plug-ins in the accused products, and, as a result, cannot establish that they function in the same manner across the various Juniper products.

product but rather a ***non-accused*** product as the purported exemplar.  Unlike TiVo's expert, Dr. Nettles has provided no probative evidence of similarity, much less similarity ***as to the particular limitations*** of the claims.  Moreover, there is no evidence that Juniper ever agreed that the accused products operate the same way as the non-accused Multiservices Module.  Dr. Alexander wrote in his report that just the opposite was true.  Alexander Ex. A ¶¶ 71-98.  There is also a fairness aspect to the result in *TiVo* that is not present here, *i.e.*, an accused infringer goes along with an exemplar approach until it loses at trial, and then suddenly argues ***against*** that approach for the first time on appeal.  Juniper, by contrast, has made it clear since the discovery phase of the case that a representative approach would not work in this case.  Mot. at 11:18-12:1 ("JUNOS is not uniform across all [accused products].").  Thus, the *TiVo* holding does not aid Implicit.

    **C.**    **Given The Complexity Of The Case And Juniper's Expert Negating Infringement, Implicit Cannot Satisfy Its Burden With Non-Expert Evidence.**

Implicit's final argument is that its infringement case can survive to trial even if the opinions of its expert, Dr. Nettles, are disregarded in their entirety.  In so arguing, Implicit ignores (but does not dispute) Juniper's account of the parties' discovery disputes regarding source code, and the Court's orders that Implicit provide source code pincites to support its infringement claims.  Essentially, Implicit begs this Court to let it proceed to trial even if the evidence and argument from its infringement expert are irrelevant.  There is no legitimate justification for Implicit's position, and Implicit cites no authority to support it.

In fact, the law is against Implicit.  While it is true that occasionally in patent cases involving simple technologies the parties may permissibly proceed without experts, in cases such as this one involving "complex technology," where the "accused infringer offers expert testimony negating infringement," the Federal Circuit has stated that "the ***patentee cannot satisfy its burden of proof by relying on testimony from those who are admittedly not an expert in the field***." *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004).

The case *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2012 WL 3679551 (W.D. Penn. Aug. 24, 2012), provides an illustrative application of *Centricut*.  In *Carnegie*, both parties had experts who had submitted reports.  *Id.* at *4.  Defendant Marvell

1  moved for partial summary judgment of non-infringement and offered expert testimony negating

2  infringement on several claim limitations.  *Id.*  Because plaintiff CMU opposed with only

3  conclusory expert testimony, the court found that it had failed to show "that claim step (f) is

4  practiced by Marvell[]."  *Id.* at *4.  In an attempt to save its infringement case, CMU pointed to

5  "numerous admissions from Marvell's witnesses" that it alleged showed infringement.  *Id.* at *5.

6  The court, however, did not find these non-expert admissions sufficient, "especially when Marvell

7  has submitted expert evidence that contradicts such a finding . . . and CMU's expert was unable to

8  show . . . all of the claim steps."  *Id.* at *5.  Summary judgment was granted.  *Id.* at *7.

9         The instant case is very similar to *Carnegie*.  As in *Carnegie*, the parties are agreed that

10  this case clearly involves "complex technology."[11]  Juniper offered expert testimony negating

11  infringement with respect to multiple claim limitations—for example, with respect to element 1f

12  of claim 1 of the '163 patent (one of the "state information" limitations).  Alexander Ex. A ¶¶ 219-

13  222.  This was all that was needed to trigger the *Centricut* rule requiring the patentee to respond

14  with competent expert evidence.  Implicit cannot, therefore, survive summary judgment merely by

15  citing non-expert excerpts from depositions and books that it claims are Juniper "admissions."

16  *Centricut*, 390 F.3d at 1368; *Carnegie*, 2012 WL 3679551, *5.[12]  As in *Carnegie*, the supposed

17  admissions do not actually address the specific requirements of the disputed elements: "conclusory

18  statements are insufficient to demonstrate [Juniper's products] practice claim step (f)" or any of

19  the other disputed elements.  *Id.* at *4.

20         Finally, Implicit contends that no expert analysis of source code is needed in this case

---

[11] *See, e.g.*, Hefazi Ex. 27 (Expert Report of Scott Nettles) ¶ 54 (patent embodiments comprise "***complex*** technology"); Reply Ex. D (1/19/2012 Claim Construction Transcript) at 112:22-23 (Implicit counsel: "these are ***complicated*** patents"); Reply Ex. B (Implicit 30(b)(6) Depo. Tr.) at 562:23-25 (describing Implicit's patented embodiment as "complex"); *see also* Hosie Ex. B ("JUNOS is a very ***complex*** operating system");  Hefazi Ex. 15 (7/27/2012 Dyckerhoff Depo. Tr.) at 19:3-9 (same).

[12] Although many of the proponents of the purported "admissions" certainly have technical experience, none were formally qualified as experts under Rule 702, submitted expert reports, or otherwise satisfied the requirements of Fed. R. Civ. P. 26.  The *Centricut* court found on this basis that testimony from the inventor himself did not qualify as requisite "expert" evidence.  *Centricut*, 390 F.3d at 1368.  *See also, e.g.*, Reply Ex. C (Tavakoli Depo. Tr.) at 122:5-10 ("Q. As to. . . implementation details. . . you're not the guy for that?  A. No. No."); Hosie Ex. B (Krishna Depo. Tr.) at 22:13-16 ("I'm not an expert on every line of code that is there in JUNOS.").

1  because the "best evidence" of infringement is found in non-source-code materials.  But this is a

2  reversal from the position that it took during discovery earlier in this case, when Implicit stated in

3  a verified interrogatory response that the "***source code is the best evidence*** of exactly how the

4  Implicit embodiments were designed and functioned."  Reply Ex. F (Implicit 6th Supp. Interrog.

5  Resp.).  Implicit never explains why source code constitutes the "best evidence" of functionality

6  for Implicit's software, but not for Juniper's software.

7  **II.     EVEN ACCEPTING IMPLICIT'S PROXY ARGUMENT, IMPLICIT HAS FAILED
            TO ADDUCE EVIDENCE ON MANY ELEMENTS OF THE ASSERTED CLAIMS**

8           As Juniper explained in its motion, even if the infringement analysis in Implicit's expert

9  report is deemed fully applicable to the accused SRX and J series products (even though it is not),

10  that analysis still fails due to the failure to prove a number of specific elements of the asserted

11  claims.  In its opposition, Implicit spends only four pages addressing these specific disputed claim

12  limitations.  *See* Opp. at 21-24.  As might be expected given this brevity, Implicit fails to provide

13  any probative evidence on these limitations sufficient to survive summary judgment.

14           **A.     Implicit Presents No Evidence That The Accused Products Satisfy The
                      "Selecting Individual Components" Limitation.**

15

16           The first disputed element is what Implicit calls the "compatibility check" between

17  component input and output formats, which it concedes is a "necessary" part of the claim element

18  "selecting individual components."  Opp. at 21:11, 21:27.  In its motion, Juniper pointed out that

19  "Dr. Nettles's report contains no evidence, explanation, or identification of any purported

20  compatibility checking in the SRX and J series products."  Mot. at 17.  If Juniper were wrong, it

21  would have been easy for Implicit to cite to the relevant paragraph or paragraphs of its expert

22  report that addressed this claim element.  Implicit did not do so.  Because Juniper's expert

23  presented evidence that the accused products do not perform the "compatibility check" (Alexander

24  Ex. A ¶¶ 176-194, 197), and because Implicit has failed to cite to any evidence from its expert that

25  the accused products practice this limitation, Implicit cannot survive summary judgment as a

26  matter of law.  *Centricut,* 390 F.3d at 1370.

27           Moreover, even if Implicit could permissibly go forward to trial in the absence of

28  supporting expert evidence on this point, its opposition puts forth virtually no evidence of ***any***

1   kind for this element.  Implicit makes no reference to and does not rely on any Juniper technical

2   documents (either public or non-public), or even the two administrator guidebooks that Implicit

3   claims are the "best evidence" of infringement.  Nor does Implicit point to **any** Juniper source

4   code alleged to satisfy this element.  Instead, the entirety of Implicit's cited evidence on this point

5   consists of about 40 lines of deposition testimony from two Juniper employees.  *See* Opp. at 22:8-

6   9; *see also id.* at 13:3-19.[13]  But this testimony does not establish that the accused products

7   perform a "compatibility check."  In fact, the cited testimony is exactly the opposite of what

8   Implicit claims in its opposition: The Juniper witnesses testified that "**no checks are required**" in

9   the Juniper products because they "know upfront exactly what we've coupled with what else," and

10  therefore "**there's never a question of compatibility** from, you know, one plug-in to another."

11  Reply Ex. C (Tavakoli Depo. Tr.) at 130:19-131:24.

12       Implicit nevertheless relies on these deposition cites to argue that Juniper's developers

13  design their systems such that there is a "logical order" to the services or plugins used.  Opp. at 13,

14  22.  But whether the services are in a logical or illogical order is a separate question from whether

15  the accused products perform a required "compatibility check."  Implicit admitted this distinction

16  during the deposition of its corporate representative, Mr. Balassanian, when he testified, with

17  respect to a particular prior art publication: "**I don't think you could infer from this** that you are

18  creating paths **such that the input and output formats are compatible**," **even though** the

19  publication at issue was "**certainly talking about** assembling components and having those

20  components be in a **logical order** . . . ."  Reply Ex. B at 1231:4-1232:5.  Implicit's expert, Dr.

21  Nettles, made the same distinction, distinguishing a check of compatibility "on the basis of

22  formats" (*i.e.*, what the claims require) from a "more deep" kind of compatibility "on the basis of

23  what [components] do," which requires developers to "design things so that they happen in the

24

---

25       [13] Implicit's direct citations are to the Tavakoli deposition (Hosie Ex. C) at 130:19-20 and
26  131:7-19.  There is also an internal citation to Section II.B of the opposition brief (the Statement
    of Facts section), which contains one subsection on the compatibility check limitation (Opp. at
27  13).  That subsection contains an additional citation to Tavakoli at 111:14-18, and two citations to
    Krishna (Hosie Ex. B) at 140:6-7 and 140:21 – 141:13.  Notably, none of these citations appear
28  anywhere in the Nettles report, despite Implicit's (false) claim that Dr. Nettles's report "cites and
    relies" on this testimony from Mr. Tavakoli (*see* Opp. at 4:9-13).

1    right order."  Reply Ex. G at 176.  Thus, even if Implicit's cited evidence were read as

2    demonstrating that Juniper developers design their products so that things "happen in the right

3    order," that would not and does not present a triable issue of fact as to whether the accused Juniper

4    products perform the distinct step of compatibility checking "on the basis of formats."  Implicit's

5    attempt to satisfy this element with mere evidence of "logical ordering" therefore fails.[14]

6        Finally, Implicit attempts to excuse its lack of evidence by arguing that the issue here is

7    really about claim construction.  *See* Opp. at 21:20 – 22:4.  This simply misconstrues Juniper's

8    position.  Juniper is not seeking to have the Court reconstrue the claims.  Moreover, Juniper's

9    summary judgment argument is not dependent on there being some sort of "temporal aspect to

10   determining compatibility," as Implicit suggests.  Rather, Juniper's argument is simple:  Implicit

11   has failed to present evidence that Juniper's accused products perform format compatibility

12   checking at ***any*** time.  Thus, summary judgment is appropriate regardless of Implicit's argument

13   about the "temporal aspect" of "selecting individual components."[15]

14   **B.    Implicit Presents No Evidence That the Accused Products Include A
         "Plurality Of Components" Satisfying The "State Information" Limitations.**

15       The second claim element for which Implicit must produce evidence is the requirement

16   that each of a "plurality of components" satisfy specific requirements involving "state

17   information."  For this element, Implicit at least makes an attempt to support its position with

18   expert evidence (*see* Opp. at 24), yet does not address the serious defects in Dr. Nettles's analysis

19   that Juniper identified in its motion.  For example, Juniper pointed out that the analysis of a single

20   "CPCD" plugin cannot be sufficient to survive summary judgment, as the plain language of the

21   claim requires a "plurality" of components.  Indeed, Implicit concedes in its opposition that it only

22

23       [14] Implicit makes a half-hearted attempt to go beyond the "logical ordering" argument by
     claiming that the cited testimony shows that "JUNOS has a 'constraint' check to make sure that

24   . . . the format inputs and outputs align."  Opp. at 13:7-8.  It is not clear what Implicit is attempting
     to quote here, as none of the cited Juniper testimony uses the term "constraint" or "constraint

25   checking" or any other variants thereof.  But in any event, there is nothing in the testimony cited
     that suggests checking to make sure format inputs and outputs align.

26       [15] In any event, the plain language of the claims itself requires that "selecting individual
     components" (which includes format compatibility checking) occur "after the first packet is

27   received."  *See* '163 patent, claim 1.  Thus, to the extent Implicit contends that the accused
     products perform compatibility checking only ***before*** the first packet, then this would be an

28   independent reason to find that Implicit has failed to meet its summary judgment burden here.

- 10 -

1    analyzed a single plugin, not a plurality of plug-ins.  Opp. at 24:12-13 ("This code review

2    describes exactly how *a specific module* reads, writes, and maintains state during a session.").**16**

3    As another example, Juniper pointed out that Dr. Nettles's code analysis failed to show the state

4    information steps are performed on a plurality of packets.  Again, in its opposition, Implicit

5    confirms Juniper's point by relying on a function that Implicit states is performed "while

6    processing *the first packet*"—a single packet only.  Opp. at 24:21-22.  And, just as with its other

7    "evidence," Implicit's assertions do not go beyond bare conclusion that the Juniper code somehow

8    satisfies these claim limitations.  As this Court has recognized, "*a party may not avoid summary*

9    *judgment simply by offering an opinion of an expert that states, in effect, that the critical claim*

10   *limitation is found in the accused device.*"  *Pixion, Inc. v. Citrix Systems, Inc.*, 2012 WL

11   3313533, *8 (N.D. Cal. Aug. 13, 2012); *see also Novartis*, 271 F.3d at 1053-54 (affirming

12   summary judgment where infringement expert merely stated his conclusions and pointed to

13   opaque source code without explanation).**17**

14   Implicit attempts to fill the gaps in the Nettles report by relying on three citations to

15   Dr. Nettles's deposition testimony regarding purported components other than the CPCD plugin.

16   *See* Opp. at 24:7-8 (citing Nettles Depo. at 213:5-10, 216:10-22, 227:3 – 228:14).  But, of course,

17   under the Federal Rules, experts are not permitted to belatedly expand the scope of their opinions

18   beyond their reports.  *In re Oracle*, 2009 U.S. Dist. LEXIS 50995, *84 (N.D. Cal. June 16, 2009)

19   (Illston, J.) ("[T]he expert report. . . defines the metes and bounds of an expert's trial testimony.").

20   Indeed, Juniper pointed out in its motion that Dr. Nettles had admitted that his report did not set

21   out any opinions on the "state information" limitations for these newly identified components

22   (*e.g.*, SSL, NAT).  Mot. at 21 & n.27 (citing Nettles deposition).**18**  Again, if Dr. Nettles had in fact

---

**16** Implicit now states in its opposition that the CPCD plugin is "exemplary" of other plugins, but there is no support for this position in the Nettles report.

**17** Implicit also reproduces in its opposition a figure from the JUNOS Software Security Guide that Dr. Nettles included in his report (*see* Opp. at 23), but as Juniper explained earlier (Mot. at 21), there is no explanation provided as to how this figure matches the detailed limitations of the claims (*e.g.*, "state information") and Implicit fails to provide any such explanation in its opposition.  This is just inadequate "opaque identification."  *Pixion*, 2012 WL 3313533 at *7.

**18** Dr. Nettles mentioned in his deposition that the JUNOS Security book might provide support for his new opinions regarding the newly accused NAT component.  Hosie Ex. H at 228:6-8.  But in its opposition, Implicit does not rely on this book at all for this limitation.

1   provided such evidence in his expert report, Implicit would surely have pointed it out.

2       Even if this Court were to now permit Implicit to expand its expert report to rely on SSL

3   and NAT to meet the "plurality" limitation, this still would not solve the problem that Implicit has

4   never provided evidence that  SSL and NAT actually retrieve, use, and store state on a packet-by-

5   packet basis, as required by the asserted claims.  Dr. Nettles says they do, but he provides no

6   evidence or analysis to support this assertion.[19]  And Implicit provides no further evidence or

7   explanation in its opposition, other than the tautology that each component "must" satisfy the state

8   limitation elements because "this is just how it works."  Opp. at 23:24 – 24:2.

9       Implicit's last-ditch effort to provide evidentiary support for these claim elements is to cite

10  to a few pages from a 2007 internal Juniper document entitled "Viking Design."  Opp. at 14:21-

11  23; *id*. at 22:18-26.  There are a number of problems with Implicit's reliance on this document, the

12  first being untimeliness.  Implicit misleadingly claims that Dr. Nettles "cites and relied upon this

13  document" in his report.  Opp. at 22:24-26.  This is apparently a reference to Exhibit 2 to the

14  Nettles report ("Juniper Additional Sources Considered") which states in relevant part:

15              Deposition Transcripts with exhibits
                . . .
16              Krishna Narayanaswamy . . .

17  Reply Ex. H (Expert Report of Scott Nettles, Exhibit 2) at 3.  Although the Viking document was

18  indeed marked as Exhibit 3 to the Krishna deposition, there is no reference to the document itself

19  anywhere in the Nettles report, much less any analysis of the document by Dr. Nettles.[20]  Thus,

20  contrary to Implicit's claim, Dr. Nettles neither "cited" nor "relied upon this document."

21      Implicit also fails to provide any evidence that the "Viking Design" document has any

22  relationship to the products Implicit is accusing of infringement in this case.  As Dr. Alexander

23  explained when asked about the Viking document at his deposition, design specifications can

24  often substantially differ from the final functionality of a product.  Reply Ex. J at 132:21-25 ("the

25  _____

26  **[19]** *Compare, e.g.*, Hosie Ex. H (10/9/2012 Nettles Depo. Tr.) at 213:9-10 ("[y]ou can't do
    decryption without reading and writing and manipulating state") *with* Hefazi Ex. 5 at 229:18-20
    ("I don't think my report is required to explain how decryption works.").

27  **[20]** During his deposition, Dr. Nettles for the first time specifically pointed to the Viking
28  document, admitting that the document was "not explicitly cited" in his expert report, even though
    there was "nothing" that had prevented him from doing so.  Reply Ex. I at 88:7 – 93:25.

design specification is done before the development begins" and "changes are forced" as the "development progresses").  In this case, the document on its face was last updated in 2007, whereas the earliest Juniper products at issue in this case date from 2010.  Reply Ex. E (Dkt. No. 113) at 1:24-26.  Implicit provides no expert opinion or other evidence on the applicability of this document.  Thus, the "Viking Design" document is not admissible on any issue relating to how the products accused of infringement in this case actually operate.  *See* Fed. R. Evid. 402, 403, 702.

Finally, even if Dr. Nettles had relied on the Viking document, Implicit had timely disclosed it, and Implicit mustered some evidence that there were a link between this document and the actual operation of the accused products, Implicit still would not be able to survive summary judgment because it does not provide any evidence that there are a "plurality" of components, much less that each of these components performs the required steps of "retrieving," "processing," and "storing" state information.  Rather, Implicit provides only attorney argument (which is inaccurate).[21]  For purposes of this motion, however, it does not matter that Implicit's attorney's argument is inaccurate; the only thing that matters is that Implicit cannot rely upon attorney argument to manufacture a genuine issue of material fact to survive summary judgment.[22]  *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 ("lawyer argument and generalized testimony. . . fail[s] to demonstrate a genuine issue of material fact").

**C.      Implicit Presents No Evidence That The Accused Products Perform The Step Of "Dynamically Identifying . . . After The First Packet."**

The third claim limitation Juniper raises in its moving papers ("dynamically identifying") is perhaps the easiest to address.  Implicit not only fails to identify any supporting expert evidence for this element, ***but fails to identify any evidence at all***.  Rather than attempt to meet its burden of producing relevant, admissible evidence, Implicit argues that it need not do so because this is a "claim[] [construction] argument," which is purportedly "identical to F5's principal non-infringement argument."  Opp. at 5:1-7, 21:13-16.  Implicit thus simply points to the "public

---

[21] For example, the "flow specific data structures" at most relate to an overall path, contrary to the Court's construction of "state information."  *See* Hosie Ex. B at 132:24-133:3.

[22] Of course, even if Implicit could establish even one component satisfying the "state information" limitations (and it does not do so), summary judgment would still be appropriate because the claims require that there be a "plurality" of such components.

1    portions of the F5 Implicit opposition" (filed 4 days after the opposition deadline in this case).

2         The problem for Implicit is that regardless of whether there is any overlap between the

3    issues raised in the respective summary judgment motions filed by Juniper and F5, there are

4    indisputably ***differences*** in the issues—including with respect to the "dynamically identifying"

5    element—that render Implicit's incorporation by reference entirely inappropriate here.  As the

6    Federal Circuit has explained, "[a]n infringement analysis involves two steps.  First, the court

7    determines the scope and meaning of the patent claims asserted . . . and then the properly

8    construed claims are compared to the allegedly infringing device."  *Cybor Corp. v. FAS Tech.,*

9    *Inc.*, 138 F.3d 1448, 1454 (Fed. Circ. 1998).  Thus, even if there were common claim construction

10   issues presented in the defendants' motions (step 1) ***the analysis for step 2—comparison of the***

11   ***construed claims with either the Juniper or F5 accused devices—is undeniably different***.

12   Regardless of any evidence Implicit has advanced regarding how ***F5's*** products operate, it has

13   failed to present evidence linking this element to ***Juniper's*** accused products.

14        Thus, the extensive factual analysis and evidence set forth in Juniper's motion on this

15   element (Mot. at 22-25) stands unrebutted.  There is literally no opposition to, *e.g.*, Juniper's

16   evidence and argument that the accused "session ignore" signal (plugin skipping) could only arise

17   in error conditions that do not ever occur under proper operation, and for which there is no

18   evidence that they have ever occurred.  Mot. at 23:26 – 25:6; Hefazi Ex. 5 at 249:23 – 259:23.

19   Juniper carefully supported this argument with appropriate evidentiary citations, including to the

20   Alexander expert report.  *Id.*  This is clearly a "step 2" accused product argument—not a "step 1"

21   claim construction argument—yet Implicit fails to respond in either this or the F5 case.**[23]**

22        Finally, Implicit's arguments from the F5 opposition brief—to the extent they can be

23   understood as applicable to the products at issue in this case—fail to present a triable issue of fact.

24   Implicit argues that this Court should equate the terms "dynamically identifying" with building or

25

26        **[23]** Implicit should not be permitted to belatedly identify the evidence it should have raised
     in its opposition, nor is the Court under any obligation to scour the record for the same.  *Carmen v.*
27   *San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  Implicit is represented by
     sophisticated counsel; it would be "profoundly unfair" to ask the Court to effectively "become[]
28   the lawyer for [Implicit]" by attempting to perform the technical infringement analysis Implicit
     omitted (and "den[ying] [Juniper] a fair opportunity to address the matter in [its] reply").  *Id.*

1  "instantiating" a path. F5 Opposition at 2 (arguing "'identifying' the path meant building a path

2  after the first packet of the message"). But as explained in Juniper's motion (and F5's summary

3  judgment papers), Implicit's argument makes no sense and is contrary to the Court's claim

4  construction. Mot. at 22:26 - 23:25.[24] Because Implicit's only argument relating to this claim

5  limitation is essentially an improper request for this Court to reconsider its prior *Markman* Order

6  (*see* Patent L.R. 7-9), the Court should grant Juniper's motion for summary judgment.

7  **III.    IMPLICIT HAS FAILED TO POINT TO SPECIFIC INSTANCES WHERE THE
          ACCUSED PRODUCTS "NECESSARILY" INFRINGE**

8          Finally, Implicit fails to put forth any evidence that Juniper products "necessarily infringe"

9  in the accused manner. Implicit simply states in conclusory manner that Juniper "necessarily

10 practice[es] the method" because it tests its products. Opp. at 25. Of course Juniper tests its

11 products. However, what Implicit needs is evidence that Juniper tests ***in the allegedly infringing***

12 ***manner*** (*e.g.*, using CPCD, service sets, session ignore). Although Implicit cites to the Nettles

13 report section on direct infringement (along with a few deposition quotes on testing), it does not

14 provide evidence required to show actual infringement in the accused mode and configuration.

15 *Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1360-1362 (Fed. Cir. 2012) (affirming non-

16 infringement for failure to prove anyone "actually performed the patented steps").[25]

17         Finally, Implicit has failed to respond to Juniper's argument that Dr. Nettles analyzed and

18 purported to establish infringement on an element-by-element basis for only a single revision of

19 the JUNOS software ("11.1R2.3"). Mot. at 25:19-20. As there is no evidence that the accused

20 aspects are the same across the various JUNOS revisions, Implicit cannot prevail on a claim of

21 infringement for any other revisions as a matter of law. *See, e.g., Medtronic Vascular, Inc. v.*

22 *Boston Scientific Corp.*, 2008 U.S. Dist. LEXIS 53373, *10-11 (E.D. Tex. July 11, 2008) (granting

23 summary judgment of non-infringement for products not analyzed).

24

---

25     [24] In any event, the evidence of record demonstrates Juniper does not infringe even under
    Implicit's new apparent claim construction. Reply Ex. C (6/19/2012 Tavakoli Depo. Tr.) at
26  126:22-127:5 ("The service chains that we have are complex enough that it behooves us, given the
    constrained set, to ***predefine all of the paths through the system, upfront***.").

27     [25] Implicit's naked claim that the accused products "necessarily" infringe is also
    contradicted by its own expert. For example, Implicit concedes that all but a few of the accused
28  products can be operated in an admittedly non-infringing "packet mode." Hefazi Ex. 8 ¶ 74.

1    Dated:  December 3, 2012                    Respectfully submitted,

2

3                                               IRELL & MANELLA LLP

4
                                               By: */s/ Nima Hefazi*
5                                                   David C. McPhie (dmcphie@irell.com)
                                                    Nima Hefazi (nhefazi@irell.com)
6                                                   Douglas J. Dixon (ddixon@irell.com)
                                                    840 Newport Center Drive, Suite 400
7                                                   Newport Beach, California 92660-6324
                                                    Telephone:  (949) 760-0991
8                                                   Facsimile:  (949) 760-5200

9
                                                    Morgan Chu (mchu@irell.com)
10                                                  Jonathan S. Kagan (jkagan@irell.com)
                                                    1800 Avenue of the Stars, Suite 900
11                                                  Los Angeles, California 90067-4276
                                                    Telephone:  (310) 277-1010
12                                                  Facsimile:  (310) 203-7199

13
                                                    *Attorneys for Defendant*
14                                                  *Juniper Networks, Inc.*

15   .

16

17

18

19

20

21

22

23

24

25

26

27

28

JUNIPER NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY     Case No. C 10-4234 SI
JUDGMENT OF NON-INFRINGEMENT

2730001