# EXHIBIT  1



Edward Balassanian

---

ENTREPRENEURS | 1/11/2012 @ 11:49AM | 7,446 views

# Why Failure Is The Engine Of Success

Move up Move down



21 images      Photos: Top 20 Americas Most Promising Companies



17 images      Photos: 16 Companies To Watch With Under $1 Million In Sales

==Fifteen years ago, I started a business that took 12 agonizing years to fail.== I invested $10 million of my own money in BeComm (later called Implicit Networks) to develop a



media-rich operating system that in many ways anticipated today's smartphones and tablets. Unfortunately, the hardware and applications needed to make use of such an operating system didn't yet exist.

Like most failed entrepreneurs, I might have had nothing to show for all my effort but a lousy tee-shirt that says, "I ran a startup, too." But because I learned some crucial lessons, I now have the beginnings of a thriving business—one that is run very differently from the traditional model for building high-tech startups.

## Lesson #1: Get Feedback Sooner Than Later

Our approach at Balassanian Enterprises relies on testing and feedback. Consider, for example, the old axiom that entrepreneurs must be unwaveringly fixated on a single goal. This is why so many startups are built around a single product or service that is assumed—but often not yet proven—to meet a real consumer need and offer a lucrative market opportunity.

The CEO of that startup is likewise singularly focused on getting a fully-baked product out the door as soon as possible in order to start generating revenue while at the same time building a pipeline for

future offerings. Given the limited resources in most startups, this often means that the engineers are building Version 2 of the product before Version 1 has even been tested in the market.

One problem: Given that we know that a majority of new products fail in the market, unwavering fixation looks like a bad bet. Wasn't it only two years ago, after all, that netbooks were supposed to be the next big thing? In today's smartphone-dominated landscape, who even remembers? But in that short span of time, a traditional startup can very easily launch a product that nobody wants anymore.

## Lesson #2: Spread Your Risk

Venture investors spread their risk by investing in perhaps two dozen startups. That's why many are able to withstand a high failure rate and still generate healthy returns, but that approach works less well for the startups themselves.

At Balassanian, we develop multiple consumer products at once — all of them designed to blend the digital and physical worlds in new ways that provide value to consumers. We employ a disciplined and repeatable process for rapidly prototyping and market testing our ideas, which results in the early and low-cost failure of some of our products but the rapid growth of others that find market support. Instead of speeding like a train on a fixed track toward a pre-set target with little chance of hitting it, we have built into our process the ability to pivot quickly and change direction—crucial to keeping abreast of today's rapidly shifting markets and technologies.

## Lesson #3: Keep It Simple

Our product design approach is different, too. Our prototypes employ only a bare minimum of features before being tested with customers. (Many startups roll out the most fully-featured product possible to release to the public.) We've found that our approach reduces cost, concentrates our resources only on products that generate clear customer support, and speeds the time needed to either validate or fail a product down to weeks or at most months.

Failure, in fact, is the engine of our success. The first iteration of our luxury shopping site *Digbee.com* tried to predict what shoppers wanted based on their past purchases. But market testing revealed that our predictive algorithm simply wasn't good enough to provide real value to users. So we developed a new service, called *Strings.com,* built around a highly-scalable crawler platform that enables users to effortlessly discover and follow their favorite designers and brands across multiple retail websites. We'll be launching *Strings* with a unique rebate model shortly.

## Lesson # 4: Protect Your IP

Another way we diverge from many startups, especially in the software field, is that we place critical importance on developing bullet-proof intellectual property—no mean feat given the backlog at the U.S. patent office. But we have learned that our ideas often have real value, and even if we can't always productize them, perhaps someone else can. The patents from our last unsuccessful venture, for example, have generated millions in licensing revenue for us in the last 18 months. If you own the intellectual property, a product failure does not have to mean a business failure. (In fact, the IP can even benefit a whole industry: The patents we secured back in 1998 for our

revolutionary "pinch, swipe, and zoom" technology, for example, were later embraced by Apple in the 2006 release of its phenomenally-successful iPhone.)

## Lesson #5: Organize By Job Function, Not By Product

This org-chart approach enables us to test multiple products at once and to use resources more efficiently. While the prototyping team is working on an untested product, the marketing and business development teams can be laying the groundwork for rapid growth for an already market-validated product.

This functional organization of teams also lies at the very core of our business model. When a new product idea has reached an inflection point of market support and is ready for rapid growth — like our *Post on the Wall* service that uses photo-collages to meld people's virtual existence with their real-world locations, events and experiences — then we recruit an outside team to spin out the business. We've found that the innovation skills of a startup team are very different from the execution, operations, and management skills of a growth-focused team.

Industry observers are starting to pick up on the benefits of this new approach to launching new businesses. (See **With A Leaner Model, Startups Reach Further Afield**, from the *New York Times*, and **The Disruptor In The Valley**, from *Forbes*, about storied tech incubator Y Combinator.) While our approach has many similarities to the new "laboratory" or "incubator" model that the *Times* wrote about, it contains at least one key difference: We invest $3 million to $5 million of our own money in the businesses we spin out, rather than require the new growth team to secure early financing themselves to scale up the business. In this sense, we try to blend the best of the "labs" model with the upside of a successful VC firm.

Our approach is certainly not appropriate for every startup. But this much I do know:  My failure has taught me that by working on several products at once —and then quickly killing all but the very best market-tested ones—I've got a much better shot at evening the odds for startup success.

*Edward Balassanian is the CEO of Balassanian Enterprises, a startup incubator that leverages new technology to create disruptive opportunities in consumer-facing markets.*

**This article is available online at:**
**http://www.forbes.com/sites/edbalassanian/2012/01/11/why-failure-is-the-engine-of-success/**

# EXHIBIT  2

CONFIDENTIAL

Page 274

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4

5     IMPLICIT NETWORKS, INC.,

6              Plaintiff,

7         vs.                    CASE NO. 3:10-cv-03365-SI

8     F5 NETWORKS,

9              Defendant.

10

11     _____

       AND RELATED ACTIONS

12     _____

13

14              30(b)(6) VIDEOTAPED DEPOSITION OF

15     IMPLICIT NETWORKS, INC., THROUGH EDWARD BALASSANIAN

16              San Francisco, California

17               Thursday, May 31, 2012

18                    Volume II

19       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

20                 ATTORNEYS' EYES ONLY

21     Reported by:

       LORI STOKES

22     CSR No. 12732

23     Job No. 146785

24

25     PAGES 274 - 548

**Sarnoff**™
A VERITEXT COMPANY      877.955.3855

CONFIDENTIAL

Page 347

1    licenses, not the royalty licenses, okay?           10:54:55

2        A    Because you said royalty.

3        Q    In that context, I mean the royalty

4    payment, the lump-sum payment.  I can use the term

5    lump-sum payment if that's more clear for you.       10:55:09

6        A    Okay.  We can just talk about a time

7    frame, too.  Past 2007 or before.

8        Q    For Implicit's lump-sum licenses, how did

9    you compute the value of future sales for the

10   purpose of computing the total-lump-sum amount?      10:55:24

11              MR. HOSIE:  Objection.  Lacks foundation.

12              THE WITNESS:  I'm sure my legal team had

13   many variables to consider in the calculation for

14   what would be a reasonable amount to accept in a

15   settlement.                                           10:55:53

16              I'm not privy to the intricacies of those

17   calculations.  My role is really to assist in

18   mapping our intellectual property to existing

19   products and also approving the final settlement

20   numbers, but I trust them in their calculations and  10:56:12

21   negotiations.

22   BY MR. McPHIE:

23       Q    As the corporate representative of

24   Implicit, can you explain sitting here today how

25   the value of future sales was computed for the       10:56:22

CONFIDENTIAL

Page 348

1   purpose of computing the lump sum paid in your        10:56:28

2   lump-sum licenses?

3           MR. HOSIE:  Objection.  Lacks foundation.

4   Asked and answered.

5           THE WITNESS:  I can be responsive to that     10:56:45

6   question, but I'm not sure I can answer it in

7   total.  If you would like me to talk to you about

8   my perspective on that, I'm happy to do that.

9   BY MR. McPHIE:

10      Q    Well, I don't want your conjecture.  What    10:56:56

11  I'm asking is whether you can explain, sitting here

12  today, how the value of future sales was computed

13  in your lump-sum licenses.

14          MR. HOSIE:  Objection.  Lacks foundation.

15  Asked and answered.                                   10:57:14

16          THE WITNESS:  So I'm not clear on which

17  future sales you're referring to.  If you want to

18  be specific about a contract, I can potentially

19  answer your question.

20  BY MR. McPHIE:                                        10:57:29

21      Q    Sure.  For example, you entered into a

22  lump-sum patent license with Apple in 2007,

23  correct?

24      A    That's correct.  I'm not sure on that

25  date, but I think you're close.  So we'll -- I       10:57:42

CONFIDENTIAL

Page 349

1   don't think it's critical.                          10:57:46

2       Q   You entered into a patent license with

3   Apple, correct?

4       A   Correct.

5       Q   And I'll represent to you it was in 2007,   10:57:52

6   in fact.

7       A   Okay, fair enough.

8       Q   And at the time you entered into that

9   license, you knew that the day after that license

10  was signed -- and for years forward, for the life   10:58:04

11  of the patent -- there would be iPods sold and

12  laptop computers and all the good products that

13  Apple offers going forward, right?

14      A   I was pretty confident that they would be

15  selling all of the devices that you mentioned.  I    10:58:25

16  didn't -- I don't think anyone forecasted the

17  degree to which Apple would dominate the industry

18  with those products, but I was clearly aware they

19  were selling them.

20      Q   Apple was doing very well in 2007,          10:58:39

21  correct?

22          MR. HOSIE:  Objection.  Lacks foundation.

23          THE WITNESS:  As I said, I don't think I

24  could have predicted how well they would do.  But,

25  by any measure, you would be hard-pressed to argue   10:58:48

**Sarnoff.**
A VERITEXT COMPANY          |  877.955.3855

CONFIDENTIAL

Page 350

| | | |
|---|---|---|
| 1 | that they would not keep selling iPods, iPhones and | 10:58:52 |
| 2 | laptops. | |
| 3 | BY MR. McPHIE: | |
| 4 | Q    And in calculating the lump-sum amount | |
| 5 | that Apple would pay to gain access to Implicit's | 10:59:05 |
| 6 | patents, Implicit had to come to some understanding | |
| 7 | of what the value of those future post license | |
| 8 | sales were, correct? | |
| 9 | MR. HOSIE:  Objection.  Lacks foundation. | |
| 10 | THE WITNESS:  So in 2007, our attorneys | 10:59:27 |
| 11 | were Goldstein, Fawcett & Prebeg.  And in any one | |
| 12 | of those negotiations, the counsel will recommend | |
| 13 | to their client, Apple is willing to pay $500,000. | |
| 14 | We recommend that you take it. | |
| 15 | Goldstein, Fawcett & Prebeg -- | 10:59:45 |
| 16 | MR. HOSIE:  I'm sorry.  I need to | |
| 17 | interject here and caution the witness not to | |
| 18 | disclose the substance of any communications with | |
| 19 | current or former counsel. | |
| 20 | THE WITNESS:  Thank you. | 10:59:56 |
| 21 | So if I may continue with regard -- | |
| 22 | paying attention to what Spencer just said. | |
| 23 | So their law firm is geared more towards | |
| 24 | getting fast licenses without much regard for who | |
| 25 | the inventor is.  That wasn't consistent with the | 11:00:12 |

CONFIDENTIAL

Page 351

1    type of licensing program I wanted to create.        11:00:17

2         It's rare that an inventor of a patent

3    continues to own the patent as long as I did.  It's

4    rare that the inventor put $10 million of his own

5    money into creating that intellectual property.      11:00:32

6    And it's rare that the inventor was able to keep

7    the entire ecosystem of patents in his portfolio

8    alive for as long as I did.

9         It was important to me to have

10   representation that didn't believe in quick          11:00:47

11   licenses.  So that's one of the factors.

12   Goldstein was much more aligned with quick

13   licenses, and he recommended that value to me.

14        In addition, there's other factors, such

15   as the financial position of the company at the      11:01:00

16   time.  Implicit was very low on cash and, had I not

17   taken that license agreement, I would have been

18   hard-pressed to continue prosecuting my patent

19   portfolio.

20        Several of the patents that have issued         11:01:17

21   since have dramatically enhanced the value of the

22   portfolio.

23        In addition to that, the value of just

24   getting one of those under your belt is factored

25   in, as well.                                         11:01:35

CONFIDENTIAL

Page 352

1      So all of those go towards determining      11:01:36
2  whether it's a fair license or not.  But the most
3  relevant of those is truly your counsel's
4  recommendation that you should take this.
5           MR. McPHIE:  What was that?            11:02:01
6           MR. HOSIE:  I'm sorry?
7           MR. McPHIE:  What was that?
8           MR. HOSIE:  What do you mean what was
9  that?
10          MR. McPHIE:  You just spoke to your      11:02:04
11  client.
12          MR. HOSIE:  I did, indeed, speak to my
13  client.  Are you asking me to disclose the
14  substance of privileged communication?
15      Was there a question pending?               11:02:11
16          MR. McPHIE:  I'm asking you whether there
17  was some advice given about the attorney-client
18  privilege just now, or if there's a statement you
19  would like to make on the record.
20          MR. HOSIE:  What I say to my client, sir,  11:02:22
21  is privileged, as you well know.
22          MR. McPHIE:  What I'm asking is, did you
23  just give him advice about attorney-client
24  privilege, or was there some statement about the
25  substance of the testimony that we're giving in the  11:02:40

CONFIDENTIAL

Page 360

1    today, Implicit actually used those factors to help    11:13:19

2    determine the amount paid under all of its

3    licenses, correct?

4              MR. HOSIE:  Objection.  Overbroad.  Vague

5    and ambiguous.                                          11:13:32

6              THE WITNESS:  There are numerous factors

7    that go into the determination of a license.  Not

8    just for the Apple one, but for all of them.

9              The state of your patent portfolio, for

10   example.  When we settled with Intel, all of our       11:13:47

11   patents-in-suit were in reexam.  All claims were

12   rejected.

13             When we settled with other defendants,

14   certain patents hadn't issued yet.  We have, I

15   believe, double the number of patents now than we       11:14:05

16   did early on.

17             The counsel that I have, the Hosie Rice

18   firm, believes in patents.  They believe in

19   inventors.  And they believe in

20   entrepreneurialship.  Their recommendations for me      11:14:18

21   for licenses are far different --

22             MR. HOSIE:  Again, let me caution the

23   witness.  I appreciate it's a difficult line to

24   draw, which is why we may have to break to confer

25   on this --                                              11:14:35

CONFIDENTIAL

Page 361

```
 1          MR. McPHIE:  He's complimenting you.      11:14:36

 2          MR. HOSIE:  And I appreciate that.  And I

 3    thank the witness for that, and your observation,

 4    sir.

 5          But please, again, be very careful not to   11:14:43

 6    disclose the substance of communications.  Because

 7    if you do -- if you do -- these defense lawyers

 8    will seize on that and say, look, you waived the

 9    privilege.

10          THE WITNESS:  So I am not waiving          11:14:56

11    privilege, just to be clear.  And my only point

12    here is that the type of counsel you have has a

13    dramatic impact on the type of recommendations you

14    get from them about the licenses and what would be

15    a fair sum.                                       11:15:11

16          If you have counsel that is focused on

17    quick licenses and, essentially, avoiding any kind

18    of litigation, you get very -- you get commensurate

19    settlement contracts.

20          If you have counsel that believes in the   11:15:30

21    robustness of the patent process and the robustness

22    of entrepreneurialship and the veracity of the

23    entire process, then you get commensurate

24    settlement agreements.  And I think that's borne

25    out by our recent trajectory.                     11:15:46
```

Sarnoff™
A VERITEXT COMPANY

877.955.3855

CONFIDENTIAL

Page 362

1   BY MR. McPHIE:                                       11:15:49

2       Q    And these are all factors that play into

3   the negotiation of a lump-sum amount for a patent

4   license, correct?

5       A    They're factors that play into the        11:15:58

6   negotiation of any patent license, whether it's

7   Microsoft and AOL or Juniper and Palo Alto

8   Networks.  That's how patent licenses are

9   determined.

10            When you sue somebody for infringing, you  11:16:12

11  have to come to a settlement.  And those settlement

12  numbers are determined by both parties, what one is

13  willing to take, what one is willing to pay, the

14  state of the patents, the threat of a countersuit,

15  the robustness of the patents, the claims, the      11:16:25

16  overlap of the claims with a particular product,

17  the sales trajectory of those products, the

18  livelihood of those products.  All of those go into

19  consideration.

20      Q    Another consideration, I think you         11:16:45

21  mentioned -- well, withdrawn.

22            Another factor that goes into the

23  licensing calculation might be the financial state

24  of the company at the time; is that right?

25      A    As the CEO of a company, you often have    11:17:03

CONFIDENTIAL

Page 447

1    BY MR. McPHIE:                                    02:28:14

2         Q    So it was possible in the 1990s, before

3    you conceived your invention, to modify a URL

4    blacklist?

5              MR. HOSIE:  Objection.  Asked and        02:28:22

6    answered.

7    BY MR. McPHIE:

8         Q    Correct?

9              MR. HOSIE:  Objection.  Asked and

10   answered.                                         02:28:28

11             THE WITNESS:  I think I've been pretty

12   clear that modifying or storing a blacklist of URLs

13   is not remotely related to my patent.

14   BY MR. McPHIE:

15        Q    The Web Tablet for Intel, was that       02:28:41

16   something that ever was released to the market?

17        A    By released to market, you mean available

18   for sale by consumers at a Best Buy?

19        Q    Among other things, yes.

20        A    I honestly don't know.  I know they made  02:29:14

21   a few thousand of them.  I don't know if it ever

22   made it to the store shelf.

23        Q    Intel made a few thousand of their Intel

24   Web Tablets?

25        A    That's my understanding.                  02:29:31

Sarnoff™
A VERITEXT COMPANY          877.955.3855

CONFIDENTIAL

Page  448

```
 1        Q     But you don't know what happened to them?   02:29:32
 2        A     I don't.
 3        Q     Did you ever receive any revenue --
 4    per-unit revenue -- based on those Web Tablets?
 5        A     No.                                          02:29:43
 6        Q     Are you aware of any Intel Web Tablet
 7    getting into the hands of an end user or consumer?
 8        A     Well, I have one.
 9        Q     Other than that one.
10        A     Honestly, I know that they had several       02:30:05
11    thousand of them.  And I think they -- I mean, I'm
12    sure they ended up in somebody's hands.  I don't
13    know -- I'm quite certain that they -- none of them
14    were actually sold by any of the partners that they
15    had lined up.  But whether they ended up in          02:30:21
16    people's hands outside of Intel, probably.
17        Q     Can you give me an example of how you
18    would use the Intel Web Tablet to practice the
19    invention claimed in the patents-in-suit?
20        A     I can.                                       02:30:35
21        Q     Please do.
22              If it's helpful, by the way, it's right
23    over there if you want to demonstrate something.
24        A     I really doubt that thing is going to
25    turn on.                                               02:30:50
```

CONFIDENTIAL

Page 449

```
1          MR. BRUN:  It powered up, but I didn't      02:30:52
2    try to turn it on.
3          THE WITNESS:  I'll explain it.  It
4    actually requires software to be running on the PC,
5    as well.  So our license agreement with Intel was   02:31:02
6    to provide them with software that would run on the
7    PC and software that would run on the tablet.
8          And if I recall correctly -- so a classic
9    example of us not selling Portal, but selling a
10   solution that we built with Portal.                02:31:18
11         We found out through our effort of doing
12   business development they Intel was trying to build
13   a tablet that would allow you to browse web pages
14   and play music, and they couldn't get it to work.
15         And the reason they couldn't get it to      02:31:35
16   work is that Real Networks would not license them
17   the codec that was required to play Real Audio on
18   that device.  But Intel already had a license for
19   the Real Audio codec on the PC.
20         So we built them a software solution on      02:31:53
21   the PC that essentially served as a proxy for all
22   requests that were being made by the tablet for
23   Real Audio streams on the internet.
24         We would intercept those requests coming
25   back.  And then, instead of just sending them       02:32:10
```

**Sarnoff**™   |   877.955.3855
A VERITEXT COMPANY

CONFIDENTIAL

Page 530

1   discussions -- any discussions I had -- regarding      04:45:03

2   anything to do with Citrix's revenue I had with my

3   counsel.

4           I, as a plaintiff, don't get to speak to

5   Citrix directly.  I talk to my counsel and my          04:45:15

6   counsel only.

7   BY MR. McPHIE:

8       Q   Can you tell me yes or no whether a rate

9   came up in any of the discussions with Citrix?

10          MR. HOSIE:  I'm sorry.  Objection to the        04:45:28

11  undefined term royalty rate.  I will also object

12  because the question would inherently call for the

13  disclosure of both privileged communications and

14  the disclosure of conversations between counsel for

15  Implicit and counsel for former defendant Citrix      04:45:57

16  that were explicitly held pursuant to Federal Rule

17  of Evidence 408.

18          I will note in that regard that Citrix

19  has informed us that it objects to our disclosing

20  any such communications and has asked for the         04:46:13

21  opportunity to be heard if there's a risk of that

22  going forward.

23  BY MR. McPHIE:

24      Q   Can you answer the question yes or no?

25          MR. HOSIE:  I'll instruct him not to           04:46:30



CONFIDENTIAL

Page 531

```
 1    answer.                                          04:46:31
 2            MR. McPHIE:  Okay.
 3            MR. HOSIE:  Counsel, you are -- candidly,
 4    you're wasting our time because you're asking the
 5    same questions that are subject to a motion right  04:46:40
 6    now.
 7            Why don't you defer this until the Court
 8    rules.  You have other things to cover, do you not,
 9    sir?
10            MR. McPHIE:  Let's move on.               04:46:52
11            MR. HOSIE:  Thank you.
12    BY MR. McPHIE:
13        Q    I think HTC is next; is that right?
14        A    What number are we looking at?
15        Q    122.                                    04:47:10
16            MR. HOSIE:  If I may, we have in the room
17    counsel for former defendant Microsoft.
18            Shane, what is Microsoft's position on
19    this issue?  Has Microsoft given permission for
20    Implicit to disclose my Rule 408 conversations with 04:47:45
21    Mike Bettinger and Isabella Fu?
22            MR. McPHIE:  I object to this.  Let's
23    move through the licenses.  If there needs to be
24    discussion about that, let's not waste the witness'
25    time.  Let's try to accomplish what we can in the  04:48:08
```

CONFIDENTIAL

Page 532

1   time we have remaining today.   That is what I would   04:48:13

2   propose.

3            MR. HOSIE:  All right.   Fair enough.

4   BY MR. McPHIE:

5        Q    Do you have in front of you Exhibit 122?   04:48:19

6        A    I do.

7        Q    Is this, in fact, the license between

8   Implicit and HTC?

9        A    It is a license between Implicit and HTC.

10       Q    What were the HTC products that Implicit   04:48:32

11   contended infringed Implicit's patents at the time

12   of the license?

13       A    I don't remember the specific name of the

14   HTC product, but it would have been one of their

15   smart phones.                                          04:48:54

16       Q    Do you recall the line of smart phones or

17   any identifying information about which one?

18       A    No.

19       Q    Going back, I think we may have skipped

20   this for AMD.  But with respect with AMD -- let me     04:49:14

21   withdraw the preamble.

22            What are the AMD projects that allegedly

23   infringed Implicit's patent at the time of the AMD

24   license?

25       A    I believe it was a media framework.   It    04:49:33



CONFIDENTIAL

Page 533

1   was basically a software package that AMD made          04:49:38
2   freely available on their website for anybody to
3   download without having to buy a chip.
4          Q     Anything else?
5          A     No.  I don't think so.                     04:49:51
6          Q     Exhibit 123 is Implicit's license with
7   IBM, correct?
8          A     We're done with 122?
9          Q     For now, yes.
10         A     Yes.                                        04:50:16
11         Q     What are the IBM products that allegedly
12  infringed Implicit patents at the time of the IBM
13  license?
14         MR. HOSIE:  I would ask that the witness          04:50:35
15  take the time to read the document before Counsel
16  asks him questions on it.
17         THE WITNESS:  I honestly don't remember
18  the specific name of the product, but it was a web
19  application server that IBM has as part of their
20  massive product portfolio.                              04:51:19
21  BY MR. McPHIE:
22         Q     Anything else?
23         A     I don't believe so.
24         Q     Is Exhibit 124 the RealNetworks license
25  agreement with Implicit?                                04:51:43



CONFIDENTIAL

Page 534

```
 1      A    I have it.                              04:51:54
 2      Q    What are the RealNetworks products that
 3   allegedly infringed Implicit's patents at the time
 4   of this license?
 5          MR. HOSIE:  I would ask that the witness  04:52:03
 6   take the time to read the document before answering
 7   questions about it.
 8          THE WITNESS:  I believe Real had a
 9   freely-available media framework that we accused.
10   BY MR. McPHIE:                                   04:52:59
11      Q    What was it called?
12      A    I think it was called Real System or
13   something analogous to that.  I don't remember the
14   exact name of the -- it's not a consumer product
15   that you would download in that manner.  It's      04:53:13
16   something that developers would use.
17      Q    Were there any other RealNetworks
18   products accused of infringement?
19      A    I don't believe so.
20      Q    Exhibit 125 is the license between       04:53:37
21   Microsoft and Implicit, correct?
22      A    I really can't read this, but it appears
23   to be.  I'm not sure why it's so small.
24      Q    My understanding is this is how it was
25   produced to us.                                   04:54:01
```

CONFIDENTIAL

Page 535

1      A      It appears to be a license agreement      04:54:03
2   between Implicit and Microsoft.
3      Q      What were the Microsoft products accused
4   of infringing Implicit's patents at the time of
5   this license?      04:54:14
6         MR. HOSIE:   Excuse me.   Let me object
7   that this is not, in fact, an authentic copy of a
8   final Microsoft agreement.   I can see it's
9   captioned Exhibit A on the top.   So it's a document
10  fragment.      04:54:42
11        MR. McPHIE:   Maybe we can identify --
12  well, let's discuss this off line, why don't we.
13        MR. HOSIE:   Sure.   And the question
14  pending?
15  BY MR. McPHIE:      04:54:59
16     Q      What were the Microsoft products accused
17  of infringing Implicit's patents at the time of
18  this license?
19     A      I believe we filed a complaint against
20  Windows Server and WFP, which is the Windows      04:55:14
21  filtering platform.
22     Q      Anything else?
23     A      Actually, I'm sorry, it wasn't Windows
24  Server, it was asp.net.   So we accused asp.net and
25  we accused Windows filtering platform.      04:55:49

CONFIDENTIAL

Page 536

1    Q     Were there any other Microsoft products        04:55:54
2  accused of infringing Implicit's patents?
3    A     I don't believe so.
4    Q     126 is the license between NVIDIA and
5  Implicit, correct?                                      04:56:14
6    A     That's correct.  This doesn't seem to be
7  a final licensing agreement, though.
8         MR. HOSIE:  Again, I would ask that the
9  witness read the document before answering
10 questions about it.                                     04:56:28
11        THE WITNESS:  I understand.  So, no, this
12 is not a licensing agreement between Implicit and
13 NVIDIA.
14 BY MR. McPHIE:
15   Q     Is that your signature on page 9?               04:56:36
16   A     It is.  But as you can see, it's not an
17 executed license agreement.  There's no NVIDIA
18 signature.  There's no date on the front of it.  So
19 it's not a final executed copy.
20   Q     Well, you executed it, right?                   04:57:00
21   A     I've signed this version of it.  I don't
22 know if there was a version after this.  That
23 happens often.  But I'm just stating that this is
24 not a final executed license agreement.
25        MR. HOSIE:  Counsel, will you represent          04:57:14

**Sarnoff**
A VERITEXT COMPANY   |   877.955.3855

CONFIDENTIAL

Page 537

1  on the record that this is the final,                    04:57:16

2  fully-executed license agreement?

3          MR. McPHIE:  I would hope that between

4  the two of you, I could get an answer to that.

5          MR. HOSIE:  Well, are you representing        04:57:28

6  that it is?  You're the one who marked it and

7  showed it to this witness.

8          MR. McPHIE:  I received from Implicit a

9  document beginning with Bates number IMP094911.

10         If you are now representing that this is     04:57:38

11  not, in fact, a final license agreement, I would

12  ask that the final executed license agreement

13  between NVIDIA and Implicit be produced

14  immediately.

15         MR. HOSIE:  I don't know if it is,           04:57:53

16  Counsel.  You just marked it and showed it.  So I

17  will go back and look at it.

18         But I will note for the record that it

19  appears to be partially executed and undated.  And

20  I will talk to Implicit's counsel at the time and   04:58:04

21  see if this is the final.

22         MR. McPHIE:  Let's get the final

23  versions.  And just to be clear, Juniper would

24  request the final executed copies of all license

25  agreements between Implicit and third parties.      04:58:20

CONFIDENTIAL

Page 538

1   MR. HOSIE:  And this may be such.  I          04:58:23

2   can't tell.  I just do note that it was partially

3   executed.  It wasn't on my watch.

4   BY MR. McPHIE:

5   Q    What were the NVIDIA products accused of     04:58:35

6   infringing Implicit's patents at the time of the

7   NVIDIA license?

8   A    I believe it was NVIDIA's SDK for

9   developing applications that talk directly to their

10  hardware and graphics accelerator and media --     04:58:54

11  media chip set.

12  Q    What was it called?

13  A    It had the initials NV in it, I can

14  remember that, for NVIDIA.  But I don't know the

15  specific name.  It was an SDK that they made        04:59:24

16  available free for developers to build applications

17  that were accelerated on the NVIDIA chip set.

18  Q    Are there documents or other information

19  available to Implicit that would allow you to

20  provide a definitive answer to that question?      04:59:39

21  A    Possibly.  I don't know offhand.  I would

22  have to go back and look.

23  Q    But you believe it's likely that this

24  information is available to Implicit, correct?

25  MR. HOSIE:  Objection.  Mischaracterizes    04:59:59

CONFIDENTIAL

Page 539

1    the testimony.                                    05:00:00

2           THE WITNESS:  I didn't say it was likely.

3    I said it's possible that there's information that

4    would help me remember what the spec name of the

5    SDK that NVIDIA provides with their chips to        05:00:10

6    application developers.

7           I don't remember the name.  There might

8    be documentation on the web or elsewhere that I

9    could look at to remember.

10   BY MR. McPHIE:                                     05:00:22

11       Q     Exhibit 127 is a patent license between

12   Implicit and Oracle, correct?

13       A     It appears to be a fully-executed license

14   agreement between Implicit and Oracle.

15       Q     What were the Oracle products accused of  05:00:49

16   infringing Implicit's patents at the time of this

17   license?

18       A     It would be the Oracle web application

19   server.  You're going to ask me the name of it, and

20   I'm trying to remember the name.  It was their      05:01:11

21   product that competes with IBM's web application

22   server that competes with Sun's ASP and Microsoft's

23   asp.net.  I don't remember the specific trade name,

24   but that's basically what the product was.

25       Q     Exhibit 128 is the license agreement      05:01:37



CONFIDENTIAL

Page 540

1    between Implicit and Palm, correct?                    05:01:43

2         A    That's correct.

3         Q    What were the Palm products accused of

4    infringing Implicit's patents at the time of this

5    license?                                               05:02:17

6              MR. HOSIE:   Objection.  Lacks foundation.

7    Patents plural.

8              THE WITNESS:  So we accused them of

9    infringing a single patent, the '349 patent, direct

10   manipulation of displayed content.  And their          05:02:32

11   product was the Palm OS.

12   BY MR. McPHIE:

13        Q    Exhibit 129 is the license agreement

14   between Implicit and RMI, correct?

15        A    It's more than that.  It includes a U.S.      05:03:35

16   District Court Western District of Washington

17   Seattle division Stipulated Motion for Dismissal of

18   RMI with Prejudice and Proposed Order stapled

19   on -- I guess that's the exhibit to it.

20        Q    Is Exhibit 129 the license agreement          05:04:03

21   between RMI and Implicit?

22        A    I apologize.  I didn't realize that was

23   an exhibit to this license agreement.

24             It appears to be a license agreement

25   between Implicit and RMI.                               05:04:29

CONFIDENTIAL

Page 541

1    Q     What are the RMI products that were        05:04:31

2  accused of infringing Implicit's patents at the

3  time of this license?

4    A     RMI had purchased a chip set from AMD

5  that included a media framework.  And that media    05:04:47

6  framework is what we accused.

7         UMF, I believe, is what the name of it

8  was.  I don't remember what that stood for.  But it

9  was a media framework for their AU1200 chip set,

10  which they renamed when they bought it from AMD.    05:05:19

11  So the name is probably different now.

12    Q     Anything else?

13    A     I don't think so.

14    Q     Exhibit 130 is a license agreement

15  between SAP and Implicit, correct?                  05:05:44

16    A     It doesn't seem to be dated, but it does

17  seem to be fully executed.

18    Q     Exhibit 130 is a license agreement

19  between SAP and Implicit, correct?

20    A     It is an undated, signed-by-both-parties    05:06:05

21  document that could very well be the final

22  fully-executed patent license and settlement

23  agreement between SAP and Implicit.

24         MR. McPHIE:  I will reiterate my request

25  for copies of all final and executed license       05:06:20

CONFIDENTIAL

Page 542

1   agreements.                                    05:06:25
2           MR. HOSIE:  I can represent that this is
3   the final and executed license agreement, and it's
4   dated on page 42.
5           MR. McPHIE:  Thank you.                05:06:35
6       Q   What were the SAP products accused of
7   infringing Implicit's patents at the time of this
8   license?
9       A   It would be SAP's web application server.
10      Q   Anything else?                         05:06:51
11      A   I don't believe so.
12      Q   I think this is the last one, correct?
13      A   131 is my final document in front of me.
14          MR. HOSIE:  Excuse me.  Last one in the
15  stack?                                         05:07:08
16          MR. McPHIE:  Last one in the stack.
17          MR. HOSIE:  Thank you.
18          MR. McPHIE:  I wasn't attempting anything
19  tricky with that question.
20          MR. HOSIE:  How uncharacteristic of you.  05:07:15
21          MR. McPHIE:  I was trying to generate
22  some enthusiasm here for getting through them all.
23          MR. HOSIE:  We appreciate the effort,
24  sir.
25

CONFIDENTIAL

Page 543

 1    BY MR. McPHIE:                                    05:07:26
 2        Q    Exhibit 131 is a license agreement
 3    between Implicit and Sybase, correct?
 4        A    It does appear to be a fully-executed
 5    license agreement between Sybase and Implicit    05:07:47
 6    Networks.
 7        Q    What are the Sybase products -- well,
 8    withdrawn.
 9             What were the Sybase products accused of
10    infringing Implicit's patents at the time of this  05:07:57
11    license?
12        A    It would be Sybase's web application
13    server.
14        Q    Anything else?
15        A    I don't believe so.                     05:08:10
16             MR. HOSIE:  Counsel, it is now after
17    5:00.
18             Is this a good time to break for the day?
19             MR. McPHIE:  We can break for today.
20    Have you been able to identify available dates for  05:08:45
21    us to continue the 30(b)(6) deposition of Implicit?
22             MR. HOSIE:  We have not.  We will
23    continue to work toward that.  I have under
24    advisement for your request for four additional
25    days.  And I think it makes sense for all the     05:08:59

CONFIDENTIAL

Page 544

```
 1     lawyers to have a deposition scheduling call given    05:09:03

 2     the number of parties that have to be involved in

 3     the continuation and conclusion of the 30(b)(6),

 4     the scheduling and continuation of the individual

 5     30(b)(6) on behalf of HP, F5 and Juniper and the      05:09:15

 6     conclusion of the witness' deposition in his

 7     percipient capacity, as a fact witness.

 8               MR. McPHIE:  To be perfectly clear, what

 9     we indicated was it was possible we could get

10     through the remaining individual Juniper topics,      05:09:34

11     individual F5 topics, individual HP topics and the

12     remaining topics and subjects for the -- what we've

13     been calling the common topics, as well as

14     individual questions for the three defendants,

15     within four days possibly, and reserving a fifth      05:09:53

16     day is what we requested, should it prove

17     necessary.

18               What we would ask is that you provide us

19     those dates by tomorrow, if possible.  Simply

20     because, as you indicated, we're getting pretty       05:10:12

21     late in the discovery period.  And once we get

22     these remaining dates in place, I think that will

23     significantly simplify the remaining scheduling

24     issues.

25               MR. HOSIE:  If I might, since you have       05:10:28
```

Sarnoff™

A VERITEXT COMPANY

877.955.3855

Highly Confidential - Attorneys' Eyes Only

```
 1    fair in January 1997.                              09:23:32

 2        A    Yes.                                      09:23:37

 3        Q    Is this the session that we saw a press release   09:23:38

 4    for in our earlier deposition?                     09:23:46

 5        A    As I mentioned, that press release was marketing   09:23:49

 6    hyperbole.  So, no, this session is what it says it was.   09:23:56

 7    We had a recruiting fair at the Four Seasons Hotel.  The   09:24:00

 8    press release talked about industry pundits and media   09:24:05

 9    people of which no one was present.  So, no, the press   09:24:09

10    release did not describe this.  This was a recruiting   09:24:14

11    fair.                                              09:24:18

12        Q    Were there -- were there two separate events that   09:24:18

13    happened in January 1997?                          09:24:22

14             MR. HOSIE:  Objection.  Asked and answered.   09:24:23

15    BY MR. McPHIE:                                      09:24:23

16        Q    Excuse me.                                09:24:25

17        A    Two separate events?                      09:24:26

18        Q    One a recruiting fair, and one the event described   09:24:28

19    in the press release.                              09:24:31

20        A    No, as I mentioned when you asked me about the   09:24:32

21    press release last time, that never happened.  There were   09:24:35

22    no -- there was no event at the Four Seasons that media   09:24:38

23    pundits were invited to or industry people.  The only   09:24:41

24    people that were invited were people that I was recruiting   09:24:45

25    who were all there under NDA.                      09:24:48
```

Page 561

Highly Confidential - Attorneys' Eyes Only

```
 1     Q     Who are the top Ph.D. graduates in computer      09:24:50

 2   science and engineering from across the country, referred  09:24:54

 3   to in Exhibit 132?                                        09:25:00

 4     A     I don't remember their names specifically.  They  09:25:02

 5   were students that I recruited from various universities. 09:25:06

 6     Q     There's a statement, "First prototypes of Portal  09:25:10

 7   ('163) are up and running by summer of 1997."  You see    09:25:18

 8   that there?                                               09:25:23

 9     A     I do.                                             09:25:23

10     Q     Was the first embodiment of the '163 patent up and 09:25:24

11   running by summer of 1997?                                09:25:29

12     A     As we stated in our interrogatory responses, the  09:25:32

13   reduction to practice wasn't until '98 that we had all the 09:25:37

14   elements of the patent, all the claim elements reduced to 09:25:41

15   practice.  So we had a prototype up and running, but it   09:25:46

16   didn't embody all of the elements of the claim.           09:25:49

17     Q     Which elements were missing as of the summer of   09:25:51

18   1997 in the Portal prototype?                             09:25:55

19     A     I don't remember.  It was a prototype, so a lot of 09:25:57

20   the ideas that we had conceived were being held together  09:26:05

21   with duct tape at that point.                             09:26:09

22     Q     What do you mean, "held together with duct tape"? 09:26:10

23     A     When you develop a system as complex as this was, 09:26:15

24   oftentimes you don't have all the pieces working, so you  09:26:19

25   fake it -- or not fake it, but you create scaffolding so  09:26:24
```

Page 562

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | that you can get to that part of the building later. | 09:26:29 |
| 2 | Q    And that is what you had in the summer of 1997? | 09:26:34 |
| 3 | MR. HOSIE:  Objection.  Asked and answered. | 09:26:37 |
| 4 | THE WITNESS:  The definition of the word | 09:26:39 |
| 5 | "prototype" is essentially that it is not fully | 09:26:42 |
| 6 | functional, so yes, we had a prototype of Portal up and | 09:26:45 |
| 7 | running by the summer of '97. | 09:26:48 |
| 8 | BY MR. McPHIE: | 09:26:50 |
| 9 | Q    If you turn to the next page, there's a statement, | 09:26:52 |
| 10 | "BeComm secures the Intel Tablet contract." | 09:26:58 |
| 11 | A    Yes. | 09:27:02 |
| 12 | Q    And this is under "January 2000 - 2001." | 09:27:02 |
| 13 | A    I see it. | 09:27:07 |
| 14 | Q    The Intel Tablet was, in fact, never released; | 09:27:08 |
| 15 | correct? | 09:27:13 |
| 16 | MR. HOSIE:  Objection.  Asked and answered. | 09:27:13 |
| 17 | THE WITNESS:  As I stated when you asked me that | 09:27:17 |
| 18 | question previously, approximately 3,000 of the Tablet | 09:27:19 |
| 19 | devices were manufactured.  I don't know what happened to | 09:27:24 |
| 20 | them at that point.  I don't know if they were put on | 09:27:27 |
| 21 | store shelves or not.  I assume they were not. | 09:27:31 |
| 22 | BY MR. McPHIE: | 09:27:33 |
| 23 | Q    So you do not know whether the Intel Tablet was, | 09:27:37 |
| 24 | in fact, released or not; correct? | 09:27:39 |
| 25 | MR. HOSIE:  Objection.  Asked and answered. | 09:27:42 |

Page 563

```
 1              THE WITNESS:  Released is a vague term.  Intel    09:27:44

 2    built the Tablet.  Whether end users bought them through    09:27:47

 3    Best Buy, or whatever the retail channels were, I don't     09:27:50

 4    know.                                                       09:27:50

 5    BY MR. McPHIE:                                              09:27:53

 6        Q    So sitting here today, you cannot say whether the  09:27:53

 7    Intel Tablet was, in fact, released?                        09:27:56

 8              MR. HOSIE:  Objection.                            09:27:58

 9    BY MR. McPHIE:                                              09:27:58

10        Q    Correct?                                           09:27:59

11              MR. HOSIE:  Objection.  Asked and answered.       09:27:59

12              THE WITNESS:  I don't know what you mean by       09:28:00

13    "released."                                                 09:28:02

14    BY MR. McPHIE:                                              09:28:04

15        Q    There is an image of a -- it appears to be a check 09:28:08

16    on this slide.  Do you see that there?                     09:28:13

17        A    I do.                                              09:28:16

18        Q    What is that check?                               09:28:17

19        A    It's hard to tell from this image, but I'm        09:28:18

20    assuming that is the check that Intel wrote us for the NRE  09:28:24

21    portion of the Tablet contract.                            09:28:28

22        Q    And what was the amount of the check?             09:28:31

23        A    I don't remember exactly.  I'd have to look at the 09:28:34

24    actual photograph of the original check.                   09:28:39

25        Q    And just to be clear, when you say "NRE," what do  09:28:41
```

Page 564

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | you mean? | 09:28:44 |
| 2 | A    The nonrecurring engineering portion. | 09:28:45 |
| 3 | Q    There's a statement that BeComm had a partnership | 09:28:47 |
| 4 | in place with Wind River.  Do you see that? | 09:28:52 |
| 5 | A    I do. | 09:28:55 |
| 6 | Q    What was the nature of your partnership with Wind | 09:28:56 |
| 7 | River? | 09:29:00 |
| 8 | A    Wind River developed the VxWorks -- V-x, the | 09:29:00 |
| 9 | letters, Works -- operating system that was actually | 09:29:07 |
| 10 | running on the Tablet, and we worked with them to port | 09:29:10 |
| 11 | Portal so it would run on top of VxWorks.  And we agreed | 09:29:14 |
| 12 | with them that we would jointly pursue customer | 09:29:19 |
| 13 | opportunities where VxWorks was the operating system of | 09:29:25 |
| 14 | choice and Portal would be the communication and | 09:29:28 |
| 15 | networking stack. | 09:29:32 |
| 16 | Q    Did you do any other projects with Wind River? | 09:29:37 |
| 17 | MR. HOSIE:  Objection.  Vague as to time. | 09:29:41 |
| 18 | THE WITNESS:  If you mean projects as in the Intel | 09:29:43 |
| 19 | Tablet, no, we did not do any other commercial -- nothing | 09:29:46 |
| 20 | went as far as the Intel Tablet.  That was our most -- I | 09:29:51 |
| 21 | don't want to use the word "successful" because it didn't | 09:29:55 |
| 22 | end up becoming a product you could go buy in the store, | 09:29:58 |
| 23 | but we didn't go that far with them, no. | 09:30:02 |
| 24 | BY MR. McPHIE: | 09:30:05 |
| 25 | Q    Did you receive revenue from Wind River? | 09:30:05 |

Page 565

| | | |
|---|---|---|
| 1 | A     No, they were a partner, not a customer. | 09:30:12 |
| 2 | Q     Did you have a partnership in place with Frog, a | 09:30:14 |
| 3 | company called Frog? | 09:30:21 |
| 4 | A     We had an informal partnership.  We, right around | 09:30:22 |
| 5 | 2001, decided that it would be best for the company to | 09:30:30 |
| 6 | actually develop its own line of consumer appliances | 09:30:33 |
| 7 | instead of relying on somewhat fickle companies, such as | 09:30:39 |
| 8 | Intel, so we designed a suite of devices, including a | 09:30:42 |
| 9 | gateway, a Tablet, a smart stereo and a smart TV all based | 09:30:47 |
| 10 | on our software, and Frog Design did the industrial design | 09:30:55 |
| 11 | for the hardware.  And it was our goal to allow OEMs to | 09:30:58 |
| 12 | buy the entire solution from us, including the hardware | 09:31:02 |
| 13 | design, and Frog Design would provide customization of the | 09:31:06 |
| 14 | plastic, if you will, for the box. | 09:31:12 |
| 15 | Q     So -- well, withdrawn. | 09:31:18 |
| 16 | Were any products actually manufactured as a | 09:31:22 |
| 17 | result of Implicit's partnership with Frog? | 09:31:27 |
| 18 | A     Frog built the devices that I just explained to | 09:31:32 |
| 19 | you.  We worked with them to actually fabricate the | 09:31:34 |
| 20 | plastic models and develop prototypes, but they were done | 09:31:38 |
| 21 | under a commission.  We paid for that, so they were not a | 09:31:41 |
| 22 | partner.  They were a vendor to us. | 09:31:46 |
| 23 | Q     And these products, made in partnership with Frog, | 09:31:51 |
| 24 | were they actual functioning products or were they models | 09:31:55 |
| 25 | essentially made out of plastic, as you said? | 09:32:01 |

Page 566

Highly Confidential - Attorneys' Eyes Only

```
 1      A      Both.  We had plastic models that looked like the      09:32:03

 2   end product would look and then we had functioning              09:32:06

 3   products that did not look like the end product looked.         09:32:09

 4      Q      Did you ever have any functioning products that       09:32:13

 5   had the appearance as designed by Frog?                         09:32:18

 6      A      Certainly we had things that had the appearance       09:32:26

 7   but not the actual plastic that Frog designed.                  09:32:27

 8      Q      Did any of these products made in partnership with    09:32:31

 9   Frog make it to market?                                         09:32:34

10      A      And just to be clear, we paid Frog Design, so they    09:32:38

11   did not do this on their own nickel.  So they were a           09:32:41

12   vendor under contract by us.  And no, none of those            09:32:44

13   products -- we were not successful in selling those            09:32:48

14   products.                                                       09:32:52

15      Q      Did Implicit have a partnership with DLink in         09:32:52

16   2000, 2001?                                                     09:32:57

17      A      DLink was interested in our communications            09:33:00

18   stack -- I say stack synonymously with operating system --     09:33:04

19   and was looking at opportunities to develop gateways for       09:33:09

20   their customers using our software, so the partnership.        09:33:14

21   They were also looking at building handheld devices such       09:33:18

22   as portable media players.  So given that they are an          09:33:22

23   ODM -- which means they're an original device                  09:33:26

24   manufacturer.  They create devices that don't have their       09:33:29

25   name on them, on behalf of other customers -- they, like       09:33:31
```

Page 567

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | other Asian manufacturers, would look for software that | 09:33:38 |
| 2 | they could use to create additional value in their | 09:33:43 |
| 3 | designs, and that was the extent of our partnership. | 09:33:46 |
| 4 | Q    Were any products made or designed as a result of | 09:33:51 |
| 5 | your partnership with DLink? | 09:33:55 |
| 6 | A    I believe they made a prototype portable media | 09:33:57 |
| 7 | player, probably using an Intel processor and the VxWorks | 09:34:02 |
| 8 | operating system.  I don't remember for sure, but they | 09:34:07 |
| 9 | never sold anything using our software. | 09:34:09 |
| 10 | Q    Did you receive any money from DLink as a result | 09:34:12 |
| 11 | of this partnership? | 09:34:16 |
| 12 | A    I don't believe so.  We might have received a | 09:34:18 |
| 13 | little bit of co-marketing for an event that they | 09:34:22 |
| 14 | produced, but I can't remember. | 09:34:28 |
| 15 | Q    When you say "a little bit," can you estimate the | 09:34:29 |
| 16 | amount? | 09:34:34 |
| 17 | A    It would have been a few thousand. | 09:34:34 |
| 18 | Q    Who was your main contact at DLink? | 09:34:39 |
| 19 | A    I don't remember. | 09:34:41 |
| 20 | Q    Who was Implicit's main contact at Frog? | 09:34:47 |
| 21 | A    It was somebody in business development.  I can't | 09:34:51 |
| 22 | remember his name.  And then also somebody in the design | 09:35:01 |
| 23 | group who actually ran the design team, and I don't | 09:35:04 |
| 24 | remember his name. | 09:35:06 |
| 25 | Q    Who was Implicit's main contact at Wind River? | 09:35:07 |

Page 568

| | | |
|---|---|---|
| 1 | A   I believe that was Chris Perrot.  I think that was | 09:35:10 |
| 2 | his name. | 09:35:22 |
| 3 | Q   In 2000 to 2001, BeComm also had a partnership | 09:35:22 |
| 4 | with Go-Video; correct? | 09:35:29 |
| 5 | A   That's right. | 09:35:31 |
| 6 | Q   What was the nature of your partnership with | 09:35:33 |
| 7 | Go-Video? | 09:35:37 |
| 8 | A   Go-Video was trying to develop a media player with | 09:35:38 |
| 9 | a full ecosystem, including digital rights management and | 09:35:51 |
| 10 | a catalog service, so you could pick movies to play on | 09:36:01 |
| 11 | your media player, as well as music.  So they were | 09:36:04 |
| 12 | essentially trying to build iTunes, and they were | 09:36:08 |
| 13 | interested in using our software to develop that.  They | 09:36:10 |
| 14 | were underfunded and were unable to actually see their | 09:36:14 |
| 15 | vision realized. | 09:36:16 |
| 16 | Q   Were any products made as a result of your | 09:36:21 |
| 17 | partnership with Go-Video? | 09:36:24 |
| 18 | A   No. | 09:36:25 |
| 19 | Q   Did you make any money from Go-Video as a result | 09:36:28 |
| 20 | of your partnership with them? | 09:36:32 |
| 21 | A   No. | 09:36:34 |
| 22 | Q   BeComm had a partnership with Sprint in the | 09:36:35 |
| 23 | 2000-2001 time frame? | 09:36:43 |
| 24 | A   Our relationship with Sprint was exactly as I | 09:36:45 |
| 25 | described before.  They had various groups evaluating our | 09:36:51 |

Page 569

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | software for -- primarily from the perspective of their | 09:36:54 |
| 2 | labs group, and one of the groups internally there in 2000 | 09:37:02 |
| 3 | was interested in using our software for a headend gateway | 09:37:06 |
| 4 | for the home.  And our relationship with them was really | 09:37:10 |
| 5 | to try to evaluate how we could convince the business | 09:37:15 |
| 6 | units to use what they were trying to develop along with | 09:37:18 |
| 7 | our software.  So it was more of an internal sales effort | 09:37:23 |
| 8 | than it was an external sales effort. | 09:37:26 |
| 9 | Q    Were your efforts with Sprint regarding headend | 09:37:28 |
| 10 | gateways successful? | 09:37:32 |
| 11 | MR. HOSIE:  Objection.  Vague and ambiguous. | 09:37:34 |
| 12 | THE WITNESS:  We learned a lot about the home | 09:37:36 |
| 13 | networking goals that companies like Sprint would have. | 09:37:40 |
| 14 | We learned a lot about how to build and design a gateway, | 09:37:44 |
| 15 | which we wouldn't have received that kind of knowledge if | 09:37:48 |
| 16 | we hadn't had that relationship with them.  So in that | 09:37:52 |
| 17 | respect, it was successful.  They are not the type of | 09:37:54 |
| 18 | company that was going to do anything speculative, so the | 09:37:57 |
| 19 | odds of them shipping anything were relatively slim.  So | 09:38:01 |
| 20 | we didn't have any aspiration of them actually building | 09:38:06 |
| 21 | anything with our product.  For us, it was more of a | 09:38:10 |
| 22 | business development opportunity.  So in that respect, | 09:38:12 |
| 23 | yes, I do think it was successful. | 09:38:15 |
| 24 | BY MR. McPHIE: | 09:38:17 |
| 25 | Q    There was no product that was ever built or that | 09:38:17 |

Page 570

| | | |
|---|---|---|
| 1 | shipped as a result of this partnership with Sprint for | 09:38:20 |
| 2 | the headend gateway; correct? | 09:38:25 |
| 3 | A    That's correct. | 09:38:28 |
| 4 | Q    Did you receive any money from Sprint as a result | 09:38:38 |
| 5 | of this project? | 09:38:40 |
| 6 | A    No. | 09:38:41 |
| 7 | Q    Was there any agreement with Sprint, a written | 09:38:41 |
| 8 | contract, reflecting this partnership? | 09:38:51 |
| 9 | A    I don't believe so. | 09:38:53 |
| 10 | Q    Was there any written agreement reflecting the | 09:38:57 |
| 11 | partnership between Implicit and Go-Video? | 09:39:03 |
| 12 | A    Outside of a nondisclosure agreement and effort by | 09:39:09 |
| 13 | them and us jointly to pursue common customers, no. | 09:39:13 |
| 14 | Q    Were there written agreements reflecting | 09:39:20 |
| 15 | Implicit's partnership with any of the companies listed | 09:39:22 |
| 16 | here under January 2000 to 2001? | 09:39:26 |
| 17 | A    Well, all of them signed nondisclosure agreements | 09:39:29 |
| 18 | and all of them signed licensing agreements which allowed | 09:39:33 |
| 19 | them to evaluate our technology in-house.  So there | 09:39:37 |
| 20 | were -- there were definitely agreements in place, but the | 09:39:41 |
| 21 | goal of our arrangements with them was to find common | 09:39:44 |
| 22 | customers, and until we closed on a common customer, there | 09:39:49 |
| 23 | wouldn't be an agreement.  The agreement would be specific | 09:39:54 |
| 24 | to a customer.  So they had, in each case, an agreement | 09:39:56 |
| 25 | that allowed them to evaluate, test, and develop to our | 09:39:59 |

Page 571

| | | |
|---|---|---|
| 1 | software platform, and that was as far as we would ever | 09:40:05 |
| 2 | take an agreement in a partnership. | 09:40:09 |
| 3 | Q    In 2000 to 2001, Implicit had a partnership with | 09:40:14 |
| 4 | RealNetworks; correct? | 09:40:18 |
| 5 | A    That's correct. | 09:40:19 |
| 6 | Q    What was the nature of that partnership? | 09:40:21 |
| 7 | A    Well, it started with the Intel Tablet because we | 09:40:23 |
| 8 | required the use of a Real codec on the PC, and Real's SDK | 09:40:28 |
| 9 | to convert the real audio stream into PCM, which we were | 09:40:36 |
| 10 | then compressing and sending to the Tablet.  So we had an | 09:40:41 |
| 11 | agreement in place with them to use their SDK.  We had an | 09:40:44 |
| 12 | agreement in place with them that allowed us to use their | 09:40:47 |
| 13 | SDK in the software package that we subsequently delivered | 09:40:52 |
| 14 | to Intel.  We also had discussions with them about jointly | 09:40:57 |
| 15 | pursuing customers.  There was some degree of | 09:41:00 |
| 16 | competitiveness between the two companies, so that was the | 09:41:08 |
| 17 | extent of the agreement between RealNetworks and Implicit. | 09:41:11 |
| 18 | Q    And when you say "competitiveness between the two | 09:41:15 |
| 19 | companies," you mean competitiveness between RealNetworks | 09:41:20 |
| 20 | and Implicit; correct? | 09:41:23 |
| 21 | A    Correct. | 09:41:25 |
| 22 | Q    Did Implicit ever build a product as a result of | 09:41:26 |
| 23 | its partnership with RealNetworks? | 09:41:33 |
| 24 | A    As I mentioned, we delivered a software stack to | 09:41:35 |
| 25 | Intel for the PC and for the Intel Tablet that included | 09:41:39 |

Page 572

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | the RealNetworks SDK, and that was a result of our | 09:41:42 |
| 2 | agreement with them. | 09:41:47 |
| 3 | Q    Was there any other product built as a result of | 09:41:48 |
| 4 | Implicit's partnership with RealNetworks other than the | 09:41:51 |
| 5 | Intel Tablet? | 09:41:55 |
| 6 | A    If, by "product," you mean something that shipped, | 09:41:56 |
| 7 | no. | 09:41:59 |
| 8 | Q    Implicit had a partnership with a company called | 09:42:01 |
| 9 | Bsquare in the 2000 to 2001 time frame; correct? | 09:42:08 |
| 10 | A    That's correct. | 09:42:11 |
| 11 | Q    What was the nature of Implicit's partnership with | 09:42:12 |
| 12 | Bsquare? | 09:42:16 |
| 13 | A    Bsquare was a Windows CE, which was Microsoft's | 09:42:17 |
| 14 | embedded operating system at the time.  They were a | 09:42:24 |
| 15 | Windows CE preferred developer.  So companies that wanted | 09:42:26 |
| 16 | to develop devices using Windows CE would hire Bsquare to | 09:42:31 |
| 17 | optimize Windows for their platform.  Our partnership with | 09:42:37 |
| 18 | them included, obviously, a nondisclosure agreement, a | 09:42:41 |
| 19 | license agreement allowing them to use and evaluate our | 09:42:47 |
| 20 | software internally.  They also partnered with us in | 09:42:50 |
| 21 | porting Portal to Windows CE.  So they helped us get it up | 09:42:55 |
| 22 | and running on Windows CE, and we jointly pursued customer | 09:43:02 |
| 23 | opportunities with Bsquare. | 09:43:06 |
| 24 | Q    Was Portal successfully ported to Windows CE as a | 09:43:08 |
| 25 | result of your partnership with Bsquare? | 09:43:15 |

Page 573

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | A    I wouldn't say as a result of, but it was | 09:43:18 |
| 2 | successfully ported to Windows CE. | 09:43:21 |
| 3 | Q    And why would you not say as a result of? | 09:43:25 |
| 4 | A    They were a participant in it, but they weren't | 09:43:27 |
| 5 | the only reason it happened.  They -- it would have been | 09:43:32 |
| 6 | ported to Windows CE with or without them.  We did the | 09:43:36 |
| 7 | bulk of the work there. | 09:43:41 |
| 8 | Q    Was there any product developed or built as a | 09:43:42 |
| 9 | result of Implicit's partnership with Bsquare? | 09:43:45 |
| 10 | A    Again, if, by "product," you mean something that | 09:43:48 |
| 11 | shipped, no, but we did develop our PDK which was the | 09:43:51 |
| 12 | Portal developer's kit, which included a port to Windows | 09:43:55 |
| 13 | CE.  So you could -- if you had a license agreement with | 09:43:59 |
| 14 | us, we would give you a copy of Portal and the Portal | 09:44:03 |
| 15 | developer kit -- it might have been called the protocol | 09:44:07 |
| 16 | development kit -- that included ports to VxWorks, Windows | 09:44:10 |
| 17 | CE, Windows and Linux.  And that product was designed to | 09:44:14 |
| 18 | allow independent software vendors, ISVs, to develop | 09:44:17 |
| 19 | custom applications using Portal. | 09:44:24 |
| 20 | Q    How much money did Implicit receive as a result of | 09:44:26 |
| 21 | its partnership with Bsquare? | 09:44:29 |
| 22 | A    The nature of these partnerships was not a | 09:44:31 |
| 23 | transaction of money.  That's why they're a partnership | 09:44:37 |
| 24 | and not a customer.  So none of these have any revenue | 09:44:41 |
| 25 | associated with them. | 09:44:46 |

Page 574

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | Q     So none of the partners listed in Exhibit 132, | 09:44:50 |
| 2 | under "January 2000 - 2001," had any revenue associated | 09:44:56 |
| 3 | with them; correct? | 09:45:01 |
| 4 | MR. HOSIE:  Objection.  Asked and answered. | 09:45:02 |
| 5 | THE WITNESS:  The partnerships were all focused on | 09:45:04 |
| 6 | using our software to find joint customers.  At that time, | 09:45:07 |
| 7 | which was probably the worst time in the history of | 09:45:10 |
| 8 | consumer electronics to go and find customers, we had a | 09:45:13 |
| 9 | significant array of companies out there looking for | 09:45:17 |
| 10 | customers.  And the goal was to use our software to build | 09:45:20 |
| 11 | solutions for those customers using whatever product these | 09:45:23 |
| 12 | vendors could bring to the table.  In the case of Wind | 09:45:27 |
| 13 | River, it was the VxWorks operating system; in the case of | 09:45:33 |
| 14 | Frog Design, it was plastics and industrial design.  In | 09:45:34 |
| 15 | the case of DLink, it was their ODM manufacturing; in the | 09:45:36 |
| 16 | case of Go-Video, it was their handheld media player; in | 09:45:40 |
| 17 | the case of Sprint, it was their headend and their home | 09:45:44 |
| 18 | gateway, which they would only be able to sell if they -- | 09:45:47 |
| 19 | a provider such as Comcast wanted it.  So, again, that | 09:45:52 |
| 20 | would be a joint partnership to try and go get a customer. | 09:45:55 |
| 21 | RealNetworks was a bit of an oddball because we | 09:45:57 |
| 22 | actually licensed their SDK as part of a solution that we | 09:46:01 |
| 23 | delivered to Intel.  Bsquare, again, was essentially a | 09:46:04 |
| 24 | software vendor that wanted to partner with us to go and | 09:46:11 |
| 25 | find joint customers.  And Comcast, I'm sure you have | 09:46:14 |

Page 575

| | | |
|---|---|---|
| 1 | questions, so I'll defer that to your questions. | 09:46:18 |
| 2 | BY MR. McPHIE: | 09:46:20 |
| 3 | Q   And, in fact, Implicit did not receive any revenue | 09:46:20 |
| 4 | as a result of its partnerships with the companies listed | 09:46:24 |
| 5 | in Exhibit 132 under "January 2000 - 2001"; correct? | 09:46:27 |
| 6 | MR. HOSIE:  Objection.  Asked and answered. | 09:46:33 |
| 7 | THE WITNESS:  No, that's not true.  Our | 09:46:35 |
| 8 | partnership with Wind River resulted in revenue that we | 09:46:38 |
| 9 | received from Intel.  They -- without them, it would have | 09:46:40 |
| 10 | been impossible for us to deliver the Wind River Tab- -- | 09:46:43 |
| 11 | of the Intel Tablet.  They were also instrumental in | 09:46:47 |
| 12 | getting us the second contract with Intel with the | 09:46:50 |
| 13 | consumer division that was a much more lucrative contract. | 09:46:53 |
| 14 | Our relationship with RealNetworks also allowed us to | 09:46:56 |
| 15 | provide a solution for the Intel Tablet.  Our relationship | 09:47:03 |
| 16 | with Wind River and Bsquare was instrumental in us getting | 09:47:07 |
| 17 | a contract with Thomson Multimedia.  In both those cases, | 09:47:13 |
| 18 | an operating system is required.  So we definitely | 09:47:18 |
| 19 | benefited from those partnerships. | 09:47:22 |
| 20 | BY MR. McPHIE: | 09:47:24 |
| 21 | Q   How much revenue did Implicit receive in the | 09:47:24 |
| 22 | January 2000 to 2001 time frame as a result of its | 09:47:30 |
| 23 | partnerships with the companies listed here in Exhibit | 09:47:36 |
| 24 | 132? | 09:47:41 |
| 25 | A   I don't know the exact number.  I believe we've | 09:47:41 |

Page 576

Highly Confidential - Attorneys' Eyes Only

```
 1    produced all the revenue that we've received.  All of the    09:47:50

 2    revenue that we received in that time frame was the result    09:47:53

 3    of these partnerships, so if you just look at our books       09:47:56

 4    from 2000 to 2001 or whatever we produced to you, any         09:47:59

 5    revenue that we got, we got through these partners.           09:48:02

 6        Q    Who is Implicit's contact at RealNetworks?           09:48:06

 7        A    I don't remember.                                    09:48:14

 8        Q    Who was Implicit's contact at Bsquare?               09:48:15

 9        A    The CEO of Bsquare, Bill Baxter.                     09:48:20

10        Q    What was the nature of BeComm's partnership with     09:48:25

11    Comcast?                                                      09:48:33

12        A    Comcast had put out an RFP asking for various        09:48:33

13    vendors to propose a home -- a complete home solution that    09:48:38

14    included a firewall, proxy, gateway, media management, and    09:48:43

15    security appliance, if you will, and we, in partnership       09:48:51

16    with Wind River, responded to that RFP and proposed a         09:48:56

17    solution that combined Wind River's operating system as       09:49:04

18    the embedded OS with our operating system on top of it as     09:49:09

19    the media networking and communication stack.                09:49:14

20        Q    And is that what is referred to a little further     09:49:19

21    down on the page where it says, "BeComm develops an           09:49:22

22    integrated gateway solution for Comcast"?                     09:49:26

23        A    Yes.                                                 09:49:30

24        Q    What did Comcast ultimately do with the integrated   09:49:34

25    gateway solution that Implicit developed?                     09:49:37
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

Highly Confidential - Attorneys' Eyes Only

```
 1      A    They tested it.  So as with any of these very big    09:49:41

 2    MSOs -- MSO meaning multiple service operator, or           09:49:48

 3    multiservice operator -- they put it through exhaustive      09:49:52

 4    and tedious tests that typically go on for a very long       09:49:58

 5    time.  So they tested it in-house, and that was the extent   09:50:05

 6    of which they used it.                                       09:50:10

 7      Q    Was the integrated gateway solution that Implicit     09:50:11

 8    developed for Comcast ever released to the public?           09:50:16

 9      A    No.                                                   09:50:20

10      Q    Going to the next page, there is a subtitle "2002     09:50:21

11    - 2006."  You see that there?                                09:50:36

12      A    I do.                                                 09:50:38

13      Q    Did BeComm consult for AMD from 2002 to 2006?         09:50:38

14      A    We -- by "consult," what we mean there is they        09:50:45

15    hired us under contract to port our operating system to      09:50:53

16    the Au1200 chipset, and they paid us for that work.          09:50:58

17      Q    How much did AMD pay Implicit for that work?          09:51:04

18      A    I don't remember the exact number, but it was         09:51:06

19    hundreds of thousands, somewhere in that range.              09:51:11

20      Q    Other than porting your operating system to an AMD    09:51:14

21    chipset, did you do any other projects for AMD?              09:51:24

22      A    We developed a complete media player solution,        09:51:27

23    including a user interface, a content synchronization        09:51:30

24    system, and movie, music and photo playback environment      09:51:36

25    that included the ability to connect with various home       09:51:43
```

Page 578

Highly Confidential - Attorneys' Eyes Only

```
 1   network devices and provide an integrated media experience    09:51:47

 2   for the user.                                                 09:51:51

 3       Q    Were any of the projects developed as a result of   09:51:55

 4   the AMD consultation ever released to the public?             09:52:00

 5       A    I believe AMD provided an SDK that included our      09:52:06

 6   stack as part of a complete solution, including a chipset     09:52:12

 7   to ODMs and OEMs.  AMD was not in the end consumer            09:52:17

 8   business, so they would never sell product direct to a        09:52:23

 9   consumer.  Their job was to sell product to manufacturers.    09:52:26

10   So they did release it.                                       09:52:30

11       Q    Essentially AMD provided an SDK that included        09:52:34

12   Strings; is that right?                                       09:52:39

13       A    And a chipset.                                       09:52:40

14       Q    AMD provided an SDK that included Strings and a      09:52:42

15   chipset; correct?                                             09:52:49

16       A    AMD sells a chipset, and they provide an SDK that    09:52:49

17   allows you to build applications on that chipset.             09:52:53

18       Q    Are you aware of any example where an AMD customer   09:52:56

19   used the Strings functionality in the AMD SDK?                09:53:05

20           MR. HOSIE:  I'm sorry, may I have that read back,     09:53:12

21   please.                                                       09:53:14

22           (Record read.)                                        09:53:23

23           THE WITNESS:  If, by "use," you mean did they         09:53:24

24   license the AMD SDK and license our SDK to develop a          09:53:28

25   solution, yes, there were any number of companies that        09:53:33
```

Page 579

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | were looking at the Au1200 as a solution for Portal media | 09:53:36 |
| 2 | players, and they did use our SDK, and they consulted with | 09:53:42 |
| 3 | us for the best way to customize our interface and | 09:53:45 |
| 4 | application for their needs. | 09:53:49 |
| 5 | BY MR. McPHIE: | 09:53:51 |
| 6 | Q    Are you aware of any companies that built a | 09:53:51 |
| 7 | product using the Strings functionality in the AMD | 09:53:56 |
| 8 | chipset? | 09:54:01 |
| 9 | A    If, by "built," you mean did they take the AMD SDK | 09:54:02 |
| 10 | and our SDK and actually develop something internally, | 09:54:07 |
| 11 | yes, there were a few companies that did do that.  If, "by | 09:54:11 |
| 12 | develop," you mean sell it on a store shelf, no.  The | 09:54:17 |
| 13 | nature of our agreement with AMD was that customers could | 09:54:22 |
| 14 | use our SDK, but they had to enter into a separate license | 09:54:24 |
| 15 | agreement with us, if they ever shipped the product.  No | 09:54:27 |
| 16 | products were shipped using the AMD SDK that included | 09:54:31 |
| 17 | Strings. | 09:54:35 |
| 18 | Q    Did BeComm consult for Thomson Multimedia in the | 09:54:40 |
| 19 | 2002-2006 time frame? | 09:54:45 |
| 20 | A    The nature of our consulting with Thomson | 09:54:47 |
| 21 | Multimedia was similar to AMD, except Thomson was the | 09:54:52 |
| 22 | actual end manufacturer of the device.  So they paid us to | 09:54:55 |
| 23 | port Portal to their home gateway solution, and that | 09:54:59 |
| 24 | required us to enable Portal on Linux and then also | 09:55:06 |
| 25 | develop protocols specific to the types of communication | 09:55:11 |

Page 580

| | | |
|---|---|---|
| 1 | that Thomson Multimedia required.  It required us to | 09:55:13 |
| 2 | configure the system, and it also required us to build a | 09:55:17 |
| 3 | user interface that would allow an end user to consume all | 09:55:23 |
| 4 | the different services within the home from a TV that was | 09:55:28 |
| 5 | attached to the Thomson set-top box.  And they paid us to | 09:55:32 |
| 6 | do that porting work, and we had an agreement with them | 09:55:38 |
| 7 | for follow-on sales of the box at the time that they would | 09:55:41 |
| 8 | actually end up selling it. | 09:55:47 |
| 9 | Q    How much money did Implicit receive as a result of | 09:55:48 |
| 10 | its consultation for Thomson Multimedia? | 09:55:54 |
| 11 | A    I don't remember the exact number, but it was | 09:55:57 |
| 12 | hundreds of thousands, in that range. | 09:56:02 |
| 13 | Q    Was the set-top box, developed in conjunction with | 09:56:05 |
| 14 | Thomson, ever released to the public? | 09:56:14 |
| 15 | A    No, that group, like all the other groups that we | 09:56:17 |
| 16 | were dealing with, had to cancel their divisions because | 09:56:21 |
| 17 | of the state of the economy, so their product was | 09:56:25 |
| 18 | basically shuttered well after we had completed our | 09:56:29 |
| 19 | portion of the development. | 09:56:35 |
| 20 | Q    And are you aware of any correspondence or other | 09:56:37 |
| 21 | documents indicating that the reason the project was | 09:56:44 |
| 22 | canceled had to do with the state of the economy? | 09:56:46 |
| 23 | MR. HOSIE:  Objection.  Vague, ambiguous, | 09:56:49 |
| 24 | overbroad. | 09:56:52 |
| 25 | THE WITNESS:  What I am aware of is the entire | 09:56:54 |

Page 581

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | division was canceled, as was the case with Intel, as was | 09:56:56 |
| 2 | the case with AMD.  And the reason was that in each of | 09:57:00 |
| 3 | these cases, the CEOs of the companies had to cut any | 09:57:04 |
| 4 | division that was working on speculative consumer | 09:57:11 |
| 5 | electronics devices.  And by "speculative," I mean devices | 09:57:13 |
| 6 | that did not yet have an established market.  None of them | 09:57:17 |
| 7 | had the gumption to try to create a market for new | 09:57:20 |
| 8 | devices. | 09:57:25 |
| 9 | BY MR. McPHIE: | 09:57:30 |
| 10 | Q    What was the nature of Implicit's consultation for | 09:57:30 |
| 11 | Phillips in the 2002-2006 time frame? | 09:57:38 |
| 12 | A    Phillips commissioned us to port Portal to the | 09:57:41 |
| 13 | iPronto Tablet.  They paid us for the porting services and | 09:57:47 |
| 14 | to develop a custom application on top of Portal that | 09:57:54 |
| 15 | allowed the iPronto device to consume music, movies, | 09:57:59 |
| 16 | control devices within the home, and to interact with | 09:58:06 |
| 17 | Portal running on one or more PCs in the home which would | 09:58:12 |
| 18 | essentially create an aggregated library of home media | 09:58:16 |
| 19 | that could be distributed throughout the home. | 09:58:20 |
| 20 | Q    Did Implicit ultimately build a product in | 09:58:37 |
| 21 | connection with its work with Phillips? | 09:58:41 |
| 22 | A    Did Implicit build a product?  Yes.  We delivered | 09:58:45 |
| 23 | a product to Phillips. | 09:58:49 |
| 24 | Q    Was the product that Implicit provided to Phillips | 09:58:51 |
| 25 | ever released to market? | 09:58:57 |

Page 582

Highly Confidential - Attorneys' Eyes Only

```
 1       A    We released it to Phillips, and that was our       09:59:00

 2   market.  So in that sense, yes.  Just as we did with every   09:59:03

 3   other customers, AMD, Intel and Thomson Multimedia.  Our     09:59:07

 4   job was to deliver to them a software package.  Their job    09:59:12

 5   was to combine that software with hardware, and then find    09:59:14

 6   a customer, either an end user or a service provider such    09:59:17

 7   as a cable company or a phone company.  So Phillips did      09:59:21

 8   not end up selling iProntos enabled with Portal, if that's   09:59:26

 9   what you're asking.                                          09:59:31

10       Q    So Phillips never released the Implicit-based       09:59:37

11   product to market; correct?                                 09:59:41

12            MR. HOSIE:  Objection.  Asked and answered.         09:59:42

13            THE WITNESS:  As I said, Phillips did not release   09:59:44

14   an iPronto bundled with Portal to market.                   09:59:46

15   BY MR. McPHIE:                                              09:59:51

16       Q    Who was Implicit's main contact at Phillips?       09:59:51

17       A    I don't remember.                                  09:59:58

18       Q    Who was Implicit's main contact at Thomson         09:59:59

19   Multimedia?                                                 10:00:04

20       A    I believe his name was Greg Lukins.                10:00:04

21       Q    Who was Implicit's main contact at AMD?            10:00:08

22       A    Bob.  That's all I remember.                       10:00:26

23       Q    Going back one page, under "January 2001 - 2002,"  10:00:28

24   there's a statement "Intel consumer division to use Portal  10:00:36

25   (now called Strings) for all consumer devices."             10:00:40
```

Sarnoff, A VERITEXT COMPANY
877-955-3845

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | Do you see that there? | 10:00:46 |
| 2 | A   I do. | 10:00:46 |
| 3 | Q   What are the "all consumer" devices you were | 10:00:47 |
| 4 | referring to there? | 10:00:51 |
| 5 | A   The particular division at Intel that we were | 10:00:52 |
| 6 | working with found out about our work on the Intel Tablet, | 10:00:55 |
| 7 | and engaged us for what was to be Intel's push into the | 10:01:00 |
| 8 | home with Intel-branded consumer devices.  This included | 10:01:07 |
| 9 | PCs that were running Strings, it included end devices | 10:01:12 |
| 10 | such as stereos running Strings and ultimately TVs that | 10:01:17 |
| 11 | would be running Strings, creating an integrated network | 10:01:21 |
| 12 | of media-rich appliances. | 10:01:26 |
| 13 | Q   Were any of the Intel consumer devices you just | 10:01:31 |
| 14 | described actually built? | 10:01:35 |
| 15 | A   We had several of the early versions of the | 10:01:36 |
| 16 | devices in our office as we were developing the solution | 10:01:42 |
| 17 | for Intel so they built them.  They never shipped them | 10:01:45 |
| 18 | because this division, like the Tablet division, was | 10:01:49 |
| 19 | canceled by the CEO of Intel in 2001 due to the company | 10:01:52 |
| 20 | having a massive cutback in spending.  Their stock | 10:02:02 |
| 21 | market -- their stock price had collapsed, as had many | 10:02:06 |
| 22 | other companies, and the September 11th impact | 10:02:10 |
| 23 | precipitated a lot of the cutbacks that we saw.  So no, | 10:02:17 |
| 24 | they did not end up shipping a product using Strings. | 10:02:21 |
| 25 | Q   And, in fact, Intel never shipped any consumer | 10:02:26 |

Page 584

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | device based on Strings; correct? | 10:02:30 |
| 2 | A    Intel -- that division of Intel never shipped a | 10:02:32 |
| 3 | device, period.  The entire division was canceled. | 10:02:38 |
| 4 | Q    And so that's correct? | 10:02:44 |
| 5 | A    No, it's not correct.  Intel sells all kinds of | 10:02:46 |
| 6 | consumer devices, including, at the time, mice, keyboards, | 10:02:50 |
| 7 | networking equipment that had nothing to do with Strings. | 10:02:53 |
| 8 | Q    And, in fact, Intel never shipped any consumer | 10:02:56 |
| 9 | device based on Strings; correct? | 10:03:01 |
| 10 | A    That's correct. | 10:03:04 |
| 11 | Q    Did -- well, withdrawn. | 10:03:12 |
| 12 | Was there any other investment made beyond the -- | 10:03:15 |
| 13 | let me withdraw that again. | 10:03:24 |
| 14 | Was there any other investment made to Implicit | 10:03:25 |
| 15 | beyond the $10 million listed under "January 2001 - 2002"? | 10:03:30 |
| 16 | MR. HOSIE:  May I have that read back, please. | 10:03:36 |
| 17 | (Record read.) | 10:03:49 |
| 18 | MR. HOSIE:  Objection.  Vague, ambiguous, "made | 10:03:50 |
| 19 | to." | 10:03:53 |
| 20 | THE WITNESS:  The nature of my investment was | 10:03:56 |
| 21 | essentially a convertible note with the company.  I would | 10:03:58 |
| 22 | lend the money to the company, and the company would | 10:04:01 |
| 23 | operate and pay its bills using the cash that I provided | 10:04:04 |
| 24 | it.  There were no other investors as part of that 10 | 10:04:08 |
| 25 | million.  There were no other convertible notes, nor did | 10:04:12 |

Page 585

Highly Confidential - Attorneys' Eyes Only

```
 1    we sell stock to anybody.                        10:04:15

 2    BY MR. McPHIE:                                   10:04:17

 3       Q    And was there any other investment in Implicit   10:04:17

 4    after 2002?                                      10:04:20

 5       A    I -- yes, there were.  There was.        10:04:22

 6       Q    When was that?                           10:04:26

 7       A    As I mentioned when we discussed this previously,   10:04:28

 8    I believe in 2006, when I had renamed the company to Dig   10:04:34

 9    Bee, and pursuing a completely different business model   10:04:40

10    with completely different code base, I raised some money   10:04:44

11    for that effort, which I subsequently paid back, but it   10:04:47

12    was unrelated to the development of Strings and Portal.  I   10:04:50

13    believe that was 2006.                           10:04:56

14       Q    Was there any other investment in Implicit after   10:04:58

15    2002?                                            10:05:03

16       A    No.                                      10:05:04

17       Q    Why did BeComm change its name to Implicit   10:05:09

18    Networks?                                        10:05:13

19       A    We were being sued by a company in Germany for   10:05:13

20    trademark infringement.                          10:05:16

21       Q    What was the outcome of that trademark   10:05:20

22    infringement suit?                               10:05:22

23       A    Actually, I misspoke.  They did not file a suit.   10:05:23

24    They told us that they would if we did not change our   10:05:26

25    name.  And our attorneys at the time advised us to change   10:05:31
```

Page 586

| | | |
|---|---|---|
| 1 | our name.  I never liked the name BeComm regardless, so it | 10:05:34 |
| 2 | was an easy decision. | 10:05:39 |
| 3 | Q    What is meant by "Implicit" in the name Implicit | 10:05:41 |
| 4 | Networks? | 10:05:49 |
| 5 | MR. HOSIE:  Excuse me.  Objection.  Lacks | 10:05:49 |
| 6 | foundation. | 10:05:53 |
| 7 | THE WITNESS:  I think you're giving us more credit | 10:05:53 |
| 8 | than we deserve.  Implicit Networks was a name that was | 10:05:56 |
| 9 | available.  And it then became our name.  It was vaguely | 10:06:01 |
| 10 | relevant, but it wasn't such a concerted effort to be | 10:06:06 |
| 11 | descriptive of what we do. | 10:06:11 |
| 12 | BY MR. McPHIE: | 10:06:13 |
| 13 | Q    You don't ascribe any particular meaning to what | 10:06:14 |
| 14 | an implicit network is; is that right? | 10:06:17 |
| 15 | MR. HOSIE:  Objection.  Vague and ambiguous. | 10:06:24 |
| 16 | THE WITNESS:  No more than what the word implies. | 10:06:25 |
| 17 | There is, today, some discussion about the concept of | 10:06:28 |
| 18 | implicit networks.  Our name was unrelated to that. | 10:06:30 |
| 19 | BY MR. McPHIE: | 10:06:35 |
| 20 | Q    To you, what does the name Implicit Networks | 10:06:37 |
| 21 | imply? | 10:06:39 |
| 22 | MR. HOSIE:  Objection.  Vague and ambiguous, lacks | 10:06:40 |
| 23 | foundation. | 10:06:42 |
| 24 | THE WITNESS:  It implies the name of our company. | 10:06:42 |
| 25 | It doesn't imply anything more or less than that.  It was | 10:06:46 |

Page 587

CONFIDENTIAL

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were duly sworn; that a record

8  of the proceedings was made by me using machine

9  shorthand which was thereafter transcribed under my

10  direction; further, that the foregoing is a true

11  record of the testimony given.

12    I further certify I am neither financially

13  interested in the action nor a relative or employee

14  of any attorney of party to this action.

15    IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated: 6/13/12

19

20

21    _____

         LORI STOKES

22       CSR No. 12732

23

24

25



```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

      _____

 4   IMPLICIT NETWORKS, INC.,    )

 5          Plaintiff,           )

 6       vs.                     )   Case No.  3:10-cv-03365-SI

 7   F5 NETWORKS, INC.,          )

 8            Defendant.         )

      _____)

 9   AND RELATED ACTIONS         )   Case Nos. 3:10-cv-03746-SI

      _____)            3:10-cv-04234-SI

10

11        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

12

13           (30)(b)(6) VIDEOTAPED DEPOSITION OF

14      IMPLICIT NETWORKS, INC., Through EDWARD BALASSANIAN

15               San Francisco, California

16               Thursday, June 7, 2012

17                      Volume III

18   Reported by:

19   GINA GLANTZ

20   CSR No. 9795, RPR, RMR

21   JOB No. 147843

22

23   PAGES 549 - 807

24   PAGES 762 - 792 ARE MARKED HIGHLY CONFIDENTIAL - ATTORNEYS'

25   EYES ONLY AND ARE BOUND SEPARATELY

                                          Page 549
```

Highly Confidential - Attorneys' Eyes Only

| | | |
|---|---|---|
| 1 | saying is that the sequence of components that is used to | 12:00:13 |
| 2 | create the data processing path is not arbitrary.  The | 12:00:17 |
| 3 | components are in a logical order such that the output of | 12:00:23 |
| 4 | one is compatible with the input of the next one. | 12:00:27 |
| 5 | BY MR. McPHIE: | 12:00:31 |
| 6 | Q    In your view, it is not enough to say everything | 12:00:31 |
| 7 | here is IP packets, we don't need to worry about format | 12:00:35 |
| 8 | matching?  That is not enough to fall within the '163 | 12:00:42 |
| 9 | patent claims; correct? | 12:00:44 |
| 10 | MR. HOSIE:  Objection.  Vague, ambiguous, | 12:00:45 |
| 11 | overbroad. | 12:00:46 |
| 12 | THE WITNESS:  When an examiner makes a claim of | 12:00:49 |
| 13 | obviousness, there needs to be a reason for that -- that | 12:00:51 |
| 14 | system to have even been contemplated. | 12:00:56 |
| 15 | BY MR. McPHIE: | 12:01:00 |
| 16 | Q    I'm asking for your view.  Can you answer the | 12:01:01 |
| 17 | question? | 12:01:03 |
| 18 | MR. HOSIE:  Could I have the question read back, | 12:01:03 |
| 19 | please. | 12:01:05 |
| 20 | (Record read.) | 12:01:19 |
| 21 | MR. HOSIE:  Same objections. | 12:01:19 |
| 22 | THE WITNESS:  If you're building a system that has | 12:01:21 |
| 23 | no formats, there is no reason to contemplate any kind of | 12:01:23 |
| 24 | format compatibility.  You don't even think of it that | 12:01:29 |
| 25 | way.  It's not within the problem space. | 12:01:33 |

Page 652

```
 1    BY MR. McPHIE:                                    12:01:35

 2        Q    And so the answer to my question is yes?  12:01:36

 3             MR. HOSIE:  Objection.  Vague, ambiguous,  12:01:38

 4    mischaracterizes the testimony.                  12:01:40

 5             THE WITNESS:  No, the answer to your question is  12:01:43

 6    there is no answer because your question was illogical and  12:01:45

 7    lacked any foundation.  You're presuming that somebody who  12:01:49

 8    is building a system that has no formats would make the  12:01:52

 9    extrapolation to think there's no formats, so I don't have  12:01:55

10    to worry about the order.  That's not the way you would  12:01:59

11    think about the problem.                         12:02:02

12    BY MR. McPHIE:                                    12:02:03

13        Q    If there's a system that only handles IP packets,  12:02:03

14    it doesn't fall within the '163 patent claims; correct?  12:02:07

15             MR. HOSIE:  Objection.  Vague, ambiguous,  12:02:10

16    overbroad.                                        12:02:13

17             THE WITNESS:  No, that's not correct.  If you  12:02:14

18    build a system that handles IP packets that looks at the  12:02:16

19    first packet of a message and identifies information in  12:02:20

20    that packet, that it uses to look up a series of  12:02:23

21    components in a mapping database that is then used to  12:02:26

22    create -- dynamically create a data processing path to  12:02:30

23    process packets of that message, then that does fall  12:02:34

24    within the scope of our patents.  You could build a system  12:02:38

25    identical to Kerr in functionality and identical to  12:02:41
```

Page 653

Highly Confidential - Attorneys' Eyes Only

1   Decasper in functionality using '163.                    12:02:45

2   BY MR. McPHIE:                                           12:02:49

3      Q    Okay.                                            12:02:49

4           MR. HOSIE:  All right.                           12:02:50

5           MR. McPHIE:  Let's break for lunch.              12:02:50

6           MR. HOSIE:  Thank you.                           12:02:52

7           THE VIDEOGRAPHER:  This ends Media No. 2, Volume 12:02:52

8   III, of the 30(b)(6) for Implicit Networks.  Off the    12:02:55

9   record at 12:02 p.m.                                     12:03:00

10          (Lunch recess.)                                  13:11:30

11          THE VIDEOGRAPHER:  Back on the record at 1:11 p.m. 13:11:33

12  This is the beginning of Media No. 3, Volume III, of the 13:11:47

13  30(b)(6) for Implicit Networks.                          13:11:50

14  BY MR. McPHIE:                                           13:11:55

15     Q    Could you turn to page 28 of Exhibit 133.  You'll 13:11:55

16  see there's a statement about the '857 reexamination     13:12:14

17  proceedings, where an office action indicated that Kerr  13:12:18

18  did not have particular disclosure of particular elements. 13:12:25

19          MR. HOSIE:  Where on the page, sir?              13:12:30

20          MR. McPHIE:  Middle of the page.                 13:12:31

21          MR. HOSIE:  Middle of the page.                  13:12:32

22  BY MR. McPHIE:                                           13:12:33

23     Q    You see that there?                              13:12:34

24     A    Are you referring to the section that says, "Kerr 13:12:34

25  does not explicitly teach any identification of a sequence 13:12:36

Page 654

```
 1    of components as part of its proper treatment of a message    13:12:40

 2    flow"?                                                        13:12:42

 3        Q    That area, do you see that there?                    13:12:42

 4        A    I do.                                                13:12:44

 5        Q    Your response nowhere mentions that the '857         13:12:44

 6    examiner, in fact, found that these elements were             13:12:50

 7    disclosed in the Pfeifer references -- the Pfeifer            13:12:54

 8    reference; correct?                                           13:12:57

 9            MR. HOSIE:  May I have that read back, please.        13:12:58

10    BY MR. McPHIE:                                                13:13:00

11        Q    Let me restate it.  Your response nowhere mentions   13:13:00

12    that the '857 patent examiner, in fact, found that these      13:13:03

13    elements were disclosed in the Pfeifer reference --           13:13:07

14            MR. HOSIE:  Objection.                                13:13:10

15    BY MR. McPHIE:                                                13:13:11

16        Q    -- correct?                                          13:13:11

17            MR. HOSIE:  Vague, ambiguous, overbroad.              13:13:11

18            THE WITNESS:  If you're asking if we reference the    13:13:20

19    Pfeifer reference in this response, we did not.               13:13:22

20    BY MR. McPHIE:                                                13:13:27

21        Q    And in fact, Pfeifer does dynamically identify a     13:13:27

22    sequence of components; correct?                              13:13:31

23            MR. HOSIE:  Objection.  Vague and ambiguous.          13:13:33

24            THE WITNESS:  If, by "dynamically identify," you      13:13:35

25    mean receive a first packet, look at information in that      13:13:38
```

Page 655

EDWARD BALASSANIAN  -  8/16/2012

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

IMPLICIT NETWORKS, INC.,

     Plaintiff,

     vs.                 Case No.:
                          3:10-cv-4234 SI

JUNIPER NETWORKS, INC.,

     Defendant.

_____   /

VIDEOTAPED 30(b)(6) DEPOSITION OF

EDWARD BALASSANIAN

VOLUME 5

Thursday, August 16, 2012

REPORTED BY:  RACHEL FERRIER, CSR 6948

(1-445620)

EDWARD BALASSANIAN  -  8/16/2012

```
 1        Q    There's no partial credit in patent
 2   infringement law; correct?
 3        A    Correct.
 4        Q    Is it your understanding that the -- that
 5   infringement of the claims of the '163 patent can be      10:01:12
 6   demonstrated at a good-faith level based on publicly
 7   available information?
 8             MR. HOSIE:  Can I have that read back, please.
 9             MR. McPHIE:  Let me -- let me rephrase it.
10        Q    It -- it is your understanding that Implicit      10:01:32
11   could form a good-faith belief regarding infringement of
12   the '163 patent based entirely on publicly available
13   information; correct?
14        A    It depends on what product we are talking
15   about.  Whose product and what publicly available      10:01:52
16   information?
17        Q    It is your understanding that Implicit could
18   form a good-faith belief regarding Juniper's alleged
19   infringement of the '163 patent based entirely on
20   publicly available information; correct?      10:02:04
21        A    Yes.
22        Q    And the reason I ask is sometimes you have
23   patents on things like complicated pharmaceuticals or
24   other very detailed technologies that one cannot
25   determine from the outside.      10:02:21
```

EDWARD BALASSANIAN   -   8/16/2012

Page 984

```
 1              You are aware of that?

 2      A    Okay.

 3      Q    But your -- your view is that this case is not

 4  one of those cases?

 5           MR. HOSIE:  Objection; vague, ambiguous,      10:02:34

 6  overbroad.

 7           THE WITNESS:  We did not patent a

 8  pharmaceutical technology or chemical, so, yes, I would

 9  agree with you on that.

10           MR. McPHIE:  Very good, but maybe in the       10:02:46

11  future.  You never know, right?  No, that really wasn't

12  my question.

13      Q    Your view is that the '163 patent is not of the

14  type that requires -- in order to have a good-faith

15  belief of infringement, that requires a digging down     10:02:59

16  into details of software code that are not available to

17  the public; correct?

18      A    No.  On the contrary, I would say it's more

19  that Juniper's product, because of the fact that it

20  relies on some fundamental concept, such as being       10:03:19

21  message-based, stateful, flow-oriented; that those are

22  earmarks of infringement that are, in our view,

23  impossible to build around.  So it's less to do with our

24  patents, more to do with the nature of Juniper's

25  product.                                                10:03:38
```

EDWARD BALASSANIAN   -   8/16/2012

Page 985

```
 1            The mapping of its features and claim

 2    functionality map directly to '163, and we don't think

 3    there is any other way to build that kind of product

 4    than '163.

 5        Q   So if I tell you that Company X has a stateful,      10:03:47

 6    flow-based firewall, have I told you everything you need

 7    to know to have a good-faith belief that Company X

 8    infringes the '163 patent?

 9        A   No.

10        Q   What else would you need to know?                   10:04:06

11        A   Well, it's laid out in this claim here.  I

12    mean, all the elements of our claim are very clearly

13    detailed.

14        Q   So the fact that a company has a state- -- a --

15    let me withdraw that.                                       10:04:18

16            So the fact that a company makes and sells a

17    stateful, flow-based firewall does not, in and of

18    itself, demonstrate infringement of the '163 patent;

19    correct?

20            MR. HOSIE:  Objection; vague, ambiguous.            10:04:32

21            THE WITNESS:  We have talked about flows

22    before.  TCP/IP sessions are a flow.  So if you have a

23    firewall that proxies TCP connections, that's a

24    stateful, flow-based firewall, and that is not an

25    infringing firewall.                                        10:04:49
```

EDWARD BALASSANIAN  -  8/16/2012

Page 986

```
 1              In our case, the elements that you need to
 2      be in- -- that would need to be there for us to have a
 3      good-faith belief that you are infringing are laid out
 4      in claim 1, and I can read it to you again if you want.
 5      I think you probably --                              10:05:04
 6              MR. McPHIE:  No, we don't need to do that.
 7              THE WITNESS:  -- recoil if I did that.
 8              MR. McPHIE:  We don't need to do that.
 9          Q   Is it fair to say that performing TCP
10      session-based communications is flow-based?          10:05:16
11              MR. HOSIE:  Objection; vague, ambiguous,
12      overbroad.
13              THE WITNESS:  One way to -- another word for a
14      "session" is a "flow," but flows can be more than TCP
15      sessions, so it's not 100 percent interchangeable.    10:05:35
16      BY MR. McPHIE:
17          Q   If I have a product that handles TCP sessions,
18      is it flow-based, under your understanding of that term?
19              MR. HOSIE:  Same objections.
20              THE WITNESS:  I wouldn't call the product       10:05:51
21      flow-based.  I would say that TCP -- as a protocol, by
22      its nature, each session is essentially a flow.
23      BY MR. McPHIE:
24          Q   So the TCP protocol is flow-based; correct?
25          A   It's not flow-based.  Sessions are synonymous   10:06:10
```

EDWARD BALASSANIAN   -   8/16/2012

Page 989

```
 1    firewall that practices the claims of the '163 patent;

 2    correct?

 3         A    Sure.  Yes.

 4         Q    And you could also have a stateful, flow-based

 5    firewall that does not practice the claims of the '163          10:08:57

 6    patent; correct?

 7         A    Correct.

 8         Q    One of the elements of claim 1 of the '163

 9    patent, as issued in the reexamination, is:  Such that

10    the output format of the components of the                     10:09:28

11    non-predefined sequence match the input format of the

12    next component.

13              Are you familiar with that element of the

14    claim?

15         A    Yes.                                                 10:09:40

16         Q    What did Implicit do to satisfy itself, prior

17    to suing Juniper, that Juniper, in fact, practiced that

18    element?

19              MR. HOSIE:  Before you answer that question,

20    let me caution the witness not to disclose the substance      10:10:01

21    of communication with counsel or consultants working for

22    counsel.

23              THE WITNESS:  So in reaching our good-faith

24    belief that Juniper, in fact, fringes, the process

25    included me looking at publicly available documentation,      10:10:25
```

EDWARD BALASSANIAN   -   8/16/2012

1   of which there is a copious amount on Juniper's website

2   and books from O'Reilly Media that talk about Juniper's

3   Junos Operating System quite elaborately.  At that

4   point, our attorneys have -- and I have to be careful

5   not to talk about our work product, but we hire experts          10:10:50

6   to dig into it further and substantiate that every

7   element of these claims is being infringed before we

8   file a complaint.  I'm not involved in every aspect of

9   that effort.

10          MR. McPHIE:   Thank you.                                  10:11:13

11       Q   Did you review claim charts for Juniper

12   products prior to authorizing a lawsuit against Juniper?

13       A   I don't know if we made a formal claim chart.

14   I don't know if the claim chart that we eventually gave

15   Juniper was created before or after the complaint, so    10:11:43

16   I'm not sure I can answer that question.

17       Q   Sitting here today as the corporate

18   representative of Implicit, can you tell me whether

19   Implicit made a claim chart regarding alleged

20   infringement by Juniper prior to filing suit against    10:12:02

21   Juniper?

22          MR. HOSIE:   And if I may, you are asking if

23   Implicit the company did as against its agents,

24   attorneys, or consults?

25          MR. McPHIE:   I'm including --                            10:12:13

EDWARD BALASSANIAN   -   8/16/2012

Page 991

```
 1              MR. HOSIE:  Okay.

 2              MR. McPHIE:  -- everyone.

 3              MR. HOSIE:  So the question is inclusive.

 4     Implicit or anyone working on Implicit's behalf prepare

 5     a claim chart prior to filing, if you know.              10:12:20

 6              THE WITNESS:  So I and the Implicit staff did

 7     not create a claim chart, but as far as I understand,

 8     our firm, Hosie Rice, our law firm, would have created a

 9     claim chart, and that was provided to Juniper sometime

10     after the complaint.                                     10:12:38

11     BY MR. McPHIE:

12        Q    Okay.  And -- and without getting into the

13     details, your testimony is that attorneys or others

14     working on behalf of Implicit created a claim chart for

15     Juniper products prior to filing the lawsuit?            10:12:57

16              MR. HOSIE:  Objection; mischaracterizes the

17     testimony, lacks foundation.

18              THE WITNESS:  So we certainly map every element

19     of the claim to Juniper functionality to give ourselves

20     the confidence that every element of the claim was, in   10:13:12

21     fact, being infringed.

22              The creation of a formal claim chart, I don't

23     know when that happened in the time line, but the

24     understanding that every element of the claim was being

25     infringed, I am certain I had confidence in, and I'm     10:13:27
```

EDWARD BALASSANIAN  -  8/16/2012

Page 1012

```
 1      A   I do think it's relevant whether a product is

 2   configurable or not, yes.

 3      Q   And, specifically, whether it's configurable at

 4   runtime; right?

 5      A   If you can change the policies at runtime, I          10:49:36

 6   think that's significant, yes, and by that, if you mean

 7   configurable, then, yes, I would agree.

 8      Q   You understand that the Court, in her Claim

 9   Construction Order, declined Implicit's proposal to

10   construe the claims to incorporate changeable at          10:50:05

11   runtime; correct?

12          MR. HOSIE:  Objection; calls for legal opinion,

13   mischaracterizes the order.

14          THE WITNESS:  I have to look at it.  My

15   recollection was that she gave us actually a better       10:50:20

16   definition than what we had, but I'm happy to look at it

17   and see what she said.

18   BY MR. McPHIE:

19      Q   Well, on page 5, Implicit's proposed

20   construction was:  Sequence of components, changeable     10:50:32

21   runtime, is what it says here.  Although, I believe it

22   was changeable at runtime; is that right?

23      A   I'm sorry.  I was reading.  Can you repeat what

24   you --

25      Q   In the Court's Claim Construction Order,           10:50:49
```

```
 1    there's a table on page 5 that says that Implicit's

 2    proposed construction was sequence of components

 3    changeable runtime -- I think there's just a word left

 4    out there.  It was changeable at runtime; correct?

 5        A    That's right.                                         10:51:03

 6        Q    Okay.  And then you go on on page 6 -- you

 7    don't have to read it out loud, but if you just look at

 8    lines 11 through 19, you see that the Court declined to

 9    adopt that proposed construction; correct?

10        A    Are you talking about line 20 and 21?               10:51:25

11        Q    I'm sorry.  Lines 11 through 19.

12        A    Oh, sorry.  So what's your question about those

13    lines?

14        Q    That the Court declined to construe the claims

15    so as to incorporate the concept of changeable at          10:51:50

16    runtime; correct?

17        A    Not the concept.  She says that it's not

18    helpful because it would -- actually, the jury wouldn't

19    understand what "changeable at runtime" means.  She

20    didn't decline the concept, she just said that those --    10:52:04

21    those terms are -- are not going to help a jury.

22        Q    Is it your understanding that the claims, as

23    construed by the Court, include the concept of

24    changeable at runtime?

25        A    Well, she defined that as:  A sequence of         10:52:20
```

EDWARD BALASSANIAN   -   8/16/2012

Page 1014

```
 1    software routines that was not identified before the

 2    first packet of a message was received.  That, to me,

 3    implies changeable at runtime.

 4        Q   After Implicit received the Court's Claim

 5    Construction Order, did it perform any analysis or         10:52:40

 6    investigation to determine whether it could still, in

 7    good faith, maintain claims of infringement by Juniper?

 8        A   I actually think we high-fived when we got this

 9    Claim Construction Order, because it feels broader to me

10    than what we said, so I don't think we needed to do any   10:53:02

11    more in-depth analysis.  This gave us more flexibility

12    in mapping our claims to Juniper's products.

13        Q   And so after Implicit received the Court's

14    Claim Construction Order, it did not perform any

15    analysis or investigation to determine whether it could  10:53:19

16    still, in good faith, maintain claims of infringement by

17    Juniper; correct?

18            MR. HOSIE:  Objection; mischaracterizes the

19    testimony, lacks foundation.

20            THE WITNESS:  So at this point in time, we had   10:53:35

21    experts who were deeply steeped in Juniper product

22    literature.  I don't know if discovery of source code

23    had happened yet or not, but there was an ongoing

24    persistent and constant analysis of infringement with

25    increasing -- daily increasing specificity in terms of   10:53:54
```

EDWARD BALASSANIAN   -   8/16/2012

Page 1015

```
1    the -- in terms of the actual infringement.
2    BY MR. McPHIE:
3       Q   Did you, as the CEO of Implicit, instigate any
4    sort of reappraisal of your claims against Juniper in
5    light of the Court's Claim Construction?                    10:54:14
6            MR. HOSIE:  Objection; asked and answered.
7            THE WITNESS:  As a matter of process, we're --
8    we have and continue to and, at this time, before and
9    after the Claim Construction Order, been very rigorous
10   about mapping our elements to all the information that     10:54:32
11   we receive from Juniper about their products.  The more
12   we receive, the more scrutiny we give it.
13           MR. McPHIE:  And I understand there is this
14   ongoing process that -- in connection with the
15   litigation.                                                 10:54:48
16      Q   I'm asking whether you, as CEO of Implicit,
17   instigated any sort of specific appraisal of your claims
18   against Juniper in light of the Court's Claim
19   Construction?
20           MR. HOSIE:  Objection; asked and answered.         10:55:01
21           THE WITNESS:  We, of course, took the Claim
22   Construction Order of the Court and made an assessment
23   about where that positioned us relative to where we were
24   before the Claim Construction Order.
25           MR. HOSIE:  I -- let me interject and caution      10:55:16
```

EDWARD BALASSANIAN   -   8/16/2012

Page 1128

1    sentence which begins:  In 2003, BeComm was renamed and

2    relaunched as Implicit Networks in transition from

3    developing operating systems to addressing a rapidly

4    developing gap in the industry for content management.

5            Do you see that there?                          15:04:21

6        A   I do.

7        Q   Is that an accurate statement?

8        A   It's an accurate reading of what it says here,

9    but I don't think it's entirely accurate in terms of

10   what we were doing.  We were trying to reposition the    15:04:32

11   company at this time to be content-management-focused,

12   so we, as you do in any marketing document, try to

13   posture, but I don't think it's an accurate reflection

14   of what we were actually working on at the time.

15       Q   When did Implicit essentially stop developing    15:04:52

16   operating systems?

17       A   We worked on it all the way up until 2006.  We

18   didn't give up until then.

19       Q   But by 2007, Implicit was no longer working on

20   developing operating systems; is that fair?              15:05:15

21       A   Not in -- not -- we weren't working on the

22   operating system that we had created, Portal or Strings.

23   We essentially gave up.

24       Q   And that happened in roughly 2007?

25       A   It coincided with us deciding to -- yes.  We      15:05:27

EDWARD BALASSANIAN   -   8/16/2012

```
 1     essentially stopped development operations.
 2         Q    And what was it that led to that change in
 3     strategy?
 4         A    We ran out of money.  I ran out of employees.
 5         Q    Okay.  And then -- it goes on, on page 11, to          15:05:45
 6     discuss Implicit's patent portfolio, and if you look at
 7     the second paragraph, it begins by saying, Having spent
 8     significant time and money in the development of these
 9     technologies, it is Implicit's intention to protect its
10     intellectual property rights and to support its ongoing   15:06:11
11     business through the strategic licensing of its patent
12     portfolio.
13         Do you see that there?
14         A    I do.
15         Q    Is that an accurate statement?                         15:06:22
16         A    It was our intention and we started to become
17     much more sensitive to intellectual property when we
18     started to realize that the industry was, essentially,
19     having a carte blanche access to our intellectual
20     property and building very profitable products based on   15:06:40
21     our efforts over the years.
22         Q    So was it -- was it in 2007 that Implicit's
23     focus shifted to protecting its intellectual property
24     portfolio and monetizing its patents?
25         A    I would say it was more a realization that we         15:06:59
```

EDWARD BALASSANIAN   -   8/16/2012

1    could not compete without doing it and that, at that

2    point, enough was enough.  We always felt like we could

3    outpace the competitors by just building better

4    products, but when our intellectual property is not

5    respected, then it becomes extremely difficult to          15:07:18

6    compete, especially when you are undercapitalized.

7         Q   And it was in 2007, roughly, that you made that

8    transition from technical development of operating

9    systems to more focused on intellectual property

10   enforcement and monetization; is that fair?                15:07:38

11        A   I would say the transition was more one from

12   having money than not having money.  So, at that point,

13   without developers, the only thing that you have got

14   left is your intellectual property.  So we ran out of

15   runway, and we had already come to realize that the        15:07:52

16   industry was in- -- infringing on our technology, so the

17   logical business decision was to protect our

18   intellectual property and recoup our investments in

19   our -- in our efforts.

20        Q   And -- and just as a matter of objective fact,    15:08:11

21   that, in fact, has been the focus of Implicit since

22   roughly 2007, enforcement of its patent portfolio and

23   intellectual property rights; correct?

24        A   We have had a lot of -- we have focused on

25   that, not entirely.  We've repeatedly talked about         15:08:34

EDWARD BALASSANIAN   -   8/16/2012

1    bringing our technology back to market, especially the

2    networking stuff, because we continue to believe our

3    code is beyond what's out there in terms of

4    sophistication, but we haven't -- we haven't pursued it.

5    It's a massive undertaking.                                    15:08:54

6        Q    So for now, part of the focus is on monetizing

7    the patent portfolio and potentially using that -- that

8    capital to then pursue development in the future?

9        A    No.   It's not -- we are not focused on

10   monetizing the patent portfolio.   We are protect -- we    15:09:14

11   are focused on protecting it and defending it, and not

12   only establishing, but exercising all the rights that we

13   were afforded by the entire patent process and the law

14   around it.   That -- that's the focus.

15       Q    Okay.   So -- so the focus for Implicit on        15:09:35

16   protecting its patent portfolio and defending it has,

17   essentially, been in place since about 2007; is that

18   fair?

19            MR. HOSIE:   Objection; vague and ambiguous,

20   overbroad and lacks foundation.                              15:09:49

21            THE WITNESS:   We -- in 2007, we -- we became

22   much more deliberate in that effort.   In the past, we

23   had talked about it, as you have seen in various

24   correspondence that you have shown me, but it wasn't

25   until 2007 that we actually engaged a firm to help us       15:10:08

EDWARD BALASSANIAN   -   8/16/2012

Page 1132

 1    with that.

 2    BY MR. McPHIE:

 3        Q    Okay.   So there was some run-up to that

 4    transition, but 2007 is when it finally executed.

 5        A    That's when we hired Goldstein, Faucett &        15:10:25

 6    Prebeg.

 7        Q    To pursue patent infringement claims?

 8        A    Yes.

 9        Q    Okay.   Are you familiar with -- withdrawn.

10            You are aware that the accused products in this    15:11:10

11    case, the accused Juniper products, include,

12    essentially, the J Series and SRX Series; correct?

13        A    I would have to look at the latest complaint to

14    see what the final list was.   I know there's been some

15    back and forth on that, but I know it does include the    15:11:31

16    SRX for sure and some subset of the J Series Routers and

17    potentially the WAN optimization products.

18        Q    So if you go to Exhibit 105, this is the First

19    Amended Complaint.

20        A    105?                                            15:11:52

21        Q    Mm-hmm.

22        A    Do I have 105?

23            MR. HOSIE:   Yeah.   It's previously marked.

24    It's the First Amended Complaint.   He had you look at

25    paragraph 22.                                            15:12:01

EDWARD BALASSANIAN   -   8/16/2012

```
 1              THE WITNESS:  Oh, right.
 2    BY MR. McPHIE:
 3         Q    And if you turn to paragraph 35 and there you
 4    see a listing of Juniper products; correct?
 5         A    Correct.                                      15:12:24
 6         Q    And the J Series Services Routers are listed
 7    there; correct?
 8         A    Yes.
 9         Q    As well as the SRX Series Services Gateways?
10         A    Right.                                        15:12:32
11         Q    And there are a number of other products listed
12    there as well?
13         A    Mm-hmm.
14         Q    And you understand that those other products
15    have now been dropped from this case; correct?         15:12:41
16              MR. HOSIE:  Objection; lacks foundation.
17              THE WITNESS:  I -- I'm not sure, when you say
18    "those other products," which ones you mean.  I would
19    have to see what the final list is to know what products
20    have been dropped and not dropped.  I know the          15:12:58
21    SRX Series Gateways are definitely in there.
22    BY MR. McPHIE:
23         Q    When we have talked about the prefiling
24    investigation that Implicit did before suing Juniper,
25    the prefiling investigation encompassed each and every  15:13:26
```

EDWARD BALASSANIAN  -  8/16/2012

Page 1234

CERTIFICATE OF REPORTER

I, RACHEL FERRIER, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony was thereafter reduced to typewriting by computer under my direction and supervision and is a true record of the testimony given by the witness;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:

_____

RACHEL FERRIER, CSR No. 6948

# EXHIBIT  3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**HIGHLY CONFIDENTIAL-- ATTORNEYS' EYES ONLY**
**TO BE FILED UNDER SEAL**
**SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **IMPLICIT NETWORKS, INC.** | |
| **Plaintiff,** | **No.  C10-4234 SI** |
| **v.** | |
| **JUNIPER NETWORKS, INC.** | |
| **Defendant.** | |

**AMENDED EXPERT REPORT OF JEFFREY LEITZINGER, PH.D.**

**Econ ONE Research, Inc.**

**September 10, 2012**

5th Floor
601 West 5th Street
Los Angeles, California 90071

witnesses. We hadn't done any review of their source code. We had no confidence about their products and the degree to which they infringed. I shouldn't say we had no confidence. We didn't have their source code to give us that additional confidence like we do with Juniper and F5, so by definition there are many different factors now at play than there were then."[84]

### c. Implicit's licenses were not directly tied to commercially successful products

35.    For the most part, the licensees in these prior licenses had yet to introduce commercially successful implementations of the patented technology.  In some cases, the products contemplated by the licensee were hardly beyond the idea stage. Examples in this regard include the Intel license described above, Sun,[85] AMD,[86] RealNetworks,[87] and nVIDIA.[88]

36.    The adjudicated proceeding involving Microsoft is another example:

> Even in our Microsoft case, we asserted our '163 patent against them and our '685 patent against them. They do not charge for the specific functionality of their asp.net modules. And for '163, it's hard to figure out whether they charge or not because they're selling a Windows server, and very few people ever buy a Windows server to just make it a firewall. So the degree to which we could associate revenue with those specific patents that we accused them for is nowhere near as clear as it would be, for example, for an F5 or a Juniper which derive a majority

---

[84] Balassanian Deposition, Volume II at 378:18 - 379:3.

[85] Balassanian Deposition, Volume II at 388:16-18

[86] "A. AMD does not make any money off the products that we accused." Balassanian Deposition, Volume II at 494:18-19.  "I believe it was a media framework.[...] a software package that AMD made freely available on their website for anybody to download without having to buy a chip."  Balassanian Deposition, Volume II at 532:25-533:3.

[87] Balassanian Deposition, Volume II at 534:8-9.

[88] Balassanian Deposition, Volume II at 388:5-7



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    9/10/2012

57.     This history shows the patented technology to have been valuable to many of the
        leading technology companies involved with networks and network communication.
        It also reveals potential interest in the technology from the perspective of a number
        of product implementations including smart phones and computer tablets as well as
        network gateways.  By the same token, Implicit was not successful in launching (or
        partnering with others to launch) a commercial implementation of these patents.  As
        a result, this factor plays a neutral role with respect to assessing where within the
        range of industry licensing results a royalty for these patents should fall.

### 6.    Implicit has licensed its technology broadly

**[GP #3: The nature and scope of the license, such as whether it is
exclusive or nonexclusive, restricted or non-restricted in terms of
territory or customers]**

**[GP #4: The patentee's policy of maintaining its patent monopoly
by licensing the use of the invention only under special conditions
designed to preserve the monopoly]**

58.     As noted above, Implicit entered into 20 license agreements, mostly through
        settlement of its patent litigation.  These agreements were non-exclusive and include a
        number of F5's competitors.  Accordingly, F5's use of Implicit's technology was not
        exclusive, nor did it undermine a monopoly that Implicit maintained over the use of
        that technology.  Median royalty rates in RoyaltyStat's non-exclusive licenses were
        lower by 1 percentage point than median rates for exclusive licenses.  LESI found
        that exclusive deals, on average, carried a royalty rate premium of 2.2 percentage
        points relative to non-exclusive deals.  Accordingly, these factors would support a
        lower rate within the customary range.

### 7.    Implicit does not compete with Juniper

**[GP Factor #5:  The commercial relationship between the licensor
and licensee, such as whether they are competitors in the same
territory in the same line of business or whether they are inventor
and promoter]**

59.     When the licensor competes with the licensee, one expects, everything else the same,
        to see higher royalty rates.  The added royalties compensate the licensor not just for
        use of the technology but also the risk and potential costs of a more effective

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

88.   Taking  59 percent of revenue for the Accused Products in the J Series and branch SRX Series, I obtain a royalty base for these products of $35.8 million.  Together with the royalty base for the high-end SRX Series, the total royalty base is $195.6 million. To arrive at the total dollar amount of reasonable royalty, I apply the five percent royalty rate to this royalty base.  That yields reasonable royalty damages of $9.8 million.

_____
Jeffrey Leitzinger, Ph.D.
September 10, 2012

# EXHIBIT  4

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
GEORGE F. BISHOP (CA Bar No. 89205)
gbishop@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
WILLIAM P. NELSON (CA Bar No. 196091)
wnelson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*IMPLICIT NETWORKS, INC.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IMPLICIT NETWORKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JUNIPER NETWORKS, INC., <br><br> Defendant. | Case No.  C 10-4234 SI <br><br> **IMPLICIT NETWORKS, INC.'S SECOND SUPPLEMENTAL RESPONSES TO JUNIPER NETWORK, INC'S FIRST SET OF INTERROGATORIES (NOS. 1-10)** |

multiple paths through selecting individual components, each with a state associated with a path. IMP120724-725 reflects the inventor's notes regarding the connection of a path and its session with a component. IMP120732-736 reflects the inventor's notes regarding building connected paths.. IMP120765 reflects the inventor's notes regarding how the mapping system of the claimed invention is initialized, including via initialization files. IMP120779-785 reflects the inventor's notes regarding the relationship between addresses, bindings, and demux.

**Interrogatory No. 3:**

Identify all efforts to license, enforce, or investigate possible infringement of the patents-in-suit (including any pre-filing investigation regarding infringement alleged in this case), including the dates of such efforts, the persons and entities involved, equipment, materials, settings, and methods used, all testing results (regardless of whether they support a claim of infringement), the dates you first became aware of each instance of supposed infringement, and the complete set of facts considered in any evaluation or conclusion of supposed infringement.

**Response:**

Implicit refers to and incorporates by reference each of the foregoing General Objections. In addition to the foregoing General Objections, Plaintiff specifically objects to this interrogatory on the grounds that it is overly broad and unduly burdensome in requesting information with "the complete set of facts." Plaintiff further objects to this interrogatory on the ground that it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protective doctrine. Plaintiff objects to this interrogatory as containing multiple discrete subparts in violation of Fed.R.Civ.P. 33(a), and reserves the right to treat this interrogatory as counting as no fewer than two separate

interrogatories – one concerning licensing efforts, and another concerning investigations of infringement.

Subject to and without waiving these objections, Implicit responds further as follows:

| Entity | Patents-in-suit infringed | Where infringement asserted | Date of first knowledge of infringement |
|---|---|---|---|
| AMD | '163 | *Implicit Networks Inc. v. Advanced Micro Devices Inc. et al*, 2-08-cv-00184, WAWD | At least by 2/4/2008 |
| Cisco | '163, '857 | *Implicit Networks, Inc. v. Cisco Systems, Inc.* 5-10-cv-03606, CAND | At least by 7/12/2010 |
| Citrix | '163, '857 | *Implicit Networks, Inc. v. Citrix Systems, Inc.* 3-10-cv-03766, CAND | At least by 8/24/2010 |
| F5 Networks | '163, '857 | *Implicit Networks, Inc. v. F5 Networks, Inc.* 3-10-cv-03365, CAND | At least by 11/2008 |
| Hewlett-Packard | '163, '857 | *Implicit Networks, Inc. v. Hewlett-Packard Company* 3-10-cv-03746, CAND | At least by 8/23/2010 |
| Juniper Networks | '163, '857 | *Implicit Networks, Inc. v. Juniper Networks, Inc.* 3-10-cv-04234, CAND | At least by 9/16/2010 |
| Microsoft | '163 | *Implicit Networks, Inc. v. Microsoft Corporation* 3-09-cv-05628, CAND | At least by 8/17/2009 |
| Nvidia | '163 | *Implicit Networks Inc. v. Advanced Micro Devices Inc. et al*, 2-08-cv-00184, WAWD | At least by 2/4/2008 |
| Raza Microelectronics | '163 | *Implicit Networks Inc. v. Advanced Micro Devices Inc. et al*, 2-08-cv-00184, WAWD | At least by 2/4/2008 |
| RealNetworks | '163 | *Implicit Networks Inc. v. Advanced Micro Devices Inc. et al*, 2-08-cv-00184, WAWD | At least by 2/4/2008 |
| Sun Microsystems | '163 | *Implicit Networks Inc. v. Advanced Micro Devices Inc. et al*, 2-08-cv-00184, WAWD | At least by 2/4/2008 |

1   Attorneys from the law firm of Goldstein, Faucett & Prebeg, L.L.P., participated in the pre-

2   filing investigation of infringement in connection with *Implicit Networks Inc. v. Advanced*

3   *Micro Devices Inc. et al*, 2-08-cv-00184.  For all subsequent matters, attorneys from the law

4   firm of Hosie Rice L.L.P, participated in the pre-filing investigation of infringement, using

5   publicly available materials, with assistance from Edward Balassanian, Scott Bradley, David

6   Bernstein, Jason Smith, and Virendra Shekhawat.  The specific analyses and their results are

7   subject to the attorney-client privilege and attorney work product protections.

8
    In further answer to this interrogatory, plaintiff will produce documents pursuant to

9
10  F.R.Civ.P. 33(d).

11  **FIRST SUPPLEMENTAL RESPONSE (11/3/11):**

12      Implicit refers to and incorporates by reference each of the foregoing General

13  Objections.  Subject to and without waiving these objections, Implicit responds further as

14  follows:

15      Implicit further responds pursuant to Fed R. Civ. P. 33(d), designating the following

16
17  documents:  IMP095022 – IMP095034, IMP104256 – IMP104275, IMP094960 –

18  IMP094980, IMP094832 – IMP094842, IMP094981 – IMP094999, IMP094857 –

19  IMP0094865, IMP094881 – IMP094910, IMP094866 – IMP094880.

20  **Interrogatory No. 4:**

21      For all actual or potential prior art relating to the patents-in-suit, identify when you,

22  Becomm and Balassanian first became aware of each such actual or potential prior art,

23  whether each such actual or potential prior art was disclosed to the United States Patent and

24  Trademark Office ("PTO") in connection with prosecution proceedings for each of the

25  patents-in-suit, and (if not) the basis for the non-disclosure.

26

27  **Response:**

28

1    Subject to and without waiving these objections, Implicit responds further as follows:

2   Implicit believes no such documents or information have been lost or destroyed since the first

3   anticipation of litigation involving the patents-in-suit.

4   Dated: April 13, 2012                          Respectfully submitted,

5

6

7                                                     /s/ William P. Nelson
                                                     SPENCER HOSIE (CA Bar No. 101777)
8                                                    shosie@hosielaw.com
                                                     GEORGE F. BISHOP (CA Bar No. 89205)
9                                                    gbishop@hosielaw.com
                                                     DIANE S. RICE (CA Bar No. 118303)
10                                                   drice@hosielaw.com
                                                     WILLIAM P. NELSON (CA Bar No. 196091)
11                                                   wnelson@hosielaw.com
                                                     HOSIE RICE LLP
12                                                   Transamerica Pyramid, 34th Floor
                                                     600 Montgomery Street
13                                                   San Francisco, CA 94111
                                                     (415) 247-6000 Tel.
14                                                   (415) 247-6001 Fax

15
                                                     *Attorneys for Plaintiff*
16                                                   *IMPLICIT NETWORKS, INC.*

17

18

19

20

21

22

23

24

25

26

27

28  PLAINTIFF'S 2ND SUPP.                    20                   Case No. C 10-4234 SI
    INTERROG. RESPONSES

## CERTIFICATE OF SERVICE

I, Jerry Shaw, am a citizen of the United States and am employed in the County of San Francisco, State of California. I am over the age of 18 years and am not a party to the within action.  My business address is Hosie Rice LLP, Transamerica Pyramid, 34th Floor, 600 Montgomery Street, San Francisco, California, 94111.

On April 13, 2012, I served the following attached

**IMPLICIT NETWORKS, INC.'S SECOND SUPPLEMENTAL RESPONSES TO JUNIPER NETWORK, INC'S FIRST SET OF INTERROGATORIES (NOS. 1-10)**

via electronic mail and U.S. Mail at San Francisco, California, addressed to the following parties:

DAVID C. MCPHIE
dmcphie@irell.com
REBECCA L. CLIFFORD
rclifford@irell.com
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324

MORGAN CHU
mchu@irell.com
JONATHAN S. KAGAN
jkagan@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276

*Attorneys for Defendant*
*Juniper Networks, Inc.*

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  April 13, 2012

/s/ Jerry Shaw
Jerry Shaw

PLAINTIFF'S 2ND  SUPP.                              21                        Case No. C 10-4234 SI
INTERROG. RESPONSES

# EXHIBIT  5

# [TO BE FILED UNDER SEAL]

# EXHIBIT  6

Implicit's Pre-Filing Investigation Privilege Log

| DOCID | Sent Date | From | To | CC | Subject | Privilege Claim |
|---|---|---|---|---|---|---|
| 1 | 5/10/2010 | Bruce Wecker (Hosie Rice) | Lynne Rose (Hosie Rice); Spencer Hosie | | E-mail attaching iRunway claim chart - US Patent '163 Vs. WFP (2) | Attorney-Client and Work Product |
| 2 | 5/10/2010 | Bruce Wecker | Lynne Rose; Spencer Hosie | | E-mail attaching iRunway claim chart - US Patent '163 Vs. WFP | Attorney-Client and Work Product |
| 3 | 5/10/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including Virendra Shekhawat (iRunway), attaching iRunway claim chart - US Patent '163 Vs. WFP(2) | Attorney-Client and Work Product |
| 4 | 6/5/2010 | Edward Balassanian | Bruce Wecker | Spencer Hosie; Virendra Shekhawat (iRunway consultant and witness in Microsoft Judge Infante mini-trial) | E-mail discussing PDF regarding multi layered firewall | Attorney-Client and Work Product |
| 5 | 6/5/2010 | Bruce Wecker | Edward Balassanian; Spencer Hosie | Virendra Shekhawat | E-mail discussing WavSource sample | Attorney-Client and Work Product |
| 6 | 6/7/2010 | Virendra Shekhawat | Bruce Wecker | | E-mail discussing and attaching MF summary and WFP summary | Attorney-Client and Work Product |
| 7 | 6/7/2010 | Bruce Wecker | Bruce Wecker; Virendra Shekhawat | Ganesh Balamitran (iRunway) | E-mail chain discussing two reports | Attorney-Client and Work Product |
| 8 | 6/7/2010 | Bruce Wecker | Scott W. Bradley; Edward Balassanian | Spencer Hosie; Virendra Shekhawat | E-mail discussing WFP patent | Attorney-Client and Work Product |
| 9 | 6/8/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including Virendra Shekhawat (iRunway), discussing PDF regarding dynamic redirection of stream | Attorney-Client and Work Product |
| 10 | 6/14/2010 | Ganesh Balamitran | Bruce Wecker | | E-mail discussing possible meeting | Attorney-Client and Work Product |
| 11 | 6/24/2010 | Spencer Hosie | Ganesh Balamitran | Bruce Wecker; Jerry Shaw (Hosie Rice); Ravi Upadrashta (iRunway) | E-mail chain regarding meeting | Attorney-Client and Work Product |
| 12 | 6/29/2010 | Ganesh Balamitran | Bruce Wecker | | E-mail regarding possible meeting | Attorney-Client and Work Product |
| 13 | 7/1/2010 | Ganesh Balamitran | Bruce Wecker | | E-mail chain regarding meeting and conflicts | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 14 | 7/2/2010 | Ganesh Balamitran | Bruce Wecker | | E-mail chain regarding meeting and conflicts | Attorney-Client and Work Product |
| 15 | 7/2/2010 | Ganesh Balamitran | Bruce Wecker; Virendra Shekhawat | | E-mail chain regarding infringement scenarios | Attorney-Client and Work Product |
| 16 | 7/6/2010 | Bruce Wecker | Ganesh Balamitran | | E-mail regarding Cisco and F5 | Attorney-Client and Work Product |
| 17 | 7/9/2010 | Ganesh Balamitran | Bruce Wecker | Animesh Kumar (iRunway) | E-mail chain regarding an introduction to counsel | Attorney-Client and Work Product |
| 18 | 7/13/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran (iRunway); Bineet Bhasin (iRunway) | E-mail chain regarding '163 target identification status (F5; Cisco) | Attorney-Client and Work Product |
| 19 | 7/12/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran (iRunway); Bineet Bhasin (iRunway) | E-mail attaching analyses of Cisco IOS and Cisco QuantumFlow Processor, and F5 | Attorney-Client and Work Product |
| 20 | 7/14/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran (iRunway); Bineet Bhasin (iRunway) | E-mail chain discussing Cisco IOS, Cisco QuantumFlow Processor, and F5 | Attorney-Client and Work Product |
| 21 | 7/14/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran (iRunway); Bineet Bhasin (iRunway) | E-mail chain regarding '163 target identification status (F5; Cisco) | Attorney-Client and Work Product |
| 22 | 7/14/2010 | Bruce Wecker | Virendra Shekhawat | | E-mail chain regarding '163 target identification status (F5; Cisco) | Attorney-Client and Work Product |
| 23 | 7/27/2010 | Spencer Hosie | Lynne Rose | | E-mail chain regarding '163 target identification status (F5; Cisco) | Attorney-Client and Work Product |
| 24 | 7/28/2010 | Bruce Wecker | Virendra Shekhawat | | E-mail attaching network management product analysis | Attorney-Client and Work Product |
| 25 | 8/5/2010 | Bruce Wecker | Virendra Shekhawat | | E-mail regarding infringing Cisco products | Attorney-Client and Work Product |
| 26 | 8/5/2010 | Bruce Wecker | Virendra Shekhawat | Spencer Hosie | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 27 | 8/5/2010 | Bruce Wecker | Edward Balassanian | Virendra Shekhawat; Spencer Hosie | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 28 | 8/5/2010 | Edward Balassanian | Bruce Wecker | Virendra Shekhawat; Spencer Hosie | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 29 | 8/5/2010 | Bruce Wecker | Edward Balassanian | Virendra Shekhawat; Spencer Hosie | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 30 | 8/6/2010 | Virendra Shekhawat | Bruce Wecker | | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 31 | 8/6/2010 | Bruce Wecker | Virendra Shekhawat | Edward Balassanian; Spencer Hosie | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 32 | 8/11/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran; Bineet Singh; Virendra Shekhawat | E-mail chain regarding Cisco Service Control Engine vs. '163 | Attorney-Client and Work Product |
| 33 | 8/18/2010 | Bruce Wecker | Virendra Shekhawat | Ganesh Balamitran | E-mail regarding HP Network products | Attorney-Client and Work Product |
| 34 | 8/18/2010 | Bruce Wecker | Virendra Shekhawat | | E-mail regarding Citrix | Attorney-Client and Work Product |
| 35 | 8/19/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran; Virendra Shekhawat; Bineet Singh | E-mail chain regarding HP Networks products | Attorney-Client and Work Product |
| 36 | 8/23/2010 | Bruce Wecker | Virendra Shekhawat | Spencer Hosie | E-mail chain discussing and attaching F5 Application Traffic Management slide deck | Attorney-Client and Work Product |
| 37 | 8/23/2010 | Spencer Hosie | Lynne Rose | | E-mail chain discussing and attaching F5 Application Traffic Management slide deck | Attorney-Client and Work Product |
| 38 | 8/23/2010 | Bruce Wecker | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching analysis on Citrix and HP products | Attorney-Client and Work Product |
| 39 | 8/24/2010 | Virendra Shekhawat | Spencer Hosie | Bruce Wecker; Ganesh Balamitran | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 40 | 8/26/2010 | Virendra Shekhawat | Spencer Hosie | Bruce Wecker; Ganesh Balamitran; Bineet Singh | E-mail chain discussing and attaching F5 TMOS claim chart | Attorney-Client and Work Product |
| 41 | 8/26/2010 | Spencer Hosie | Virendra Shekhawat | Bruce Wecker; Ganesh Balamitran; Bineet Singh | E-mail chain discussing F5 TMOS claim chart | Attorney-Client and Work Product |
| 42 | 8/26/2010 | Spencer Hosie | Jerry Shaw; Lynne Rose | | E-mail chain discussing and attaching F5 TMOS claim chart | Attorney-Client and Work Product |
| 43 | 8/27/2010 | Bruce Wecker | Virendra Shekhawat; Spencer Hosie | Bineet Singh; Ganesh Balamitran | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 44 | 8/27/2010 | Spencer Hosie | Jerry Shaw; Lynne Rose | | E-mail chain discussing and attaching F5 TMOS claim chart | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 45 | 8/27/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat; Bruce Wecker | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 46 | 8/27/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat; Bruce Wecker | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 47 | 8/27/2010 | Bruce Wecker | Edward Balassanian; Spencer Hosie | Virendra Shekhawat | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 48 | 8/27/2010 | Bruce Wecker | Edward Balassanian | Spencer Hosie; Virendra Shekhawat | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 49 | 8/27/2010 | Edward Balassanian | Bruce Wecker | Spencer Hosie; Virendra Shekhawat | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 50 | 8/29/2010 | Virendra Shekhawat | Bruce Wecker; Edward Balassanian | Spencer Hosie | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 51 | 8/29/2010 | Virendra Shekhawat | Bruce Wecker; Spencer Hosie | Bineet Singh; Ganesh Balamitran; Edward Balassanian | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 52 | 8/30/2010 | Virendra Shekhawat | Edward Balassanian; Spencer Hosie | Bruce Wecker; Bineet Singh | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 53 | 8/30/2010 | Spencer Hosie | Virendra Shekhawat | Edward Balassanian; Bruce Wecker; Bineet Singh | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 54 | 8/30/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie; Bruce Wecker | E-mail chain discussing F5 claim chart | Attorney-Client and Work Product |
| 55 | 9/1/2010 | Bineet Singh | Bruce Wecker | Virendra Shekhawat; Jason Smith; Spencer Hosie | E-mail chain regarding VMware ACE virtual desktop management features | Attorney-Client and Work Product |
| 56 | 9/1/2010 | Bruce Wecker | Bineet Singh | Virendra Shekhawat; Jason Smith; Spencer Hosie | E-mail chain regarding VMware ACE virtual desktop management features | Attorney-Client and Work Product |
| 57 | 9/1/2010 | Bruce Wecker | Virendra Shekhawat | Ganesh Balamitran | E-mail regarding Juniper | Attorney-Client and Work Product |
| 58 | 9/2/2010 | Virendra Shekhawat | Bruce Wecker | Ganesh Balamitran | E-mail chain regarding Juniper | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 59 | 9/3/2010 | Virendra Shekhawat | Spencer Hosie | Bruce Wecker | E-mail regarding Alcatel Lucent Omni Access research | Attorney-Client and Work Product |
| 60 | 9/3/2010 | Virendra Shekhawat | Bruce Wecker | | E-mail chain regarding Juniper | Attorney-Client and Work Product |
| 61 | 9/4/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie | E-mail regarding VMware | Attorney-Client and Work Product |
| 62 | 9/6/2010 | Virendra Shekhawat | Edward Balassanian | Spencer Hosie; Ganesh Balamitran; Bruce Wecker | E-mail chain discussing and attaching VMware analysis | Attorney-Client and Work Product |
| 63 | 9/6/2010 | Virendra Shekhawat | Spencer Hosie | Bruce Wecker; Edward Balassanian; Ganesh Balamitran | E-mail chain regarding Alcatel Lucent Omni Access research | Attorney-Client and Work Product |
| 64 | 9/6/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie; Ganesh Balamitran; Bruce Wecker | E-mail chain regarding VMware | Attorney-Client and Work Product |
| 65 | 9/6/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching VMware analysis | Attorney-Client and Work Product |
| 66 | 9/7/2010 | Virendra Shekhawat | Edward Balassanian | Spencer Hosie; Bruce Wecker; Ganesh Balamitran | E-mail chain regarding VMware | Attorney-Client and Work Product |
| 67 | 9/9/2010 | Virendra Shekhawat | Edward Balassanian | Spencer Hosie; Bruce Wecker; Ganesh Balamitran | E-mail chain regarding VMware | Attorney-Client and Work Product |
| 68 | 9/9/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie | E-mail regarding Juniper JUNOS | Attorney-Client and Work Product |
| 69 | 9/9/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 70 | 9/9/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 71 | 9/9/2010 | Virendra Shekhawat | Spencer Hosie | Edward Balassanian; Bruce Wecker; Ganesh Balamitran | E-mail chain regarding VMWare and VMSafe | Attorney-Client and Work Product |
| 72 | 9/9/2010 | Virendra Shekhawat | Edward Balassanian; Spencer Hosie | | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 73 | 9/13/2010 | Virendra Shekhawat | Spencer Hosie | Edward Balassanian; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 74 | 9/14/2010 | Virendra Shekhawat | Spencer Hosie; Edward Balassanian | Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 75 | 9/14/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 76 | 9/14/2010 | Spencer Hosie | Virendra Shekhawat | Edward Balassanian; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 77 | 9/14/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 78 | 9/14/2010 | Spencer Hosie | Edward Balassanian | Virendra Shekhawat; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 79 | 9/14/2010 | Spencer Hosie | Edward Balassanian | Virendra Shekhawat; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 80 | 9/14/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 81 | 9/14/2010 | Spencer Hosie | Edward Balassanian | Virendra Shekhawat; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 82 | 9/14/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat; Bruce Wecker | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 83 | 9/14/2010 | Spencer Hosie | Edward Balassanian | Virendra Shekhawat; Bruce Wecker; George Bishop (Hosie Rice); Diane Rice (Hosie Rice) | E-mail chain regarding Juniper JUNOS | Attorney-Client and Work Product |
| 84 | 9/16/2010 | Bruce Wecker | Edward Balassanian | Spencer Hosie; Virendra Shekhawat | E-mail regarding Juniper | Attorney-Client and Work Product |
| 85 | 9/16/2010 | Virendra Shekhawat | Spencer Hosie; Bruce Wecker; Edward Balassanian | | E-mail chain regarding Junos OS platform | Attorney-Client and Work Product |
| 86 | 9/16/2010 | Edward Balassanian | Spencer Hosie | | E-mail chain regarding Junos OS platform | Attorney-Client and Work Product |
| 87 | 9/16/2010 | Spencer Hosie | Virendra Shekhawat | Bruce Wecker; Edward Balassanian | E-mail chain regarding Junos OS platform | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 88 | 9/17/2010 | Virendra Shekhawat | Spencer Hosie | Edward Balassanian | E-mail chain regarding Juniper | Attorney-Client and Work Product |
| 89 | 9/17/2010 | Edward Balassanian | Virendra Shekhawat | Spencer Hosie | E-mail chain regarding Juniper | Attorney-Client and Work Product |
| 90 | 9/17/2010 | Edward Balassanian | Virendra Shekhawat; Bruce Wecker; George Bishop | | E-mail chain regarding Juniper | Attorney-Client and Work Product |
| 91 | 9/17/2010 | Spencer Hosie | Virendra Shekhawat | Edward Balassanian; Bruce Wecker; George Bishop; Ganesh Balamitran | E-mail chain discussing HP charts | Attorney-Client and Work Product |
| 92 | 9/17/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching claim chart for HP Tipping Point IPS | Attorney-Client and Work Product |
| 93 | 9/17/2010 | Spencer Hosie | Virendra Shekhawat | Edward Balassanian; Bruce Wecker; George Bishop; Ganesh Balamitran | E-mail chain discussing claim chart for HP Tipping Point IPS | Attorney-Client and Work Product |
| 94 | 9/17/2010 | Edward Balassanian | Spencer Hosie | Virendra Shekhawat; Bruce Wecker; George Bishop (Hosie Rice); Ganesh Balamitran | E-mail chain discussing claim chart for HP Tipping Point IPS | Attorney-Client and Work Product |
| 95 | 9/17/2010 | Virendra Shekhawat | Spencer Hosie | Edward Balassanian; Bruce Wecker; George Bishop; Ganesh Balamitran | E-mail chain discussing HP charts and ComWare | Attorney-Client and Work Product |
| 96 | 9/17/2010 | Bruce Wecker | Virendra Shekhawat | Edward Balassanian; Spencer Hosie | E-mail discussing and attaching HP IMC QoSM vs. '163 claim chart | Attorney-Client and Work Product |
| 97 | 9/20/2010 | Spencer Hosie | Lynne Rose | Janine DeAndre (Hosie Rice) | E-mail chain, including iRunway, discussing and attaching HP IMC QoSM vs. '163 claim chart | Attorney-Client and Work Product |
| 98 | 9/20/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching Comware platform software overview | Attorney-Client and Work Product |

Implicit's Pre-Filing Investigation Privilege Log

| | | | | | | |
|---|---|---|---|---|---|---|
| 99 | 9/20/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including iRunway, regarding HP charts | Attorney-Client and Work Product |
| 100 | 9/20/2010 | Spencer Hosie | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching HP's Tipping Point Intrusion Prevention System (IPS) claim chart | Attorney-Client and Work Product |
| 101 | 9/20/2010 | Virendra Shekhawat | Spencer Hosie | Bruce Wecker; Edward Balassanian | E-mail chain regarding Juniper | Attorney-Client and Work Product |
| 102 | 9/20/2010 | Bruce Wecker | Lynne Rose | | E-mail chain, including iRunway, discussing and attaching Cisco claim charts | Attorney-Client and Work Product |