# EXHIBIT  21



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,660 | 03/02/2012 | 7711857 | 159291-0025(857) | 3313 |

7590        12/21/2012

HEIM, PAYNE & CHORUSH, LLP
600 TRAVIS STREET
SUITE 6710
HOUSTON, TX 77002

| EXAMINER |
|---|
| WHITTINGTON, KENNETH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/21/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| **Transmittal of Communication to Third Party Requester** *Inter Partes* **Reexamination** | **Control No.** 95/000,660 | **Patent Under Reexamination** 7711857 |
|---|---|---|
| | **Examiner** KENNETH J. WHITTINGTON | **Art Unit** 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

┌──── (THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS) ────┐

      IRELL & MEANELLA, LLP
      Attn: David McPhie
      840 Newport Center Dr., Ste. 400
      Newport Beach, CA  92660

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| *ACTION CLOSING PROSECUTION* *(37 CFR 1.949)* | Control No. 95/000,660 | Patent Under Reexamination 7711857 |
|---|---|---|
| | Examiner KENNETH J. WHITTINGTON | Art Unit 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

**Responsive to the communication(s) filed by:**
Patent Owner on <u>10 July, 2012</u>
Third Party(ies) on <u>02 November, 2012</u>

Patent owner may once file a submission under 37 CFR 1.951(a) within <u>1</u> month(s) from the mailing date of this Office action. Where a submission is filed, third party requester may file responsive comments under 37 CFR 1.951(b) within 30-days (not extendable- 35 U.S.C. § 314(b)(2)) from the date of service of the initial submission on the requester. **Appeal <u>cannot</u> be taken from this action.** Appeal can only be taken from a Right of Appeal Notice under 37 CFR 1.953.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

**PART I.  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**
1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**
1a. ☒ Claims <u>1,4 and 10</u> are subject to reexamination.
1b. ☒ Claims <u>2,3 and 5-9</u> are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable.  [Amended or new claims]
5. ☒ Claims <u>1,4 and 10</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____  ☐ are acceptable  ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:  ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
   ☐ been received.  ☐ not been received.  ☐ been filed in Application/Control No _____
10. ☐ Other _____

Application/Control Number: 95/000,660                                    Page 48
Art Unit: 3992

the objective evidence of nonobviousness is not sufficient to outweigh the evidence of obviousness. See id.

In the instant case, the Request presents strong cases of obviousness of claims 1, 4 and 10 (Issues 2, 7 and 8) as outlined in the Request and maintained as noted above in this action.  Examiners find herein the evidence presented by Patent Owner to show these claims satisfied a long felt need or failure of others and the evidence presented by Patent Owner to make a determination of commercial success (via sales and licensing) of these claims is not sufficient to overcome the strong rejections outlined above.  Therefore, the obvious rejections are maintained herein.


## VI.  CONSIDERATION OF INFORMATION DISCLOSURE STATEMENTS

With respect to the Information Disclosure Statements (PTO/SB/08A) filed on July 10, 2012, November 28, 2012 and December 5, 2012 (2 of them), the numerous materials cited therein has been considered and the information cited thereon has been considered to the extent suggested in the MPEP.  Note that MPEP §§2256 and 2656 indicate that degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information.  It is further noted that those references listed that have no apparent date thereon or provided by filer will not be considered and are lined through.

Application/Control Number: 95/000,660                                    Page 52
Art Unit: 3992

     Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should

be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

/KENNETH J WHITTINGTON/
Primary Examiner, Art Unit 3992

Conferees

/Salman  Ahmed/
Primary Examiner, Art Unit 3992


/ANDREW J. FISCHER/
Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT  22

## The State of Patent Litigation

### Chief Judge Randall R. Rader
### United States Court of Appeals for the Federal Circuit

### E.D. Texas Judicial Conference

Yesterday I returned to my room to find this magnificent book entitled _AMERICA'S TEAM.   To my surprise, the book was not about the Washington Redskins, but my real question is simple: After the results of the game last night, does the sender wish to stand and let me know that he sent the book?

Every year the President of the United States addresses Congress to assess the State of the Union.   Before I presume to address the state of patent litigation, I am anxious to confess that I come far short of presidential stature, but then you are not the Congress either.   At current approval ratings, perhaps we are both better off.

As long as Congress continues their rolling approval of temporary budgets to prevent a governmental shutdown, I have the great privilege of presiding over patent disputes.   As you can imagine, I have seen the state of patent litigation evolve over the past two decades and have also heard various reactions from some of the legends of our profession.

From the lawyer's perspective, I can give the state of patent litigation in two words: NOT ENOUGH.     For the corporate litigant, I can predict a similar two-

word evaluation: TOO . . . EXPENSIVE; for the Patent Office: GOOD START; for the damages expert: DEMANDING SUPPLY; for the venture funding firm: PROFIT PROSPECT; for the legal academic: CRITICISM BONANZA; for the judges: NO COMMENT; from my perspective: NEEDS IMPROVEMENT!

## I

Let me introduce my topic with a story: Several years ago our government sent me to China on a mission of importance.   In Beijing, I met with the U.S. Ambassador, Sandy Rand, who asked me to encourage the Chinese judiciary to enforce non-Chinese IP rights as aggressively as Chinese rights.   Now I must confess that I saw a great danger in advising the highly-skilled Chinese judges on the administration of their own law in their own jurisdiction.   I could, however, advocate, as I have often in foreign nations, the need for an international standard of judicial performance.   Under this international standard, to some degree implicit in TRIPS, courts must enforce IP regardless of the character, nationality, ownership, or origin of those rights.

With that determination, I traveled south to Shanghai and delivered my address to a large gathering of judges and IP professionals:   Courts have an obligation to render the same justice to all nationalities!   I finished with a flourish. The applause had not subsided when the hand of the President of the Shanghai

High Court shot into the air.  I acknowledged my friend and he arose with a simple question:   "Is that the way they do it in the Eastern District of Texas?"

When the clamor died down, I answered: "While I do not have any statistics on Texas judgments, I would not be surprised if juries in Marshal or Tyler are pretty hard on foreign corporations, BUT," I continued, "you have to understand that in East Texas, anyone who comes from East of Shreveport or West of Dallas is considered 'foreign.'"

My attempt at humor dampened the impact of the question for that audience, but the question itself has haunted me.   In truth, the US must adhere to the high principles it preaches.  We need to equalize the playing field for plaintiffs and defendants, whether they are home grown or foreign, a solo garage inventor or a Fortune 100 Company.   The landscape of patent litigation is changing, and likewise, we need to keep evaluating and adapting with it.   The question of my friend in Shanghai is a reprimand, a threat, a challenge, but most important, a call to IMPROVE.

Now the Shanghai question singled out the Eastern District of Texas, but we are all in this together.   No doubt "ED Tex" gets much of the attention only due to its emergence as a focal point for IP enforcement in the US, as did E.D. Virginia and Delaware before it.   As I suggest, we are all responsible for the implicit reprimand in that Shanghai question—trial judges, trial attorneys, corporate IP

managers, IP rights holders, and yes, appellate judges, too.   Moreover I would suggest that our responsibility to improve has recently multiplied.   I do not need to remind anyone that a consortium of buyers purchased a couple thousand patents recently for billions, with a B!   With the market prophesying the importance of our work, and the increase of media attention and consumer interest, we must raise our vision and strengthen our resolve to respond to the challenge in the Shanghai question.

To better qualify myself to call our discipline to a higher vision and a stronger resolve, I sought more first-hand trial experience.   Although I had presided as a trial judge in Washington, Chicago, Brooklyn, Syracuse, Oakland and more, I undertook to act as a District Judge in Texas.   I was very grateful that Chief Judge Folsom, Judge Ward, Judge Davis, and Judge Clark welcomed me to their district and made extensive arrangements for my visit.   I must say, I knew my fellow judges were happy to share their heavy dockets, but I was not quite prepared for the extent of their generosity.   Without any intention to embarrass, I thought I had volunteered to preside over one patent case; I got six!   Now THAT's Southern hospitality! (Incidentally, Chief Judge Folsom's prediction was correct.   Of the six, only one went all the way to trial.)

The experience allowed me to break in my cowboy boots, enjoy some real Texas barbecue at the Country Tavern, and swelter in unbreakable 100 degree heat.

And of course, I have a few observations from my experience as a trial judge as well:  First, the quality and dedication of the judges in the Eastern District of Texas is inspiring.   I do not need to tell this audience that they preside with vast grace and skill.

Next, the juries also inspired me.   As I noted, I have presided over juries in many jurisdictions.   Invariably up to twenty percent of my jury pool made every attempt to evade their civic duty.   Not in Marshal!   Every person was willing to make sacrifices, if necessary, to serve.   I observed many jurors who served despite hardships.   In particular, I can still see the face of one lady who announced that she alone owned and operated a radio station, and did not know what would happen to her radio business if she was picked for the jury.   When she was selected as juror number 3, she did not voice a single complaint.   She assumed her seat and served attentively and effectively for an entire week.   Based on my limited experience, I heartily commend the jurors of the Eastern District of Texas.

At this point, however, I want to return to the Shanghai question and its implicit challenge to improve our administration of justice.   With that challenge echoing in our ears, I would like to focus on six ways to improve patent litigation:

1.     Discovery management and control.   In the electronic age, discovery procedures designed for the 19th and 20th centuries just do not work for complex

5

patent litigation. For example, blanket stipulated orders requiring the production of all relevant documents leads to waste.   Courts must control the cost and efficiency of electronic discovery.

2.   Summary judgment.   In these vast technical lawsuits, summary judgment is the key to efficient resolution of disputes.   The bar has a responsibility to work with the bench to present, if at all possible, a summary judgment motion, or maybe TWO, that can end the litigation or narrow the case to dimensions more amenable to settlement.

3.   Transfer motions and Joinder.   In an era when 14 different districts have stepped forward and volunteered to expertly handle patent disputes, the bar should again work with the bench to file cases or find venues that best suit the convenience of parties and logical distribution of these important cases. Moreover the trend towards an excess number of parties also unnecessarily multiplies the complexity of already-complex litigation.

4.   Early procedural and substantive valuation of cases.   All patents and all patent cases are not created equal!   The bar needs to work with the bench to determine at an early stage the economic value of the case for both parties.   With that evaluation in mind, the court may then tailor its timing and procedures to make sure a billion-dollar case gets a "billion-dollar" process and a thousand-dollar case gets its due as well.

6

5.    Rules and Practice.   Much of the value of our US system of adjudication lies in the individuality and independence of the judges themselves. At the same time, our courts need to understand that these complex and demanding patent cases profit from an announced and dependable set of procedural rules that all parties understand in advance.

6.    Troll and grasshopper control.   No doubt you would like to know right now what this entails, but I am going to keep you in suspense on this last category.

Oh yes, and there is a seventh recommendation, tailored to ED Tex, which I will also save to the end.


## II

Every person in this room understands that the greatest weakness of the US court system is its expense.   And the driving factor for that expense is discovery excesses.   Electronic recordkeeping in the modern age has multiplied the expense of looking behind every curtain.   As we all understand, the modern electronic age has rendered old discovery processes obsolete or, at least inappropriate for the vast complexity and volume of large patent disputes.   Patent cases, in particular, produce disproportionally high discovery expenses.   In one 2010 report, the Federal Judicial Center determined that "Intellectual Property cases had costs almost 62% higher, all else equal…."

7

We all understand as well that those expenses multiply exponentially when attorneys use discovery as a tactical weapon.    Generally, the production burden of expansive e-requests outweighs their benefits.    I saw one analysis that concluded that .0074% of the documents produced actually made their way onto the trial exhibit list—less than one document in ten thousand.    And for all the thousands of appeals I've evaluated, email appears even more rarely as relevant evidence.

Our courts are in danger already of becoming an intolerably expensive way to protect innovation or prove freedom to operate.    These vast expenses can force accused infringers to acquiesce to non-meritorious claims.    This only serves as an unhealthy tax on innovation and open competition.

To address this problem, the Advisory Council of the Federal Circuit created a special subcommittee to draft a model rule for e-discovery governance.    The subcommittee included some vastly skilled judges and attorneys from various regions and backgrounds.    For this conference, I will note that Judge Everingham participated extensively and effectively as a member of that subcommittee.    After the subcommittee's work, the entire Federal Circuit Advisory Council considered and unanimously adopted the model rule that I have the honor of unveiling today.

This proposed Model Order on E-Discovery in Patent Cases should serve as a helpful starting point for district courts to enforce responsible, targeted use of e-

discovery in patent cases.   The goal of this Model Order is to streamline e-discovery, particularly email production, and require litigants to focus on the proper purpose of discovery—the gathering of material information—rather than on unlimited fishing expeditions.

This Model Order begins with a discovery process whereby the parties exchange core documentation concerning the patent, the accused product, the prior art, and the finances before seeking email production.   Just as Federal Rule of Civil Procedure 30 presumptively limits cases to ten depositions and seven hours per deposition, this Model Order presumptively limits the number of record custodians and the number of search terms for email production requests.   When the default numbers with limits on depositions were first included in the Federal Rules, veteran lawyers panicked that these limits were arbitrary and would prevent the discovery of critical information.   But after two decades of experience, few question the wisdom of these limits.   And the era of the endless deposition is fortunately over.

Under this new e-discovery model order, each party seeking email production presumptively gets 5 custodians per producing party and 5 search terms per custodian.   However, the parties may jointly agree to modify these limits or request court modification for good cause.

The Order also contemplates that a discovering party may exceed the discovery limits.   If the party wants to exceed those limits, however, they do so at their own expense.   I believe cost shifting will encourage more conscientious requests, as we all know, when you are ordering drinks at a bar, you order a little more wisely when you know you are paying the tab!

One other point, a large source of e-discovery cost is the pre-production review of documents by attorneys.   Even with claw-back provisions, pre-production review is often necessary to ensure adversaries do not receive privileged or sensitive but irrelevant documents.   This Model Order addresses attorney-client and work product protections to minimize expensive pre-production review.

In sum, the Model Order of the Advisory Council of the Federal Circuit promises to bring some discipline to e-discovery expenses.   Of course, for this Model Order to have a real impact, district judges will need to put these suggestions (or some variation) into practice.   Fortunately, district courts have inherent power to control their dockets to further "economy of time and effort for itself, for counsel and for litigants."   *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).   I would respectfully ask our bar to work with the bench to implement this first improving vision.   I will attach the model order to the printed version of this speech.

III

Next, the patent litigation system needs more effective, summary judgment practice.   At this point, I want to repeat something I said before: our US common law system profits vastly from the independence and individuality of the judicial officers who render the judgment that ultimately characterizes the system.   These individual judges often have varying conceptions of the best way to supply that judgment.   Moreover individual parties and attorneys, who vastly influence the procedural posture of every case, also have varying procedural strategies and objectives.

Nonetheless, as you have come to realize, much of my message can be summarized with an allusion to the "goose that laid the golden egg" fable. Needless to say, if we cannot control the cost, complexity, and complications of patent litigation, the litigants that we serve will simply find a better way, or a better place, to resolve their disputes.   Unchecked and uncontrolled inflation of litigation costs can potentially kill our golden goose and leave us empty handed. But, YES, I would also slightly amend the "goose" fable for our setting.   Patents and inventions are essential to the global economy, and in our case, geese are laying eggs—resolving patent   disputes—all around the world.   If the US system requires a litigant to "feed the goose" ten ounces of gold only to get a golden egg of five ounces in return, obviously geese from other counties that don't require

11

such an investment, such as Germany or Japan or China, become more appealing. We must be careful not to drive away our golden goose by self-imposed encumbrances.

Summary judgment can streamline processes and, at the same time, produce a proper record for decision and appeal.   As the Supreme Court wisely explained in Celotex, summary judgment is not a "disfavored procedural shortcut," but rather an integral part of the Federal Rules "to secure the just, speedy and inexpensive determination of every action."

At some personal peril, let me refer to my experience in Texas.   As I mentioned, I received 6 cases.   Of that number, a jury verdict concluded one case, three settled after the court indicated some of its directions in pre-trial motions and arguments, and the court resolved two more by summary judgment.   Of course, I do not suggest that five-sixths of all cases can reach resolution through aggressive pre-trial proceedings.   Nor do I suggest that a third of all cases deserve summary judgment.   The actual numbers may be even higher.

I do suggest that it is the duty of the bar to assist the bench in presenting proper motions to reduce the time and expense of lengthy proceedings.   As I suggested before, this improvement requires the parties to present a summary judgment motion, or maybe two, that either resolves the case entirely or reduces it to dimensions amenable to settlement. The bar must realize that it too has a stake

in pursuing a more efficient adjudicatory system.   Now, I realize that not every case can be entirely dismissed on a motion; but I do believe most cases have specific issues that can be resolved on summary judgment.   The bar has the first responsibility to present summary judgment motions that identify these particular issues.   The Federal Circuit receives and resolves the vast majority of its patent cases under summary judgment rules.   The same should probably apply to district courts.   Besides, aggressive summary judgment practice clears a congested trial court docket for cases that really deserve a full trial.   We must strive to use summary judgment tools effectively to control costs and keep our golden goose healthy.

IV

Next, transfer motions and joinder practice.   I am not going to present a lengthy dissertation on the legal merits of a correct venue.   I am not even going to discuss courts and counsel as public servants who should seek the best interests of its clientele.   Instead I am going to appeal to your common sense.   Plaintiffs, you must evaluate whether your chosen venue is a rational option BEFORE filing a Complaint.   Before setting the wheels of the litigation machine in motion and expending party and judiciary efforts, give all your options equal consideration. The Northern District of California, the District of Delaware, or the Eastern

13

District of Texas should not be chosen by default, or for attorney convenience, especially with 12 other districts participating in the Patent Pilot Program.

Moreover, the best way for us to strengthen our judicial system is to share and promote other venues.   Think about it!   In your personal relationships, you actually advance yourself by advancing others.   When you praise and aggrandize others, the reflection enhances you!   Courts and counsel are really no different! If courts and counsel share and promote other forums where appropriate, in the long run, they are really promoting themselves as the most reasonable and the most respectable of all.

I would ask you to remember too that in the long run our US judicial system is really competing with the world.   In that sense, a conscientious effort to pursue and continue litigation in a more convenient and proper US district court is really advancing ourselves on the world stage where it most matters.

On joinder, I will just note that the Federal Circuit Advisory Council, under the dynamic leadership of its Chairman Ed Reines, intends to turn its full attention to the trend toward cases and appeals with many parties.   This trend is very evident and worrisome to our Court as well.

V

All patents and all patent cases are not created equal!   Case management is really the skill of giving each case the time and effort it deserves.   Of course, the

14

most fundamental aspect of that skill is learning to discern the true value of each case.   At this point, I could use the standard verbalization that I have used throughout this speech about "the bar has the obligation to assist the bench in evaluating cases," but frankly that will not work for this area of improvement—damages and accurate case valuation.   Every attorney seems to believe, genuinely, that his or her case is the most important one on any judge's docket.

Thus, for this improvement, I think I am addressing primarily the judges.   I recommend that trial judges use their authority, including DAUBERT inquiries, to ascertain early in the case the approximate dollar value of the case.   With some searching inquiry into the parties' damages model, the trial judge can get a good idea of the worth of the contested technology and its implications in the market place.   The parties also benefit from early damages discussions and disclosures because it can provide a realistic evaluation of both Defendant's exposure and Plaintiff's damages calculation and further promote early and effective mediation. This inquiry can occur at the onset of the case during case management conferences or even a little later in connection with *Markman* hearings.

With an understanding of the case's true worth, the trial judge would then be poised to identify cases that would benefit from tailoring the standard procedures to fit the case and its significance.   In colloquial terms, the court may adjust timing and procedures of the case to make sure a billion-dollar case gets a "billion-

dollar's worth" of process—adequate time and witnesses and confidential information protections and more—and a thousand-dollar case gets . . . well, less.

May I observe at this point that I am reluctant to advise masterful district judges about case management.   In truth, I believe that these judges know this subject better than me.   Still I am concerned that our system as a whole tends to overlook and "undervalue" the damages and valuation stage of our adjudicatory process.   From the attorney's standpoint, we understand that the defendant wants to avoid damages discussions because it seems to admit that remedies are warranted.   And the plaintiff wants to postpone remedies discussions until it has shown fault because damages will escalate in the face of established culpability. Therefore, I suggest to my fellow judges that we are going to have to take the initiative to improve patent procedure by intervening ourselves to get a realistic valuation of the case much earlier.

## VI

Rules.   Again this improvement involves me in the uncomfortable enterprise of advising my brighter and more experienced colleagues.   I do not want to enter the debate about the merits of the strict patent case rules of the Northern District of California or more lenient rules in some other District.   I merely want to suggest that clear and defined rules make every game fairer. Particularly in the 14 districts that have enlisted for the Patent Pilot Project, I

16

would suggest the merits of some uniform procedures that clarify expectations in advance.   With expectations settled, the bar involved in the case can then focus on an efficient way to achieve each step of the process.

VII

At last we have reached the one that you wanted to hear about right at the outset: Troll and grasshopper control!   Of course, before we can control trolls and grasshoppers, we have to know who they are.   And again, OF COURSE, that is the difficulty!   Even some Supreme Court justices have referred to the non-practicing entity, the proverbial NPE.   We also all understand that the NPE designation sweeps in some unintended "culprits" like universities and research clinics and can also extend to almost every corporation and business because they practice only a fraction of their patent portfolio.   For that reason, I have always preferred an alternative definition of a "troll," namely, any party that attempts to enforce a patent far beyond its actual value or contribution to the prior art.

Every "troll" discussion, however, needs a note of balance.   Just as trolls litter the patent system with marginally meritorious lawsuits, so the system also suffers from the IP "grasshopper."     The IP grasshopper is the entity that is quick to steal the "inventor-ant's" work and research investment because he did no work himself and the winter of competition approaches.   We can recognize the grasshopper because he refuses to pay any license fee until his legs and claws are

17

held to the proverbial litigation fire.    Once again, a grasshopper is hard to define, but I can venture a description according to the same basic notion that helped us identify the troll:   A grasshopper is any entity which refuses to license even the strongest patent at even the most reasonable rates.

Frankly I am not sure who causes more meritless litigation—the troll asserting patents beyond their value or the grasshopper refusing to license until litigation has finally made it impossible to avoid.   I am surer, however, that both the troll and the grasshopper tend to blame and feed off of each other.    Neither deserves encouragement or tolerance.   And so that gets us to the prospect of controlling trolls and grasshoppers.

As I have suggested, it is difficult to control the troll or the grasshopper in advance because they cannot really be identified until their abuse is already over— the troll has lost its case of little value or gotten negligible value for a nominally winning case; the grasshopper has finally accepted a reasonable license fee after dragging the court and the patent owner through years of litigation.   The troll and the grasshopper only emerge after the case is over and the court has lost its ability to remedy the abuse.

Well . . . not so fast!   The court does have one remaining option to control trolls and squash grasshoppers—reverse the fees and costs!   When the case is over and the court can identify a troll or a grasshopper, I strongly advocate full-

18

scale reversal of attorney fees and costs!  Of course, the bar can help here by making a motion.   While I understand that the case must qualify as exceptional, I believe that adequate documentation of "trolls" or "grasshoppers" would qualify. Keep in mind that the Federal Circuit reviews a finding of an exceptional case for clear error and the award of attorney's fees for a very infrequent abuse of discretion.  Just one further word:  this improvement suggestion is not really discarding the American rule that each party pays its own attorney.    Instead this fee reversal recommendation is a tool to discourage cases that are brought only to obtain revenue from litigation avoidance instincts.   In that sense, this recommendation is part of the responsibility of the bench and bar to protect the integrity of the US judicial structure.

VIII

I think I promised one more recommendation, in this case, specifically targeted at ED TEX!   My recommendation is really quite simple and based on personal experience:   Marshall really needs more good restaurants!

IX

I want to return for just a moment to the Shanghai question that should strengthen our determination to improve.   I told you my smart aleck answer to the question, but in truth, I went on to give a more complete answer.   I noted that far less than 4% of all patent cases reach the trial stage and many of those trials do not

19

employ a jury.    Nonetheless the prospect of trial and the specter of a jury—whether in Texas or any other state—can drive parties to settlement at unjustified rates.    Settlement, by and large, is essential to the success of the US system of dispute resolution.    Without settlements, the system would collapse under its own weight.    Nonetheless, those settlements must occur on fair, neutral, and justified economic terms, not as the result of stratagems, threats, or fears.    Otherwise our system is failing.

We all, bench and bar alike, owe our system more than we can ever repay. We know that our liberties are priceless and we know that we owe much of that liberty to our law enforcement and judicial systems.    Moreover we know that our discipline—patent law—fosters prosperity and economic growth regardless of upturns or downturns in the market.    Bearing that in mind, we have an obligation to pass this system on to our children and their children in as good or better shape than we found it.    We need to ensure that patent law continues to serve its purpose of fostering innovation and that patent litigation does not become an unwieldy, unpredictable, and unaffordable burden on innovation.    Thus, I encourage each of us, bench and bar alike, to raise our vision and strengthen our resolve to make our courts and our patent litigation better in the future.    We need to answer that Shanghai question in the future with a single uniform response: we do not allow our courts to be used for anything, except the pursuit of justice!    Thank you.

20

# AN E-DISCOVERY MODEL ORDER

## INTRODUCTION

Since becoming a staple of American civil litigation, e-discovery has been the subject of extensive review, study, and commentary.  *See The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production* (2d ed. June 2007).   In view of the growing concern about e-discovery, the Federal Rules of Civil Procedure were amended in 2006 to more fully address e-discovery.   Likewise, several district courts have adopted local e-discovery rules.[1]

Despite these amendments, e-discovery continues to present a broad spectrum of challenges, such as preservation obligations, production format, and the disproportionate cost of e-discovery.[2]   Patent cases, in particular, tend to suffer from disproportionally high discovery expenses.   *See* Emery G. Lee III & Thomas E. Willging, *Litigation Costs in Civil Cases: Multivariate Analysis* 8 (Fed. Judicial Ctr. 2010) ("Intellectual Property cases had costs almost 62% higher, all else equal, than the baseline 'Other' category."); s*ee also* Thomas E. Willging et al., *Discovery and Disclosure Practice, Problems, and Proposals for Change: A Case-*

---

[1]  District Courts in Delaware, Kansas and Maryland have adopted e-discovery local rules.   The Seventh Circuit has adopted an e-discovery pilot program.

[2]  The following are the main cost areas for e-discovery:

**Collection:**   Forensically sound (*e.g.*, preserving the document date) collection can require a trained specialist.   Costs will include vendor fees and/or licensing fees, and media related charges. Inactive data requires restoration and software licensing fees.

**Processing:**   Requires use of licensed assessment or review tools (more than 1 tool are often used for this process).   Expenses will include data and text extraction, de-duplication, imaging fees, project management time and potential hosting fees.   Frequently includes narrowing or broadening the scope of collection based on results.

**Review:**   Requires continued hosting and licensing fees.   Project management time is necessary for database setup and management, additional keyword filtering/assessment and searching.   If human review is involved, this is the largest area of cost.

**Production:**   Requires any additional data and image conversion, text extraction and/or appropriate language OCR generation.   Tech time will include dealing with problematic files (*e.g.*, Excel).   Also requires endorsement and control numbering.   Costs will also be incurred for project management/tech time and media related charges.

**Post Production:**   Project management and load time for importing productions into production review tool or index. Additional costs for associating native files to records.

*Based National Survey of Counsel in Closed Federal Civil Cases* 38-39 (Fed. Judicial Ctr. 1997) (finding that patent cases "stood out for their high discovery expenses").  Such expenses are compounded when attorneys use discovery tools as tactical weapons, which hinders the "just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

In recent years, the exponential growth of and reliance on electronic documents and communications has exacerbated such discovery abuses. Excessive e-discovery, including disproportionate, overbroad email production requests, carry staggering time and production costs that have a debilitating effect on litigation.  Routine requests seeking all categories of Electronically Stored Information often result in mass productions of marginally relevant and cumulative documents.  Generally, the production burden of these expansive requests outweighs the minimal benefits of such broad disclosure.

Most discovery in patent litigation centers on what the patent states, how the accused products work, what the prior art discloses, and the proper calculation of damages.  These topics are normally the most consequential in patent cases. Thus, far reaching e-discovery, such as mass email searches, is often tangential to adjudicating these issues.

As technology and knowledge play an increasingly important role in our economy, the courts must not become an intolerably expensive way to resolve patent disputes.  Specifically, litigation costs should not be permitted to unduly interfere with the availability of the court to those who seek to vindicate their patent rights—the enforcement of such rights is both an obligation of the legal system and important to innovation.  Likewise, disproportionate expense should not be permitted to force those accused of infringement to acquiesce to non-meritorious claims.  This only serves as an unhealthy tax on legitimate commerce.

Fortunately, district courts have inherent power to control their dockets to further "economy of time and effort for itself, for counsel and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).  Our objective is thus narrow, but important.  The accompanying Model Order Limiting E-Discovery in Patent Cases is intended to be a helpful starting point for district courts to use in requiring the responsible, targeted use of e-discovery in patent cases.  The goal of this Model Order is to promote economic and judicial efficiency by streamlining e-discovery, particularly email production, and requiring litigants to focus on the proper purpose of discovery—the gathering of material information—rather than permitting unlimited fishing expeditions.  It is further intended to encourage

discussion and public commentary by judges, litigants, and other interested parties regarding e-discovery problems and potential solutions.

## DISCUSSION OF THE MODEL ORDER

Hard-worn experience in patent cases and recent commentary teach that efforts to identify comprehensively the discovery issues or to produce all "relevant" documents at once at the outset of the case can result in the vastly overbroad production of e-discovery. Indeed, the practice of gathering huge amounts of information at the front of a case and running broad key searches as the issues emerge has come under increasing question. The recently published *Judges' Guide to Cost-Effective E-Discovery* critiqued this practice sharply:

> Some argue that e-discovery is best accomplished by taking large amounts of data from clients and then applying keyword or other searches or filters. While, in some rare cases, this method might be the only option, it is also apt to be the most expensive. In fact, keyword searching against large volumes of data to find relevant information is a challenging, costly, and imperfect process.

Anne Kershaw & Joe Howie, *Judges' Guide to Cost-Effective E-Discovery* 4 (Fed. Judicial Ctr. 2010).

Hence, this Model Order requires a discovery process whereby the parties exchange core documentation concerning the patent, the accused product, the prior art, and the finances before making email production requests. Moreover, email production requests should be focused on a particular issue for which that type of discovery is warranted. Much as Federal Rule of Civil Procedure 30 presumptively limits cases to ten depositions and seven hours per deposition,[3] this Model Order presumptively limits the number of custodians and search terms for all email production requests. However, the parties may jointly agree to modify these limits or request court modification for good cause.

This is not to say a discovering party should be precluded from obtaining more e-discovery than agreed upon by the parties or allowed by the court. Rather, the discovering party shall bear all reasonable costs of discovery that exceeds these

---

[3] Such limits have reformed deposition practice, making it more efficient. *See* Fed. R. Civ. P. 30(a), 1993 Advisory Committee Notes (explaining that Rule 30 limits the number of depositions a party may take in order to "to emphasize that counsel have a professional obligation to develop a mutual cost-effective plan for discovery in the case").

limits.  This will help ensure that discovery requests are being made with a true eye on the balance between the value of the discovery and its cost.

A large source of e-discovery cost is the pre-production review of documents by attorneys or other human reviewers.  Even with clawback provisions, this pre-production review is often undertaken to avoid the disclosure of privileged or other sensitive documents to adversaries.  Accordingly, this Model Order addresses concerns regarding waiver of attorney-client privilege and work product protection in order to minimize human pre-production review.

**E-Discovery Committee**

Chief Judge James Ware (ND Cal)
Judge Virginia Kendall (ND Ill)
Magistrate Judge Chad Everingham (ED Tex)
Chief Judge Randall Rader (Fed. Cir.)
Tina Chappell
Richard "Chip" Lutton
Joe Re
Edward Reines
Steve Susman
John Whealan

Addendum: Discovery Model Order

Plaintiff,

v.

Defendant.                              Case No.

**[MODEL] ORDER REGARDING E-DISCOVERY IN PATENT CASES**

The Court ORDERS as follows:

1.      This Order supplements all other discovery rules and orders.   It streamlines Electronically Stored Information ("ESI") production to promote a "just, speedy, and inexpensive determination" of this action, as required by Federal Rule of Civil Procedure 1.

2.      This Order may be modified for good cause.   The parties shall jointly submit any proposed modifications within 30 days after the Federal Rule of Civil Procedure 16 conference.   If the parties cannot resolve their disagreements regarding these modifications, the parties shall submit their competing proposals and a summary of their dispute.

3.      Costs will be shifted for disproportionate ESI production requests pursuant to Federal Rule of Civil Procedure 26.   Likewise, a party's nonresponsive or dilatory discovery tactics will be cost-shifting considerations.

4.      A party's meaningful compliance with this Order and efforts to promote efficiency and reduce costs will be considered in cost-shifting determinations.

5.      General ESI production requests under Federal Rules of Civil Procedure 34 and 45 shall not include metadata absent a showing of good cause.   However, fields showing the date and time that the document was sent and received, as well as the complete distribution list, shall generally be included in the production.

6.      General ESI production requests under Federal Rules of Civil Procedure 34 and 45 shall not include email or other forms of electronic correspondence (collectively "email").   To obtain email parties must propound specific email production requests.

7.      Email production requests shall only be propounded for specific issues, rather than general discovery of a product or business.

8.      Email production requests shall be phased to occur after the parties have

exchanged initial disclosures and basic documentation about the patents, the prior art, the accused instrumentalities, and the relevant finances.   While this provision does not require the production of such information, the Court encourages prompt and early production of this information to promote efficient and economical streamlining of the case.

9.     Email production requests shall identify the custodian, search terms, and time frame.   The parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe.

10.     Each requesting party shall limit its email production requests to a total of five custodians per producing party for all such requests.   The parties may jointly agree to modify this limit without the Court's leave.   The Court shall consider contested requests for up to five additional custodians per producing party, upon showing a distinct need based on the size, complexity, and issues of this specific case.   Should a party serve email production requests for additional custodians beyond the limits agreed to by the parties or granted by the Court pursuant to this paragraph, the requesting party shall bear all reasonable costs caused by such additional discovery.

11.     Each requesting party shall limit its email production requests to a total of five search terms per custodian per party.   The parties may jointly agree to modify this limit without the Court's leave.   The Court shall consider contested requests for up to five additional search terms per custodian, upon showing a distinct need based on the size, complexity, and issues of this specific case.   The search terms shall be narrowly tailored to particular issues. Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.   A conjunctive combination of multiple words or phrases (*e.g.*, "computer" and

"system") narrows the search and shall count as a single search term.   A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word.   Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the production and shall be considered when determining whether to shift costs for disproportionate discovery.   Should a party serve email production requests with search terms beyond the limits agreed to by the parties or granted by the Court pursuant to this paragraph, the requesting party shall bear all reasonable costs caused by such additional discovery.

12.    The receiving party shall not use ESI that the producing party asserts is attorney-client privileged or work product protected to challenge the privilege or protection.

13.    Pursuant to Federal Rule of Evidence 502(d), the inadvertent production of a privileged or work product protected ESI is not a waiver in the pending case or in any other federal or state proceeding.

14.    The mere production of ESI in a litigation as part of a mass production shall not itself constitute a waiver for any purpose.

# EXHIBIT  23

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of:  Edward Balassanian | Examiner:      Kenneth Whittington |
| U.S. Patent No. 7,711,857 | Technology Center/Art Unit:  3992 |
| Reexamination Control No.: 95/000,660 | COMMENTS TO ACP |
| Reexamination Request Filed:  March 2, 2012 | |
| For:  Method and System for Data Multiplexing | |

Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

Patent Owner has received the PTO's Action Closing Prosecution ("ACP") dated December 21, 2012.  In the ACP, the Examiner maintained his rejection of claims 1, 4 and 10 as anticipated under 35 U.S.C. 102(b) by Decasper98 and as rendered obvious under 35 U.S.C. 103(a) by Decasper98.  The Examiner also maintained his rejection of claims 1, 4 and 10 as rendered obvious under 35 U.S.C. 103(a) by Decasper98 in view of IBM96 and as rendered obvious under 35 U.S.C. 103(a) by Decasper98 in view of IBM96 and Nelson.  Patent Owner acknowledges with appreciation the withdrawal of the rejection based on Kerr.

Patent Owner continues to traverse these rejections.  The pending claims are reflected in the Listing of Claims attached as an Appendix.  Exhibit 1 (Dr. Ng's Declaration) is also attached.  While Patent Owner does not believe any fees are required, if fees are necessary, then such fees are hereby petitioned and authorized to be charged to Deposit Account No. 504592.

> analyzing the data type of a first packet of the message to dynamically identify a sequence of components for processing a plurality of packets of the message such that the output format of the components of the sequence match the input format of the next component in the sequence,
>
> wherein analyzing the data type of the first packet of the message to dynamically identify the sequence of components includes selecting individual components to form the sequence of components after the first packet of the message is received;…

Claims 4 and 10 require similar limitations. These limitations capture the essence of the '857 technology and, when properly and fully understood, are patentably distinguishable from Decasper. This claim construction sub-section is critical because it establishes that Decasper and the '857 technology—*as claimed*—are fundamentally different. The various legal principles and MPEP rules that govern the claim construction inquiry are set forth on pages 11-13 of Patent Owner's initial Response and, for brevity, will not be repeated here.

### 1.    "analyzing the data type"

Claims 1 and 10 require analyzing the "data type" of a first packet. Analyzing the data type of a first packet means identifying the protocols in the multiple layers that are used in the first packet's headers.

The Abstract directly supports this construction when it states that "[t]he system identifies the message handlers [i.e., the claimed components] based on the initial data type of the message and a target data type. The identified message handlers effect the conversion of the data to the target data type through various intermediate data types." ==Here, the Abstract makes an unequivocal reference to what the '857 patent is all about:   converting packets between various *data types*.== The specification establishes that these data types are synonymous with protocols at different layers when it discusses the same conversion between various *layers*. For example, the background section of the specification describes the context of the problem that the novel '857 system solves:

> Indeed, when data is generated on one computer system and is transmitted to another computer system to be displayed, the data may be converted in many different intermediate formats before it is eventually displayed. For example, the generating computer system may initially store the data in a bitmap format. To send the data to another computer system, the computer system may first compress the bitmap data and then encrypt the compressed data. The computer system may then convert that compressed data into a TCP format and then into an IP format. The IP formatted data may be converted into a transmission format,

situation, although she is receiving a new message the second time she listens to the song, the first packet of that new message is not recognized as such.  It is not identified as a first packet, even though it is the first packet of a new message.

22.      If the storage space of a Decasper router is depleted, "the oldest flow records are recycled (*i.e.*, the old entries in the cache are replaced with new ones)."  In such situations, this recycling process cannot be optional.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made herein on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001.

Respectfully submitted,

T.S. Eugene Ng

# EXHIBIT  24

# In The Matter Of:

*IMPLICIT NETWORKS*
*v.*
*F5 NETWORKS*

_____

*SCOTT NETTLES, Ph.D. - Vol. 1*
*November 6, 2012*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

Page 160

| | | |
|---|---|---|
| 1 | general packet processing of the patents-in-suit.  Do | 03:47:24 |
| 2 | you see that? | 03:47:27 |
| 3 | A.   Uh-huh. | 03:47:27 |
| 4 | Q.   What's the more general packet processing that | 03:47:28 |
| 5 | you're referring to here of the patents-in-suit? | 03:47:32 |
| 6 | A.   Well, I mean, the patents-in-suit are all | 03:47:39 |
| 7 | about general demultiplexing, so they're not talking | 03:47:41 |
| 8 | about just processing IP packets as IP packets.  They're | 03:47:45 |
| 9 | talking about demultiplexing all sorts of different | 03:47:47 |
| 10 | messages in all sorts of different ways.  So we've seen | 03:47:52 |
| 11 | lots of examples of that today.  You know, it's just a | 03:47:57 |
| 12 | much more general -- the patents-in-suit are a much more | 03:48:02 |
| 13 | general target than this -- than this paper. | 03:48:05 |
| 14 | Q.   Again, as part of the process here that you're | 03:48:19 |
| 15 | referring to would be the format conversion of packets, | 03:48:35 |
| 16 | things like that? | 03:48:38 |
| 17 | A.   As an example. | 03:48:41 |
| 18 | Q.   But then the patents could also just use | 03:48:42 |
| 19 | routines to route information to as well.  Is that | 03:48:46 |
| 20 | right? | 03:48:50 |
| 21 | A.   Well, I mean, I think it's important to | 03:48:50 |
| 22 | understand that the components of the patents don't have | 03:48:54 |
| 23 | to change the formats.  So -- and that's clear from the | 03:49:00 |
| 24 | claim construction.  But to anticipate the patents, you | 03:49:05 |
| 25 | have to disclose the full scope of the patents.  And the | 03:49:10 |

SCOTT NETTLES, Ph.D. - 11/6/2012

Page 161

| | | |
|---|---|---|
| 1 | full scope of the patents definitely includes format | 03:49:15 |
| 2 | conversion. | 03:49:18 |
| 3 | Q.   So based on that, is it your opinion that | 03:49:18 |
| 4 | Decasper does not disclose the full scope of the | 03:49:40 |
| 5 | patents? | 03:49:43 |
| 6 | A.   Well, I mean, I think it's, you know, more | 03:49:43 |
| 7 | limited than that.  I mean, my report makes it clear the | 03:49:49 |
| 8 | various limitations, but I think it doesn't anticipate a | 03:49:53 |
| 9 | number of different aspects of the patents.  In | 03:49:55 |
| 10 | particular, it doesn't anticipate format conversion. | 03:49:59 |
| 11 | Q.   So on that point, is it your opinion that each | 03:50:12 |
| 12 | of the claims, asserted claims require format | 03:50:14 |
| 13 | conversion? | 03:50:18 |
| 14 | MR. HOSIE:  Objection.  Vague, ambiguous, | 03:50:18 |
| 15 | and asked and answered in a prior deposition. | 03:50:21 |
| 16 | A.   Well, so again, I think I just explained this. | 03:50:26 |
| 17 | The Court held and the patent is very clear on that the | 03:50:31 |
| 18 | components do not have to do format conversion, but they | 03:50:35 |
| 19 | do disclose format conversion.  And so to anticipate the | 03:50:41 |
| 20 | patents, you would need to disclose format conversion. | 03:50:46 |
| 21 | To infringe the patents, you don't necessarily have to | 03:50:49 |
| 22 | do format conversion. | 03:50:52 |
| 23 | Now as it turns out, F5 systems definitely do | 03:50:53 |
| 24 | format conversion.  So really the infringement | 03:50:57 |
| 25 | allegations that we've made don't hinge on this question | 03:51:02 |

Page 162

```
1    of whether or not there's no formatted conversion or    03:51:05
2    not, but, you know, Decasper doesn't anticipate the     03:51:07
3    patents.                                                 03:51:14
4        Q.   (BY MR. BRUN)  Okay.  Just to make sure of      03:51:16
5    your understanding of the legal issues and the law that 03:51:18
6    you're applying, is it your opinion that you can         03:51:22
7    infringe a patent without anticipating it?              03:51:23
8            MR. HOSIE:  Sorry.  Can I hear that             03:51:29
9    again, please?                                           03:51:31
10           (Requested testimony read.)                      03:51:32
11       A.   Well, I mean, I don't think I have a general    03:51:46
12   opinion about that, and it seems like that infringement 03:51:53
13   is something that happens in the present or at least     03:51:59
14   after the patent's been issued in anticipation of        03:52:01
15   something that happens in the past.  Here it's clear     03:52:05
16   that, based on the Court's claim construction ruling,    03:52:08
17   that the components are not required to do conversion to 03:52:15
18   infringe.  That's completely clear.  But here there      03:52:24
19   aren't even formats.  There's no idea that there's an    03:52:30
20   input format and an output format.  Everything is IP.    03:52:34
21   So this doesn't anticipate.                              03:52:38
22       Q.   (BY MR. BRUN)  And actually, I should have      03:52:54
23   asked my last question not as an opinion on the law      03:53:45
24   because that's not what you're here to testify about,    03:53:48
25   but there are certain understandings that you need to    03:53:51
```

Page 182

1      otherwise interested in the outcome of the action.

2           Certified to by me _____, 2012.

3

4

5                          _____

                           Julie C. Brandt, CSR, RMR, CRR

6                          Texas CSR No. 4018

                           Expiration Date:  12/31/12

7

                           Merrill Corporation

8                          Reg. No. 191

                           4144 North Central Expressway

9                          Suite 850

                           Dallas, Texas 75204

10                         800-966-4567

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT  25

1   SPENCER HOSIE (CA Bar No. 101777)
    shosie@hosielaw.com
2   DIANE S. RICE (CA Bar No. 118303)
    drice@hosielaw.com
3   DARRELL R. ATKINSON (CA Bar No. 280564)
    datkinson@hosielaw.com
4   HOSIE RICE LLP
    Transamerica Pyramid, 34th Floor
5   600 Montgomery Street
    San Francisco, CA 94111
6   (415) 247-6000 Tel.
    (415) 247-6001 Fax
7

8   *Attorneys for Plaintiff*
9   *IMPLICIT NETWORKS, INC.*

10

11              UNITED STATES DISTRICT COURT
12        FOR THE NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
13

14   IMPLICIT NETWORKS, INC.,

                                        Case No. 10-CV-3365 SI
15              Plaintiff,

                                        **IMPLICIT NETWORKS' OPPOSITION**
16   v.                                 **TO JUNIPER NETWORKS/F5**
                                        **NETWORKS' MOTION FOR**
17   F5 NETWORKS, INC.,                 **SUMMARY JUDGMENT OR, IN THE**
                                        **ALTERNATIVE, FOR PARTIAL**
                Defendant.              **SUMMARY JUDGMENT, ON THE**
18                                      **ISSUE OF INVALIDITY**

19

20

21   _____

22   IMPLICIT NETWORKS, INC.,           Case No. C 10-4234 SI

23              Plaintiff,              Date:        December 14, 2012
                                        Time:        9:00 a.m.
24   v.                                 Courtroom: 10

25   JUNIPER NETWORKS, INC.,

26              Defendant.

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND SUMMARY                                              1

II.     PROCEDURAL STATE: REEXAM REDOUBT                                      3

III.    THE PATENTS-IN-SUIT: A FLEXIBLE AND EXTENSIBLE NETWORK
        OPERATING SYSTEM                                                      4

        A.      Implicit's Patents: A Modular Network Operating System        4

        B.      Implicit's Products and Sales                                 7

IV.     THE PRESUMPTION OF VALIDITY MEANS SOMETHING HERE                      8

V.      DECASPER'S ROUTER DOES NOT ANTICIPATE                                 9

        A.      Packets Stand Alone in a Router, the Very Converse of '163    9

        B.      Decasper Does Not Anticipate                                  12

                1.      No Data Conversion; No Formats                        12

                2.      Decasper Does Not Maintain State, as Required by the Claims   13

VI.     JUNIPER'S COMBINATIONS DO NOT RENDER '163 OBVIOUS                     14

VII.    JUNIPER IGNORES THE SECONDARY INDICIA                                 16

VIII.   JUNIPER IS ASSERTING PATENTS REMARKABLY SIMILAR TO '163,
        JUST LATER IN TIME                                                    16

IX.     CONCLUSION                                                            18

## TABLE OF AUTHORITIES

**Cases**                                             **Page**

*In Re Icon Health*,
    496 F.3d 1374 (Fed. Cir. 2007)                              1

*Juniper Networks, Inc. v. Palo Alto Networks*,
    2012 WL3133092 (D. Del. 2012)                         2, 17

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001)                           15

1

## I.      INTRODUCTION AND SUMMARY.

Decasper is a one format system.  It is a router, a node in a network that takes in IP packets and spits out IP packets.  It carefully preserves the IP format throughout.  Decasper turns on the efficient processing of uniform IP packets.  It centers on preserving the one format it handles, exactly the converse of the demultiplexing (conversion) claimed by the patents-in-suit.

As a router, Decasper does not disclose building paths to demultiplex the packets of a message.  *See* below § V.  It does not teach input and output formats, as it does not deal with formats at all.  Nor does Decasper teach storing state to process the subsequent packets of a message, as claimed here.  *See* below § V.

Neither Juniper nor F5 could build their infringing products based on Decasper.  Juniper's and F5's products process packets by unwrapping the packets, inspecting the contents layer by layer, and then determining the correct processing post-TCP.  Decasper does not do this.  Nor does Decasper necessarily maintain state for the duration of a message.  In fact, Decasper routers may not even see all the packets of a message.  That is not what routers do.

Appreciating these points, Juniper combines Decasper with two generic texts, Nelson and IBM.  Juniper cites to pages dealing with LZ compression, and then incongruously argues that mixing compression with Decasper gives rise to '163.  But LZ compression would not work with Decasper, as this compression requires exactly the kind of all packet state that Decasper disclaims.  *See* below § V.  Putting together disparate things to break a larger whole is the antithesis of the kinds of combinations giving rise to real obviousness.  *See In Re Icon Health*, 496 F.3d 1374, 1382 (Fed. Cir. 2007)

For that matter, there would be no motivation to combine Decasper's one format fast router with a demultiplexing system. The two systems are exactly at cross purposes; adding format driven conversion to Decasper's fast router thwarts the very goals that Decasper serves. Mixing the two would be like sewing a bowling ball onto the belly of a fish – it would make no sense and neither would function well.

Two other points merit note in a brief introduction. Juniper trumpets the pending reexams, and suggests (without quite saying) that the process is all but over. It is not. These are early rejections, as is common, and the process has years to run. The foundation on this Bleak House is yet being dug.

Juniper also suggests that the presumption of validity means nothing here and that it need not prove invalidity by clear and convincing evidence. Juniper Br. at 2. It argues that the PTO did not have Decasper before it in the original prosecution, and hence the presumption of validity has no force. What Juniper does not acknowledge, however, is that art very similar to Decasper was fully disclosed in the original prosecution. Decasper is cumulative over the art disclosed, a point that Juniper carefully sidesteps. Indeed, Juniper's expert, Dr. Calvert, despite writing a 235 page expert report with 36 separate references and 40 combinations, carefully did not even look at whether any art disclosed in the first prosecution was similar to Decasper. *See* § IV below. This was no mere inadvertence.

Perhaps the best evidence that Juniper does not truly think '163 is invalid comes in its conduct in a related case, *Juniper Networks, Inc. v. Palo Alto Networks*, 2012 WL3133092 (D. Del. 2012). There, Juniper is asserting seven networking patents against its competitor, Palo Alto Networks. Juniper characterizes these patents as "core" networking patents and vigorously defends their validity. These patents are *remarkably* similar to '163, just later in time. *See* § VIII, below. Surely the jury is entitled to hear Juniper explain how its own

copycat networking patents are valid and non-obvious, even while insisting that Implicit's earlier and similar patents are neither.

## II.   PROCEDURAL STATUS: REEXAM REDOUBT.

In December 2008, a consortium of companies, led by Intel, put Implicit's '163 patent in ex parte re-exam.  Although Intel et al. cited numerous pieces of prior art against '163, including one very similar to Juniper's new references, Decasper, the re-exam focused on one particular piece of art: Mosberger, "Scout: A Path Based Architecture."

Mosberger involved processing paths configured in code, and then these possible paths are compiled and hard-coded into a kernel.  As a result, paths in Mosberger were fully pre-defined before the system was turned on.  When the system would boot up, Mosberger's system would create all anticipated paths.  These paths were created in a top-down fashion since the definition of the paths was inherent in the code itself.  Neither the arrival nor content of the first packets of a message played a role in path construction.  In contrast, Implicit claimed paths constructed bottom-up, post-first packet, and where path creation varied based on information in the first packet.  Because Implicit's system was configurable and changeable prior to the first packet, the system could be modified to accommodate different devices, formats, applications as networking changed day over day.

The PTO agreed that '163 was novel as amended over Mosberger and '163 reissued in June 2010.

In February 2012, after a year and a half of robust litigation, and post-claims hearing, Juniper filed a second re-exam on the '163 patent, an inter partes re-exam.  A second reexam followed in March for the other patent-in-suit, the '857 patent.

These second re-exams are early in the PTO process.  The parties have exchanged Office Actions, and all claims stand rejected.[1]  Although Juniper will say this is significant, the PTO routinely rejects all claims, as it did initially in the first '163 reexam and as it did for some of the patents that Juniper even now asserts against Palo Alto Networks, and then the process continues.  These re-exams are not remotely over.

## III.    THE PATENTS-IN-SUIT: A FLEXIBLE AND EXTENSIBLE NETWORK OPERATING SYSTEM.

### A.    Implicit's Patents: A Modular Network Operating System.

Implicit invented, claimed, and subsequently built a modular networking operating system, U.S. Patent No. 6,629,163 ("Method and System for Demutiplexing a First Sequence of Packet Components to Identify Specific Components Wherein Subsequent Components Are Processed Without Re-Identifying Components") ("'163").  In Implicit's systems individual code processing functions were captured in individual code modules, known as "beads."  The beads were not glued together at compile time, but rather remained individual and then were recruited as part of a message/flow-specific processing path after a first packet of a new flow arrived.  At that point, the system would "demultiplex," *i.e.* "unwrap" the packets, and then build a data processing path by selecting individual beads based on and guided by configuration information present before the first packet.  As part of this process, and as set forth in the preferred embodiment, Implicit used configuration information expressed as a sequence of processing steps – do "a," then do "b," then do "c" – a cache it called "LabelMapGet."

---

[1]    Most recently, there was an action closing prosecution, which is the reexam equivalent to a final office action.  This will spark a further round of comments and then an appeal to the Board.

Unlike prior art, the actual processing path in the Implicit system was built dynamically after the first packet of a new flow arrived and variant on information in that first packet. This meant that Implicit's system was flexible and could be changed to accommodate different processing steps, different applications, different protocols, and the like. In the prior art systems, the "policies," *i.e.*, what do with the traffic, were hard-baked into the code, and the paths were created before and in anticipation of the type of traffic the system was designed to process; in Implicit's systems, the configuration policies could be changed at any time pre-first packet and changing the policies would change the processing by changing the paths that the system built.

This dynamic path construction did not mean that Implicit disclaimed using administrator set configuration information in path construction. Indeed, the ability to configure the system differently as the world changed was one explicit object of the invention. *See* below, § III.

As described in the specification, the steps in the Implicit system were as follows:

**_A packet arrives_:**

When a packet arrives, the system knows one thing: that the packet arrived at an Ethernet port. That Ethernet packet could have any number of embedded protocols, including IP. The Ethernet component makes no assumptions about content. Rather, Ethernet component inspects the header to determine the next layer, and then hands the packet off to the module responsible for processing that format.

**_Ethernet determines it is carrying IP data_:**

If the packet is carrying IP data, the system sends the packet to the IP module: IP is the "compatible format" here.

**_IP determines it is carrying TCP data_:**

The IP module then determines the type of payload in the next layer.  IP can carry many types of data, including TCP.  The IP module inspects the header, and if it sees TCP, it hands the packet to the TCP component for subsequent processing.  TCP is the "compatible format" here.

### *TCP determines it is carrying application data:*

TCP can carry any number of application layer data types. This could be HTTP on port 80 or thousands of other types of data.  As such, the format of data encapsulated by TCP is defined by the TCP port number.  There is no way for TCP to know how to map its payload to a subsequent component. There must be a mechanism in the system that dictates the mapping of TCP data types (*e.g.* the port number) to a subsequent component.

The mechanism described in '163 is a "policy" look-up.  At this point, the specification describes methods to determine the next series of processing steps, *e.g.*, a LabelMapGet ("LMG") cached list of steps.  Once this is done, a message specific path is built, and all subsequent packets in the same message shuttle through that path.  The state associated with each path is message and component specific and each component uses this information for processing the data received from the previous component.

The steps in this method are captured in the language of the claims as follows:

- A method "providing a plurality of components,"

- for the first packet of the message, "*dynamically identifying* a *non-predefined* sequence of components for processing the packets of a message such that the output format of the components of the *non-predefined* sequence match the input format of the next component in the non-predefined sequence,"

- and "wherein *dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received*; and

- storing an indication of each of the identified components so that the non-predefined sequence does not need to be re-identified for subsequent packets of the message;"

- and "for each of a plurality of packets of the message," storing, retrieving, and using state to process "the next packet of the message."

*See* Dixon Decl., Ex. 5.

Read together, these limitations describe constructing, post-first packet, a stateful, message specific data processing path – that is exactly what the claims say.

**B.** **Implicit's Products and Sales.**

Implicit first offered for sale a commercial product based on its patents at the Consumer Electronics Show in January 2000.  Thereafter, Implicit entered into significant development and sales contracts with Intel, AMD, Raytheon, and other sophisticated technology companies.

These companies bought the Implicit technology precisely because it was new and novel at the time.  For example, prior to entering into its first contract with Implicit, Intel had a senior engineer, David Anderson, conduct an engineering due diligence.  *See* Hosie Decl., Ex. A, Anderson Tr. at 64:12-24.  Intel concluded that the Implicit technology was novel and something Intel could not find elsewhere.  *Id.* at 65:6-20.  Intel was sufficiently impressed with the Implicit technology that it entered into agreements with Implicit to develop a very early version of an iPad (62:3-9) and a very early version of a "digital music player," something we now know as an iPod.  *Id.* at 61:17-62:2.  Intel ultimately did not release these products for independent business reasons, not because the technology was not novel.  *Id.* at 63:9-19.

Intel's venture capital business, Intel Capital, also approached Implicit about investing in the company in late 2001.  *Id.* at 68:22-69:11.  It did so, in part, given Intel's

appreciation of the value and novelty of Implicit's technology.  *Id.* at 69:14-17.  All of this serves as commercial recognition of the value and novelty of Implicit's technology.

Although Juniper argues that Implicit has not shown any secondary indicia, and even though it relies on Dr. Calvert's expert report on this point, Juniper did not even provide the Anderson transcript to Dr. Calvert.  Hosie Decl., Ex. 8, Calvert Depo. at 59:7-13.

## IV.    THE PRESUMPTION OF VALIDITY MEANS SOMETHING HERE.

How many reexams does it take?  This patent has already gone through one reexam – surely, that means something.

Not, evidently, to Juniper.  Juniper now argues that the "Patent Office did not have all relevant information at its disposal during prosecution of the patents," and so the presumption of validity really means little.  Hosie Decl., Ex. C, Calvert Report at 4:26-28.  When pressed at deposition about the "information" the PTO lacked, Dr. Calvert could only cite one missing reference: Mosberger.  *See* Hosie Decl., Ex. B, Calvert Depo. at 103-105 ("I believe that in the initial prosecution, the initial prosecution history, the 1997 dissertation by Mosberger was not considered.…  [A] piece that they didn't have at their disposal was Mosberger.").[2]  While Mosberger may be many things, missing is not among them: Mosberger was explicitly disclosed in the original prosecution,[3] and rivers of ink spilled over Mosberger in the first reexam.

After lunch, and after being prompted by Juniper's lawyers (as Dr. Calvert was good enough to admit; Calvert at 124:8-9), Dr. Calvert then mentioned Kerr and Decasper as also missing.  But it is clear from the transcript that this was more lawyer channeling than the independent thinking of an expert.  *Id.*

---

[2]       He was asked this question repeatedly; "just Mosberger," he repeatedly replied.

Nor are Juniper's "new" references in fact new, but instead cumulative over prior art disclosed.  For example, Dietz, Method and Apparatus for Monitoring Traffic in a Network, 6,651,099, cited in the first reexam and attached as Hosie Decl., Ex. D, involves an extended router that creates flows, keeps flow tables, classifies flows given packet identification, and maintains state.  Decasper and Kerr are cumulative over Dietz, and Dietz was squarely before the PTO – it, like Mosberger, is cited on the face of the patent.  Juniper's Dr. Calvert had no idea whether Decasper and Kerr were cumulative over Dietz, as he did not look, even though he ventured the opinion that the presumption of validity means little here as the PTO was bereft of necessary information.  Hosie Decl., Ex. B, Calvert Depo. at 118:14-20.  ("I didn't look at all of the patents that were cited as prior art.").[4]

## V.    DECASPER'S ROUTER DOES NOT ANTICIPATE.

With that, to the meat of it: Decasper's router is a much different beast than '163's demultiplexing system.

### A.    Packets Stand Alone in a Router, the Very Converse of '163.

An IP router is a piece of networking gear that sits in the middle of an IP network, e.g., the Internet.  IP packets come in, are inspected, and then forwarded along the network.  By design, the packets of one message are not necessarily sent through the same series of routers.  To the contrary, packets are broken up and may be sent through a multitude of different routers before arriving and being reassembled at the ultimate endpoint.  For example, some packets in a VoIP (Voice Over IP) call from San Francisco to Chicago might go through routers in Seattle, and Omaha, while others might go through routers in Tulsa and

---

[3]    It is cited on the face of the patent.

[4]    Indeed, this witness professed not to even know what the question meant by "prior art similar to Decasper."  *Id.* at 118:22-119:3.

Abilene, Texas, before being received and reassembled at the endpoint in Chicago.  This is a deliberate design choice rooted in the defense-system origin of the Internet.

By design, every IP packet stands alone.  Each is independent; each can be seen and sent along without regard to any other IP packets.  As Juniper puts it in a pretty lucid white paper, "Packet-based forwarding is performed on a packet-by-packet basis without regard to flow or state information.  Each packet is assessed individually for treatment."  *See* Juniper White Paper: Understanding Packet-Based and Flow-Based Forwarding.  Hosie Decl., Ex. E.  As Juniper recognizes, "Packet-based forwarding does not require any information about either previous or subsequent packets that belong to a given connection…."  *Id.*

Flow-based processing as debated in this case[5] is fundamentally unlike such packet-based routing.  In flow-based processing, a "session" is created to ensure that all packets of a flow are treated similarly.  No longer do packets stand alone, which is the object and goal of routing.  To the contrary, flow-based processing absolutely requires that all packets of a flow be identified and collated with that flow.  In contrast, a router is not even guaranteed to see all packets of a given message (Abilene; Omaha), much less being capable of processing packets of a message as a whole.

Decasper is on the packet-based router side of this great divide.  Decasper is an extended integrated services router.  This type of router enhances traditional router functionality by adding some limited flexibility in how IP packets (and just IP packets; *see* below) are processed.  Decasper accomplishes this by adding "gates" to the system.  A gate is a place where the system can add a plug-in; a plug-in is a piece of code that does some form

---

[5]     '163 and the infringing systems necessarily maintain state for the duration of a message.  Absent this, the systems could not ensure that flows would be processed as flows or even support session-based protocols such as TCP.

of IP packet processing.  Although the ordering and number of the gates are compiled in, so that the actual processing done and the sequence of the processing is immutable absent recompiling the kernel, plug-ins can be upgraded at the gates and different plug-ins can be associated with different flows.  The function at a gate is driven by the nature of the gate itself, *e.g.*, a security gate will always be a security gate.

Decasper is not guaranteed to see all the packets of a given message.  It is a routing node in a network – some packets pass through, others may not.  It is hard to process what you do not even see.  As a consequence, as an IP router, Decasper has no ability to guarantee that "state" is maintained for all the packets of a given message.

Along the same lines, because Decasper does not support plugins that operate at a higher level than IP, there is no inherent notion of a session in Decasper.  Rather, Decasper uses the notion of "flows" as an optimization to group packets together but **not** to process all packets of a message with the same processing state.  How could it?  A Decasper router is not even guaranteed to see all the packets of a message since many of these packets will end up at different routers.

A direct architectural implication of the fact that Decasper is an IP router is that Decasper maintains only "soft state."  *See* Dixon Decl., Ex. 1, Decasper at 9 ("to store per-flow 'soft state'").  Soft state is defined as "state which is useful for efficiency, but not essential, as it can be regenerated or replaced if needed."  *See* Hosie Decl., Ex. F.  As a consequence of this soft state only, Decasper might reset in the middle of processing any particular message, be it an e-mail, a Skype conversation, or a Juniper or F5 box serving as a proxy.  *See* Decasper at 9 ("recycle" mid-flow); *id.* at 5 (dumping flow if idle).  With such a random flush facility, Decasper could not do what Juniper and F5 products do.  There is no room for debate on this.

In distinction, '163 (and the infringing systems) need "hard state" to operate as designed. Hard state means state that is required for correct function and state that cannot be flushed randomly without regard to the processing of flows.

As another consequence of being an IP router, Decasper has no ability to process packets higher in the stack than IP. To go deeper into the packet, Decasper would have to be able to convert formats, match formats, and determine what to do post-TCP. To illustrate, the TCP module is required to collect all the packets of a given message, make sure that all packets are present, eliminate duplication, and ensure that the packets are in the right sequence. A TCP module can do this only if it is guaranteed to have all of the packets constituting a message. As a router is has all of the packets constituting a message, a router simply has no ability to do TCP protocol layer processing.[6] As a router, Decasper has simply no ability to do any of this.

In short, Decasper and '163 are profoundly different systems. Equating them is like arguing that the Queen Mary is akin to a bicycle because both are made of steel and involve transport. But no one could build the Queen Mary from a bicycle or a bicycle from the schematics for the Queen Mary.

**B.** **Decasper Does Not Anticipate.**

Given this meta level difference, it is not surprising that Decasper does not anticipate the specific elements of the '163 claims. Juniper likes Decasper because the **vernacular** makes it sound close to '163: flows, components, gates. Here is how Decasper is different and why it does not anticipate:

**1.** **No Data Conversion; No Formats.**

Decasper is premised on preserving the format of its one-size IP packets, exactly the opposite of the data conversion claim elements in '163. *See* Nettles at 20, ¶64, 71-72. Decasper is a one format system that does not process packets above the IP layer – nor could it be extended to do so.  IP packets come in; IP packets come out, and they are IP packets throughout.  In Decasper, there is no reason to consider input and output formats; the formats match because that is the architecture of the underlying system.  Decasper accordingly teaches a system in which format conversion is neither needed nor desirable, exactly the opposite of the '163 claim limitations.  Indeed, Decasper teaches away from conversion or processing up the stack in any form. *See* Nettles at 21, ¶ 72, 74-75.

On this score, Juniper scrambles and argues that a given "component" in '163 need not convert.  Br. at 13.  True, *but it is a system that converts* – that is the point.  A system that is antithetical to conversion hardly discloses conversion.

## 2.   Decasper Does Not Maintain State, as Required by the Claims.

Decasper does not maintain state as required by the claims of '163.  Given the specification and claims, '163 absolutely requires that the system maintain state for the duration of a message. *See* claims excerpts above at 6 (maintain state for all packets of a message).  First, and as noted above, as a router, Decasper is not even guaranteed to get all the packets of a message. This means that Decasper could not do any processing requiring that all packets of a message be identified and kept together as members of a larger whole. This coherency of the larger whole is essential to '163, and explicit in its specification and claims.

---

[6]     And there are many protocols post-TCP in the stack that likewise require 100% packet inclusion to process, *e.g.* LZ compression (discussed below), decryption, and the like.

Second, Decasper notes that it only maintains "soft" state.  *See* above.  This means that state is maintained as is efficient, but that state may be discharged at any time.  As applied to a message/flow-based operating system, this would never work; in the Decasper architecture, flows can be timed out even though the system might be in the middle of processing many given messages.  In '163, in contrast, the packets of a message have to be processed as part of that message, *and state has to be maintained for the duration of that message*.  If the system can willy-nilly discard state, all mid-flow processing would blow-up, and the system be as useful as our bowling ball flounder.  How can a system incapable of maintaining message specific state anticipate a system that depends on that very property?

For these reasons, Decasper does not disclose at least the following limitations:

- 1A:  "Providing a plurality of components, each components being a software routine for converting data within input format into data within output format;"

- 1B:  For the first packet of the message, "dynamically identifying a non-predefined sequence of components for processing the packets of a message such that the output format of the components of the non-predefined sequence match the input format of the next component in the non-predefined sequence;"

- 1E:  For each of a plurality of components in the identified non-predefined sequence, retrieving state information relating to performing the processing of the component with the previous packet of the message;

- 1F:  Performing the processing of the identified component with the packet and the retrieved state information; and

- 1G:  Retrieving state information relating to the processing of the component with packets for use when processing the next packet of the message.

## VI.   JUNIPER'S COMBINATIONS DO NOT RENDER '163 OBVIOUS.

Perhaps anticipating the failure of its anticipation argument, Juniper argues that Decasper could be combined with two other references, Nelson and IBM, so as to render

'163 obvious.  The cited sections of the references deal with stateful compression, *e.g.* LZ77 compression.

First, compressing the data in the IP payload does not change the format of an IP packet.  While the data may be compressed, the packet remains an IP packet in Decasper.  Juniper's argument is akin to arguing the swapping out a pound cake for a tinker toy in a brown UPS wrapped packet changes the brown package.  It does not – the package remains the package.  For this reason, Juniper's compression combo does not cure the lack of format conversion – the combo still does not convert formats.

Second, any such combination is absurd.  LZ77 is a **stateful** compression algorithm, which means that all the packets of a message need to be maintained together.  Putting an LZ77 compression module on a node router like Decasper would break the system – the router does not necessarily even see all packets, and the LZ compression algorithm could not work.  It is difficult to argue that a combination that breaks the system is obvious, just as it is difficult to argue that there would be a motive to combine disparate parts in a dysfunctional way.  Yet, this is exactly what Juniper does here.  *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) ("If references taken in combination would produce a 'seemingly inoperative device,' we have held that such references teach away from the combination and this cannot serve as predicates for a prima facia case of obviousness.").

Adding IBM as cited by Defendant's expert adds nothing as it is just another compression reference.  For that matter, even if one were to entertain a per packet compression system (*e.g.* compress each IP packet individually) the system would have to wrap each packet in a new IP header; the format would not change.  *See* Nettles at 26, ¶ 102, 104.  Nor would there be a motive to combine Decasper and the compression combinations.  *See* Nettles at 26, ¶ 102.

**VII.    JUNIPER IGNORES THE SECONDARY INDICIA.**

Juniper misperceives Implicit's business.  Implicit was not in the business of selling network operating systems to *consumers*.  To the contrary, its customers were large, sophisticated technology companies, such as Intel.  When Juniper argues that Implicit had no commercial success because its products were not sold to consumers, it misses the point: Implicit did have success selling its technology to companies like Intel, as set forth above.

Consider Sprint.  Sprint met with Implicit (then BeComm) in early February 1999. Here is Spring's reaction on Implicit's prototype:

> We had two very informative and interactive meetings with Becomm this past Friday.  **This may be the most exciting and strategic opportunity that has been brought to Sprint**, at least with respect to ION.  Becomm's communication platform (Portal) is **truly unique** and may be the platform that ultimately provides true consumer connectivity within the home as well as remotely. Based upon the information seen to date and assuming further assessment is positive, this **opportunity could truly differentiate Sprint** in the marketplace, giving Sprint a definitive/clear competitive advantage by enabling Sprint to truly deliver the vision of ION in the consumer space.  In addition, this opportunity extends to the HO, SOHO, and potentially LEG market segments.

Hosie Decl., Ex. G at SP-175-0731 (emphasis added).  (Jenn Brockman memo, subpoenaed from Sprint by Juniper).  This hardly sounds like an obvious technology.

Implicit was first, and early, with a modular, extensible network operating system. Years later it was copied by many competitors, including the two current Defendants, F5 and Juniper.  Both of these companies released their similar modular, extensible network operating system years after Implicit went to market in January of 2000.  *See* Hosie Decl., Ex. H, Implicit Interrogatory Response on secondary indicia (this response summarizes the evidence of secondary indicia).

**VIII.    JUNIPER IS ASSERTING PATENTS REMARKABLY SIMILAR TO '163, JUST LATER IN TIME.**

Patent cases tend to be arid battles over words, but every so often a party does something in the real world that really makes a difference.  So it is here.

Eleven months ago Juniper filed a patent infringement complaint against a competitor, Palo Alto Networks, Inc.  Juniper initially asserted six patents against Palo Alto Networks, all of which Juniper told the Court concerned "core firewall technology concepts…."  *See Juniper Networks, Inc. v. Palo Alto Networks*, 2012 WL3133092 (D. Del. 2012).  Even as we write, Juniper is pursuing this litigation with great zest against Palo Alto Networks.

As it turns out, that the patents that Juniper is asserting against Palo Alto Networks are remarkably similar to '163, although more basic and less detailed and generally later in time.  For example, Patent 7,650,634, "Intelligent Integrated Network Security Device," involves a method to ensure security which includes "receiving and examining a first packet," retrieving a "single flow record" associated with that packet, then "evaluating a flow table for a matching flow record entry using the packet header identifier," where "there is a matching flow record entry, retrieving that flow record," where there is "no matching flow record," "creating a new flow record," and then "extracting flow instructions" from policies loaded in the machine.  *See* Hosie Decl., Ex. I, '634, Claim 1.  This patent has a priority date of February 8, 2002, more than two years after Implicit's '163.

These steps are similar to some of the core steps in '163, although '163 has significant additional steps that would render it less likely to be anticipated and obvious.  But the simple point is this: if Juniper truly believes that the patents it asserts against Palo Alto Networks are valid, as presumably it does having filed and prosecuted a lawsuit, then how

can it say that Implicit's similar, yet earlier, patents are invalid and obvious as a matter of law?  Juniper's horses are pulling in different directions.

Juniper's expert on invalidity knew nothing about Juniper's "core firewall" patents or its suit to enforce those patents against Juniper; Juniper told him nothing of its Palo Alto Networks frolic.  Hosie Decl., Ex. B, Calvert Depo. at 81:1-16; 92:9-15.

## IX.     CONCLUSION.

For the reasons set forth above, Implicit Networks respectfully requests that this Court deny Juniper's Invalidity Summary Judgment Motion.

Dated: November 16, 2012                    Respectfully submitted:


                                            */s/ Spencer Hosie*
                                            SPENCER HOSIE (CA Bar No. 101777)
                                            shosie@hosielaw.com
                                            DIANE S. RICE (CA Bar No. 118303)
                                            drice@hosielaw.com
                                            DARRELL R. ATKINSON (CA Bar No. 280564)
                                            datkinson@hosielaw.com
                                            HOSIE RICE LLP
                                            Transamerica Pyramid, 34th Floor
                                            600 Montgomery Street
                                            San Francisco, CA 94111
                                            (415) 247-6000 Tel.
                                            (415) 247-6001 Fax

                                            *Attorneys for Plaintiff*
                                            *IMPLICIT NETWORKS, INC.*

# EXHIBIT  26

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IMPLICIT NETWORKS INC,

        Plaintiff,

  v.

F5 NETWORKS INC,

        Defendant.

_____/

IMPLICIT NETWORKS INC,

        Plaintiff,

  v.

JUNIPER NETWORKS, INC.

        Defendant.

_____/

Nos. C10-3365 SI; C 10-4234 SI

**ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Currently before the Court are summary judgment motions by defendant Juniper Networks (Case No. 10-4234 SI) and defendant F5 Networks (Case No. 10-3365 SI) for non-infringement; and a motion for summary judgment by defendant Juniper Networks, in which defendant F5 Networks joins, as to invalidity of the asserted patents. Having considered the arguments of counsel and the papers submitted, the Court GRANTS defendants' motions.

**BACKGROUND**

In these two related cases, plaintiff Implicit Networks, Inc. accuses defendants' products of infringing two patents owned by plaintiff: U.S. Patent No. 6,629,163, as issued September 30, 2003 and as it emerged after reexamination on June 22, 2010 ('163 Patent); and U.S. Patent No. 7,711,857 ('857

*United States District Court*
*For the Northern District of California*

Patent), issued May 4, 2010 as a continuation application from '163. In early 2012, Juniper filed requests for *inter partes* reexamination on both patents. The *inter partes* proceedings are still pending, although the examiners have issued Patent Action Closing Prosecutions (ACPs) concluding that both patents are invalid as anticipated and/or obvious.

According to Implicit, the patents cover a modular networking system which dynamically selects software routines ("modules" or "beads") after the arrival of the first packet of a message to build a data processing path for the subsequent packets of the message ("flow"). *See, e.g.*, Implicit's Opposition to Motion for Summary Judgment on Invalidity ("Invalidity Oppo.") at 4-7. Since Implicit's system creates the processing path dynamically and only after the arrival of the first packet, Implicit's system is flexible and can be changed to accommodate different processing steps, can be adapted to handle different sorts of technology/flows, and can adopt "policies" based on administrator direction. *Id.*

Implicit accuses two lines of products made by defendant Juniper Networks, Inc.: the SRX and J series of gateways and routers that use "flow based" processing of internet traffic. Implicit accuses F5's "BIG-IP" IP networking products which act as intermediaries and transfer data between users (*e.g.*, a consumer) and servers (*e.g.*, an e-commerce business like Amazon). The BIG-IP products help "enterprise applications" sort and get traffic to the appropriate servers.

## DISCUSSION

### I. Defendants' Motion on Invalidity

Juniper, joined by F5, moves for summary judgment on invalidity, arguing that the asserted claims are invalid as disclosed or rendered obvious by Daniel Decasper, *et al.*, "Router Plugins: A Software Architecture for Next Generation Routers," Computer Communication Review, a publication of ACM SIGCOMM, Vol. 28, No. 4 Oct. 1998. (Decasper98). Juniper also argues that the asserted claims are rendered obvious by Decasper98 in combination with IBM, Local Area Network Products Concepts and Products: Routers and Gateways (May 1996) (IBM96) and Mark Nelson and Jean Loup Gailly, the Data Compression Book, M&T Books (2nd ed. 1996) (Nelson).

Juniper notes that the PTO examiners in both of the pending *inter partes* reexamination proceedings have rejected all of the asserted claims. The PTO issued an Action Closing Prosecution

2

United States District Court

For the Northern District of California

(ACP) in the '163 Patent reexam on October 1, 2012 and issued an ACP in the '857 Patent reexam on December 21, 2012. *See* '163 Patent ACP, Declaration of Douglas Dixon [Dixon Decl., Docket No. 167-5], Ex 15; '857 Patent ACP, Docket No. 201  The two panels of examiners found that Claims 1, 5, and 35 in the '163 Patent and Claims 1, 4 and 10 of the '857 Patent were anticipated in light of Decasper98 and obvious in light of Decasper98 alone and/or in combination with IBM96 and Nelson.[1] Implicit contends that the PTO actions are irrelevant for two reasons.  First, the PTO examiners applied only a "preponderance of the evidence" standard of review in determining invalidity, but this Court must apply the higher "clear and convincing" standard.   Second, Implicit notes that the *inter partes* proceedings are far from over.  Following the issuance of the ACPs, patent owners are allowed to submit additional comments to the examiners and an appeal may follow. *See, e.g.*, Manual of Patent Examining Procedures, §§2671, 2672.

As relevant to the motion for summary judgment on invalidity, the parties' dispute centers on five claim limitations, designated by the parties "1a," "1b," "1e," "1f" and "1g" and shown in bold below, which are all present in Claim 1 of the '163 Patent:

Claim 1 of '163 Patent:

1.      A method in a computer system for processing a message having a sequence of packets, the method comprising:
   **[1a] providing a plurality of components, each component being a software routine for converting data with an input format into data with an output format;**
   **[1b] for the first packet of the message,**
       ***dynamically* identifying a *non-predefined* sequence of components for processing the packets of the message such that the output format of the components of the *non-predefined* sequence match the input format of the next component in the *non-predefined* sequence,** *wherein dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received*; and
       storing an indication of each of the identified components so that the *non-predefined* sequence does not need to be re-identified for subsequent packets of the message; and
   for each of a plurality of packets of the message in sequence,
       **[1e] for each of a plurality of components in the identified *non-predefined* sequence,**
           **retrieving state information relating to performing the processing of the component with the previous packet of the message;**
           **[1f] performing the processing of the identified component with the**

_____

[1]  For the '163 Patent, the PTO also found that the claims were anticipated and/or obvious in light of Patent No. 6,243,667 (Kerr).  *See generally* Dixon Decl., Ex. 15.  However, the PTO rejected that same argument with respect to Claims 1, 4, and 10 in the '857 Patent ACP.  '857 ACP at 35.

**packet and the retrieved state information; and**
**storing state information relating to the processing of the component [1g] with packet for use when processing the next packet of the message.**

*See* Dixon Decl., Ex 15 (italics added in reexamination; bold added by Court to show limitations involved in challenge to validity); *see also* Dixon Decl., Ex. 19 (Report of Dr. Scott Nettles on Infringement by Juniper; identifying limitations within claims).[2]

### A.    Legal Standard

#### i.    In General

A patent is presumed valid after the PTO examination process, based on "the basic proposition that a government agency such as the then Patent Office was presumed to do its job." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (*abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)) (citing *Morgan v. Daniels*, 153 U.S. 120 (1894)).  The defendant carries a high burden on summary judgment of invalidity, as the "moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr. Labs*, 251 F. 3d 955, 962 (Fed. Cir. 2001).  The presumption of validity can nonetheless be overcome with sufficient evidence. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) ("The validity of a patent is always subject to plenary challenge on its merits. A court may invalidate a patent on any substantive ground, whether or not that ground was considered by the patent

---

[2] Juniper argues that the elements of the other asserted claims *not* corresponding to the five limitations identified by Implicit ( *i.e.*, non-contested elements of claims 1, 15 and 35 of the '163 Patent and non-contested elements of Claims 1, 4, and 10 of the '857 Patent) are disclosed by Decasper98 and, therefore, at a minimum partial summary judgment should be entered in Juniper's favor on those claims/elements.  *See* Juniper Motion re Invalidity at 19-21.  Implicit does not contest this in its Opposition.  In Reply, Juniper also argues that because Implicit only challenges whether Decasper98 covers sub-aspects of each of the limitations identified in Claim 1 (*e.g.*, Implicit does not dispute that Decasper98 discloses "a plurality of components, each component being a software routine" from 1a) summary judgment should be granted in Juniper's favor on the "undisputed aspects" of elements 1a, 1b, 1e, 1f and 1g.  Juniper Reply on Invalidity at 2; *see also* Juniper's Slides from Summary Judgment Hearing at 4-8 (identifying undisputed claim elements).

examiner.").[3]

The moving party's burden is "especially difficult" when the prior art references presented were considered by the patent examiner during prosecution. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004). But when, as here, additional evidence is presented by the moving party, "the burden may be more or less easily carried because of the additional evidence." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996). New evidence supporting an invalidity contention may "carry more weight" than evidence previously considered by the PTO. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2251 (2011).[4] As the Supreme Court has held, "[s]imply put, if the PTO did not have all material facts before it, its considered judgment may lose significant force. . . . And, concomitantly, the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain." *Id.* (internal citations omitted).

### ii.    Anticipation

Under 35 U.S.C. § 102(b):

A person shall be entitled to a patent unless–

    * * *

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

In determining validity of a patent claim over the prior art, a two-step process applies. The first step is the claim construction by the Court. *See Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999). The second step is a comparison of the asserted claims against the prior art reference. A determination that a claim is invalid for anticipation requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference." *Celeritas*

---

[3] *See also Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985) ("[t]he Examiner's decision, on an original or reissue application, is never binding on the court. It is, however, evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence.").

[4] Citing *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-1356 (Fed.Cir. 2000) ("[T]he alleged infringer's burden may be more easily carried because of th[e] additional [evidence]"); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (similar).

United States District Court
For the Northern District of California

*Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360, 47 USPQ2d 1516, 1522 (Fed. Cir. 1998). The Federal Circuit has held that "it is axiomatic that that which would literally infringe if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001); *see also Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987).[5]

### iii.    Obviousness

Defendants must prove by clear and convincing evidence that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Obviousness under 35 U.S.C. § 103 is a question of law, with underlying factual considerations regarding (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966); *see also Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000). A claimed invention is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.[6]

"Although it is well settled that the ultimate determination of obviousness is a question of law, it is also well understood that there are factual issues underlying the ultimate obviousness decision." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001). Summary judgment may be

---

[5] Implicit does not contest that Decasper98, IBM96 and Nelson are publications under 35 U.S.C. § 102(b) which could qualify as prior art.

[6] The parties' experts describe a "person of ordinary skill in the art" differently. Juniper's expert (Dr. Calvert) describes the person as one with a bachelor's degree in a relevant field and at least four years' work experience or a master's degree in a relevant field and two years experience. *See* Declaration of Dr. Kenneth I. Calvert [Docket No. 167-1] and Exhibit 2 [Calvert Invalidity Expert Report], ¶ 42. Implicit's expert describes the person as having a bachelor's degree in the relevant field and at least two years' experience. Expert Report of Dr. Scott Nettles on Validity Rebuttal [Docket No. 167-9], ¶ 30. Implicit points out the distinction, but does not argue that the distinction matters for resolution of the arguments made in the invalidity motion.

United States District Court
For the Northern District of California

6

United States District Court
For the Northern District of California

1    appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill

2    in the art are not in material dispute, and the obviousness of the claim is apparent in light of these

3    factors." *KSR*, 550 U.S. at 427 (citing *Graham*, 383 U.S. at 17).  However, a factual dispute as to any

4    one of these elements will defeat the motion.  *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed.

5    Cir. 2000).

6

7         **B.     Whether Decasper98 Anticipates or Renders Obvious the Asserted Claims**

8         Juniper's expert, Dr. Kenneth L. Calvert, concludes that Decasper98 alone anticipates or renders

9    obvious claims 1, 15, 35 of the '163 Patent as well as claims 1, 4 and 10 of the '857 Patent.  *See* Calvert

10   Declaration [Docket No. 167-1] and Exhibit 2 [Calvert Invalidity Expert Report] ¶¶ 543-611.[7]

11   Decasper98 describes a general "framework" for IP processing, that is "extensible" and can be applied

12   to applications other than IP processing.  Decasper98 (Dixon Ex. 1) at 2.  Dr. Calvert argues Decasper98

13   describes a router system for processing message flows comprising multiple packets.  Calvert Invalidity

14   Report, ¶¶ 544-545.  In Decasper98, packets traveling through the system encounter "gates" and at that

15   point the system dynamically loads "plug-ins" (software routines) to process the message flow.  *See*

16   Decasper98 at 1,2, 4; *see also* Calvert Invalidity Report ¶¶ 546, 548.  Decasper98 uses an

17   "identification unit" which stores information relating to processing of particular types of packets, as

18   well as "pointers to state information for each plugin that uses state information."  Calvert Invalidity

19   Report, ¶549.  The system maintains two types of state, including a "pointer" to the particular plugin

20   and a pointer to "private data" for the plugin instance associated with the particular packet within a flow.

21   *Id.*, ¶ 557.  Based on those and other conclusions not contested by Implicit, Dr. Calvert opines that

22   Decasper98 anticipates the asserted claims of the patents at issue.  *Id.*, ¶¶ 543, 567.[8]

23        The PTO examiners in both the '163 and '857 *inter partes* reexams have likewise concluded that

24   the patents in suit are anticipated and/or rendered obvious in light of Descasper98.  *See* '163 Patent ACP

25   _____

26        [7]  As discussed below, Dr. Calvert also finds that Decasper98 in view of IBM96 alone and with
     Nelson likewise render the asserted claims obvious.  Calvert Invalidity Report ¶¶ 673-700.

27
          [8]  The Court notes that Decasper98 also expressly contemplates use of the framework in an edge-
28   router.  Decasper98 at 2.

**United States District Court**
For the Northern District of California

at 93,118 [Dixon Decl., Ex 15]; '857 Patent ACP at 7, 19.[9]  In the '163 Patent ACP, the examiner found that Decasper98 used "'**plug-ins**' as the claimed '**individual components'** that are dynamically selected to create a sequence in accordance with this claim limitation."  '163 Patent ACP at 11, 20 (emphasis in original).  The examiner also found that simply because Decasper98 might be designed to handle one type of traffic (IP), did not mean it could not read on the format-matching or compatibility limitation of the claims.  *Id.*, 21-22.  Finally, the examiner found that Descasper98 teaches the maintenance of message-specific state information as required by the claims.  *Id.*, at 36; *see also id.* 118-137 [rejecting Claims 15 and 35 as anticipated by Decasper98].[10]  In the '857 ACP, the examiner found Claims 1, 4 and 10 anticipated by Decasper98.  '857 ACP at 7.[11]  In particular, the examiner found that even assuming Decasper98 uses a single IP format, Decasper98 still discloses the input and output matching feature of the claims.  '857 ACP at 16.  The examiner also found that Decasper98 discloses storing state information for each of the plug-in sequences/software routines to be used in processing the next packets as recited in the challenged claims.  *Id.*, at 18-19.

In opposition, Implicit argues that Decasper98 cannot anticipate the claim limitations of the '163 patent identified above because Decasper98 describes a simple "one format fast router" which routes only IP packets.  As Decasper98 handles only one type of format of message (IP),[12] it cannot cover the demultiplexing (conversion) processing claimed by the patents in suit, nor does it necessarily have to maintain state information for the processing of all packets in the message/flow.  As such, Implicit argues, Decasper98 cannot anticipate Implicit's inventions.  Implicit, however, does not rely on its

---

[9]  The Court recognizes that in the reexaminations the PTO is considering validity under a preponderance of the evidence standard, as opposed to the clear and convincing evidence standard that applies here.  The reasoning of the PTO, however, is persuasive and supports the Court's conclusions.

[10]  The examiner in the '163 Patent ACP also rejected Claim 1 as obvious in light of Decasper98.  '163 Patent ACP at 93-117.

[11]  In the alternative, the examiner in the '857 Patent ACP rejected Claims 1, 4 and 10 as obvious under Decasper98, as well as obvious under Decasper in view of IBM96 and IBM96 and Nelson combined.  *Id.*, at 19, 22, 31.

[12]  As the parties explained in the tutorial IP (Internet Protocol) is responsible for addressing hosts and routing packets of messages across the internet.  *See, e.g.*, Defendants' Technology Tutorial at 10.

8

United States District Court
For the Northern District of California

1  expert to contradict Dr. Calvert and Juniper's assertions on these key points. Indeed, the Rebuttal

2  Expert Report on Invalidity of Dr. Scott Nettles, Implicit's expert, attempts to distinguish Decasper98

3  on different grounds, namely: (1) that Decasper98 does not dynamically identify components because

4  components are initially identified by a static core; (2) plugins in Decasper98 are not components or

5  software routines as defined by the Court; and (3) Decasper98 does not process packets so that input

6  format matches output format. Nettles Invalidity Rebuttal Report ¶¶ 67-75. Implicit's opposition

7  arguments – Decasper98 does not convert data and fails to maintain state – are made without citation

8  to expert support, although Nettles does assert that Decasper98 is a one-format system. *See, e.g.*, Nettles

9  Invalidity Rebuttal Report, ¶ 64.

### i.   Effect of PTO Not Considering Decasper98 in Prior Proceedings

12        As an initial matter, Implicit disputes the impact – in terms of the deference the Court should

13  provide to the presumption of validity of the patents – of the failure of the PTO to consider Decasper98

14  as prior art in the prosecution proceedings. Implicit argues that the failure of the PTO to consider

15  Decasper98 does not lower Juniper's burden to demonstrate invalidity by clear and convincing evidence

16  under *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. at 2251, because the invention disclosed in

17  Decasper98 is cumulative to prior art that was disclosed in the prosecution, namely Dietz, Method and

18  Apparatus for Monitoring Traffic in a Network, United States Patent No. 6,651,099 (Dietz). *See*

19  Invalidity Oppo. at 9. While Implicit attaches the Dietz patent to the Declaration of Spencer Hosie in

20  Opposition to Invalidity (Hosie Invalid. Decl.), Implicit does not provide any analysis – by way of an

21  expert or argument in its brief – as to *how* it believed Decasper98 was cumulative to Dietz. Instead,

22  Implicit criticizes Juniper's expert, Dr. Calvert, for failing to address Dietz. *Id.*

23        Dietz does not describe a router or gateway – the types of devices at issue here – but a "monitor

24  and method of examining packets." By contrast, Decasper98 teaches an architecture "to quickly and

25  efficiently classify packets into flows, and to apply different policies to different flows" through

26  "dynamically loaded" plug-ins. Dixon Decl., Ex. 1 at 2. Decasper98, on its face, closely matches the

27  inventions covered by the patents in suit, while Dietz does not. Moreover, in his expert report Dr.

9

Calvert did address Dietz, if only to determine whether it, in combination with another reference (Kerr) rendered obvious the patents in suit. Calvert Invalidity Report, ¶¶318-331. Finally, in issuing the Office Actions and the Patent ACPs rejecting the asserted claims based in significant part on Decasper98, the PTO has apparently agreed that Decasper98 was a substantial new piece of prior art and *not* cumulative to Dietz, which had been before the PTO on its initial consideration. *See, e.g.,* MPEP § 2647 (requests for reexamination "will be denied if a substantial new question of patentability is not found based on patents or printed publication.").

In sum, Implicit has not shown that the Dietz reference is cumulative to the aspects of Decasper98 that Juniper – and the PTO in the *inter partes* reexam– rely on. As such, Juniper faces a somewhat lighter burden under the clear and convincing evidence standard for demonstrating invalidity.

### ii. Format Matching/Conversion

Implicit's main argument against Decasper98 acting as an anticipating (or obviating) reference is that Decasper98 is a one format system – the packets that are processed are IP and the packets that come out of processing are IP. According to Implicit, the system covered by the patents is a system that *converts* data to ensure input and output formats match. Implicit and its expert acknowledge that – based on Implicit's arguments during claim construction – the Court has already held that the "components" or software routines in Implicit's system need not always "convert" data, but Implicit and Dr. Nettles contend that a system like Decasper98, which does not convert any data, cannot disclose the system covered by the patents. *See* Invalidity Oppo. at 13. Juniper responds that based on the Court's claim construction, the components/software routines – the plug-ins in Decasper98 – need not actually convert anything; simple processing is enough. *See* Claim Construction Order [Docket No. 69 in Case No. 10-4234] at 9 ("'conversion' is not a necessary limitation with respect to the processing of each packet").[13] Juniper also contends, supported by Dr. Calvert, that Decasper98 discloses the possibility

---

[13] In issuing its ACPs the PTO likewise agreed that Implicit's claims, as construed, can cover processing of data and need not convert data or formats. *See, e.g.,* '163 ACP at 16 (Decasper98 invention "can cover protocol stacks conforming to the OSI model, even where the same general type of processing is performed at each layer, and in a predetermined order") and at 22 ("within IP, various plugins handle various different formatting needs"); '857 ACP at 15 ("There is no requirement of

of using a conversion plug-in, which – as Implicit's expert agrees – is "conversion" pursuant to the patent claims. *See* Calvert Invalidity Report ¶ 553; Dixon Decl., Ex. 20 [Nettles Depo..] at 191:11-192:16.[14]

The Court concludes, based on clear and convincing evidence not contradicted by Implicit's expert, that the system described in Decasper98 processes the IP packets in a manner that anticipates Implicit's inventions.

### iii.    State Information

Implicit also argues that Decasper98 cannot anticipate or render obvious Implicit's system because the Decasper98 system does not maintain "state" regarding each components' processing of a specific message, as required by the claims. Implicit argues that as a basic IP router, Decasper98 is not guaranteed to even see all packets of a particular message and, therefore, cannot manage the processing and maintenance of all packets of a particular message or flow, which is essential to the '163 Patent. *See* Oppo. at 9-10, 13. Relatedly, Implicit argues that given its structure, Decasper98 maintains only "soft state" information and not "hard state" as required by the '163 Patent to ensure all packets in a message are processed consistent with the dynamically identified path. Soft state, according to Implicit, means that the state information could be dumped at any time, jeopardizing the ability of a system to fully process all packets in a flow that, for example, contains TCP data. Oppo. at 14.

Juniper responds that because Decasper98 explicitly indicates it can be implemented as a router at the edge of a network, it would – in that configuration – see every message in a particular flow. *See* Decasper98 at 2; Juniper Reply on Invalidity at 7. Implicit did not address or rebut this point during oral argument. Juniper also notes that Implicit has no evidence that Decasper98 cannot maintain "hard" state and that Implicit's citation to portions of Decasper98 that allow an administrator to "reset state

multiple formats or any conversion of format in the claims") and at 17 (nonetheless evidence showed that plugins in Decasper98 have differences in format, "which would require coordination of formats between the plug-ins.").

[14]   Juniper also notes that the patents' inventor, Edward Balassanian, testified that an all IP processing system could satisfy the input/output matching limitations. Dixon Decl., Ex. 34 [Balassanian Rule 30(b)(6) deposition] at 1054:14-24.

United States District Court
For the Northern District of California

information," *i.e.*, dump it when useful, does not undermine the fact that Decasper98 maintains state for the flows it processes. Juniper Reply on Invalidity at 7-8 & n.8 (noting that Decasper98 explains that the administrator can set the system to clear out or recycle cached entries in a flow table as necessary, but also the system is capable of exponential expansion to handle more cached records, demonstrating an ability to keep "hard state"); *see also* Decasper98 at 5, 9. The Court agrees with Juniper's evidence that Decasper98 demonstrates the "maintenance of state" limitation of the patents.

As such, the Court finds that based on clear and convincing evidence, which was not before the PTO initially, Decasper98 anticipates the asserted claims.

### iv. Obviousness as Single Prior Art Reference

Having found that Decasper98 anticipates the asserted claims, the Court need not reach whether Decasper98 renders the asserted claims obvious. The Court notes, however, that Implicit's argument against Decasper98 as an obviousness reference is based on its "meta-level" argument that Decasper98 cannot anticipate because it is a single-format basic router. As discussed above, the Court has found that Decasper98 explicitly contemplates use as an edge-router, contemplates and ensures input and output format matching within the parameters of IP processing, and likewise contemplates the use of a conversion "plug-in" which could convert data (if that limitation were required, although under the Court's Claim Construction Order, it is not). Those findings support a conclusion that Implicit's claims are unpatentable over (as rendered obvious by) Decasper98.

### C. Whether Decasper98 in Combination with IBM96 and Nelson Render the Asserted Claims Obvious

The Court has found that Decasper98 alone both anticipates the '163 patent and renders it obvious. Further, the Court finds that Decasper98 in combination with IBM96 and Nelson render the asserted claims obvious.

IBM96 and Nelson disclose the use of software components (plugins) for data compression and/or decompression, that according to Juniper and Dr. Calvert, one skilled in the art could have appreciated applying within the Decasper98 system. *See* Calvert Invalidity Report, ¶¶ 673-700. Dr.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Calvert explains that IBM96 teaches compression as a useful technique for gateways and routers, and

2    that it would have been obvious for one skilled in the art to use IBM's stateful compression component

3    with the "extensible" Decasper98 router. *Id.*, ¶¶ 674, 675, 678, 684. Dr. Calvert contends that Nelson,

4    which further elaborates on specific compression algorithms that can be used to implement a "stateful"

5    compression plugin, would likewise have been obvious to use with Decasper98's flexible and

6    expandable router architecture. *Id.*, ¶¶ 689, 691.[15]

7         Implicit responds that the IBM96 and Nelson references cannot combine with Decasper98 to

8    render the asserted claims obvious because IBM96 and Nelson speak to "stateful compression" of data.

9    Compression of data does not alter its format, and so these references cannot disclose the conversion

10   aspects of Implicit's patents. However, as noted above, the Court has rejected the requirement that each

11   packet be converted. Implicit also argues that a stateful compression algorithm would require all

12   packets of a message to be maintained together, something which Decasper98 as a "node router"

13   couldn't do. However, as noted above, Decasper98 explicitly disclosed its use as an "edge router,"

14   which could maintain the packets. Finally, Implicit relies on Dr. Nettles' conclusion that there would

15   be no motive to combine Decasper98 with IMB96 and/or Nelson because the compression techniques

16   discussed in IBM96 and Nelson are not suitable for IP routers. Nettles Invalidity Rebuttal Report, ¶¶

17   102, 108. Dr. Nettles does not explain in any detail why the IP router described by Decasper98 would

18   not function with or could not be reasonably combined with IBM96 – which contemplates use of

19   compression algorithm with a router – and/or Nelson, and the argument is not fleshed out in Implicit's

20   brief. *See* Invalidity Oppo. at 15 (stating simply that "[n]or would there be motive to combine Decasper

21   and the compression combinations," citing to Nettles Invalidity Rebuttal Report, ¶ 102). Dr. Calvert's

22

23   _____

24   [15] In the '857 ACP, the examiner rejected Claims 1, 4 and 10 in light of Decasper98 in view of IBM96, in light of Decasper98 teaching use of router plugins and IBM96 teaching a router platform having a compression algorithm. The examiner found that combining the two would have been obvious

25   in an effort to achieve faster data transmission and processing. '857 ACP at 22-23 (citing Nelson to illustrate features of a stateful compression algorithm). In light of the extensible nature of Decasper98,

26   IBM96's teaching use of a compression algorithm in a router, and the higher data rates, improved response times, and lower costs from compression in transmitting data, the examiner found explicit

27   reasons as to why the references would be combined by one skilled in the art. *Id.*, at 24; *see also id.* at 35 (noting LZ compression algorithm discussed in Nelson applied in the router architecture of IBM96

28   provides the basis to add it as a Decasper98 plugin).

1  discussions on reasonableness and motive for those skilled in the art for combining Decasper98 and

2  IBM96 and/or Nelson are much more thorough, and stand essentially unrebutted.

3

4  **D.    Objective Evidence of Nonobviousness**

5  Finally, Implicit can challenge Juniper's obviousness argument by showing that the "commercial

6  success" of its inventions covered by the patents "supports its contention of nonobviousness." *Demaco*

7  *Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). In order to defeat

8  a showing of obviousness on summary judgment, a patentee must make a "prima facie case" showing

9  "both that there is commercial success, and that the thing (product or method) that is commercially

10 successful is the invention disclosed and claimed in the patent." *Id.*, at 1392. Implicit relies on its

11 development and sales contracts with Intel, AMD and Raytheon. Invalidity Oppo. at 7 & 16. In

12 particular, Implicit relies on an agreement it entered into with Intel to develop products (which never

13 made it to market), Implicit's discussion with Sprint about an Implicit prototype, and an "approach"

14 about investment made by a venture capital firm. Invalidity Oppo. at 7-8.

15 Juniper responds that Implicit has failed to show that any of its commercial embodiments

16 actually satisfy the asserted claims' elements, and that the development agreements and inquiries

17 Implicit relies on do not show any true "commercial success." The Court agrees with Juniper.

18 While Implicit mentions contracts with Intel, AMD and Raytheon, Implicit does not cite to

19 copies of those contracts or provide expert analysis explaining that the use of the asserted patents'

20 technology was key to those contracts. (*See, e.g.*, Calvert Invalidity Report, ¶ 775 (noting no evidence

21 that contracts with Intel and AMD embodied technology of patents in suit and citing Balassanian

22 deposition admitting the Raytheon contract had nothing to do with the patents-in-suit)). Implicit relies

23 on the fact that Intel's due diligence engineer testified that Implicit's technology was novel, and that

24 Intel entered into agreements with Implicit to develop an early version of an Ipad-type device and digital

25 music player, and that Intel's venture capital business "approached" Implicit about investing in the

26 company in late 2001. Oppo. at 7. However, there is no evidence before the Court that the technology

27 covered by the contracts with Intel or the technology discussed by the engineer in his deposition

28

14

*included* the technology at issue in the asserted patents. *See* Ex. A to the Hosie Decl., at 61-68; *see also* Calvert Invalidity Report, ¶ 778.[16]

Implicit also relies on the conclusion of Sprint, which met with Implicit's predecessor company BeComm in early February 1999. Oppo at. 16. According to a document created around that time by Sprint, Sprint considered the BeComm communication platform prototype (Portal) to be unique, exciting, and a good strategic opportunity for Sprint. *See* Hosie Decl., Ex. G at SP-175-0731. Sprint, however, made that assessment "based on information to date and assuming further assessment is positive." *Id*. There is no evidence that Sprint's initial reactions, based on two meetings on one day, were supported by further assessment. An initial reaction based on a preliminary exposure cannot show that Implicit achieved "commercial success" or was addressing a long felt but unresolved need.[17]

For the foregoing reasons, the Court finds – based on clear and convincing evidence presented by Juniper's expert – that the asserted claims in the '163 and '857 patents are anticipated as well as rendered obvious by Decasper98 alone and/or in combination with IBM96 and Nelson. The conclusion is supported by the findings of the Patent Office ACPs. The Court also finds that in light of the strong evidence of obviousness, Implicit's weak evidence of secondary of non-obviousness cannot overcome that conclusion.

Concluding that the asserted claims of the patents are invalid, the Court need not reach whether Juniper and F5 are entitled to summary judgment on non-infringement. However, as discussed below, as alternate grounds to granting the motion for summary judgment as to invalidity, the Court finds that defendants are entitled to summary judgment on non-infringement as well.

---

[16] Moreover, even if the Implicit technology Intel was seeking to secure through its contract with Implicit was the technology of the asserted claims, Implicit has cited no evidence that any of the projects Implicit worked on for Intel were released to market or that the duration or terms of the Intel contracts amounted to commercial success. *See* Calvert Invalidity Report, ¶ 775.

[17] The PTO noted that Mr. Balassanian did not demonstrate that any commercial success of his company (presumably the contracts with Intel, AMD and Raytheon) was due to the claimed features of the '857 patent. '857 ACP at 44. The PTO also viewed skeptically Implicit's assertion that commercial success was shown by numerous licenses Implicit had negotiated with other third-parties for use of the technology, because it was "reasonable to assume the licenses were taken in lieu of defending [] infringement suits." *Id*. at 46-47.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## II.     Juniper's Motion for Summary Judgment on Non-infringement

Juniper moves for summary judgment arguing that Implicit has failed in its burden to establish a material issue of fact on its infringement claims. Juniper rests its argument on the fact that Implicit's expert did not consider the code for the actual accused products – the SRX and J series – and as a result had to extrapolate as to how the SRX and J series products work from generalities present in the operating code (JUNOS) that both products use. That "high level" assumption, according to Juniper, cannot carry Implicit's burden in opposing summary judgment. For the reasons discussed below, the Court agrees and rejects Implicit's attempt to shift its own burden – to show a material question of fact supporting infringement in this technically complex case with highly specific claim limitations – onto Juniper. *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006).

### A.     Legal Standard

To find infringement, "the court must determine that every claim limitation is found in the accused device." *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (internal citations omitted). Summary judgment of non-infringement is a two-step analysis. First, the claims of the patent must be construed to determine their scope, as a question of law. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). Second, "a determination must be made as to whether the properly construed claims read on the accused device." *Id.* The determination of infringement is generally a question of fact. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Since the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

### B.     Motion to Exclude Expert Testimony of Dr. Alexander

As an initial matter, Implicit moves to exclude the expert testimony of Juniper's non-

16

infringement expert, Dr. Peter Alexander.  Juniper opposes that motion and, in response, cross-moves to exclude the expert testimony of Implicit's infringement expert, Dr. Scott Nettles.  Implicit attacks Dr. Alexander's testimony on two grounds.  The first ground is that Dr. Alexander did not independently explore how the accused products operate and, therefore, his opinions are baseless.  The second ground is that when Dr. Alexander testified that Implicit's expert Dr. Scott Nettles failed to prove by a "preponderance of the evidence" that Juniper infringed, Dr. Alexander is not only incorrect, he is attempting to usurp the jury's function.

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Expert testimony under Rule 702 must be both relevant and reliable.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).  When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable.  *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

Regarding Implicit's first argument, the Court finds that given the scope of Dr. Alexander's role – which was to rebut Implicit's expert's infringement analysis – Dr. Alexander was not required to conduct the in-depth "infringement analysis" Implicit contends he should have undertaken.  Moreover, Implicit's arguments do not establish that Dr. Alexander's opinions are unreliable such that they should be excluded, but go more to the weight a jury may give to Dr. Alexander's opinion (assuming Dr. Alexander's understanding of the accused products is relevant to his assertion that Dr. Nettles' opinions are deficient).  With respect to the second argument, the Court finds that Implicit's contentions regarding the deficiencies in Dr. Alexander's testimony (*i.e.*, how Dr. Alexander criticized Dr. Nettles' conclusions and the basis for those criticisms) go to the weight a jury might give Dr. Alexander's conclusions and not their admissibility.  *See, e.g., Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Finally, the fact that Dr. Alexander opines that Dr. Nettles has not established infringement by a preponderance of the

United States District Court
For the Northern District of California

1    evidence, is not a basis on which to exclude his testimony.  *See, e.g., Symbol Technologies, Inc. v.*

2    *Opticon, Inc*., 935 F.2d 1569, 1575 (Fed. Cir. 1991) ("testimony on the ultimate issue of infringement

3    is permissible in patent cases").

4          Implicit's Motion to Exclude the testimony of Dr. Alexander, therefore, is DENIED.  As

5    Juniper's cross-motion to exclude Dr. Nettles' report is made only in the alternative to its opposition

6    to Implicit's motion to exclude Dr. Alexander's testimony, that motion is likewise DENIED.

7

8          **C.    Non-infringement**

9          Juniper argues that Implicit has failed to produce any evidence that the accused products – the

10   SRX and J-Series gateways and routers – contain all of the claim limitations.  Juniper argues that by

11   relying only on an analysis of source code from a product series that is not alleged to infringe (the

12   "Multiservices" products) , and by relying on general technical and marketing documents regarding the

13   JUNOS operating system that is used across Juniper products, Implicit has failed to prove that the SRX

14   and J series products infringe.

15         Implicit does not contest that its expert, Pavel Treskunov, limited his code analysis to the

16   Multiservices products, as well as plug-ins/software components used by the Multiservices products.

17   Nor does Implicit contest that its infringement expert, Dr. Scott Nettles, relied on the Treskunov code

18   analysis to create his expert report regarding infringement.  Indeed, throughout his report Dr. Nettles

19   relies on the Multiservices code and a list of plugins for the Multiservices products.  *See, e.g.*, Nettles

20   Expert Infringement Report, Ex. A [Ex. 8 to Hefazi Decl.], ¶ 14 (citing to Exhibit 3 for list of plug-ins

21   related to flow based processing); ¶ 32 (citing code).  But *nowhere* in his discussion does Dr. Nettles

22   acknowledge that the code and plugins are for the Multiservices products.  Nor does Dr. Nettles explain

23   why *he believes* that the Multiservices code and plugins he analyzes are used in the SRX or J-series

24   products, so that the SRX and J-series products would read on each limitation of the asserted claims.

25   Relatedly, as Juniper's non-infringement expert Dr. Alexander points out, when Dr. Nettles conducts

26   his limitation-by-limitation infringement analysis, Dr. Nettles does not distinguish between different

27   types of SRX products (branch vs. high end) or between the SRX and J series products.  *See* Alexander

28

18

United States District Court
For the Northern District of California

Report, ¶ 71.[18]

Dr. Alexander, on the other hand, explains that Nettles' reliance on the CPCD plugin[19] is misplaced, as that plugin is not used in the SRX or J series products. Alexander Report, ¶¶ 75-83. Dr. Nettles' reliance on the "mspman" packet handling code, which is related to the Multiservices PIC Manager,[20] is also misplaced as Dr. Alexander concludes the Multiservices PIC add-on card is a product for routers that is not used by the SRX or J series products. Alexander Report, ¶¶ 84-96. Dr. Alexander also criticizes Dr. Nettles' reliance on the "service sets" concept, which Dr. Nettles uses as the basis for his flow-based processing analysis and of the "dynamically identifying a non-predefined sequence of components" limitations. Alexander Report, ¶ 87. Dr. Alexander concludes that the Service Set was designed for use with the Multiservices products and is not used in the accused products. *Id.*; *see also id.*, ¶¶ 88-97.

Implicit argues that it can rely on Treskunov's and Nettles' analysis under the "proxy" or exemplar infringement theory because the Multiservices products as well as the SRX and J series products all use the One JUNOS Operating System. Therefore, Implicit argues that all of the products can be assumed to operate and infringe in the way Dr. Nettles asserts that Multiservices products infringe. However, Implicit provides no legal authority that would allow a device that is not accused of infringing to be the proxy for accused devices.[21]

---

[18] As a specific example *see* Dr. Nettles's evidentiary support for asserting SRX and J series products read on Claim 1a, where Dr. Nettles does not cite any documents specifically regarding the J series products. Nettles Infringement Report, ¶ 71 (citing evidence, including Multiservices plugins as support for meeting Claim 1a limitation), ¶ 73 (citing *Junos Security* document referencing SRX but not J series products as support for meeting Claim 1a limitation).

[19] *See* Nettles Infringement Report at 37 (example of "CPCD plugin handling first packet"); at 51 ("example of CPCD plugin returning 'session ignore' code as a result of the processing of the first packet of a session").

[20] *See* Nettles Infringement Report at 20 (discussing the mspman daemon).

[21] Under the "proxy" theory, an expert who analyzes only one device in depth can testify that *other* accused products operate similarly as to the specific claim at issue. *See, e.g., Tivo, Inc. v. Echostar Communications Corp.*, 516 F.3d 1290, 1308 (Fed. Cir. 2008) ("there is nothing improper about an expert testifying in detail about a particular device and then stating that the same analysis applies to other allegedly infringing devices that operate similarly, without discussing each type of device in detail.").

United States District Court
For the Northern District of California

More importantly, Dr. Nettles provides no reasoned opinion showing that the SRX and J series products *actually* operate in the same way – for purposes of infringement analysis – as the Multiservices products. A patentee cannot "simply 'assume' that all of [accused infringer's] products are like the ones that [the patentee] tested and thereby shift to [the accused infringer] the burden to show that is not the case." *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006). As Dr. Alexander points out, having a single operating system "does not mean [] that all of that software is loaded on each and every system." Tavakoli Depo. at 151:4-19; *see also* Alexander Report, ¶ 74.[22] Different products have different functionality enabled and use different portions of the JUNOS code tree. Tavakoli Depo. at 151:16-19.

To support its argument that the Multiservices products operate in the same way – for purposes of infringement – as the SRX and J series products, Implicit relies on the deposition testimony of Krishna Narayanaswamy, a Juniper deponent. In his testimony, Mr. Narayanaswamy agreed that the Multiservice DPC used "Junos-based" "flow-based" processing as did the J series routers and the SRX products. Narayanaswamy Depo. [Exhibit B to Hosie Declaration re Juniper Infringement] at 190:16 - 192:3. However, that testimony does not establish that the "flow-based" processing being discussed in general would read on the very specific claim limitations in this case.[23] Therefore, while Implicit has shown – by citation to deposition testimony and Juniper's technical documents – that Juniper products use JUNOS as the base source code (*see, e.g.*, Appendix A to Expert Report on Infringement of Dr. Scott Nettles at 7 (citing JUNOS OS: The Power of One Operating System at 1)), Implicit has *not* shown how the accused products use specifically identifiable portions of JUNOS to support a finding that the accused products read on every element of the asserted claims.

---

[22] For example, Dr. Alexander points out that Dr. Nettles cites to JUNOS source code allowing for both flow-based and packet-based processing. Nettles Infringement Report, ¶¶ 31-32. According to Dr. Alexander, Dr. Nettles further contends that the high-end SRX series *cannot* perform packet-based processing. Alexander Report, ¶ 86. The fact that one of the SRX products at issue does *not* perform a function that is enabled by JUNOS shows the weakness of Implicit's argument. Simply demonstrating that all products draw code blocks from JUNOS cannot support of showing of infringement here, especially considering the differences between the accused products.

[23] Mr. Narayanaswamy also testified that other Juniper products were "flow-based" but did not operate on JUNOS. *Id.*, at 192.

20

United States District Court
For the Northern District of California

1    That missing connection cannot, on this summary judgment record, be made based on the fact

2 that all of Juniper's products – or at least the SRX, J and Multiservices products – operate "flow based"

3 processing. As Implicit's own founder testified, the patents at issue do not automatically cover "flow

4 based" processing systems. Balassanian Depo. at 985:5-9 (Ex. B. to Hefazi Reply Decl.[Docket No.

5 191-3]). Rather, specific elements of the patent claims at issue – *e.g.*, dynamically identifying

6 components to process the data after receipt of the first packet, maintain state specific to a software

7 routine for a specific message that is not information related to an overall path – must be shown to be

8 practiced within the "flow based" processing used by the SRX and J series products.[24] Implicit's

9 evidence simply fails to make a showing sufficient to create a material issue of fact to defeat Juniper's

10 summary judgment motion.

11    Finally, Implicit repeatedly criticizes Juniper for failing to rebut Implicit and Dr. Nettles' high-

12 level generalized arguments that the One JUNOS source code allows for an inference that the accused

13 products operate similarly to the actually-analyzed Multiservices products. However, Implicit is

14 impermissibly attempting to shift its own burden – to show a material question of fact supporting

15 Juniper's infringement – onto Juniper. *L & W, Inc. v. Shertech, Inc.*, 471 F.3d at 1318. Implicit has the

16 burden, especially in a technically complex case such as this, to show by expert testimony how the

17 accused products actually work. *See, e.g., Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370

18 (Fed. Cir. 2004) ("the patentee cannot satisfy its burden of proof by relying on testimony from those

19 who are admittedly not an expert in the field."). Dr. Nettles' assertions about JUNOS are far too

20 generalized and rely too much on technical citations and code for products other than the SRX and J

21 series, to support a claim-by-claim and limitation-by-limitation infringement analysis necessary to meet

22 Implicit's burden in opposing summary judgment. *See, e.g., Eugene Baratto, LLC v. Brushstrokes Fine

23 Art, Inc.*, 701 F. Supp. 2d 1068, 1080-81 (W.D. Wis. March 24, 2010) (exemplar approach "does not

24

25    [24] Given the complex nature of the products at issue, and the specific, technical requirements
of the asserted claims (*e.g.*, maintaining component-based state information that is not related to the
26 overall processing path), "even slight variations in product functionality may easily be the difference
between infringement and non-infringement." Alexander Report, ¶ 74. As such, even assuming that
27 portions of the JUNOS code may practice on the method claimed, there still needs to be evidence
showing not only that the accused products utilize the infringing aspects of the JUNOS code but how
28 that use of that code in the *accused* products infringes. That showing has not been made here.

1    work when the only evidence supporting such grouping is merely that different versions of a product

2    are part of the same family and have the same basic functionality." *Baratto v. Brushstrokes Fine Art,*

3    *Inc.*, 701 F. Supp. 2d 1068, 1081 (W.D. Wis. 2010) (internal quotation omitted)).

4        The Court concludes, therefore, that Implicit has failed to raise a material question of fact on

5    infringement against Juniper, further supporting the grant of Summary Judgment in Juniper's favor.[25]

6

7    **III.    F5's Motion for Summary Judgment on Non-infringement**

8        F5 argues that its products do not meet the "dynamically identifying" and "non-predefined

9    sequence" post-first packet limitations because the accused F5 "BIG-IP" products use sequences of

10   components (Hudfilters) that have been fully identified and arranged (in Hudchains) prior to any data

11   entering the system.  Implicit responds that the BIG-IP products infringe because the Hudchains are

12   simply processing policies, and F5's products create a "stateful" message-specific path (the Connflow)

13   *after* the first packet of a message enters the system.  It is the creation of the Connflow, Implicit argues,

14   that satisfies the dynamic identification of a non-predefined sequence of components limitation.  For

15   the reasons discussed below, the Court agrees with F5, and finds Implicit has not raised a material issue

16   of fact as to the "dynamically identifying" and "non-predefined sequence of components" limitations.[26]

17

18       **A.    The Technology of the Patents and F5's BIG-IP Products**

19       As discussed in the Claim Construction Order, according to Implicit's complaint, the heart of

20

21       ───────────

22       [25]  Juniper also argues, as an alternate ground for summary judgment of non-infringement, that
     the source code and other materials relied upon by Implicit and Dr. Nettles fail to show that both of the
23   accused products meet three other limitations: (1) that they "select individual components" in a
     compatibility check; (2) that the plurality of components selected meet the limitations requiring them
24   to keep specific pieces of state; and (3) that the components are "dynamically identified" after the first
     packet is received.  Because the Court has granted summary judgment of non-infringement, the Court
25   need not reach these arguments but notes that Juniper has made a strong case that its products do not
     practice these three limitations.

26       [26]  F5 also argues that the accused products do not read on the "for each of a plurality of packets
     of the message in sequence," "state information" and selecting components based on a "message"
27   limitations. However, given the Court's findings set out in this order, it need not reach F5's additional
     arguments.  *See Kahn v. GMC*, 135 F.3d 1472, 1477 (Fed. Cir. 1998) ("The absence of even a single
28   limitation of [a claim] from the accused device precludes a finding of literal infringement.").

United States District Court
For the Northern District of California

the patents' invention is a networking process where "discrete computer function[s], *e.g.,* processing http server requests over TCP/IP, streaming a video web-based client, or managing voice-over-ip calls, would be built into a discrete software module, called a 'bead.'" The system devised could "dynamically" "receive a stream of data – say video – determine what services were necessary to render that content and where the content was to be rendered, and then assemble – or string together – the requisite service beads (modules) at run-time." *See, e.g.,* FAC [Docket No. 31, Case No. 10-3365], ¶ 16. This system, according to Implicit, dramatically departed from the prior art where a developer of applications had to anticipate who would use the applications and for which devices and content, and then build-in the ability to handle the anticipated demands. *Id.*, ¶ 11. The prior art model had many short falls, including an "ever-increasing complexity, cost, and processing overhead . . . Given that all anticipated uses had to be preconfigured at build-time, any unanticipated new use, *e.g.*, a different format or a different device, would simply break the system. The developer had to have the foresight to specify explicitly all possible configurations in advance, a difficult task in a rapidly changing world." *Id.*, ¶ 12.

The '163 Patent entered reexamination in 2008 and emerged in June 2010 with additional limitations. The purpose and result of the reexamination was to distinguish the '163 series of patents from the prior art, and specifically from David Mosberger, "Scout: A Path-Based Operating System," Doctoral Dissertation Submitted to the University of Arizona. *See* Claim Construction Order at 3. The '163 reexamination added a number of significant limitations in order to distinguish Mosberger, including "*dynamically* identifying a *non-predefined* sequence of components" for processing "messages," wherein "*dynamically identifying includes selecting individual components to create the non-predefined sequence of components*. . . ." '163 Reexam.

As discussed in the Claim Construction Order, Implicit's September 1, 2009 Amendment and Response in the '163 Reexam cited to the '163 specification distinguishing prior art systems which "typically use predefined configuration information" to load the correct series of conversion routines that make up the "path." 9/1/09 Amendment and Response at 18. Implicit was attempting to distinguish itself from prior art which had to "pre-bake" complete processing sequences for all potential formats

United States District Court
For the Northern District of California

23

1   of data a system might want to process at compile time; Implicit patented inventions which require that

2   the sequences of components to be used to process messages be *dynamically* identified during run-time

3   but post-first packet, in order to accommodate for new data formats or different devices. *See, e.g.,* FAC,

4   ¶ 12.  Implicit's Amendment and Response makes clear that what it was disclaiming in the prior art was

5   use of preconfigured sequences of routines, in other words preconfigured processing paths. *See* 9/1/09

6   Amendment and Response at 18 ("[T]he sequence of conversion routines (or 'path') is not configured

7   prior to receiving the first packet of a message."); *see also* 2/8/10 Amendment and Response at 16.

8        The accused F5 products are all part of the BIG-IP line of products.  The BIG-IP products are

9   application controllers that allow clients to manage, inspect, transform and route their application traffic.

10  Declaration of Dr. James Storer, ¶ 42.  For example, an internet users' application request (*e.g.,* placing

11  an order with an e-retailer, seeking access to bank account information) travels over the internet to an

12  F5 customer's BIG-IP, which then processes and forwards the request to specific servers on the client-

13  side.  *Id.,* ¶ 43.  Given the massive amounts of data being processed per second, the BIG-IP products

14  are designed to help increase the speed and performance of the client websites.  *Id.* ¶ 41.

15       The BIG-IP products use a common operating system, Traffic Management Operating System

16  (TMOS).  TMOS is a "modular," or "pluggable" operating system.  *Id.* ¶ 50.  Within that system are

17  modules known as Hudfilters, which are code units that perform a processing step on the network traffic.

18  *Id.* ¶ 53.  Hudchains are comprised of an identified set of Hudfilters that have been interconnected to

19  form a data processing sequence.  *Id.* ¶ 54.  The contents of the Hudchains – Hudfilters connected in a

20  specific sequence – are determined by Profiles selected by clients within the boundaries of F5's hard-

21  coded configuration rules, called Hudfilter constraints.  *Id.,* ¶ 56.  BIG-IP ships with a set of Profiles

22  that control the behavior and processing of particular types of network traffic, and client system

23  administrators can select which Profiles to implement or can build custom Profiles (for example, client

24  administrators can decide to enable cookie encryption for HTTP profiles).  *Id.*  Once the system

25  administrator selects or creates the Profiles, the BIG-IP system will use a Hudchain template to create

26  the Hudchains that include all necessary Hudfilters to process the client's traffic in light of the client's

27  needs.  *Id.,* ¶ 64.  The Hudchain template is then built, using a Hudchain_select command, which

28

ensures compatibility between the Hudfilters. *Id.*, ¶¶ 65-66. At that point, the system constructs the actual Hudchain by implementing the Hudchain_construct function. *Id.*, ¶ 67. The system will then assign the Hudchain a "listener" pointer which, when a particular type of traffic arrives, will direct the packets to the Hudfilters specified in the Hudchain for processing that type of message. *Id.*, ¶¶ 68, 69. As such, the Hudchains are fully identified and determined before any network traffic enters the system. *Id.*, ¶ 69.

Once the first packet of a message or flow hits the system and a TCP connection is established – which requires the exchange of information between the user computer and the client server and therefore occurs only after the exchange of three preliminary packets of a message/flow[27] – the system creates a Connflow. The Connflow is a dedicated area of memory in the system, that has a pointer to the first Hudfilter of an existing Hudchain to allow the processing of the flow. *Id.*, ¶70; *see also id.* ¶¶86-87. The Connflow stores information unique to a particular flow and tracks, for example, the Hudfilter's connection state and the expected sequence number of the next packet of the flow. *Id.*, ¶ 87. However, the individual Hudfilters processing the packets as well as the Hudchains setting out the parameters for the processing, are stored in separate memory space and are loaded into the system on initialization. *Id.* Once a message/flow starts to be processed, any changes in the Hudchain or additions to the functionality of the Hudfilters, will not be applied to any existing flow.[28] Those changes will only be applied to new flows that enter the system after the revised or new Hudchain is constructed. *Id.*, ¶ 70.

Implicit and its expert Dr. Scott Nettles do not dispute that this is the basic design and configuration of the BIG-IP products. Instead, as discussed below, the main point of dispute between the parties is whether the Hudchain *or* the Connflow is the "sequence" or "path" that needs to be dynamically-identified by the system post-first packet in order to read on the claim limitations. Because the parties' arguments hinge on claim construction – and largely reiterate arguments made during Claim

---

[27] *See id.*, ¶ 81.

[28] For example, the system allows client administrators to implement iRules to enhance the functionality of specific Hudfilters. *Id.*, ¶ 71.

United States District Court
For the Northern District of California

Construction – they lend themselves to resolution on summary judgment. *See, e.g., Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1324 (Fed. Cir. 2002).

## B. Non-Predefined Sequence of Components

As noted above, the Court defined "non-predefined sequence of components" as "a sequence of software routines that was not identified before the first packet of a message was received." Claim Construction Order at 6. In doing so, the Court noted that in the initial '163 Reexam, Implicit did not disclaim the ability to rely in "some part" on predefined "configuration information" to identify the non-predefined sequence, but disclaimed the use of "pre-configured paths." *Id*. The Court also noted that the claim language itself requires that identification of the sequence occur "after the first packet is received." *Id.*

F5 argues that its BIG-IP products cannot meet this limitation because the sequence of components is pre-defined – it is defined in the Hudchains before any traffic hits the system. Implicit counters that F5's Connflows, created post-first packet, are the *actual* processing paths followed by the packets in a message and that they represent the "sequence of components" identified "after the first packet is received" which satisfy this limitation. The Court rejects Implicit's argument. Implicit attempts to add a requirement – that the method not only identify the sequence of components to be used to process a particular type of message/flow but also "create" an actual, "stateful" path in memory that will track the processing of one particular message/flow. *See* Oppo. at 13, 19.[29] The Court recognizes the distinction between the Hudchains (which set out how types of messages/flows will be processed) and the Connflows (which keep in memory the pointers to the initial Hudfilters and keep track of the actual processing of the packets of a specific flow/message), but the identification and selection of the individual components to form the processing sequence is what is required by the claim language. That is what happens when the Hud_construct function creates the Hudchains based on the

---

[29] Apparently, this is why Implicit proposed construing "create" as used in "wherein dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received" to mean "instantiate in memory." Claim Construction Order at 11. The Court rejected Implicit's attempt and adopted the plain meaning of create. *Id.*

United States District Court
For the Northern District of California

1    Policies adopted by the BIG-IP clients. This conclusion is consistent with Implicit's repeated

2    characterization of its invention as one which was different from prior art because Implicit's patents

3    identify the individual components needed process the message (the sequence) dynamically and post-

4    first packet. *See, e.g.*, 9/1/09 Amendment and Response at 12 ("configuring a path at build time (i.e.,

5    identifying the components used to process message packets before actually receiving any message

6    packets) is fundamentally different than configuring a path at run-time (i.e., identifying the components

7    for processing message packets after receiving the packets). . . ."). It was this dynamic selection of

8    components, occurring post-first packet, that would allow Implicit's system to accommodate a message

9    carrying a new format or needing to be delivered to a new device.[30] FAC, ¶ 12.[31]

10       It is true that Implicit did not disavow using pre-configured processing information "in some

11   part." *See* Claim Construction Order at 6. However, Implicit's *did* disclaim the use of a pre-configured

12   sequence of components, as represented in the BIG-IP products as the Hudchain. *Id*. It is not disputed

13   that the Hudchains which set out the processing routines to be applied to every authorized type of

14   message/flow are defined and loaded into the system's memory prior to the arrival of the first packet.

15   Therefore, they cannot read on this significant limitation.

16

17   **C.    Dynamically Identifying and Selecting Individual Components**

18       In the Court's Claim Construction Order, the Court adopted the plain meaning of "dynamically

19   identifying" because it was adequately defined in the wherein clause of the claim language ("wherein

20

21   _____

22   [30] The undisputed fact that thousands of flows could use the same Hudchain at the same time
     but only one Connflow is created for each message/flow (*see* Oppo. at 12), does not change the Court's
23   conclusion. The fact that Connflows are necessary to provide memory enabling and tracking the
     processing of each message/flow does not make them into a "non-predefined sequence of components."
24   The Connflow is simply a feature that allows the identified, predefined sequence controlled by the
     Hudchain to run.

25   [31] Implicit does not dispute that if the BIG-IP products receive a data packet that is *not*
26   recognized or pre-authorized for processing by a specific Hudchain, the packet will not be processed.
     *See* Storer Report, ¶ 95; *see also id.*, ¶¶ 69, 153 (noting that in order to process high volumes of network
27   traffic, BIG-IP uses preset processing sequences; a non-predetermined system using dynamic selection
     of processing routines "could not achieve the data throughput requirements of a large enterprise
28   application."). BIG-IP, therefore, functions in a way that is contrary to the purpose of Implicit's
     inventions.

United States District Court
For the Northern District of California

dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received"). Claim Construction Order at 7. The Court also construed "selecting individual components" as "selecting the individual software routines of the sequence so that the input and output formats of the software routines are compatible." *Id.*, at 11.

### i. Dynamically Identifying

F5 argues that the BIG-IP products cannot meet the limitation of "dynamically identifying" a non-predefined sequence, where "dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received." Claim Construction Order at 7. F5 notes that no dynamic identification occurs post-first packet because the Hudchains determine the components to be used for processing prior to any information hitting the system. Implicit responds that because the actual processing of the packets is controlled by the Connflow, which is not created until post-first packet, this limitation is met. However, the Connflow is a structure in the memory used to track the actual processing of a specific message. By contrast, the dynamic identification limitation is aimed at selecting the individual software routines, which in the BIG-IP products happens through the predefined Hudchains prior to any traffic hitting the system. For the same reasons as discussed above, the BIG-IP products cannot meet this limitation.[32]

### ii. Selecting Individual Components

The Claim Construction Order found that a "necessary" part of selecting individual components is determining the compatibility between the output of one software routine and the input of the next. Claim Construction Order at 11. F5 argues that Implicit has failed to identify a "compatibility check" in the BIG-IP products that operates *during* the dynamic identification of the individual components which, under Implicit's argument, allegedly occurs during the instantiation of the Connflow. Instead,

---

[32] This analysis is not altered by calling the "non-predefined sequence of components" a "path," as Implicit's expert, Dr. Nettles, does repeatedly. *See* Nettles Infringement Report, ¶¶ 53-59. The claims do not require the dynamic selection of a physical processing path, they require the dynamic selection of the full sequence of processing components. There is no support for Implicit's attempt to redefine the claims.

United States District Court
For the Northern District of California

F5 argues that the compatibility check in the BIG-IP products is handled by the Hudfilter constraints implemented prior to the building of the actual, predefined Hudchains. Implicit responds that the claims do not require any particular "process" for ensuring compatibility, other than application of general policies (for example, industry standards) which ensure the packets of a message can be handed off for further processing from one component to the next. Implicit also argues that this "compatibility" can be ensured when components are matched together in creating F5's Hudchains or Implicit's LabelMapGet utility. Oppo. F5 at 24. However, like the "selecting of individual components" step of which it is a part, the compatibility step has to be done *post-first packet*. Implicit points to no evidence that there is any type of compatibility check in BIG-IP, other than in the Hudfilter constraints step run before the Hudchains are put in place and run well before the instantiation of the Connflow.[33] Moreover, whether or not Implicit's LabelMapGet utility functions in a similar manner to the Hudfilter constraints used by BIG-IP products, there is no dispute that LabelMapGet is used in Implicit's inventions post-first packet.[34]

For these additional reasons, F5's BIG-IP products do not read on necessary limitations in the claims and summary judgment should be granted in F5's favor.[35]

///

///

[33] *See* Nettles Deposition [Ex. C to Brun Decl.] at 158:23-159:6 (testifying that F5 satisfies the selecting individual components limitation by applying constraints before the first packet of a flow is received).

[34] Relatedly, although Implicit's inventions may "rely[] in some part on 'predefined configuration information'" in light of the LabelMapGet function used in a preferred embodiment, Implicit disclaimed use of a pre-defined sequence of processing components. Claim Construction Order at 6. The amended claim language and Implicit's statements in the Reexam therefore require *some* dynamic-identification of *individual* components, ensuring the packets are compatible, post arrival of the first packet. Implicit has not pointed to any feature in the BIG-IP products that does this.

[35] Having determined that at least these significant limitations are not met by F5's products, the Court need not address F5's remaining non-infringement arguments.

United States District Court
For the Northern District of California

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court GRANTS defendants' motion for summary judgment on invalidity. The Court also GRANTS both defendants' motions for summary judgment on non-infringement.

**IT IS SO ORDERED.**

Dated: March 13, 2013

SUSAN ILLSTON
United States District Judge

# EXHIBIT  27

1   SPENCER HOSIE (CA Bar No. 101777)
    shosie@hosielaw.com
2   GEORGE F. BISHOP (CA Bar No. 89205)
    gbishop@hosielaw.com
3   DIANE S. RICE (CA Bar No. 118303)
    drice@hosielaw.com
4   WILLIAM P. NELSON (CA Bar No. 196091)
    wnelson@hosielaw.com
5   HOSIE RICE LLP
6   Transamerica Pyramid, 34th Floor
    600 Montgomery Street
7   San Francisco, CA 94111
    (415) 247-6000 Tel.
8   (415) 247-6001 Fax

9   *Attorneys for Plaintiff*
10  *IMPLICIT NETWORKS, INC.*

11

12              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
13                   OAKLAND DIVISION

14

15  IMPLICIT NETWORKS, INC.,                    Case No. C 10-4234 SI

16              Plaintiff,                       **PLAINTIFF'S OPENING CLAIM
                                                CONSTRUCTION BRIEF**
    v.
17                                              **[PATENT L.R. 4-5]**
    JUNIPER NETWORKS, INC.,
18
                Defendant.
19

20  ─────────────────────────────

21  IMPLICIT NETWORKS, INC.,                    Case No. C 10-3746 SI

22              Plaintiff,

23  v.

24  HEWLETT-PACKARD COMPANY,

25              Defendant.

26  ─────────────────────────────

27

28

Under the defendants' construction, "Label Map Get" functionality, and the '211 "address" functionality would be read entirely out of this patent. This construction cannot be right, and the defendants proposed "one by one" selection is not a limitation.

More, if this claim phrase required a sequential use of the output format of the previous component to identify the next component, there would have been no need to add this precise limitation to independent Claim 45, which requires that the input format of the next component in the sequence be "identified *by using* the output format of the previous component to identify a component with a compatible input format." *See* Exhibit F at Claim 45. *See Phillips*, 415 F.3d at 1325 ("claim terms should not be read to contain a limitation where another claim restricts the invention in exactly the same manner"). Claim differentiation counts against defendants here.

## 2. Edge Compatibility Selection is not a Limitation.

Implicit's '163 contemplates numerous ways of selecting modules to create a stateful processing path, post-first packet. For example, it can use the Label Map Get function, and Label Map Get consists of a cache with sequences identified. *See* Exhibit A at Column 3, 45-50; Column 4, 15-20, citing Fig. 1. As part of this process, the system tests to ensure that the modules linked to one another are compatible, so that a module understanding Urdu, as it were, is not hooked directly to a module understanding only Russian. *That the system has a compatibility constraint test does not mean that edge compatibility is the only way the system selects modules.* The claims themselves make clear that a compatibility constraint is just that, not the sole selection mechanism. For example, Claim 1 of the '163 C1 patent reads as follows, "dynamically identifying a non-predefined sequence of components for processing the packets of a message <u>such that</u> the output format of the components of the non-predefined

sequence match the input format of the next component…." *See* Exhibit F. The words "such that" make clear that compatibility constraint is a test, not an exclusive selection mechanism.

Without saying as much, the defendants appear to be arguing that Implicit has limited itself to just one component selection mechanism (edge component compatibility) as the price of reissuance over Mosberger. But edge compatibility had nothing to do with Mosberger, or indeed with the re-exam --- all sequences in Mosberger were built-in by the developer, and there was **no** runtime component selection whatsoever. None. This is not a situation where the patentee surrendered scope to secure a patent over prior art. If Defendants wish to argue prosecution history estoppel or surrendering of claims scope, they must do so plainly and unambiguously. They cannot remotely do so here. "For prosecution disclaimer to attach our precedent requires that alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Cordis Corp. v. Medtronic Ave., Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008).

Finally, during the reexamination Implicit did not limit itself to *sequentially* selecting components, but to "identifying the *sequential order* of the components based on the received packet (*i.e.*, performing the affirmative act/function of *identifying the sequential order at run-time*)." *See* Exhibit L at 2 (emphasis added). Implicit repeatedly referred the examiners to the Label Map Get routine for the process of identifying the sequence at runtime. *See* Exhibit L, Exhibit A thereto at 3 ("The Label Map Get module maintains a database containing each component and the input formats they accept"), 9 ("'163 corresponding structure is 'label map get routine'"). Implicit emphasized that the addition of the words "selecting individual components to form the non-predefined sequence of components after the first packet is received" was "intended to capture distinctions over Mosberger," as described above. Exhibit D at 10.

1  DATED:  November 28, 2011             Respectfully submitted,

2

3                                         */s/ Spencer Hosie*_____
                                          SPENCER HOSIE (CA Bar No. 101777)
4                                         shosie@hosielaw.com
                                          GEORGE F. BISHOP (CA Bar No. 89205)
5                                         gbishop@hosielaw.com
                                          DIANE S. RICE (CA Bar No. 118303)
6                                         drice@hosielaw.com
                                          WILLIAM P. NELSON (CA Bar No. 196091)
7                                         wnelson@hosielaw.com
                                          HOSIE RICE LLP
8                                         Transamerica Pyramid, 34th Floor
                                          600 Montgomery Street
9                                         San Francisco, CA 94111
                                          (415) 247-6000 Tel.
10                                        (415) 247-6001 Fax
11

12                                        *Attorneys for Plaintiff*
                                          *IMPLICIT NETWORKS, INC.*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT  28

1   SPENCER HOSIE (CA Bar No. 101777)
    shosie@hosielaw.com
2   DIANE S. RICE (CA Bar No. 118303)
    drice@hosielaw.com
3   DARRELL R. ATKINSON (CA Bar No. 280564)
    datkinson@hosielaw.com
4   HOSIE RICE LLP
    Transamerica Pyramid, 34th Floor
5   600 Montgomery Street
    San Francisco, CA 94111
6   (415) 247-6000 Tel.
    (415) 247-6001 Fax
7

8   *Attorneys for Plaintiff*
9   *IMPLICIT NETWORKS, INC.*

10

11                  UNITED STATES DISTRICT COURT
12          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
13

14  IMPLICIT NETWORKS, INC.,

15              Plaintiff,                    Case No. 10-CV-3365 SI

16  v.                                        **IMPLICIT NETWORKS' OPPOSITION
                                              TO F5 NETWORKS' MOTION FOR
17                                            SUMMARY JUDGMENT OF NON-
    F5 NETWORKS, INC.,                        INFRINGEMENT**

18              Defendant.                    Date:        December 14, 2012
                                              Time:        9:00 a.m.
19                                            Courtroom:  10

20

21

22

23

24

25

26

27

28

**"pre-configured"** paths.  In contrast, '163 claimed paths built post-first packet based in part on information in the first packet.  Implicit described its own paths, built post-first packet as "non-preconfigured paths."  *See* § III below.

As this Court held in the Claims Order, "Defendants attempt to impose a significant limitation on the term [non-predefined] by arguing that the sequence of routines cannot be identified or 'determinable from configuration information' in place before the first packet of a message is received."  *Id.* at 5.  But the Court correctly concluded that Implicit did not disclaim the use of "predefined configuration information" in distinguishing Mosberger.  To the contrary, Implicit disclaimed "only the use of pre-configured paths."  *Id.* at 5-6; 10.  And what was the disclaimed pre-configured path?  The pre-built Mosbergerian paths, the art being distinguished.

On this record, the Court found that a "sequence of processing components" meant a path.  *Id.* at 6.  A non-predefined path was one "not identified before the first packet of a message was received."  *Id.*  And on "identifying," the Court found that the claims expressly defined this as "selecting individual components to **create** the non-predefined sequence of components after the first packet is received."  *Id.* at 7, citing '163 C1, Column 1:36-39.  "Identifying" the path meant building a path after the first packet of a message, not identifying or "creating" configuration information itself.

F5 takes these constructions and argues that a "sequence of processing routines" is just a list and not a path.  It then says that "identifying" means merely setting out in a list, *e.g.* a list of groceries.  *See* below § IV.A.  In this fashion, F5 concludes that any processing path built using configuration information does not infringe, which is exactly the position it advanced and lost at claims.  In F5's world, no system could ever infringe, as all systems use configuration information – they are, after all, just machines.

1    Dated: November 15, 2012          Respectfully submitted:

2

3                                      */s/ Spencer Hosie*
                                       SPENCER HOSIE (CA Bar No. 101777)
4                                      shosie@hosielaw.com
                                       DIANE S. RICE (CA Bar No. 118303)
5                                      drice@hosielaw.com
                                       DARRELL R. ATKINSON (CA Bar No. 280564)
6                                      datkinson@hosielaw.com
                                       HOSIE RICE LLP
7                                      Transamerica Pyramid, 34th Floor
                                       600 Montgomery Street
8                                      San Francisco, CA 94111
                                       (415) 247-6000 Tel.
9                                      (415) 247-6001 Fax
10

11                                     *Attorneys for Plaintiff*
                                       *IMPLICIT NETWORKS, INC.*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT  29

1   IRELL & MANELLA LLP
    Morgan Chu (SBN 70446)
2   (mchu@irell.com)
3   Jonathan S. Kagan (SBN 166039)
    (jkagan@irell.com)
4   1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
5   Telephone:   (310) 277-1010
    Facsimile:    (310) 203-7199
6
7   David C. McPhie (SBN 231520)
    (dmcphie@irell.com)
8   Nima Hefazi (SBN 272816)
    (nhefazi@irell.com)
9   Douglas J. Dixon (SBN 275389)
    (ddixon@irell.com)
10  840 Newport Center Drive, Suite 400
    Newport Beach, California 92660-6324
11  Telephone:   (949) 760-0991
    Facsimile:    (949) 760-5200
12
13  Attorneys for Defendant
    JUNIPER NETWORKS, INC.
14

15                  UNITED STATES DISTRICT COURT
16          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
17

18  IMPLICIT NETWORKS, INC.,              Case No. C 10-4234 SI

19              Plaintiff,

20       v.                              **JUNIPER NETWORKS, INC.'S REPLY
                                         IN SUPPORT OF ITS MOTION FOR
21  JUNIPER NETWORKS, INC.,              SUMMARY JUDGMENT OF NON-
                                         INFRINGEMENT**
22              Defendant.
                                         Date:          December 14, 2012
23                                       Time:          9:00 a.m.
                                         Courtroom:    10
24

25

26

27

28

kind for this element. Implicit makes no reference to and does not rely on any Juniper technical documents (either public or non-public), or even the two administrator guidebooks that Implicit claims are the "best evidence" of infringement. Nor does Implicit point to *any* Juniper source code alleged to satisfy this element. Instead, the entirety of Implicit's cited evidence on this point consists of about 40 lines of deposition testimony from two Juniper employees. *See* Opp. at 22:8-9; *see also id.* at 13:3-19.[13] But this testimony does not establish that the accused products perform a "compatibility check." In fact, the cited testimony is exactly the opposite of what Implicit claims in its opposition: The Juniper witnesses testified that "*no checks are required*" in the Juniper products because they "know upfront exactly what we've coupled with what else," and therefore "*there's never a question of compatibility* from, you know, one plug-in to another." Reply Ex. C (Tavakoli Depo. Tr.) at 130:19-131:24.

Implicit nevertheless relies on these deposition cites to argue that Juniper's developers design their systems such that there is a "logical order" to the services or plugins used. Opp. at 13, 22. But whether the services are in a logical or illogical order is a separate question from whether the accused products perform a required "compatibility check." Implicit admitted this distinction during the deposition of its corporate representative, Mr. Balassanian, when he testified, with respect to a particular prior art publication: "*I don't think you could infer from this* that you are creating paths *such that the input and output formats are compatible,*" *even though* the publication at issue was "*certainly talking about* assembling components and having those components be in a *logical order* . . . ." Reply Ex. B at 1231:4-1232:5. Implicit's expert, Dr. Nettles, made the same distinction, distinguishing a check of compatibility "on the basis of formats" (*i.e.*, what the claims require) from a "more deep" kind of compatibility "on the basis of what [components] do," which requires developers to "design things so that they happen in the

---

[13] Implicit's direct citations are to the Tavakoli deposition (Hosie Ex. C) at 130:19-20 and 131:7-19. There is also an internal citation to Section II.B of the opposition brief (the Statement of Facts section), which contains one subsection on the compatibility check limitation (Opp. at 13). That subsection contains an additional citation to Tavakoli at 111:14-18, and two citations to Krishna (Hosie Ex. B) at 140:6-7 and 140:21 – 141:13. Notably, none of these citations appear anywhere in the Nettles report, despite Implicit's (false) claim that Dr. Nettles's report "cites and relies" on this testimony from Mr. Tavakoli (*see* Opp. at 4:9-13).

Dated:  December 3, 2012                    Respectfully submitted,


                                            IRELL & MANELLA LLP

                                            By: */s/ Nima Hefazi*
                                                David C. McPhie (dmcphie@irell.com)
                                                Nima Hefazi (nhefazi@irell.com)
                                                Douglas J. Dixon (ddixon@irell.com)
                                                840 Newport Center Drive, Suite 400
                                                Newport Beach, California 92660-6324
                                                Telephone:  (949) 760-0991
                                                Facsimile:  (949) 760-5200

                                                Morgan Chu (mchu@irell.com)
                                                Jonathan S. Kagan (jkagan@irell.com)
                                                1800 Avenue of the Stars, Suite 900
                                                Los Angeles, California 90067-4276
                                                Telephone:  (310) 277-1010
                                                Facsimile:  (310) 203-7199

                                                *Attorneys for Defendant*
                                                *Juniper Networks, Inc.*

.

# EXHIBIT  30

# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


IMPLICIT NETWORKS, INC.,          )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )     No. C 10-4234 SI
                                  )
JUNIPER NETWORKS, INC.,           )
                                  )
          Defendant.              )
_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF:   OLIVER TAVAKOLI

TAKEN ON:        June 19, 2012


          13145              BRENDA L. MARSHALL

                            CSR No. 6939

30

| | | |
|---|---|---|
| 10:29:00 | 1 | Q.  So let's -- let's, then, discuss |
| 10:29:03 | 2 | technology of, say, the SRX products.  What's a |
| 10:29:07 | 3 | plug-in, in that context, sir? |
| 10:29:08 | 4 | A.  A plug-in is a discernible module that |
| 10:29:13 | 5 | has some boundaries to it. |
| 10:29:15 | 6 | Q.  Can you give me some examples of |
| 10:29:18 | 7 | plug-ins? |
| 10:29:19 | 8 | A.  Protocol parser, deep packet inspector, |
| 10:29:27 | 9 | application identifier, application layer |
| 10:29:33 | 10 | gateway, ALGs. |
| 10:29:37 | 11 | Q.  How many plug-ins come with the SRX |
| 10:29:40 | 12 | product? |
| 10:29:43 | 13 | MR. KAGAN:  Objection.  Vague. |
| 10:29:45 | 14 | THE WITNESS:  My -- I mean, I don't know |
| 10:29:47 | 15 | precisely because it doesn't really map to the |
| 10:29:51 | 16 | externally visible characteristics.  It's kind |
| 10:29:55 | 17 | of like more the modules that make up the |
| 10:29:57 | 18 | system.  Redacted |
| | 19 | BY MR. HOSIE: |
| 10:29:59 | 20 | Q.  Okay.  When you say "more the modules |
| 10:30:02 | 21 | that make up the system," what do you mean? |
| 10:30:04 | 22 | A.  These are the building blocks out of |
| 10:30:06 | 23 | which the system is built. |
| 10:30:07 | 24 | Q.  The plug-ins are the building blocks out |
| 10:30:10 | 25 | of which the system is built? |

Implicit Networks, Inc. v. Juniper Networks, Inc.                    Oliver Tavakoli - CONFIDENTIAL

82

| | | |
|---|---|---|
| 11:26:45 | 1 | Q. So the first packet comes in. Is there |
| 11:26:49 | 2 | a step in the process where the system looks at |
| 11:26:51 | 3 | the policy, figures out what the processing will |
| 11:26:53 | 4 | be, and then allocates enough memory for that |
| 11:26:56 | 5 | particular processing for that particular flow? |
| 11:26:59 | 6 | MR. KAGAN: Objection. Vague and |
| 11:27:00 | 7 | compound. |
| 11:27:03 | 8 | THE WITNESS: I -- yeah. I -- I |
| 11:27:04 | 9 | wouldn't put it that way. I mean, the policies |
| 11:27:07 | 10 | themselves are all in memory. These systems |
| 11:27:09 | 11 | don't have disk on the -- on the SPCs. So |
| 11:27:13 | 12 | everything is in memory. Right? The policies |
| 11:27:16 | 13 | are all in memory. It's just a question of |
| 11:27:18 | 14 | finding which one, right, and having found that |
| 11:27:21 | 15 | policy, you don't need to make a copy of it for |
| 11:27:23 | 16 | this particular flow. If you had a million |
| 11:27:25 | 17 | flows that were going off of that same policy, |
| 11:27:27 | 18 | it would be a million flows going off of that |
| 11:27:29 | 19 | same policy. |
| 11:27:30 | 20 | BY MR. HOSIE: |
| 11:27:30 | 21 | Q. How -- let's assume there's a million |
| 11:27:32 | 22 | flows going off of the same policy. How were |
| 11:27:34 | 23 | each of those flows kept, distinctly? |
| 11:27:36 | 24 | A. There are -- there -- as I say, there's |
| 11:27:38 | 25 | a preallocation. It's kind of a static |

Miller & Company Reporters          (415) 956-6405 - (310) 322-7700 - (800) 487-6278
www.millerreporters.com

Implicit Networks, Inc. v. Juniper Networks, Inc.          Oliver Tavakoli - CONFIDENTIAL

84

| | | |
|---|---|---|
| 11:28:30 | 1 | flow? |
| 11:28:31 | 2 | MR. KAGAN: Objection. |
| 11:28:32 | 3 | THE WITNESS: It's not -- it's not |
| 11:28:32 | 4 | dynamically allocated. It's static -- it's a |
| 11:28:34 | 5 | slot assigned to that particular flow. |
| 11:28:35 | 6 | BY MR. HOSIE: |
| 11:28:35 | 7 | Q. Okay. Okay. And is that how, in our |
| 11:28:39 | 8 | illustration, a million different flows are kept |
| 11:28:42 | 9 | distinctly? |
| 11:28:43 | 10 | A. Yes. |
| 11:28:43 | 11 | Q. And how does that work? I mean, how are |
| 11:28:46 | 12 | they kept distinctly? |
| 11:28:47 | 13 | MR. KAGAN: Objection. Vague. |
| 11:28:48 | 14 | THE WITNESS: The -- so -- I'm not -- |
| 11:28:51 | 15 | again, I'm not quite sure what you're trying to |
| 11:28:53 | 16 | get at. Each flow has a unique characteristic. |
| 11:28:56 | 17 | Right? Even though you have a wild-carded rule, |
| 11:28:59 | 18 | wild-carded rule says from this IP address to |
| 11:29:02 | 19 | this IP address, but on any ports. Right? So |
| 11:29:05 | 20 | the first flow that might arrive -- the first |
| 11:29:08 | 21 | session -- TCP session that might arrive might |
| 11:29:11 | 22 | be from port 1 to port 2. |
| 11:29:12 | 23 | BY MR. HOSIE: |
| 11:29:12 | 24 | Q. Yes. |
| 11:29:13 | 25 | A. The next one that might arrive might be |

104

| | |
|---|---|
| 12:48:12 | 1 |
| 12:48:15 | 2 |
| 12:48:15 | 3 |
| 12:48:17 | 4 |
| 12:48:19 | 5 |
| 12:48:23 | 6 |
| 12:48:24 | 7 |
| 12:48:25 | 8 |
| 12:48:26 | 9 |
| 12:48:26 | 10 |
| 12:48:28 | 11 |
| 12:48:29 | 12 |
| 12:48:31 | 13 |
| 12:48:33 | 14 |
| 12:48:36 | 15 |
| 12:48:36 | 16 |
| 12:48:36 | 17 |
| 12:48:39 | 18 |
| 12:48:43 | 19 |
| 12:48:44 | 20 |
| 12:48:54 | 21 |
| 12:49:11 | 22 |
| 12:49:17 | 23 |
| 12:49:25 | 24 |
| 12:49:30 | 25 |

external corollaries, right --

Q.  In terms of --

A.  -- so you just -- in terms of you don't
tend to think of, well, I'm going to enable
protocol parsing, but protocol parsing is a
plug-in that --

Q.  Okay.  Thank you.  Let me -- let me
be --

A.  Yeah.

Q.  -- a little more precise in my question.

In terms of what a system admin would
see in configuring the system, could you give me
a list of those plug-ins.

A.  Again, I can give you a list of
features.

Q.  Okay.

A.  You wish to only have a list of features
that are implemented as plug-ins?

Q.  Yes.

A.  I believe IPS is, ALGs are, App ID, App
Firewall, App QOS, I think, is the other one,
App DOS.

Q.  Okay.  And a system admin can configure
a box so that a number of these plug-ins are to
be used; correct?

105

12:49:31  1     A.   I think a system administrator

12:49:34  2  configures a box toward a particular end,

12:49:39  3  functional end, as we kind of have been talking

12:49:42  4  about use cases before, and as a result of that,

12:49:46  5  our developers, basically, having considered all

12:49:50  6  of the combinations of those features, decide

12:49:55  7  which plug-ins ought to be enabled as -- as a

12:49:58  8  result in -- in response to the configuration

12:50:02  9  combinations.

12:50:03  10     Q.   Okay.  When you say plug-ins enabled,

12:50:05  11  what do you mean?

12:50:06  12     A.   I mean by -- by saying that plug-ins are

12:50:10  13  enabled, it basically means that based on

12:50:13  14  policy, based on the set of features you have

12:50:15  15  selected for a given five tuple selector that

12:50:22  16  you specified in the policy, you may have

12:50:26  17  enabled three features that may result in a very

12:50:31  18  particular sequence of components being enabled

12:50:39  19  and, in fact, being past the traffic of that

12:50:43  20  flow.

12:50:44  21          And, again, the point here is that --

12:50:46  22  that that's not limited to the plug-ins that are

12:50:50  23  kind of explicitly obvious.  Right?  If I enable

12:50:54  24  IPS, it's -- you would say, well, it's kind of

12:50:57  25  obvious that the IPS plug-in better get the

106

| | |
|---|---|
| 12:51:00 | 1 |
| 12:51:02 | 2 |
| 12:51:05 | 3 |
| 12:51:07 | 4 |
| 12:51:11 | 5 |
| 12:51:12 | 6 |
| 12:51:16 | 7 |
| 12:51:19 | 8 |
| 12:51:21 | 9 |
| 12:51:23 | 10 |
| 12:51:25 | 11 |
| 12:51:27 | 12 |
| 12:51:30 | 13 |
| 12:51:32 | 14 |
| 12:51:36 | 15 |
| 12:51:39 | 16 |
| 12:51:43 | 17 |
| 12:51:45 | 18 |
| 12:51:47 | 19 |
| 12:51:49 | 20 |
| 12:51:52 | 21 |
| 12:51:55 | 22 |
| 12:51:58 | 23 |
| 12:52:01 | 24 |
| 12:52:05 | 25 |

traffic, but there are a whole bunch of

ancillary plug-ins that have to do

preprocessing, postprocessing that are part and

parcel of -- of the set of plug-ins that are,

quote, enabled.

    Q.  Okay.  I understand.  And so if I'm the

system admin, if I say IPSec, that's going to

cause -- that's a feature, and it's going to

cause the machine to do something to make sure

that the necessary sequence of components will

be called for that traffic?

    A.  Yeah.  I mean, with IPSec, it's --

it's -- it's a little more difficult.  There are

things called route-based policies, there are

basically explicit policies that you -- that you

put in that are not route-based.

        IPSec configuration, in general, is a

little bit more complex and requires a fair

amount of special sauce for the developer to

kind of translate that policy into exactly what

happens when it recovers.

    Q.  Okay.  Now, as I understand it, all of

the plug-ins basically come with the basic

Juniper system, like the 5800 SRX box; right?

They're built in?

107

| | |
|---|---|
| 12:52:06 | 1 |
| 12:52:10 | 2 |
| 12:52:14 | 3 |
| 12:52:15 | 4 |
| 12:52:17 | 5 |
| 12:52:17 | 6 |
| 12:52:19 | 7 |
| 12:52:22 | 8 |
| 12:52:26 | 9 |
| 12:52:29 | 10 |
| 12:52:30 | 11 |
| 12:52:32 | 12 |
| 12:52:33 | 13 |
| 12:52:35 | 14 |
| 12:52:37 | 15 |
| 12:52:39 | 16 |
| 12:52:42 | 17 |
| 12:52:50 | 18 |
| 12:52:52 | 19 |
| 12:52:56 | 20 |
| 12:53:03 | 21 |
| 12:53:05 | 22 |
| 12:53:08 | 23 |
| 12:53:10 | 24 |
| 12:53:10 | 25 |

1   A.  The -- the SRX 5800 basically has, you

2   know, a monolithic static code image.  You

3   pretty much get everything.  There are no

4   differences in images.

5       Q.  Got it.

6       A.  There's only one image.

7       Q.  Okay.  And when, through configuration,

8   different plug-ins are enabled, the system

9   selects which plug-ins to pick or which plug-ins

10  to omit?

11      MR. KAGAN:  Objection.  Vague.

12  Incomplete hypothetical.

13      THE WITNESS:  You know, I wouldn't

14  describe it in that way.  All of the plug-ins

15  are in memory, they're part of the static code

16  image that we just talked about.

17      So the question is simply which sequence

18  traffic for a particular -- that meets a

19  particular five tuple in the policy, in what

20  sequence it basically traverses those plug-ins,

21  whether -- again, whether they be kind of the

22  explicit plug-ins that you think of or the

23  ancillary plug-ins that I mentioned earlier.

24  BY MR. HOSIE:

25      Q.  Okay.  Is there a portion of the box

111

| | | |
|---|---|---|
| 12:55:51 | 1 | admin is going to say, "Enable protocol parser." |
| 12:55:54 | 2 | Q. Right. Because they don't know what |
| 12:55:56 | 3 | that means. |
| 12:55:57 | 4 | A. They don't know what the hell that |
| 12:55:58 | 5 | means. And they don't know what -- what |
| 12:55:58 | 6 | plug-ins would require that. |
| 12:55:59 | 7 | So, as a result, the programmer, the |
| 12:56:04 | 8 | developers of the system, basically look at the |
| 12:56:07 | 9 | combinations. If I have IPS with ALGs, does IPS |
| 12:56:12 | 10 | come before ALG or does it come after ALG? If I |
| 12:56:15 | 11 | have IPS and NAT, which one comes first? |
| 12:56:17 | 12 | So all of these com- -- combinations |
| 12:56:19 | 13 | have been thought out in advance. |
| 12:56:21 | 14 | Q. So there's a logical order, a sequence? |
| 12:56:23 | 15 | A. There's a logical sequence that these |
| 12:56:25 | 16 | things need to run in. It isn't enough to |
| 12:56:27 | 17 | simply say that these things are, quote, |
| 12:56:29 | 18 | enabled -- |
| 12:56:29 | 19 | Q. Right. |
| 12:56:30 | 20 | A. -- and as a result of it, you know, we |
| 12:56:32 | 21 | can shop -- shop the packet around willy-nilly. |
| 12:56:34 | 22 | Q. Right. Because certain things have to |
| 12:56:36 | 23 | go before other -- other things. There's an |
| 12:56:38 | 24 | order, a logical order. |
| 12:56:39 | 25 | A. But that order, again, you know, in our |

116

| | | |
|---|---|---|
| 13:00:26 | 1 | you mentioned, he's pushed commit.  At that |
| 13:00:28 | 2 | point, somewhere in memory, there's a list of |
| 13:00:31 | 3 | all of these policies kept -- |
| 13:00:33 | 4 | A.  Correct. |
| 13:00:34 | 5 | Q.  -- correct? |
| 13:00:34 | 6 | And at that point, the system looks at |
| 13:00:36 | 7 | all of these policies in this service chain -- |
| 13:00:39 | 8 | A.  Looks at each policy. |
| 13:00:41 | 9 | Q.  In the service chain -- |
| 13:00:42 | 10 | A.  Not in the service chain. |
| 13:00:44 | 11 | Q.  Okay. |
| 13:00:45 | 12 | A.  There's a list of -- there's a policy. |
| 13:00:47 | 13 | That policy applies to anything that goes from |
| 13:00:49 | 14 | security zone A to security zone B. |
| 13:00:51 | 15 | Q.  Okay. |
| 13:00:52 | 16 | A.  Within that policy, there are rules. |
| 13:00:53 | 17 | Q.  Okay. |
| 13:00:54 | 18 | A.  Those rules have five tuples in them. |
| 13:00:56 | 19 | Q.  Okay. |
| 13:00:56 | 20 | A.  For each rule, there's a set of actions |
| 13:00:59 | 21 | that you might take. |
| 13:01:00 | 22 | Q.  Okay. |
| 13:01:00 | 23 | A.  You're going to go ahead and precompute, |
| 13:01:04 | 24 | effectively -- well, not precompute.  You're |
| 13:01:06 | 25 | going to go select for that -- if that rule gets |

117

| | | |
|---|---|---|
| 13:01:11 | 1 | triggered and these features are requested and |
| 13:01:14 | 2 | to your point in this example that you're |
| 13:01:16 | 3 | giving, all features have been selected.  Right? |
| 13:01:18 | 4 | Q.  Uh-huh. |
| 13:01:19 | 5 | A.  You're going to basically say, at that |
| 13:01:21 | 6 | point, I'm going to select that service chain, |
| 13:01:23 | 7 | that -- that is basically just my static service |
| 13:01:25 | 8 | chain that I'm always going to run all flows |
| 13:01:28 | 9 | through that meet the criteria of this packet. |
| 13:01:31 | 10 | Right? |
| 13:01:31 | 11 | Q.  Right. |
| 13:01:32 | 12 | A.  So when the packet -- when that packet |
| 13:01:33 | 13 | appears in the flow table, I'm going to look in |
| 13:01:36 | 14 | the policy, when that rule triggers, I'm going |
| 13:01:38 | 15 | to have this preselected path through the system |
| 13:01:42 | 16 | that that flow will take. |
| 13:01:44 | 17 | Q.  Okay.  And the moment before the first |
| 13:01:48 | 18 | packet hits the system, what exists in the Junos |
| 13:01:53 | 19 | box? |
| 13:01:54 | 20 | A.  The policy, the rule, and the selection |
| 13:01:57 | 21 | of that precomputed -- I mean, the selection, |
| 13:02:00 | 22 | basically, of that service chain -- |
| 13:02:03 | 23 | Q.  Okay.  So is it -- |
| 13:02:04 | 24 | A.  -- that will be used.  When -- it's |
| 13:02:05 | 25 | basically saying when a packet arrives, when a |

Implicit Networks, Inc. v. Juniper Networks, Inc.          Oliver Tavakoli - CONFIDENTIAL

118

| | | |
|---|---|---|
| 13:02:08 | 1 | flow arrives, that meets this rule -- |
| 13:02:09 | 2 | Q.  Do the following? |
| 13:02:10 | 3 | A.  -- do this processing on it. |
| 13:02:11 | 4 | Q.  Do this processing.  Okay. |
| 13:02:13 | 5 | And so you don't have actual data |
| 13:02:15 | 6 | structures instantiated in memory as part of a |
| 13:02:19 | 7 | flow-specific processing packet? |
| 13:02:20 | 8 | A.  Not -- not at that point. |
| 13:02:21 | 9 | Q.  Not at that point because it's pre-first |
| 13:02:23 | 10 | packet? |
| 13:02:24 | 11 | A.  Yeah. |
| 13:02:24 | 12 | Q.  Okay. |
| 13:02:24 | 13 | A.  There is no flow yet.  In fact, given |
| 13:02:27 | 14 | that you can have wild cards in these rules, it |
| 13:02:29 | 15 | makes no sense to have a flow-specific one; |
| 13:02:32 | 16 | right?  If you had a wild-carded rule, the |
| 13:02:34 | 17 | sequence -- the service chain you would drive |
| 13:02:36 | 18 | something -- drive a flow through, right, would |
| 13:02:39 | 19 | be the same for all flows -- |
| 13:02:41 | 20 | Q.  Sure. |
| 13:02:41 | 21 | A.  -- that met those criteria.  So it does |
| 13:02:43 | 22 | not make sense to do that on a flow-by-flow |
| 13:02:46 | 23 | basis. |
| 13:02:46 | 24 | Q.  Okay.  Okay.  And so, then, the first |
| 13:02:48 | 25 | packet comes in? |

Miller & Company Reporters          (415) 956-6405 - (310) 322-7700 - (800) 487-6278
www.millerreporters.com

168

| | | |
|---|---|---|
| 13:59:57 | 1 | THE WITNESS: I don't -- yeah. I'm not |
| 13:59:58 | 2 | sure I would kind of describe it that way. I |
| 14:00:00 | 3 | think there is -- there is memory allocated in |
| 14:00:03 | 4 | the session table for each of the individual |
| 14:00:07 | 5 | flows. There may be additional things that are |
| 14:00:10 | 6 | linked off of those tables, but I'm not -- I |
| 14:00:14 | 7 | know, like, for things like -- IPv6 is an |
| 14:00:16 | 8 | example, there will be a pointer off to an IPv6 |
| 14:00:21 | 9 | block, and I think that may be more dynamically |
| 14:00:23 | 10 | allocated. |
| 14:00:23 | 11 | BY MR. HOSIE: |
| 14:00:23 | 12 | Q.  Once memory is allocated on a |
| 14:00:26 | 13 | flow-specific basis, then you have a stateful |
| 14:00:28 | 14 | instantiated data processing path in your |
| 14:00:30 | 15 | system? |
| 14:00:30 | 16 | MR. KAGAN:  Objection. Vague. |
| 14:00:32 | 17 | THE WITNESS:  That's a mouthful. |
| 14:00:36 | 18 | When -- when we -- so we allocate memory on an |
| 14:00:42 | 19 | as-needed basis; right? |
| 14:00:43 | 20 | BY MR. HOSIE: |
| 14:00:43 | 21 | Q.  Post-first packet. |
| 14:00:45 | 22 | A.  Post -- so post-first packet, I tend to |
| 14:00:49 | 23 | think of there being -- there seldom being |
| 14:00:51 | 24 | memory allocation. I think most of the -- |
| 14:00:56 | 25 | most -- so the slot that's allocated to you in |

Implicit Networks, Inc. v. Juniper Networks, Inc.                Oliver Tavakoli - CONFIDENTIAL

178

14:09:04  1    arrives.

14:09:04  2        Q.  At -- where -- where you can look at the

14:09:06  3    first packet and say, "Okay.  This is a flow,

14:09:07  4    this is what it needs, let's allocate memory."

14:09:10  5        A.  When I can look up policy.  I mean, the

14:09:11  6    point at which I can look up policy.  So as we

14:09:14  7    kind of discussed in the TPC case, it's actually

14:09:17  8    probably at the point that the third packet has

14:09:19  9    arrived at the box --

14:09:20  10       Q.  Given a handshake?

14:09:22  11       A.  -- we've done the handshake, now we

14:09:24  12   basically go up and we're going to look up

14:09:25  13   policy.

14:09:25  14       Q.  And then allocate memory according to

14:09:26  15   what you need?

14:09:26  16       A.  And then for anything that is -- that is

14:09:28  17   not statically allocated, basically, I think the

14:09:31  18   plug-ins -- and it's not so much at a central

14:09:33  19   point within the system.  I expect that each

14:09:35  20   plug-in would logically make its own

14:09:37  21   determination for anything that it needs --

14:09:39  22   needs to dynamically maintain.  So --

14:09:41  23       Q.  Right.

14:09:41  24       A.  -- it's going to vary, again, from

14:09:43  25   plug-in to plug-in to plug-in.

Implicit Networks, Inc. v. Juniper Networks, Inc.               Oliver Tavakoli - CONFIDENTIAL

179

| 14:09:44 | 1 | Q. Okay. But at that point, as the first |
| 14:09:46 | 2 | packet arrives, when you have a flow in the |
| 14:09:48 | 3 | system, allocate dynamically what needs to be |
| 14:09:50 | 4 | allocated dynamically? |
| 14:09:51 | 5 | MR. KAGAN: Objection. Misstates |
| 14:09:52 | 6 | testimony. Vague. |
| 14:09:54 | 7 | THE WITNESS: I think, at that point, |
| 14:09:56 | 8 | each plug-in will make its own determination, |
| 14:09:58 | 9 | and it -- and it may be on the first packet it |
| 14:10:02 | 10 | ever sees, it may be on the tenth packet it |
| 14:10:04 | 11 | sees, it may be on the hundredth packet it sees. |
| 14:10:07 | 12 | BY MR. HOSIE: |
| 14:10:07 | 13 | Q. Do you know the implementation details |
| 14:10:08 | 14 | of that, sir, how the plug-ins allocate memory |
| 14:10:11 | 15 | or have memory allocated for them? |
| 14:10:13 | 16 | A. No. I do not. |
| 14:10:14 | 17 | MR. HOSIE: Okay. Why don't we take a |
| 14:10:16 | 18 | break. |
| 14:10:18 | 19 | THE VIDEOGRAPHER: We're off the record |
| 14:10:20 | 20 | at 2:10 P.M. |
| 14:10:22 | 21 | (A brief recess was taken.) |
| 14:15:24 | 22 | THE VIDEOGRAPHER: We're back on the |
| 14:23:39 | 23 | record at 2:23 P.M. in the deposition of |
| 14:23:42 | 24 | Mr. Oliver Tavakoli. Please continue. |
| | 25 | BY MR. HOSIE: |

Case 3:10-cv-04234-SI Document 210-3 Filed 04/08/13 Page 129 of 157
Case3:10-cv-04234-SI Document194-3 Filed02/04/13 Page17 of 157

Implicit Networks, Inc. v. Juniper Networks, Inc.

Oliver Tavakoli - CONFIDENTIAL

199

1

2

3          I, BRENDA L. MARSHALL, Certified

4    Shorthand Reporter, License No. 6939, do hereby

5    certify:

6          That, prior to being examined, the

7    witness named in the foregoing deposition, to

8    wit, OLIVER TAVAKOLI, was by me duly sworn to

9    testify the truth, the whole truth and nothing

10   but the truth:

11         That said transcript was taken down by

12   me in shorthand at the time and place therein

13   named and thereafter reduced to computerized

14   transcription under my direction.

15

16         I further certify that I am not

17   interested in the event of the action.

18

19

20         WITNESS this 3rd day of July, 2012.

21

22

23         _____

24         BRENDA L. MARSHALL

25

# EXHIBIT  31

# IRELL & MANELLA

### LLP



## Jonathan S. Kagan

Partner

1800 Avenue of the Stars        T: 310-203-7092
Suite 900                       F: 310-203-7199
Los Angeles, CA 90067-4276      E: jkagan@irell.com

**PRACTICE AREAS**

IP Litigation

Litigation

**EDUCATION**

UCLA School of Law (J.D., 1993), Order of the Coif

University of Pennsylvania (The Wharton School) (B.S., Economics, 1990), *cum laude*

Jonathan Kagan is a partner in the Los Angeles office of Irell & Manella LLP, where he is a member of the litigation and intellectual property practice groups. He currently serves on the firm's Executive Committee.

Mr. Kagan's practice focuses on the litigation of complex intellectual property disputes, with particular emphasis on patent litigation. He also has significant experience litigating and counseling clients in other areas of intellectual property, including trademark and copyright. Mr. Kagan has consistently been recognized as a leading IP litigator by the *Los Angeles* and *San Francisco Daily Journal*. Twice in the past, the *Daily Journal* has named Mr. Kagan's defense victories to its annual list of top defense verdicts.

In the 2010 edition of *Chambers USA,* Mr. Kagan is described as a "brilliant thinker who employs some very creative strategies." He is also recognized by *The Legal 500 US* for his work in the area of Patent Litigation: hi-tech electronics and IT. Mr. Kagan was selected for inclusion in *The Best Lawyers in America* for years 2010-2013 and since 2004, has consistently been honored by *Los Angeles Magazine* as a Southern California "Super Lawyer" in intellectual property litigation.

Mr. Kagan is a past president of the Century City Bar Association. He also serves on the Editorial Advisory Board of NITA (the National Institute for Trial Advocacy), and is a Member of the Board of Governors of the Los Angeles Chapter of the Association of Business Trial Lawyers. He is a frequent lecturer on the litigation of complex commercial and intellectual property disputes.

Mr. Kagan graduated from the Wharton School of the University of Pennsylvania, *cum laude*, with a B.S. in Economics in 1990. He received his J.D. from the UCLA School of Law in 1993, where he was elected to the Order of the Coif, and served as an editor for the *UCLA Law Review*.

IRELL & MANELLA
LLP

Jonathan S. Kagan (continued)

## Representative Matters

Juniper Networks v. Toshiba America Information Systems. Mr. Kagan has represented Juniper Networks in a number of intellectual property matters, including this protracted patent infringement dispute with Toshiba. In response to a motion filed by Juniper Networks shortly before trial, the Court issued a sanctions order against Toshiba that, among other things, barred Toshiba from calling its expert witness on non-infringement and severely limited Toshiba's time for its opening statement and closing argument. The case settled in late 2007, shortly after the Court issued the sanctions order.

Ultratech Stepper v. ASML. Mr. Kagan served as trial counsel for ASML, one of the world's leading suppliers of semiconductor manufacturing equipment, in this patent infringement case. While both of ASML's competitors (who were initially co-defendants in this action) entered into substantial settlements with the plaintiff, ASML elected to litigate. After a four-week trial – and with less than one day of deliberation – the jury found the plaintiff's patent invalid on multiple grounds. The Federal Circuit affirmed the jury's verdict in its entirety.  The *Los Angeles* and *San Francisco Daily Journal*'s recognized this victory as one of the top ten defense verdicts of 2005.

Aviza Technology v. ASML.  Mr. Kagan served as lead counsel for ASML in this arbitration, in which the claimant accused ASML of fraud and negligence. After a one-week hearing, the Arbitrator found in favor of ASML on all causes of action, and determined that ASML was entitled to recover its litigation expenses, including attorneys' fees.

Sharper Image v. Ionic Pro. Mr. Kagan defended a patent and trademark case brought by Sharper Image against retailers and manufacturers of air purifiers that competed against its flagship "Ionic Breeze." This case settled after Sharper Image's claims of trade dress and design patent infringement were dismissed on summary judgment.

Stac Electronics v. Microsoft. Mr. Kagan represented Stac Electronics, a small software company, in a patent infringement suit it brought against industry giant Microsoft. After an extensive trial, the jury awarded Stac Electronics $120 million in patent damages. Stac also obtained a worldwide injunction against the sale of Microsoft's operating system.

Novellus Systems v. Applied Materials. Mr. Kagan represented Novellus Systems, a manufacturer of semiconductor manufacturing equipment, in a patent infringement lawsuit filed against it by industry-leader Applied Materials. Over a period of seven years, each of the patents Applied Materials had asserted against Novellus was declared invalid, held not to be infringed, or withdrawn from the case. The parties then reached a settlement of the case, which involved a payment from Applied Materials to Novellus.

# EXHIBIT  32

# IRELL & MANELLA

### LLP



## David C. McPhie

Partner

840 Newport Center Drive     T: 949-760-5216
Suite 400                    F: 949-760-5200
Newport Beach, CA 92660-6324 E: dmcphie@irell.com

**PRACTICE AREAS**

IP Litigation

Litigation

Patent, Copyright & Trademark

**EDUCATION**

Harvard Law School (J.D., 2003), *magna cum laude*

Harvard College (B.A., Physics 2000), *magna cum laude*

David McPhie is a litigation partner in the Newport Beach office of Irell & Manella LLP. Mr. McPhie's practice focuses on intellectual property litigation, with clients involved in technologies as diverse as semiconductor fabrication, computer networking, consumer electronics, video software, and biomedical devices. He has provided advice on patent, trademark, and copyright matters and other complex commercial disputes, representing clients at every stage of litigation through trial and appeal. He has also prosecuted matters (including reexamination proceedings) before the U.S. Patent & Trademark Office. He has been named a "Rising Star" in intellectual property litigation by *Super Lawyers* magazine.

Mr. McPhie earned his J.D. *magna cum laude* in 2003 from Harvard Law School, where he graduated in the top ten percent of his class and served as an editor on the Harvard Journal of Law and Technology. While in law school, Mr. McPhie received awards for his extensive writing on constitutional, patent, and copyright law issues, including: Stanford Technology Law Review Paper Contest (first place); BBCLE.com IP Student Writing Competition (first place); FDLI H. Thomas Austern Writing Competition (second place, short paper); Santa Clara Computer & High Technology Journal Comment Contest (third place); ASCAP Nathan Burkan Memorial Competition (second place, HLS & national); First-year Ames Moot Court Competition (best brief).

From 2003 to 2004, Mr. McPhie served as a law clerk to the Honorable Samuel A. Alito, Jr. of the United States Court of Appeals for the Third Circuit.

Mr. McPhie received his bachelor's degree *magna cum laude* in Physics from Harvard College, where his coursework included classical and quantum mechanics, electromagnetism, wave theory, chemistry, electrical engineering, and computer science. Prior to starting law school, Mr. McPhie co-authored the book Perl How to Program with Deitel & Associates, a best-selling publisher of computer programming textbooks.

IRELL & MANELLA

LLP

David C. McPhie (continued)

Mr. McPhie also worked at the Electron Vision Group of AlliedSignal, where he did research on electron beam applications for semiconductor photoresist curing.

## Representative Matters

*Juniper Networks v. Toshiba America Information Systems* (E.D. Tex.): Mr. McPhie has represented Juniper Networks in numerous ongoing and completed intellectual property matters, including this patent infringement dispute with Toshiba. In response to a motion filed by Juniper Networks shortly before trial, the Court issued a sanctions order against Toshiba that, among other things, barred Toshiba from calling its expert witness on non-infringement and severely limited Toshiba's time for its opening statement and closing argument. The case settled shortly after the Court issued the sanctions order.

*Ultratech Stepper v. ASML* (N.D. Cal.). Mr. McPhie served as trial counsel for ASML, one of the world's leading suppliers of semiconductor manufacturing equipment, in this patent infringement case. While both of ASML's competitors (who were initially co-defendants in this action) entered into substantial settlements with the plaintiff, ASML elected to litigate. After a four-week trial – and with less than one day of deliberation – the jury found the plaintiff's patent invalid on multiple grounds. The Federal Circuit affirmed the jury's verdict in its entirety. The Los Angeles and San Francisco Daily Journals recognized this victory as one of the top ten defense verdicts of 2005.

*Guidant v. St. Jude Medical* (D. Minn., D. Del.)  Mr. McPhie has represented St. Jude Medical in a number of matters, including protracted disputes with Guidant and Cardiac Pacemakers, Inc. involving patents on cardiac rhythm management devices and electrical leads. Mr. McPhie was heavily involved in every aspect of these cases, including technical analysis, written and deposition discovery, expert discovery, and briefing on claim construction and summary judgment. The cases ultimately settled shortly before trial in the Delaware matter.

*Plantronics v. Fashion Electronics, Datel Design and Development*, and *ESI Cases and Accessories, Inc.* (N.D. Cal.): Mr. McPhie successfully represented Plantronics in multiple actions asserting design patent infringement, trade dress, and unfair competition claims relating to defendants' sales of cell phone headsets.

*Fraker v. KFC Corp.* (S.D. Cal.): Mr. McPhie successfully represented KFC in the defense of class and unfair competition claims on behalf of consumers alleging false advertising. The court entered judgment in favor of KFC after granting two motions to dismiss (ultimately without leave to amend).

*Simon Systems v. Corel* (D. Md.): Mr. McPhie served as lead counsel for Corel, a leading multimedia and office productivity software company, in a patent infringement suit brought by Simon Systems. In response to an early motion filed by Corel, Simon Systems was forced to dismiss and refile its suit, and the case settled shortly thereafter.

## Publications

"Almost Private: Pen Registers, Packet Sniffers, and Privacy at the Margin," 2005 *Stan. Tech. L. Rev.* 1 (2005)

IRELL & MANELLA
LLP

David C. McPhie (continued)

"Access Made Accessible: Shaping the Laws and Technologies that Protect Creative Works," 51 *J. Copyright Soc'y U.S.A.* 521 (2004)

"Old Drugs, New Uses: Solving a Hatch-Waxman Patent Predicament," 59 *Food & Drug L.J.* 155 (2004)

Book Note, 15 *Harv. J. Law & Tech.* 539 (2002) (reviewing Stuart Biegel, "Beyond Our Control? Confronting the Limits of Our Legal System in the Age of Cyberspace" (2001)).

## Professional Activities

- J. Reuben Clark Law Society, Orange County Chapter

## Bar & Court Admissions

- 2004, California

- U.S. District Court, Central, Northern and Southern Districts of California

- U.S. Court of Appeals, Ninth Circuit

- U.S. Court of Appeals, Federal Circuit

- United States Patent and Trademark Office

# EXHIBIT  33

IRELL & MANELLA
LLP



# Douglas J. Dixon
Associate

840 Newport Center Drive          T: 949-760-5220
Suite 400                                        F: 949-760-5200
Newport Beach, CA 92660-6324    E: ddixon@irell.com

**PRACTICE AREAS**

Litigation

**EDUCATION**

Georgetown University Law Center (J.D., 2005), *magna cum laude*; Order of the Coif; Editor, *The Georgetown Law Journal*

University of Tennessee at Chattanooga (B.A., Political Science: American Studies, 1998), *magna cum laude*

Douglas Dixon is an associate in the Newport Beach office of Irell & Manella LLP, where he is a member of the firm's Litigation practice group.

Prior to joining Irell, Mr. Dixon was a litigation associate at Cravath, Swaine & Moore LLP, where his practice focused on complex civil litigation relating to securities law, contract law, mergers and acquisitions, alien tort claims, international torts and the Federal False Claims Act in both trial and appellate courts.

Mr. Dixon earned his J.D. *magna cum laude* from Georgetown University Law Center in 2005, where he was elected to the Order of the Coif and was an Editor on *The Georgetown Law Journal.* During law school, Mr. Dixon worked as an extern in the U.S. Department of Justice Antitrust Division. Following graduation, Mr. Dixon clerked for the Honorable Edward Rafeedie of the U.S. District Court for the Central District of California.

Mr. Dixon earned his B.S. *magna cum laude* in Political Science: American Studies from the University of Tennessee at Chattanooga in 1998.

## Bar & Court Admissions

- 2011, California
- 2006, New York
- U.S. District Court, Southern District of New York
- U.S. Court of Appeals, Second Circuit
- Supreme Court of the United States

# EXHIBIT  34

# IRELL & MANELLA LLP

## Associate

Newport Beach
T: 949-760-5277
F: 949-760-5200
cfromherz@irell.com

## Practice Areas

- Litigation

## Education

- University of
  Pennsylvania Law School,
  *cum laude* (J.D., 2008);
  Comments Editor,
  *University of Pennsylvania
  Law Review*; Member,
  National Moot Court
  Team; Public International
  Law Fellow
- Lewis and Clark College
  (B.A., English, 2003)

## News

- $150 Million Settlement
  Ends Six-Year Insurance
  Recovery Legal Battle



### Christopher J. Fromherz

Christopher Fromherz is an associate in the
Newport Beach office of Irell & Manella LLP,
where he is a member of the firm's litigation
workgroup.

Mr. Fromherz earned his J.D., *cum laude*,
from the University of Pennsylvania Law
School, where he was Comments Editor of
the *University of Pennsylvania Law Review* and an oralist for the
National Moot Court Team. He also served as a Public
International Law Fellow, working in Quito, Ecuador on research
into Latin American environmental law and policy. He received
his B.A. in English from Lewis and Clark College.

Mr. Fromherz is the author of: "Indigenous Peoples' Courts:
Egalitarian Juridical Pluralism, Self-Determination, and the United
Nations Declaration on the Rights of Indigenous Peoples," 156 *U.
Pa. L. Rev.* 1341 (2008).

## Bar Admissions

- 2008, California

# EXHIBIT  35

# IRELL & MANELLA

### LLP



# Nima Hefazi

Associate

840 Newport Center Drive       T: 949-760-5204
Suite 400                      F: 949-760-5200
Newport Beach, CA 92660-6324   E: nhefazi@irell.com

---

**PRACTICE AREAS**

IP Litigation

Litigation

**EDUCATION**

University of California,
Berkeley School of Law (J.D.,
2010)

Purdue University (B.S., with
distinction, Electrical
Engineering, 2006)

Nima Hefazi is an associate in the Newport Beach office of Irell & Manella LLP, where his practice focuses on IP litigation. Mr. Hefazi's experience includes the representation of speech recognition software developers and companies providing computer networking solutions.  Such matters have included jury trials and claim construction hearings. Mr. Hefazi is also registered to practice in the U.S. Patent & Trademark Office.

Mr. Hefazi earned his J.D. from the University of California, Berkeley School of Law in 2010, and was awarded the Certificate in Law and Technology for his extensive studies in the field of intellectual property law and technology.  He earned his B.S., with distinction, in Electrical Engineering at Purdue University in 2006.

## Bar & Court Admissions

- 2010, California

- U.S. Patent & Trademark Office

# EXHIBIT  36

IRELL & MANELLA
LLP



# Patrick M. McGill
Associate

840 Newport Center Drive    T: 949-760-5226
Suite 400    F: 949-717-6376
Newport Beach, CA 92660-6324    E: PMcGill@irell.com

**PRACTICE AREAS**

Litigation

**EDUCATION**

Columbia Law School (J.D., 2009) Harlan Fiske Stone Scholar; staff member, *Columbia Journal of Transnational Law*

Yale University (B.A., History, 2006) *cum laude*; Distinction in the History major

Patrick McGill is a litigation associate in the Newport Beach office of Irell & Manella LLP. Mr. McGill has represented clients in various aspects of civil litigation in state and federal courts, including securities fraud, class action, patent and corporate litigations.  Mr. McGill also has extensive pro bono experience, having represented a Tennessee death row inmate in state post-conviction and federal habeas corpus proceedings, including in a petition for certiorari to the Supreme Court of the United States.  Prior to joining Irell, he was a litigation associate at a firm in New York.

Mr. McGill earned his J.D. from Columbia University School of Law, where he was a Harlan Fiske Stone Scholar and a staff member of the *Columbia Journal of Transnational Law*. After law school, he served as a judicial intern to the Honorable Judge Alvin Hellerstein of the U.S. District Court for the Southern District of New York, assisting with issues related to the Ground Zero Workers' September 11 Litigation.

Mr. McGill earned his B.A. in History, *cum laude*, from Yale University, where he was senior editor and opinion editor of the *Yale Herald Newspaper*.  At Yale, he received the Andrew D. White Prize for the best senior essay on a topic in European History, and the F. Wilder Bellamy Prize, awarded for "high spirits, integrity, and loyalty."

## Bar & Court Admissions

- 2012, California

- 2010, New York

# EXHIBIT  37

# IRELL & MANELLA
### LLP



## Christopher Vieira
Associate

840 Newport Center Drive        T: 949-760-5208
Suite 400                       F: 949-760-5200
Newport Beach, CA 92660-6324    E: cvieira@irell.com

**PRACTICE AREAS**

Litigation

**EDUCATION**

Duke University School of Law
(J.D., *cum laude*, 2010);
Executive Editor, *Alaska Law
Review*; Chair, Duke Moot Court
Board

Claremont McKenna College
(B.A., *cum laude*, Government
and Legal Studies, 2007)

Christopher Vieira is an associate in the Newport Beach office of Irell &
Manella LLP, where he is a member of the firm's Litigation practice group.

Mr. Vieira earned his J.D., *cum laude*, at Duke University School of Law in
2010 where he was Executive Editor of the *Alaska Law Review* and Chair of
the Duke Moot Court Board.  Mr. Vieira earned his B.A., *cum laude,* in
Government and Legal Studies at Claremont McKenna College in 2007.

An accomplished oral advocate, Mr. Vieira won the Duke Mock Trial
Tournament and quarterfinaled in Duke's Hardt Cup Moot Court
Tournament.  He was a semifinalist at the Herbert Wechsler National
Criminal Law Moot Court Competition, where he was also named the
tournament's best advocate.

Mr. Vieira argued his first case, *Robinson v. Clipse*, 602 F.3d 605 (4th Cir.
2010), during his final semester at Duke.  The case involved an appeal of a
summary judgment in a federal civil rights case. The Fourth Circuit found
that the district court erred when it granted summary judgment on the basis
of the statute of limitations.  The appellate court also held that when a *pro
se* prison inmate is granted *in forma pauperis* status, the Federal Rules of
Civil Procedure Rule 4(m) time period for serving the inmate's summons
and complaint will not begin to run until after the district court authorizes
the U.S. Marshals Service to effect service.

## Bar & Court Admissions

- 2010, California

- U.S. District Court, Central District of California

- U.S. Court of Appeals for the Federal Circuit

# EXHIBIT  38

# [TO BE FILED UNDER SEAL]

# EXHIBIT  39

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO CIVIL DIVISION

MAR 06 2012

BY _____
EBONY SHAW, DEPUTY

1  IRELL & MANELLA LLP
   Brian J. Hennigan (CA Bar No. 86955)
2  Joseph M. Lipner (CA Bar No. 155735)
   Dorian S. Berger (CA Bar No. 264424)
3  1800 Avenue Of The Stars, Suite 900
   Los Angeles, California 90067-4276
4  Telephone: (310) 277-1010
   Facsimile: (310) 203-7199
5  bhennigan@irell.com
   jlipner@irell.com
6  dberger@irell.com

7  Attorneys for Plaintiff and Cross-Defendants
   Dallen Trealoff and Eclipse Recreational Vehicles, Inc.

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                FOR THE COUNTY OF SAN BERNARDINO

11

12 DALLEN TREALOFF,                    )  Case No. SCVSS96372
                                       )
13        Plaintiff,                   )  [~~PROPOSED~~] ORDER GRANTING
                                       )  PLAINTIFF'S MOTION FOR
14        v.                           )  APPELLATE ATTORNEYS' FEES AND
                                       )  MEMORANDUM OF COSTS
15 FOREST RIVER, INC. and PETER LIEGL, )
                                       )
16        Defendants.                  )  Date:    February 28, 2012
                                       )  Time:    8:30 a.m.
17 _____)  Dept:    S36
                                       )  Judge:   Hon. Brian S. McCarville
18                                     )
   AND RELATED CROSS-ACTION.           )  Complaint Filed:   August 5, 2002
19                                     )
                                       )
20 _____)

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2597381

1    On February 28, 2012 at 8:30 a.m., the parties appeared through their respective counsel

2 before this Court for a hearing on Plaintiff Dallen Trealoff's ("Trealoff") Motion for Appellate

3 Attorneys' Fees (the "Motion").  After full consideration of the papers submitted by the parties,

4 counsel's oral argument, and all other matters in the record, the Court finds that Trealoff is entitled

5 to recover its appellate attorneys' fees pursuant to California Code of Civil Procedure sections

6 1021 and 1032 and California Rule of Court 3.1702.  The Court finds that the fees incurred were

7 reasonably necessary and the fee amount was reasonable.

8    IT IS THEREFORE **ORDERED** THAT Plaintiff Trealoff's Motion for Attorneys' Fees is

9 GRANTED, and Trealoff shall recover its attorneys' fees from Defendants in the amount of

10 $481,634.50.  In addition, Trealoff is entitled to recover from Defendants the costs set forth in

11 Trealoff's Memorandum of Costs, in the amount of $25,068.36.

12

13

14    **IT IS SO ORDERED.**

15       MAR 0 6 2012

16 Dated: _____          BRIAN S. McCARVILLE
                                           _____
17                                         Hon. Brian McCarville
                                           Judge of the Superior Court
18

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2597381

- 1 -

[Proposed] Order Granting Plaintiff's Motion for Appellate Attorneys' Fees
and Memorandum of Costs

1

**PROOF OF SERVICE**

2      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1800 Avenue of the Stars, Suite 900,

3   Los Angeles, California 90067-4276.

4      On March 1, 2012, I served the foregoing document described as **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR APPELLATE ATTORNEYS' FEES AND**

5   **MEMORANDUM OF COSTS** on each interested party, as follows:

6   George S. Howard, Jr., Esq.           Michael C. Terrell, Esq.
     Erica L. Reilley, Esq.               Taft Stettinius & Hollister LLP

7   Jones Day                          One Indiana Square, Suite 3500
     12265 El Camino Real, Suite 200      Indianapolis, Indiana 46204

8   San Diego, California 92130         Telephone:  (317) 713-3500
     Telephone:  (858) 314-1200         Facsimile:  (317) 713-3699

9   Facsimile:  (858) 314-1150

10                                    Attorneys for Plaintiffs and Cross-Defendants
     Attorneys for Plaintiffs and Cross-Defendants  Forest River, Inc. and Peter Liegl
     Forest River, Inc. and Peter Liegl

11

12   ☒       (BY OVERNIGHT DELIVERY SERVICE)  I served the foregoing document by FedEx, an express service carrier which provides overnight delivery, as

13              follows.  I placed a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed, as set forth above,

14              with fees for overnight delivery paid or provided for.

15              ☒      (BOX DEPOSIT)  I deposited such envelopes or packages in a box or other facility regularly maintained by the express service

16                      carrier.

17              ☐      (CARRIER PICK-UP)  I delivered such envelopes or packages to an authorized carrier or driver authorized by the express service

18                      carrier to receive documents.

19      Executed on March 1, 2012, at Los Angeles, California.

20      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

21

22

23       Celia B. Silver                                       
     (Type or print name)                        (Signature)

24

25

26

27

28

2597381

# EXHIBIT  40

ORIGINAL

**FILED**
LOS ANGELES SUPERIOR COURT

MAY 2 0 2005

JOHN A. CLARKE, CLERK

BY F. MOREAU, DEPUTY

RECD
CENTRAL

MAY 1 0 2005

L.A. SUPERIOR COURT

1
2
3
4
5
6
7
8    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         FOR THE COUNTY OF LOS ANGELES

10   OUTDOOR MEDIA GROUP, INC., a          Case No. BC 305 029
     California corporation,                Assigned to Hon. William F. Fahey
11                                          Dept. 78
              Plaintiff,
12                                          [PROPOSED] ORDER GRANTING
        vs.                                 CROSS-DEFENDANTS REGENCY
13                                          OUTDOOR ADVERTISING, INC.,
     FISHER & ASSOCIATES, a California      DRAKE KENNEDY, AND BRIAN
14   corporation, et al.,                   KENNEDY'S MOTION FOR
                                            ATTORNEYS' FEES
15            Defendants.

16   ─────────────────────────────
     J. KEITH STEPHENS, an individual, VALLEY
17   OUTDOOR, INC., a California corporation,

18            Defendants/Cross-Complainants,

19      vs.

20   OUTDOOR MEDIA GROUP, INC., a
     California corporation; JON M. GUNDERSON,
21   an individual, REGENCY OUTDOOR
     ADVERTISING, INC., a California corporation,
22   DRAKE KENNEDY, an individual, BRIAN
     KENNEDY, an individual, and ROE 1 through
23   ROE 50, inclusive,

24            Plaintiffs/Cross-Defendants.

25   ─────────────────────────────
26
27
28

                 [PROPOSED] ORDER GRANTING REGENCY'S MOTION FOR
                                 ATTORNEYS FEES

1      On April 29, 2005, at 10:00 a.m. in the above-referenced Department, the Court heard

2  argument on Cross-Defendants Regency Outdoor Advertising, Inc., Drake Kennedy, and Brian

3  Kennedy's (collectively "Regency") Motion for Award of Attorneys' Fees against Cross-

4  Complainants Valley Outdoor, Inc. and J. Keith Stephens (collectively "Valley").  Irell & Manella

5  by Brian Hennigan and Peter Shimamoto appeared for Regency.  Van Etten Suzumoto & Becket

6  LLP by Eliot Disner and Darrel Menthe appeared for Valley.  After full consideration of the

7  papers submitted by the parties, as well as counsel's oral argument, and all other matters before the

8  Court, the Court finds that Regency is entitled to recover its attorneys fees, for the reasons set

9  forth in the Court's Order dated May 3, 2005.  Accordingly, IT IS HEREBY ORDERED THAT:

10      Regency's Motion for Award of Attorneys' Fees is hereby granted, and Regency shall

11  recover its attorneys' fees from Valley in the amount of $464,720.75.  In addition, Regency is

12  entitled to recover from Valley the costs set forth in Regency's Costs Memorandum, which was

13  not opposed by Valley, in the amount of $12,807.75.  The Clerk is directed to enter an Amended

14  Judgment setting forth the amount of costs (including attorneys' fees) awarded to Regency in the

15  form attached hereto.

16

17  Dated: _____5/20/06_____        _____

18                                Judge, Los Angeles Superior Court

19  Submitted by:

20  Submitted by:

21  PARKER MILLS & PATEL LLP
   DAVID B. PARKER

22  JAYESH PATEL
   IRELL & MANELLA, LLP

23  BRIAN HENNIGAN, ESQ.
   PETER SHIMAMOTO, ESQ.

24

25  Brian J. Hennigan

26  Attorneys for Cross-Defendants REGENCY
   OUTDOOR ADVERTISING, INC, a California

27  Corporation, DRAKE KENNEDY, an individual,
   and BRIAN KENNEDY, an individual

28

                    WILLIAM F. FAHEY

- 1 -

[PROPOSED] ORDER GRANTING REGENCY'S MOTION FOR
ATTORNEYS FEES



SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| OUTDOOR MEDIA GROUP, INC., a California corporation, | Case No. BC 305 029 [Assigned to Hon. William F. Fahey] |
| Plaintiff, | AMENDED JUDGMENT BY COURT GRANTING CROSS-DEFENDANTS |
| vs. | REGENCY OUTDOOR ADVERTISING, INC.; DRAKE KENNEDY, AND BRIAN |
| FISHER & ASSOCIATES, a California corporation, et al., | KENNEDY'S MOTION FOR ATTORNEYS' FEES |
| Defendants. | |
| J. KEITH STEPHENS, an individual, VALLEY OUTDOOR, INC., a California corporation, | |
| Defendants/Cross-Complainants, | |
| vs. | |
| OUTDOOR MEDIA GROUP, INC., a California corporation, JON M. GUNDERSON, an individual, REGENCY OUTDOOR ADVERTISING, INC., a California corporation, DRAKE KENNEDY, an individual, and BRIAN KENNEDY, an individual, and ROE 1 through ROE 50, inclusive, | |
| Plaintiffs/Cross-Defendants. | |

1297375

AMENDED JUDGMENT RE REGENCY CROSS-DEFENDANTS

1       This Court, having on February 24, 2005, granted Cross-Defendants Regency Outdoor

2   Advertising, Inc., Drake Kennedy, and Brian Kennedy's (collectively "Regency") Motion to

3   Dismiss the Fourth Cause of Action asserted against Regency in the First Amended Cross-

4   Complaint, for declaratory relief, of Cross-Complainants Valley Outdoor, Inc. and J. Keith

5   Stephens (collectively "Valley"), which was the sole cross-claim remaining against Regency; and

6   having on May 3, 2005 granted Regency's Motion for Award of Attorneys' Fees.

7       IT IS HEREBY ORDERED, ADJUDGED AND DECREED that

8       Cross-Complainants Valley Outdoor, Inc. and J. Keith Stephens shall take nothing, and

9   that Cross-Defendants Regency Outdoor Advertising, Inc., Drake Kennedy, and Brian Kennedy

10   shall recover from said Cross-Complainants their costs (including attorneys' fees) in the amount of

11   $477,528.50.

12

13   Dated: _____

14                       Judge, Los Angeles Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1297375

-1-

AMENDED JUDGMENT RE REGENCY CROSS-DEFENDANTS

1

**PROOF OF SERVICE**

2       I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

3

4       On May 10, 2005, I served the foregoing document described as [PROPOSED] ORDER GRANTING CROSS-DEFENDANTS REGENCY OUTDOOR ADVERTISING, INC., DRAKE KENNEDY, AND BRIAN KENNEDY'S MOTION FOR ATTORNEYS' FEES on each interested party, as follows:

5

6

7  Eliot G. Disner, Esq.                 Luis F. Magdaleno, Esq.
  Van Etten Suzumoto & Becket LLP      Magdaleno Law Office
8  1620 26th Street, Suite 6000 North      7700 Irvine Center Drive, Suite 800
  Santa Monica, California 90404        Irvine, CA  92618

9  Jeffrey A. Tidus, Esq.
  Baute & Tidus LLP
10 801 S. Figueroa Street, Suite 1100
  Los Angeles, California 90017

11

12    [X]    (BY OVERNIGHT DELIVERY SERVICE)  I served the foregoing document by FedEx, an express service carrier which provides overnight delivery, as

13         follows.  I placed a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed, as set forth above,

14         with fees for overnight delivery paid or provided for.

15        [X]    (BOX DEPOSIT) I deposited such envelopes or packages in a box or other facility regularly maintained by the express service

16            carrier.

17        [ ]    (CARRIER PICK-UP)  I delivered such envelopes or packages to an authorized carrier or driver authorized by the express service

18            carrier to receive documents.

19    Executed on May 10, 2005, at Los Angeles, California.

20       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

21

22

23     _____     _____
       Debi Del Grande               (Signature)
24     (Type or print name)

25

26

27

28

122023B