IRELL & MANELLA LLP
Morgan Chu (SBN 70446)
(mchu@irell.com)
Jonathan S. Kagan (SBN 166039)
(jkagan@irell.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

David C. McPhie (SBN 231520)
(dmcphie@irell.com)
Douglas J. Dixon (SBN 275389)
(ddixon@irell.com)
Nima Hefazi (SBN 272816)
(nhefazi@irell.com)
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

Attorneys for Defendant
JUNIPER NETWORKS, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT NETWORKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JUNIPER NETWORKS, INC., <br><br> Defendant. | Case No. C 10-4234 SI <br><br> **JUNIPER NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. § 285** <br><br> Hearing Date: May 10, 2013 <br> Time: 9:00 a.m. |

Case No. C 10-4234 SI
2807019    JUNIPER NETWORKS, INC.'S REPLY IN SUPPORT OF MOTION FOR FEES UNDER 35 U.S.C. § 285

# TABLE OF CONTENTS

Page

I. IMPLICIT'S CASE AGAINST JUNIPER WAS OBJECTIVELY BASELESS ........................................................................................................................ 2

    A. Implicit Unreasonably Relied On Source Code It Knew Was Not In The Accused Products .................................................................................. 2

    B. Implicit's Litigation Positions Were Unsupported And Even Contradicted By Its Own Experts ......................................................................... 4

    C. Implicit Unreasonably Relied On Inconsistent Claim Construction Positions ........................................................................................................... 6

    D. Implicit Presented No Evidence Of An Adequate Prefiling Investigation .................................................................................................... 7

II. IMPLICIT SUBJECTIVELY KNEW OR SHOULD HAVE KNOWN ITS CASE WAS BASELESS BY MAY 2012 AT THE LATEST .................................. 9

III. THIS CASE IS ALSO EXCEPTIONAL BASED ON IMPLICIT'S LITIGATION MISCONDUCT ...................................................................................... 11

IV. JUNIPER'S FEES REQUEST IS REASONABLE ........................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ................................................................................................ 6

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
    888 F. Supp. 2d 637 (W.D. Pa. 2012) ..................................................................................... 4

*Centricut, LLC v. Esab Group, Inc.*,
    390 F.3d 1361 (Fed. Cir. 2004) ................................................................................................ 4

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
    903 F.2d 805 (Fed. Cir. 1990) ......................................................................................... 3, 10

*E-Pass Tech., Inc. v. 3Com Corp.*,
    559 F.3d 1374 (Fed. Cir. 2009) ........................................................................................ 5, 8

*Highmark, Inc. v. Allcare Health, Inc.*,
    687 F.3d 1300 (Fed. Cir. 2012) ........................................................................................ 2, 9

*iLOR, LLC v. Google, Inc.*,
    631 F.3d 1372 (Fed. Cir. 2011) ................................................................................................ 9

*In re Bill of Lading*,
    2012 U.S. Dist. LEXIS 29020 (W.D. Ohio 2012) ............................................................ 3, 4

*MarcTec, LLC v. Johnson & Johnson*,
    664 F.3d 907 (Fed. Cir. 2012) ........................................................................................ 6, 11

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005) ................................................................................................ 5

*Precision Links Inc. v. USA Prods. Group*,
    800 F. Supp. 2d 706 (W.D.N.C. 2011) .................................................................................... 7

*Raylon, LLC v. ComPlus Data Innov., Inc.*,
    700 F.3d 1361 (Fed. Cir. 2012) ..................................................................................... passim

Juniper established in its moving papers that this is an "exceptional" case meriting an award of fees under *either* of two independent tests: (1) that the case was objectively baseless and Implicit knew or should have known that fact by May 2012 at the latest, or (2) litigation misconduct by Implicit. In response, Implicit spends most of its opposition arguing that the facts set forth in Juniper's motion supposedly do not constitute "deceit" or other litigation misconduct (i.e., the second test). Implicit virtually ignores whether those same facts demonstrate known objective baselessness under the first test (which they plainly do). **Both** tests are satisfied here.

The Federal Circuit has expressly rejected the type of incomplete Section 285 analysis that Implicit invites the Court to undertake, most recently in a case overturning a decision to deny a request for fees. *Raylon, LLC v. ComPlus Data Innov., Inc.*, 700 F.3d 1361 (Fed. Cir. 2012). The district court in *Raylon* had based its denial on a conclusion that the case was not "objectively baseless." *Id.* at 1366. On appeal, the Federal Circuit vacated the denial of fees, noting that the district court's analysis on the objective prong improperly weighed subjective factors and limited its analysis to just one or two issues instead of fully "considering the merits of the suit." *Id.* at 1366-68, 1370-71.[1] The case was thus remanded for a full Section 285 analysis, with instructions to "consider *all* of [plaintiff's] conduct . . . as raised by defendant." *Id.* at 1371 (emphasis added).

Like the district court in *Raylon*, Implicit gives especially short shrift to the objective prong of the Section 285 analysis in this case, choosing to dwell on details regarding Implicit's prior litigation and licensing history and a few limited claim construction issues.[2] But as set forth in Juniper's motion (and again below), the evidentiary record in this case contains numerous indicia of objective baselessness, *all* of which must be accounted for in evaluating Juniper's fees request. *See* Section I below. Juniper further demonstrated that by May 2012, Implicit "knew or should have known" that its case lacked objective merit, thus establishing the "subjective bad faith" prong of the first test. *See* Section II below. Finally, Juniper proved significant litigation misconduct by Implicit as an alternative basis for an award of fees. *See* Section III below.

---

[1] The objective prong of a Section 285 analysis is reviewed *de novo*, "without deference." *Highmark, Inc. v. Allcare Health, Inc.*, 687 F.3d 1300, 1309 (Fed. Cir. 2012).

[2] The "objective merit" section of Implicit's opposition is only about three pages long, and is mostly copied from Implicit's opposition to F5's brief. *See* Opp. at 19-22.

A proper Section 285 analysis is performed not by weighing colorful adjectives used in attorney argument, but by carefully considering the totality of the evidentiary facts before the Court—evidence that is sorely lacking in Implicit's opposition. Based on the undisputed (and indisputable) evidence of record, Implicit knew by the end of May 2012 that its case against Juniper lacked objective merit. Yet instead of dropping its claims, Implicit elected to forge ahead with its meritless case, knowingly plunging the parties into months of intensive fact and expert discovery and summary judgment proceedings—all at significant cost to Juniper. It is only fair that Implicit and not Juniper shoulder the consequences of that decision in this exceptional case.

This reply first addresses Juniper's arguments regarding objective baselessness and subjective bad faith, and then turns to its alternate grounds based on litigation misconduct.

## I.   IMPLICIT'S CASE AGAINST JUNIPER WAS OBJECTIVELY BASELESS

Under Federal Circuit law, courts consider the "threshold objective prong" first. *Highmark*, 687 F.3d at 1309, 1315. This analysis is a "single backwards-looking inquiry into the reasonableness of the claims" that requires "a retrospective assessment of the merits of the entire litigation" in light of the "full record" made in the case. *Id.* at 1310-11.

"For litigation to be objectively baseless, the allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Raylon*, 700 F.3d at 1370. Juniper demonstrated in its motion that Implicit's case against Juniper satisfies that standard in multiple respects and—as shown below—Implicit presents no real response in opposition.

### A.   Implicit Unreasonably Relied On Source Code It Knew Was Not In The Accused Products

No reasonable litigant could reasonably have expected to establish that the accused SRX and J series products infringed by relying on code for the ***non-accused*** Multiservices products. In its opposition, Implicit does not even attempt to claim that the code its expert analyzed was in fact used in the accused SRX and J series products. Indeed, as the Court has already noted: "Implicit does not contest that its expert . . . limited his code analysis to the Multiservices products." Ex. 26 (SJ Order) at 18.[3] This is the very code that Dr. Nettles "relied on . . . throughout his report" in an

---

[3] "Ex. __" refers to the exhibits to the Declaration of Jonathan Kagan in Support of Juniper's Motion For Fees, executed April 8, 2013.

attempt to show infringement by the accused SRX and J series products. *Id.* An infringement case is plainly meritless where based on analysis or testing of non-accused products. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 808, 810 (Fed. Cir. 1990) (awarding fees; defendant produced accused instrumentalities for review, yet plaintiff only analyzed "a grade of [product] not used by [defendant]" and "did not even attempt to reproduce" the accused functionality).[4]

Implicit's only response is to fall back on its novel variant of a "proxy" theory of infringement. Opp. at 1-2, 11-12. But this approach lacks objective merit because it is devoid of legal basis: "Implicit provides no legal authority that would allow a device that is not accused of infringing to be the proxy for the accused devices." Ex. 26 at 19.

Implicit's "proxy" theory is also objectively baseless as lacking competent evidentiary support. In its opposition, Implicit asserts that its expert "concluded" that Juniper's products "did flow-based processing the same way" (Opp. at 2), but, in fact, the Nettles report states no such thing and provides no such comparative analysis. Implicit instead points to three pages from its summary judgment opposition, which in turn cite: (1) the high-level "One JUNOS" white paper; (2) three paragraphs from the Nettles report quoting the white paper without analysis; (3) deposition snippets about the white paper and generic "flow-based processing"; and (4) the *JUNOS Security* book Implicit called the "roadmap" to infringement. Reply Ex. 2 (Implicit's MSJ Non-Infringement Opp.) at 16-18.[5] No reasonable litigant would accept a cursory evaluation of these high-level documents in place of competent expert analysis, especially where Implicit had a full and fair opportunity by May 2012 to review the "best evidence" of the SRX and J series operation: the code itself. *See In re Bill of Lading*, 2012 U.S. Dist. LEXIS 29020 at *31 (W.D. Ohio 2012), *aff'd*, 2013 U.S. App. LEXIS 2541 (Fed. Cir. 2013) (granting fees; "it was objectively unreasonable for [the patentee] to persist in arguing that the white paper is a 'roadmap' to

---

[4] Despite Juniper's detailed discussion and application of *Eltech* to the facts of this case (*see* Motion at 13-16), Implicit does not even address this case in its opposition.

[5] "Reply Ex. __" refer to the exhibits to the Declaration of Nima Hefazi in Support of Juniper's Reply In Support of Its Motion For Fees, executed April 29, 2013.

practicing the patent.").[6]

Nor is there any evidence to support Implicit's argument that its expert "pick[ed]" the Multiservices code only after concluding it would serve as a "good and fairly self-contained example" applicable to all Juniper products. *Cf.* Opp. at 11-12. Implicit here again cites only to a declaration from its attorney rather than any expert evidence or analysis. The actual experts provided "no reasoned opinion" to support the proxy theory advanced by Implicit's counsel, as the Court has already found: "Dr. Nettles provides no reasoned opinion showing that the SRX and J series products *actually* operate in the same way . . . as the Multiservices products." Ex. 26 at 20 (emphasis in original). Given that the SRX and J series products were accused since the very beginning of the case, Implicit's failure to perform even a basic technical infringement analysis after two and a half years of litigation is inexplicable—and objectively baseless.[7]

### B. Implicit's Litigation Positions Were Unsupported And Even Contradicted By Its Own Experts

No reasonable litigant could reasonably have expected to succeed on positions regarding infringement and invalidity that were unsupported—and in some cases directly contradicted—by its own experts. Yet that is exactly what Implicit did here. As Implicit concedes in opposition, this was a "technically complex case" (Opp. at 19), which means that Implicit was obligated to support its technical positions with expert authority. *See, e.g.*, *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004); *Carnegie Mellon v. Marvell Tech., Ltd.*, 888 F. Supp. 2d 637, 641 (W.D. Pa. 2012). Implicit repeatedly failed to do this.

Implicit's only response here is to point to various pages of its summary judgment briefing where it ***did*** rely on expert evidence. Opp. at 17. But to put forward an objectively plausible opposition to summary judgment, it was not enough for Implicit to put forward expert evidence on just some claim elements and not others. *See, e.g., In re Bill of Lading*, 2012 U.S. Dist. LEXIS

---

[6] Even the "roadmap" book that Implicit relied upon was itself clear that not all JUNOS code is used in all JUNOS products. *See* Reply Ex. 3 (Diagram from *JUNOS Security*) at 77.

[7] Because a reasonable litigant would have realized the need to analyze the accused products' code regardless of how a court ruled on claim construction, Implicit is not helped by the cases that deny fees based on reasonable uncertainty regarding the outcome of claim construction. *See, e.g.*, Opp. at 7 (citing *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1376-77 (Fed. Cir. 2011).

29020, at *11, *aff'd*, 2013 U.S. App. LEXIS 2541 (Fed. Cir. 2013) (awarding fees where "[the patentee] adduced virtually no admissible evidence that Pitt Ohio practiced ***the last step*** of the claimed method") (emphasis added).  Of course, under governing precedent, there is no "partial credit" for proving some but not all of the elements of a patent claim.  *See, e.g.*, *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005).

For example, in responding to Juniper's non-infringement argument regarding input/output format compatibility checking, Implicit's opposition cited no expert evidence whatsoever, but rather 40 or so lines of non-expert deposition testimony.  Reply Ex. 2 at 13, 21-22.[8]  Similarly, for the "dynamically identifying . . . after the first packet" limitation, Implicit failed to present any Juniper-specific factual evidence at all (expert or non-expert), citing instead to its opposition to F5's brief.  *Id.* at 5, 21.  And Implicit did the same thing in opposing Juniper's motion for summary judgment of invalidity.  For example, Implicit claimed—without expert support—that Decasper did not satisfy the "state" elements of the claims.  In fact, Dr. Nettles had affirmatively disclaimed such an opinion at his deposition: "I haven't disputed anything about the specific use of state in my report as best I remember."  Reply Ex. 5 (10/19/2012 Nettles Depo. Tr.) at 83:9-84:7.  "[T]he nonexistence of . . . evidence to be presented at the time of summary judgment leads inexorably to the conclusion that there was no such evidence known to [Implicit] . . . ."  *E-Pass Tech., Inc. v. 3Com Corp.*, 559 F.3d 1374, 1377 (Fed. Cir. 2009) (quotation omitted).  No reasonable litigant could reasonably expect success on the merits in such a situation.[9]

Implicit also selectively ignored the analysis of its code expert, Mr. Treskunov, and in particular his conclusion, in reviewing the code prior to May 2012, that the sequence of components is known ***before*** the first packet arrives.  Implicit tries to excuse its disregard for its own expert by pointing out that Mr. Treskunov's report goes on to state that, under certain

---

[8] Even the deposition testimony Implicit cites here showed the opposite of what it contended, i.e., that in fact "no checks are required" in the accused products.  Reply Ex. 4 (6/19/2012 Tavakoli Depo. Tr.) at 130:19-131:24.

[9] Nor did Implicit take into account the expert analysis and conclusions of the two separate panels of PTO examiners that rejected Implicit's patent claims during reexamination.  These are powerful objective indicia on the merits of Implicit's validity case, and in its opposition brief Implicit identifies no alleged error by the PTO.  *Cf.* Opp. at 4 n. 3.

circumstances, the predefined sequence of components created before the first packet might later be changed during operation of the device ("runtime"). Opp. at 2-3. But the ability to change at runtime does not mean the sequence was not defined before the first packet, and in fact, Mr. Treskunov confirmed that it was. In any event, given that the Court rejected Implicit's proposed "changeable at runtime" construction—a construction the Court ruled did "not find support in the specification" (Ex. 13 (Markman Order) at 6)—no reasonable litigant could reasonably expect to avoid the impact of Mr. Treskunov's adverse analysis under a "changeable at runtime" theory.

### C. Implicit Unreasonably Relied On Inconsistent Claim Construction Positions

No reasonable litigant could have reasonably expected to succeed on the merits using a theory that required contradictory claim interpretations for purposes of infringement and invalidity.[10] In its opposition, Implicit attempts to excuse its shifting positions as reflecting mere "slight differences [in] language" (*see* Opp. at 18), but this is not a fair characterization. For example, with respect to "format conversion," Implicit's expert Dr. Nettles testified:

> [T]o anticipate the patents, you would need to disclose format conversion. To infringe the patents, you don't necessarily have to do format conversion.

*See* Ex. 24 (Nettles Validity Depo. Tr.) at 161:19-22. Claiming that a particular element is required in the prior art but not the accused products is a substantive contradiction, not a mere rephrasing. Nor is it merely a matter of word choice to simultaneously argue that the claim term "processing" both does and does not require conversion—this is a crucial substantive change. *See* Motion at 10; *see also MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012) (awarding fees; "having represented to the PTO that the claims exclude stents . . . [patentee] cannot turn around in litigation and assert the patents-in-suit against the [accused] stent").

Implicit's only other argument is that it was forced to use inconsistent theories because the Protective Order in this case required it to use different counsel for the litigation and reexamination. Opp. at 17-18. But the Protective Order is not implicated here where Implicit's

---

[10] Federal Circuit precedent is clear on this point. *See, e.g.*, *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses").

claim construction positions were a matter of public record in both the litigation and reexamination proceedings—including the PTO rejections in April and May 2012—and Implicit's principal and named inventor Mr. Balassanian was heavily involved in both. In any event, this argument does not excuse Implicit's shifting theories within the litigation itself.

### D. Implicit Presented No Evidence Of An Adequate Prefiling Investigation

No reasonable litigant could reasonably expect success on the merits where a prefiling investigation provided no support for the allegations of the plaintiff's complaint. *See, e.g.*, *Precision Links Inc. v. USA Prods. Group*, 800 F. Supp. 2d 706, 714 (W.D.N.C. 2011) (awarding fees where prefiling investigation was "completely devoid of analysis and fail[ed] to provide an objective basis for bringing suit for infringement").

The evidentiary record regarding Implicit's prefiling investigation as to Juniper is utterly devoid of any objective fact or basis justifying suit against Juniper. The totality of that record is that, between September 9 and September 17, 2010, there were about 21 emails exchanged between Mr. Balassanian, Implicit's counsel, and a technical consultant (Mr. Shekhawat) regarding "Juniper" and/or "JUNOS." *See* Ex. 6 (privilege log); Opp. at 4. There is literally no evidence regarding the substance of these emails or any conclusions regarding the accused Juniper products.[11] For all we know, Implicit's consultant may have told Implicit and its counsel that there was no basis for an infringement claim against Juniper's products because they all establish a sequence of components before the first packet is received.[12] The mere fact that there were email communications regarding Juniper between Mr. Balassanian, Implicit's counsel, and a consultant

---

[11] Despite Juniper's efforts to take discovery on (for example) the purported adequacy of Implicit's prefiling investigation, Implicit blocked this discovery with a sweeping invocation of privilege. *See* Motion at 3 n. 6; *see also*, *e.g.*, Reply Ex. 6 (Smith Depo.) at 117, 122-128.

[12] In its opposition, Implicit makes broad claims to the contrary, e.g., that Mr. Shekhawat (1) was "deeply knowledgeable about the patent and network processing technology"; (2) analyzed Juniper technical information including "Juniper's technical whitepapers"; and (3) "concluded that, in his view, JUNOS infringed." Opp. at 4, 13-14. But this is mere attorney argument; Implicit cites no evidentiary support for any of these statements, and Juniper is aware of none. Similarly, the conclusory statements of Implicit's own witness about his purported "good-faith belief" (while withholding details due to "work product" concerns) (*see* Opp. at 14) cannot be enough to establish a proper prefiling investigation as to Juniper.

over the course of about a week does not come close to establishing a prefiling investigation adequate to provide an objective basis for a suit against Juniper.[13]

The only other argument Implicit presents in an attempt to establish an objectively reasonable prefiling basis for its complaint against Juniper is a two-page statement from Judge Edward Infante (Ret.) in connection with Implicit's binding mediation with Microsoft. As an initial matter, Implicit cannot fairly rely on this document as it was neither produced nor logged during discovery in this case despite a specific Court order for Implicit to log its prefiling mediation documents. *See* Dkt. No. 144 at 1-2.

More importantly, the award Implicit received in connection with the Microsoft mediation was in no way an endorsement of the strength of the '163 and '857 patents, as Implicit suggests. Here is what Implicit actually argued to Judge Infante in that mediation:

> This is not one case, but many cases, all consolidated for this mediation. It is not one patent, but many. There are literally hundreds of claims. . . . To secure a significant judgment, Implicit does not have to win every time, or even most of the time. It has to win just once, across the many cases, patents, and claims. . . .
>
> This is not a case where Implicit has to win on most or indeed many of the claims to drive significant damages – given the nature of the accused products, even if one or two claims survive, the numbers quickly scale into the significant eight figures.

Reply Ex. 7 (Implicit Mediation Br.) at IMP135879, 901. In other words, Implicit actually argued to Judge Infante that the objective merits did not matter as to any particular patent or claim (including the '163 and '857 patents), because Implicit was likely bound to win something eventually as a matter of statistics—even if all of its other cases were losers on the merits.

In any event, the actual decision from Judge Infante was merely a dollar amount—there were no findings regarding claim construction, validity, or infringement for any patent (much less

---

[13] Implicit further suggests that prefiling work it performed for F5 and other defendants somehow also supported its lawsuit against Juniper. Opp. at 14. But no amount of infringement analysis for other defendants could give rise to an objective conclusion that ***Juniper*** infringed. *E-Pass Tech.*, 559 F.3d at 1378 (granting fees where patentee made "generalized accusations . . . without acknowledging . . . that the infringement allegations against [the defendants] were different."). Implicit expert Dr. Nettles acknowledged this very point in deposition. Ex. 19 (Nettles Infringement Depo. Tr.) at 98:19-99:21.

for the '163 and '857 patents in particular), or the primary issues of relevance to this case (e.g., the operation of Juniper's products, Implicit's inadequate analysis of Juniper code, and scope of the Decasper prior art). Without such analysis or explanation, a bare number means little or nothing to this case given the "many" patents and "hundreds of claims asserted" against Microsoft and the size of the accused Microsoft damages base—including every single computer in the United States running the Windows operating system.[14] In other words, no reasonable litigant could reasonably expect success against Juniper *on the merits* based on the outcome of the Microsoft mediation.

In summary, Juniper has satisfied the "threshold objective prong" of the Section 285 test based on a proper assessment of "all of [Implicit's] conduct" in light of the "full record" in this case. *Raylon*, 700 F.3d at 1370; *Highmark*, 687 F.3d at 1310-11.

## II. IMPLICIT SUBJECTIVELY KNEW OR SHOULD HAVE KNOWN ITS CASE WAS BASELESS BY MAY 2012 AT THE LATEST

Once Implicit's claims against Juniper are found to be objectively baseless, it is straightforward to take the second (and final) step of concluding that Implicit subjectively knew or should have known about that objective baselessness by May 2012 at the latest. *Highmark*, 687 F.3d at 1309.[15] Although it is possible that a patentee "may have reason to believe that its allegations are supportable" even though objectively baseless, subjective bad faith may be found where no such showing is made. *Id*. at 1313. In other words, the subjective bad faith prong asks whether Implicit had any reason to *subjectively* believe its case had merit even though it was objectively baseless. The answer to that question is "no." There are only two possibilities here: either Implicit and its counsel lacked the competence to discern that their case was objectively baseless (even by May 2012), or they rightly perceived this fact but elected to continue forward with their lawsuit all the same. The first of these possibilities can be rejected outright. Implicit

---

[14] *See, e.g.*, Reply Ex. 7 at IMP135879 ("And the claims reach fundamental Microsoft products [including the] operating systems themselves, Vista and Windows 7."); *see also id.* (noting "Windows Vista revenue in the last calendar year approached $16 billion."). The effective royalty rate in the Microsoft mediation, if applied to the Juniper case, would have resulted in a damages claim in the low six figures.

[15] "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1376 (Fed. Cir. 2011).

was represented at all times by highly talented attorneys; indeed, lead counsel Spencer Hosie has been profiled by the National Law Journal as one of the 10 most successful trial lawyers in the United States, in addition to other accolades.[16] Moreover, Implicit founder and named inventor Edward Balassanian was heavily involved at every stage of this case against Juniper and brought all of his prior experience regarding his company's technology and the patents-in-suit. Thus, it cannot be the case that Implicit and its counsel simply lacked the capacity to identify the multiple serious defects in the objective merits of their case. This leaves only the second possibility: that they knew or should have known about these problems but made an affirmative decision to maintain this patent case against Juniper all the same. This is all that the second, "subjective" prong of the Section 285 analysis requires. *Id.* at 1309.

Rather than address the substance of the subjective prong, Implicit attempts to sidestep it altogether by claiming Juniper did not even allege subjective bad faith in its moving papers. *See* Opp. at 22. This claim is demonstrably false.[17] As Juniper stated on page 13 of its opening brief: "The court properly infers subjective bad faith '[w]here . . . the patentee is manifestly unreasonable in assessing infringement . . . .'" Motion at 13 (quoting *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990)). Juniper then went on to identify numerous examples—supported by evidentiary facts—illustrating subjective bad faith. For example, Juniper pointed out that Implicit not only relied on the wrong source code, but it ***knew*** that it was relying on the wrong source code. Motion at 13-16; *see also* Ex. 26 at 18 ("But *nowhere* in his discussion does Dr. Nettles acknowledge that the code and plugins are for the Multiservices products.") (emphasis in original).[18] Juniper showed how Implicit's own expert

---

[16] *See* <http://www.hosielaw.com/profile_spencer-hosie.html>.

[17] To the extent that Implicit is demanding direct evidence of its mental state, that is (of course) not what the law requires. *See Eltech*, 903 F.3d at 810 (finding subjective bad faith while recognizing "difficulty of proving what is in an adversary's mind"). Nevertheless, as shown in this section, Juniper provided direct evidence of Implicit's knowledge sufficient to establish subjective bad faith.

[18] Implicit had no reason to believe in good faith that the Multiservices code could serve as an appropriate proxy for the SRX and J series products, as no such belief was explained in the report of Implicit's infringement expert. Ex. 26 at 18 ("Nor does Dr. Nettles explain why *he believes* that the Multiservices code and plugins he analyzes are used in the SRX or J series

evidence demonstrated that Implicit "***knew*** that Juniper did not practice several limitations of the asserted claims." Motion at 17-20 (emphasis added). And Juniper explained how Implicit's unfounded assumptions and the complete absence of an adequate prefiling investigation were "***insufficient to form a good faith basis***" to file or maintain this lawsuit against Juniper. Motion at 20-22 (emphasis added).[19]

In short, the facts upon which Juniper relies to show objective baselessness are all things that Implicit knew or should have known by the end of May 2012 at the latest. Accordingly, Juniper has established both objective baselessness and subjective bad faith in this case, which renders this case "exceptional" under Federal Circuit law. *Raylon*, 700 F.3d at 1370.

### III. THIS CASE IS ALSO EXCEPTIONAL BASED ON IMPLICIT'S LITIGATION MISCONDUCT

In the alternative, Juniper has established an independent basis for an exceptional case finding in light of Implicit's acts of "litigation misconduct," as that term is used in the context of Section 285 case law.[20] As explained above and in Juniper's moving papers, Implicit not only knew about the serious substantive problems with the merits of its case, but further took active steps in a number of (ultimately unsuccessful) attempts to conceal those facts. Implicit's attempts to explain away these attempts are unavailing.

With respect to the "wrong source code" issue, Implicit argues repeatedly in opposition that it did not "conceal" the Multiservices code. Of course not—and Juniper never argued that it did. Juniper's point is not that Implicit hid the code itself, but rather that Implicit pruned the

---

products, so that [they] would read on each limitation of the asserted claims.") (emphasis in original).

[19] *See MarcTec*, 664 F.3d at 917 ("courts normally use the term 'bad faith' to mean '*subjective* bad faith'") (emphasis in original). Of course, Juniper provided yet additional evidence of bad faith throughout its moving papers. *See, e.g.*, Motion at 10 (Implicit's knowledge of reexamination rejections over Decasper and contradictory claim construction positions).

[20] Notwithstanding Implicit's suggestion (*see, e.g.*, Opp. at 1), Juniper is not seeking Rule 11 sanctions in this case. Juniper acknowledges that it litigated this case against talented counsel whose interactions throughout the litigation have been generally courteous and professional, notwithstanding the serious disputes between the parties. Juniper believes nonetheless that an award of fees against Implicit is warranted given the exceptional nature of this case and the substantial costs to Juniper that could have and should have been avoided under the circumstances.

Treskunov report's analysis of the Multiservices code when it was cut and pasted into the Nettles report so as to obscure the fact that it pertained to the non-accused Multiservices product.

An illustration is useful to show the "pruning" that Implicit now claims never happened. The following is an excerpt from the Treskunov report showing a flow chart diagram that was derived from the Multiservices code, as the title at the top indicates ("Multi-services daemon"):

**Multi-services daemon**

After Multi-services daemon (mspmand) starts and performs it's initialization steps, it launches (as many as number of "data CPUs" present in the system) threads running "main packet loop" (Function: mspman_svcs_data_loop, Page: JSC00001056, File: mspman_svcs_pktloop.c).

**Main Packet Loop**

"Main Packet Loop" function runs endless loop performing operations depicted in Figure 3 and described below.

Figure 3: Main Data Loop (mspman_svcs_data_loop)

*See* Ex. 12 (Treskunov Report) at 8. When it came time to include this diagram in Implicit's infringement contentions and the Nettles report, however, the top-level title and explanation of origin was completely omitted and replaced with a bland statement that the diagram illustrated "JNI's basic packet processing loop" (see the following page):

- 12 -

### a) JNI's basic packet processing loop

31. Put graphically, JNI's basic packet processing loop is as follows:

[Flowchart: 1. Get next incoming packet → 2. Header integrity check, IP fragmentation check → 3. Extract Service Set ID and look up Service Set → 4. Flow or Packet? → (Packet) 5. Run Packet Plugins → loop back; (Flow) 6. Get "Flow Selector" from Packet → 7. Lookup Session → 8. Found? → (No) 9. Create New Session → 10. Run Plug-ins with "Session Interest" message → (Yes from 8) 12. Run Plug-ins with "Packet Processing" message → 13. Get Next Packet that belongs to this session → 11. Repeat this loop until there is no more packets for this session]

*See* Reply Ex. 8 (Nettles Rpt. Appx. A) at 14. The Nettles report goes on to specifically rely on this purported "basic packet processing loop" in an attempt to show infringement by the accused SRX and J series products. *See, e.g.*, *id.* at 29 (based on "JNI's basic packet processing loop," concluding that, "in my opinion JNI's accused products meet limitation 1a.").

Had Implicit truly intended to be open about its reliance on the unusual "proxy" argument that would allege infringement by the SRX and J series products using the non-accused Multiservices code, one would have expected Implicit's expert to disclose that fact somewhere in his report. Yet Implicit failed to do so, as this Court has already found: "But *nowhere* in his discussion does Dr. Nettles acknowledge that the code and plugins are for the Multiservices products." Ex. 26 at 18 (emphasis in original).[21]

---

[21] Implicit now claims further it was clear all along that it was relying solely on Multiservices code because some of the filenames identified in its report start with the letters "mscvs" or "msp." Opp. at 9. But of course, the name of a file is not itself dispositive of origin. Juniper's expert had to do a detailed technical analysis that went far beyond filenames to show that the cited code pertained to the Multiservices products. *See* Ex. 26 at 19. And the question remains as to why Implicit chose to omit the language from the Treskunov report that specifically

- 13 -

This was not an isolated event.  In preparing its infringement contentions and expert report, Implicit also deliberately altered Mr. Treskunov's finding that, in the Multiservices products, the sequence of plugins is "known before the packet arrives."  *See* Motion at 7-8.  In its opposition and supporting declaration, Implicit now claims that it did not "alter anything" and denies that it "cut and pasted" the Treskunov report "with just one strategic change."  Opp. at 10 n. 9; Hosie Decl. ¶ 26.  For an illustration of the specific, targeted alteration that Implicit now alleges was never made, Juniper has prepared a detailed chart attached as Exhibit 1 that clearly shows on an element-by-element basis which language was kept and which was changed.  The only reasonable inference from a comparison of the two documents is that Implicit made a deliberate choice to alter its expert's technical analysis on a point that had been a significant dispute between the parties: whether or not the sequence of plugins in the Juniper products is known ***before*** the first packet arrives (as opposed to ***after***, as required under the claims).  *See* Reply Ex. 1.

Finally, Implicit takes issue with the details of Juniper's background discussion regarding Implicit's litigation history and its strategic decision to increase the aggressiveness with which it pursued its claims.  Opp. at 15.  The undeniable point here is this:  that after Implicit had amassed a war chest of over $20 million—primarily consisting of litigation settlements in the six figures—Implicit changed strategy with its most recent round of litigation against Juniper, F5, and their three other former co-defendants.  Specifically, even though Juniper and the other recent targets were for the most part smaller than many of the parties with whom Implicit had settled earlier (Apple, IBM, Intel), Implicit made clear that it would no longer be satisfied with small settlements of the sort it had agreed to earlier.  ***Indeed, Implicit told Juniper it faced exposure in the nine figures***—and it told F5 the same.  *See* Dkt. No. 187 (Case No. 3:10-cv-03365-SI) at 7.  Perhaps Implicit realized it was reaching the end of its litigation campaign and thought it was worth taking a long shot at a blockbuster trial verdict.  But that did not entitle Implicit to ignore and even attempt to conceal the clear signs that it had no legitimate case against Juniper on the merits.

---

disclosed the understanding that "mspmand" corresponded to the "Multi-services daemon."  Implicit's other contention—that Juniper itself uses the term "MSP" to refer to the Multiservices products—is incorrect and not supported by Implicit's "evidence."  *See* Hosie Decl. ¶ 20 & Ex. C.

For these reasons as well as those set forth in Section II above and in Juniper's moving papers, this case should be declared exceptional based on Implicit's acts of litigation misconduct.

### IV.  JUNIPER'S FEES REQUEST IS REASONABLE

Juniper was well within its rights in choosing to vigorously defend this case rather than capitulate to Implicit's unreasonable demands.  Indeed, Implicit does not contend (nor can it) that Juniper was unreasonable in incurring millions of dollars in legal fees in defending itself against a case in which Implicit claimed entitlement to a payout in the eight or nine figures.  Nor does Implicit contest the statistical surveys on which Juniper relies showing that the fees it incurred are well within a customary range for high-stakes patent litigation in the San Francisco area.

Implicit merely lodges two cursory complaints in a footnote.   First, it notes that Juniper incurred more in fees than its co-defendant F5.  But as Implicit noted throughout the case, Juniper took the lead in this litigation, including in numerous aspects such as the claim construction hearing, at depositions, the reexamination proceedings, and at the summary judgment stage (*e.g.*, Juniper prepared and filed an invalidity motion in addition to its non-infringement motion).  This significant increased allocation of work to Juniper is reflected in the amount of fees sought.

Second, Implicit contends—without support—that the associate billing rates for which Juniper seeks compensation are "outrageous."  Opp. at 23 n. 21.  But Juniper willingly paid these fees without even knowing the outcome of this fees motion. *See* Kagan Decl. ¶ 17.  Given the potentially huge amount at stake (according to Implicit at least), Implicit is hard-pressed to contend that these amounts were unwarranted or unreasonable.

Finally, Implicit spends little time arguing against Juniper's request for expert fees and prejudgment interest.  Opp. at 22-23.  But the extraordinary nature of this case speaks for itself.  It was ***Implicit***, after all, that deliberately decided to continue with this case after May 2012 (including the expensive expert discovery phase) with full knowledge that its case lacked objective merit.  Indeed, Implicit went beyond the basic requirements for an "exceptional" case and deliberately engaged in a number of failed attempts to hide the fact that its case was unraveling on the merits.  A complete award is therefore appropriate and equitable here to make Juniper whole.

| | |
|---|---|
| Dated:  April 29, 2013 | Respectfully submitted, |
| | IRELL & MANELLA LLP |
| | |
| | By:  */s/ David C. McPhie* |
| | David C. McPhie (dmcphie@irell.com) |
| | Douglas J. Dixon (ddixon@irell.com) |
| | Nima Hefazi (nhefazi@irell.com) |
| | 840 Newport Center Drive, Suite 400 |
| | Newport Beach, California 92660-6324 |
| | Telephone:  (949) 760-0991 |
| | Facsimile:  (949) 760-5200 |
| | |
| | Morgan Chu (mchu@irell.com) |
| | Jonathan S. Kagan (jkagan@irell.com) |
| | 1800 Avenue of the Stars, Suite 900 |
| | Los Angeles, California 90067-4276 |
| | Telephone:  (310) 277-1010 |
| | Facsimile:  (310) 203-7199 |
| | |
| | *Attorneys for Defendant* |
| | *Juniper Networks, Inc.* |